AES:HDM/MAM/JRS/PC
F. #2016R00695

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
*    DECEMBER 21, 2023    *
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

  - against -

MANUEL CHANG,
     also known as "Pantero" and
     "Chopstick,"

                              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. 18-681 (S-2) (NGG)
(T. 18, U.S.C., §§ 371, 981(a)(1)(C),
 982(a)(1), 982(b)(1), 1349, 1956(h), 3238
 and 3551 et seq.; T. 21, U.S.C., § 853(p);
 T. 28, U.S.C., § 2461(c))

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times relevant to this Superseding Indictment, unless otherwise indicated:

I.     The Defendant and Relevant Entities and Individuals

          1.     The Republic of Mozambique was a sub-Saharan African nation.

          2.     Proindicus S.A. ("Proindicus"), Empresa Moçambicana de Atum, S.A.

("EMATUM") and Mozambique Asset Management ("MAM") were companies owned,

controlled and overseen by the Government of Mozambique.   The companies were created to

undertake three maritime projects in Mozambique for and on behalf of Mozambique.

Proindicus was to perform coastal surveillance, EMATUM was to engage in tuna fishing and

MAM was to build and maintain shipyards.

          3.     The defendant MANUEL CHANG, also known as "Pantero" and

"Chopstick," was a citizen of Mozambique and Mozambique's Minister of Finance between

approximately February 2005 and January 2015.

4.      Antonio Do Rosario was a citizen of Mozambique and an official in Mozambique's governmental state intelligence and security service, known as Servico de Informacoes e Seguranca do Estado ("SISE"), which, together with other Mozambican government agencies, was an owner of Proindicus, EMATUM and MAM.

5.      Teofilo Nhangumele was a citizen of Mozambique acting in an official capacity for and on behalf of the Office of the President of Mozambique.

6.      Mozambican Co-Conspirator 1, an individual whose identity is known to the Grand Jury, was involved in obtaining the Mozambican government's approval of the Proindicus project.

7.      Mozambican Co-Conspirator 2, an individual whose identity is known to the Grand Jury, was a senior official in Mozambique's Ministry of Finance and a director of EMATUM.

8.      Privinvest Group was an Abu Dhabi, United Arab Emirates ("UAE")-based holding company consisting of numerous subsidiaries (collectively, "Privinvest"), including Privinvest Shipbuilding S.A.L., Abu Dhabi MAR ("ADM"), Logistics International and Palomar Capital Advisors and Palomar Holdings Ltd. (collectively, "Palomar").   On its website, Privinvest described itself as "one of the largest global shipbuilding groups for naval vessels, fuel-cell submarines, superyachts, offshore constructions and associated services."

9.      Jean Boustani, also known as "Jean Boustany," ("Boustani") was a citizen of Lebanon and was the lead salesman and negotiator for Privinvest.   Boustani also participated in the management of Palomar.

10.      Najib Allam, also known as "Naji Allam," ("Allam") was a citizen of Lebanon and the Chief Financial Officer of Privinvest.

11.     Privinvest Co-Conspirator 1, an individual whose identity is known to the Grand Jury, was hired by Privinvest to develop business with African nations through connections with African government officials.

12.     Privinvest Co-Conspirator 2, an individual whose identity is known to the Grand Jury, was a principal executive of Privinvest.   Through other entities, Privinest Co-Conspirator 2 controlled an approximate two-thirds interest in Palomar.

13.     Credit Suisse A.G. was a global investment banking, securities and investment management firm incorporated and headquartered in Europe.   It conducted its activities primarily through various subsidiaries and affiliates (collectively, "Credit Suisse").

14.     Andrew Pearse was a citizen of New Zealand and was, until approximately September 13, 2013, a managing director of Credit Suisse and the head of Credit Suisse's Global Financing Group.   In or about April 2013, Pearse also began working for the benefit of Privinvest.   Pearse also controlled a one-third interest in Palomar.

15.     Surjan Singh was a citizen of the United Kingdom and was, until approximately February 16, 2017, a managing director in Credit Suisse's Global Financing Group.

16.     Detelina Subeva was a citizen of Bulgaria and was, until approximately August 21, 2013, a vice president in Credit Suisse's Global Financing Group.   In or about April 2013, Subeva also began working for the benefit of Privinvest, and later worked as an employee for Palomar.

17.     Investment Bank 1 the identity of which is known to the Grand Jury, was an international investment bank owned by a foreign government, and had offices in New York, London and elsewhere.

18.     The International Monetary Fund ("IMF") was an inter-governmental institution that, until in or about March 2016, provided financial assistance and advice to Mozambique.   To receive such assistance, Mozambique agreed, among other things, to limit its borrowing from private lenders.   Mozambique was also required to make certain disclosures to the IMF, including disclosures related to loans and indebtedness.

II.     Terms and Definitions

19.     A "security" was, among other things, any note, stock, bond, debenture, evidence of indebtedness, investment contract or participation in any profit-sharing agreement.

20.     A "syndicated loan" was a loan arranged by one or more banks on behalf of a group of lenders, referred to as a syndicate, who work together to provide funds for a single borrower.

21.     A "loan participation note" or "LPN" was a fixed-income security that provided the holder with a pro-rata interest in the borrower's payment of interest and principal

22.     A "Eurobond" was an international bond sold in a currency other than the currency of the borrower.

III.    The Fraudulent Scheme

A.      Overview

23.     Through a series of financial transactions between approximately 2013 and 2016, Proindicus, EMATUM and MAM borrowed in excess of $2 billion through loans guaranteed by the Mozambican government.   These loans were arranged by Credit Suisse and Investment Bank 1 and sold to investors worldwide.   Investors irrevocably committed themselves in the United States to invest millions of dollars in the loans.   Over the course of the transactions, the co-conspirators, among other things, conspired to defraud investors and

4

potential investors in the Proindicus, EMATUM and MAM financings through numerous material misrepresentations and omissions relating to, among other things: (i) the use of loan proceeds; (ii) bribe and kickback payments to Mozambican government officials and bankers; (iii) the amount and maturity dates of debt owed by Mozambique, including the existence of the Proindicus and MAM loans; and (iv) Mozambique's ability and intention to pay back the investors.

24.     Each of the companies, Proindicus, EMATUM and MAM, entered into contracts with Privinvest to provide equipment and services to complete the maritime projects. The loan proceeds were supposed to be used exclusively for the maritime projects, and nearly all of the borrowed money was paid directly to Privinvest, the sole contractor for the projects, to benefit Mozambique and its people.   In reality, the Proindicus, EMATUM and MAM maritime projects were used by the defendant MANUEL CHANG and his co-conspirators to divert portions of the loan proceeds to pay millions in bribes and kickbacks to themselves, other Mozambican government officials and bankers.

25.     In furtherance of the scheme, Privinvest charged inflated prices for the equipment and services it provided, the proceeds of which were then used, at least in part, to pay bribes and kickbacks.   After conducting little business activity, Proindicus, EMATUM and MAM each defaulted on their loans.

26.     In connection with their fraudulent scheme, the co-conspirators relied on the U.S. financial system, by, among other things, seeking and securing investors and potential investors physically present in the United States, causing sales of investments in the loans to be made by sellers physically present in the United States and sending and receiving wires that passed through the United States, including through the Eastern District of New York.   The co-

conspirators caused material misstatements to be transmitted by wire to investors and potential investors in the United States to induce investment in the Proindicus and EMATUM loans, and in connection with the exchange of the EMATUM loan participation notes in approximately 2016 for a Eurobond (the "Exchange").   Pursuant to the loan agreements, investors funded the loans using bank accounts of New York City-based banks, and Privinvest received loan proceeds raised by the fraudulent scheme from accounts at New York City-based banks.   The co-conspirators then diverted some of these proceeds to make U.S. dollar denominated bribe and kickback payments, which were made using the U.S. financial system through transactions transferred through bank accounts in the United States, including at least $5 million to the defendant MANUEL CHANG through the Eastern District of New York.

B.   The Proindicus Project

27.   Beginning in or about 2011, Jean Boustani, through discussions with Teofilo Nhangumele arranged by Privinvest Co-Conspirator 1, attempted to persuade Mozambican government officials to establish a coastal monitoring system through a contract with Privinvest.   Throughout 2011, Boustani and Nhangumele discussed bribe and kickback payments that Privinvest would have to make for the benefit of Mozambican government officials for the project to be approved.

28.   After more than a year of negotiations, on or about January 18, 2013, Privinvest and Proindicus signed a $366 million contract for Privinvest to provide a coastal monitoring system to Mozambique.   Five days later, on or about January 23, 2013, Jean Boustani instructed a bank in the UAE to make payments to Teofilo Nhangumele and Mozambican Co-Conspirator 1.

6

29.     At the same time as Jean Boustani and Teofilo Nhangumele were negotiating bribe and kickback payments to Mozambican government officials regarding the Proindicus project, Boustani recruited Credit Suisse to arrange financing for the project.   During negotiations, bankers at Credit Suisse made clear that Credit Suisse would only arrange a loan that was at or near market interest rates, with debt that was either directly issued or guaranteed by the Government of Mozambique.

30.     To further negotiations on the Proindicus project, on or about September 13, 2012, Andrew Pearse traveled to the UAE to meet with Jean Boustani, Teofilo Nhangumele and a close relative of a senior Mozambican government official, among others.

31.     To help obtain Mozambique's agreement to Credit Suisse's terms, including that any loan be at or near market rates and guaranteed by the Mozambican government, Jean Boustani and Teofilo Nhangumele enlisted the defendant MANUEL CHANG, Mozambique's Minister of Finance.   On or about December 22, 2012, CHANG wrote a letter to Privinvest Co-Conspirator 2, which was forwarded to an employee of Credit Suisse ("Credit Suisse Employee 1"), an individual whose identity is known to the Grand Jury, explaining that "the financing of this project is still constrained by the IMF imposed limitation on the Government for Mozambique to accept commercial credit for commercial projects.   Therefore, we have devised an alternative solution whereby an SPV [Special Purpose Vehicle] . . . will be formed."

32.     On or about December 26, 2012, Jean Boustani sent an email to Teofilo Nhangumele in preparation for a meeting in Mozambique between employees of Credit Suisse, Privinvest and Proindicus to negotiate the terms of the transaction.   In the email, Boustani emphasized: "But the only imperative matter for [Credit Suisse] bro is [the defendant MANUEL

7

CHANG's] signature of the guarantee for the loan."   On or about February 28, 2013, CHANG signed the guarantee for the Proindicus Loan.

33.     On or about March 28, 2013, Andrew Pearse notified Surjan Singh, Detelina Subeva and others at Credit Suisse that Proindicus sought to borrow an additional $250 million from Credit Suisse.

34.     On or about June 13, 2013, the defendant MANUEL CHANG signed, on behalf of Mozambique, a government guarantee for an additional $250 million in borrowing by Proindicus.   One day later, on or about June 14, 2013, Credit Suisse and Proindicus amended their loan agreement to permit Proindicus to borrow up to an additional $250 million from Credit Suisse.   Between approximately June and August 2013, Credit Suisse increased the Proindicus Loan by approximately $132 million.   On or about November 15, 2013, Investment Bank 1 further increased the Proindicus Loan by $118 million, for a total increase of $250 million – the additional amount that Mozambique had guaranteed.   The total loaned amount to Proindicus was ultimately $622 million, and the guarantees that CHANG signed obligated Mozambique to pay back the entire loan if Proindicus was unable to repay it.

35.     On or about June 25, 2013, Credit Suisse wired approximately $100 million, less its fees, through a bank account at a New York City-based financial institution ("New York City Bank 1"), the identity of which is known to the Grand Jury, to a Privinvest account at UAE Bank 1.   Credit Suisse marketed and sold portions of the debt to investors, including to an investor in the United States.

36.     In or about December 2014, CHANG approved increasing the Proindicus Loan guarantee by another $278 million, bringing the potential loan to total $900 million, although this additional portion of the loan did not ultimately occur.

8

37.     An accounting spreadsheet maintained by Najib Allam reflected that Privinvest made bribe and kickback payments to obtain the Proindicus contract and the subsequent upsizes.   For example, the accounting spreadsheet indicates an anticipated payment of approximately $400,000 to the defendant MANUEL CHANG for the final $278 million upsize CHANG approved for the Proindicus guarantee.

38.     Proindicus never conducted significant operations or generated significant revenue and defaulted on its loan payment due on or about March 21, 2017.

C.     EMATUM

        (1)     The EMATUM Loan Agreement and Solicitation of United States Investors

39.     On or about August 2, 2013, EMATUM entered into an approximately $785 million contract with Privinvest to purchase vessels, equipment and training to create a state-owned tuna fishing company.   On or about August 30, 2013, Credit Suisse agreed to make up to $850 million in loans guaranteed by Mozambique to EMATUM (the "EMATUM Loan"). The EMATUM loan agreement was signed by, among other people, Surjan Singh on behalf of Credit Suisse and Antonio Do Rosario on behalf of EMATUM.   The defendant MANUEL CHANG signed the government guarantee on behalf of Mozambique.   On or about September 11, 2013, Credit Suisse loaned approximately $500 million to EMATUM to finance the EMATUM project and, because Credit Suisse refused to loan additional funds, on or about October 11, 2013, Investment Bank 1 loaned an additional approximately $350 million to EMATUM.

40.     The EMATUM loan agreement provided that all payments by the borrower or the lenders would be paid to Credit Suisse's bank account at New York City Bank 1. The agreement also required EMATUM to "apply all amounts borrowed by it under the

9

[EMATUM loan agreement] towards . . . the purchase of fishing infrastructure, comprising of 27 vessels, an operations centre, and related training."   The loan agreement also prohibited improper payments in connection with the project, including payments that would violate the Foreign Corrupt Practices Act of 1977 ("FCPA"), the UK Bribery Act and the Mozambican Anti-Corruption Law.

41.     On or about September 11, 2013, Credit Suisse sent $500 million in loan proceeds, less its fees, to Privinvest.   Credit Suisse funded the EMATUM Loan by selling loan participation notes to investors in the United States and elsewhere.   By email and other electronic means, Credit Suisse sent potential investors, including United States investors, materials that included the EMATUM loan agreement and an offering circular.   Like the loan agreement, the offering circular stated: "The proceeds from the Loan will be used by the Borrower towards the financing of the purchase of fishing infrastructure, comprising of 27 vessels, an operations centre and related training and for the general corporate purposes of the Borrower."

42.     In reliance on the representations in the loan agreement and offering circular, investors purchased EMATUM loan participation notes.   Certain investors irrevocably committed themselves in the United States to purchase EMATUM loan participation notes, and certain sellers irrevocably committed themselves in the United States to sell EMATUM loan participation notes to United States investors.

43.     Despite projections that EMATUM would generate annual fishing revenues of approximately $224 million by December 2016, it generated virtually no revenues and, as of approximately late 2017, conducted minimal fishing operations.   EMATUM defaulted on its financing payment due on or about January 18, 2017.

(2)     Bribe and Kickback Payments

44.     Jean Boustani and Najib Allam of Privinvest coordinated the payment of bribes to Mozambican government officials.   On or about April 8, 2014, Boustani sent an email to Allam, providing an accounting of bribes through the Proindicus and EMATUM projects and stating that Privinvest had paid "125 [million U.S. dollars] for all for everything …."   Boustani summarized the distribution of the bribes, including $7 million to the defendant MANUEL CHANG, $8.5 million to Teofilo Nhangumele and $15 million to Antonio Do Rosario, among others.

45.     In an effort to conceal the unlawful nature of these payments, Jean Boustani, Najib Allam and Antonio Do Rosario used third-party entities and fabricated invoices to distribute money to the Mozambican government officials.   For example, on or about October 17, 2013, Boustani wrote an email to Do Rosario, stating: "I need asap invoices in the name of: Logistics International Abu Dhabi [a Privinvest-related company].   Invoices for everything my brother. Each one mentioning the subject (real estate purchase…etc….).   Even for Pantero [the defendant MANUEL CHANG], a small paper say 'consultancy fees.'"

46.     Accordingly, on or about and between October 20, 2013 and December 4, 2013, Jean Boustani caused Privinvest to make bribe payments of approximately $5 million, from Privinvest's UAE-based bank account, through the Eastern District of New York, for the benefit of the defendant MANUEL CHANG, to a bank account in Spain.

D.   MAM

    (1)   MAM Loan Agreement

    47.   In early 2014, Privinvest Co-Conspirator 2 and Jean Boustani devised a shipyard project for Mozambique to further enrich themselves and their co-conspirators.   On or about May 1, 2014, MAM and Privinvest executed an approximately $500 million contract for Privinvest to, among other things, build a shipyard, provide additional naval vessels and upgrade two existing facilities to service Proindicus and EMATUM vessels.

    48.   On or about May 20, 2014, Investment Bank 1 and the Privinvest-controlled entity Palomar, acting through Andrew Pearse and Detelina Subeva, together with others, arranged a syndicated loan of up to $540 million to MAM, guaranteed by the Republic of Mozambique (the "MAM Loan").   Investment Bank 1 solicited investors, using, among other things, the MAM loan agreement and a confidential information memorandum that summarized its terms.   As with the Proindicus and the EMATUM loans, the loan agreement required that the MAM loan proceeds be used for project purposes and prohibited illegal and corrupt payments. Antonio Do Rosario signed the loan agreement on behalf of MAM, and the defendant MANUEL CHANG signed the government guarantee on behalf of Mozambique.

    49.   The MAM loan agreement also provided that all payments required under the agreement were to be made to a bank account at a New York City-based financial institution ("New York City Bank 2"), the identity of which is known to the Grand Jury.   On or about and between approximately May 23, 2014, and June 11, 2014, MAM borrowed approximately $535 million from Investment Bank 1, guaranteed by the Republic of Mozambique, which Investment Bank 1 sent directly to Privinvest through correspondent bank accounts at New York City Bank 2.

12

50.     Despite projecting approximately $63 million in operating revenues by the end of its first year of operations, MAM generated virtually no revenues and defaulted on its loan payment due on or about May 23, 2016.

(2)     MAM Bribe and Kickback Payments

51.     An accounting spreadsheet maintained by Najib Allam reflected that Privinvest made and anticipated making bribe and kickback payments to obtain the MAM contract.   Such payments included an anticipated payment of approximately $5 million, or approximately 3.7 million euros, to the defendant MANUEL CHANG, among others.

E.     The Exchange and the Proindicus, EMATUM and MAM Loan Defaults

52.     In or about 2015, Proindicus, EMATUM, MAM and Mozambique encountered problems servicing the approximately $2 billion in debt they had amassed in 2013 and 2014, including as a result of the Proindicus, EMATUM and MAM Loans.   Furthermore, at around the same time, Mozambican government officials received inquiries from the IMF concerning the use of some of the loan proceeds.

53.     To hide from the public and the IMF the near bankruptcy of the project companies resulting from loan proceeds being diverted as part of the fraudulent scheme, avoid inquiry from the IMF and conceal discovery of the scheme, several of the co-conspirators proposed the Exchange.   The Exchange was designed to exchange the EMATUM loan participation notes, which were to mature in 2020, for Eurobonds issued directly by the Mozambican government that would mature in 2023.

54.     On or about March 9, 2016, Credit Suisse and Investment Bank 1 announced the Exchange.   To convince investors to exchange their EMATUM loan participation notes for Eurobonds, Andrew Pearse and Detelina Subeva, together with bankers at Credit Suisse

13

and Investment Bank 1, prepared documents that were sent to investors, including in the United

States.   The Exchange documents failed to adequately disclose the existence of the Proindicus

and MAM Loans or the maturity dates of those loans.   The Exchange documents also included

false and misleading statements regarding the use of proceeds of the original EMATUM loan

participation notes and the risks of corruption and money laundering in Mozambique.   For

example, the Exchange documents did not disclose information Credit Suisse had about a

significant shortfall between the price Privinvest charged EMATUM for the 27 boats in that

project and the fair market value of those boats.   The documents therefore contained false and

misleading information about the Eurobonds and Mozambique's creditworthiness.

55.     After the Exchange, in or about and between May 2016 and March 2017,

Proindicus, EMATUM and MAM each defaulted on their loans, and Proindicus, EMATUM and

MAM proceeded to miss more than $700 million in loan payments.

## COUNT ONE
(Conspiracy to Commit Wire Fraud)

56.     The allegations contained in paragraphs one through 55 are realleged

and incorporated as if fully set forth in this paragraph.

57.     In or about and between January 2011 and December 2018, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendant MANUEL CHANG, together with others, did knowingly and intentionally conspire to

devise a scheme and artifice to defraud one or more investors and potential investors in

Proindicus, EMATUM, MAM and the Exchange, and to obtain money and property from them

by means of one or more materially false and fraudulent pretenses, representations and promises,

and for the purpose of executing such scheme and artifice, to transmit and cause to be

14

transmitted by means of wire communication in interstate and foreign commerce writings, signs,

signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349, 3238 and 3551 et seq.)

COUNT TWO
(Conspiracy to Commit Securities Fraud)

58.    The allegations contained in paragraphs one through 55 are realleged and

incorporated as if fully set forth in this paragraph.

59.    In or about and between January 2013 and December 2018, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendant MANUEL CHANG, together with others, did knowingly and willfully conspire to use

and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule

10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission,

Title 17, Code of Federal Regulations, Section 240.10b-5, by: (i) employing one or more

devices, schemes and artifices to defraud; (ii) making one or more untrue statements of material

fact and omitting to state material facts necessary in order to make the statements made, in light

of the circumstances under which they were made, not misleading; and (iii) engaging in one or

more acts, practices and courses of business which would and did operate as a fraud and deceit

upon investors and potential investors in EMATUM and the Exchange, in connection with the

purchase and sale of investments in EMATUM and the Exchange, directly and indirectly, by use

of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United

States Code, Sections 78j(b) and 78ff.  In furtherance of the conspiracy and to effect its objects,

within the Eastern District of New York and elsewhere, the defendant MANUEL CHANG,

together with others, did commit and cause to be committed, among others, the following:

15

OVERT ACTS

(a)     On or about July 5, 2013, Andrew Pearse sent Jean Boustani a PowerPoint presentation regarding the project that would become EMATUM that stated that the project would be funded through "the international bond markets."

(b)     On or about July 21, 2013, Detelina Subeva wrote an email to Jean Boustani, Andrew Pearse and Antonio Do Rosario, stating: "[W]e should also keep a cushion for Proindicus of $17mn so that we don't need to go back to MoF and they are on our side."

(c)     In or about August 2013, Surjan Singh met with CHANG and told him that the EMATUM loan would be a public capital markets transaction and sold to international investors.

(d)     On or about August 30, 2013, CHANG signed the government guarantee for the EMATUM loan agreement on behalf of Mozambique for the approximately $850 million loan to purchase vessels, equipment and training from Privinvest to create a state-owned tuna fishing company, which incorporated the representations and warranties in the EMATUM Facility Agreement by reference.   The EMATUM Facility Agreement's representations prohibited improper payments in connection with the project, including payments that would violate the FCPA, the UK Bribery Act and the Mozambican Anti-Corruption Legislation.

(e)     In or about September 2013, Credit Suisse and Investment Bank 1 sent out the EMATUM offering circular to international investors, including investors located in the United States.   The EMATUM offering circular stated: "The proceeds from the Loan will be used by the Borrower towards the financing of the purchase of fishing infrastructure, comprising

16

of 27 vessels, an operations centre and related training and for the general corporate purposes of the Borrower."

     (f)  On or about October 11, 2013, Investment Bank 1 sent $350 million in EMATUM loan proceeds, less its fees of more than $37 million, to Credit Suisse's bank account at New York City Bank 1, which payment passed through the Eastern District of New York.

     (g)  On or about October 11, 2013, Credit Suisse sent approximately $312 million in EMATUM loan proceeds from New York City Bank 1 to Privinvest, which payment passed through the Eastern District of New York.

     (h)  On or about October 17, 2013, Jean Boustani wrote an email to Antonio Do Rosario, stating: "I need asap invoices in the name of:   Logistics International Abu Dhabi [a Privinvest-related company].   Invoices for everything my brother. Each one mentioning the subject (real estate purchase…etc….).   Even for Pantero [CHANG], a small paper say 'consultancy fees.'"

     (i)  On or about October 21, 2013, a Privinvest entity with a bank account in the UAE sent approximately $1.5 million through the Eastern District of New York to a bank account in Spain for the benefit of CHANG.

     (j)  On or about November 12, 2013, a Privinvest entity with a bank account in the UAE sent approximately $1.5 million through the Eastern District of New York to a bank account in Spain for the benefit of CHANG.

     (k)  On or about December 4, 2013, a Privinvest entity with a bank account in the UAE sent approximately $2 million through the Eastern District of New York to a bank account in Spain for the benefit of CHANG.

(l)     On or about April 8, 2014, Jean Boustani sent an email to Najib Allam detailing bribes and kickbacks Privinvest paid or intended to be paid in connection with the Proindicus and EMATUM projects, including $7 million to CHANG.

(m)    On or about December 3, 2014, Jean Boustani forwarded three emails to Antonio Do Rosario, including a travel itinerary for Mozambican Individual 1, Mozambican Individual 2 and Mozambican Individual 3, close relatives of CHANG whose identities are known to the Grand Jury.   The itineraries showed travel by Mozambican Individials 1, 2 and 3 from Mozambique to Dubai, United Arab Emirates and Beirut, Lebanon. That same day, Jean Boustani forwarded an email with passport information for the three travelers to Privinvest Employee 1, an individual whose identity is known to the Grand Jury.

(n)     On or about December 8, 2014, Mozambican Individual 1 emailed Jean Boustani an attachment containing bank account information at a bank in Beirut, Lebanon. The bank account information listed Mozambican Individual 1 in the account name.

(o)     On or about March 2, 2015, a Palomar employee sent an email to Andrew Pearse and Detelina Subeva, in which the employee summarized a meeting with Mozambican Co-Conspirator 2, and stated that Mozambique's Minister of Finance who had replaced CHANG was "now aware of Proindicus and MAM" and that transactions associated with those entities "were not disclosed to the IMF."   The Palomar employee further stated that while the new Minister of Finance disagreed with the failure to disclose the loans to the IMF, he nonetheless accepted that those "transactions now need to remain undisclosed."

(p)     On or about February 19, 2016, an employee of Credit Suisse emailed Surjan Singh two valuation reports regarding the value of the 27 boats sold to

18

EMATUM by Privinvest.   Those reports indicated that the boats were valued at approximately

$265 million to $394 million less than the EMATUM Loan.

(q)     On or about March 14, 2016, Antonio Do Rosario and other co-

conspirators flew from London, England to John F. Kennedy International Airport in Queens,

New York, in the Eastern District of New York, to attend meetings with investors regarding the

Exchange.

(r)     On or about April 13, 2017, Najib Allam sent an email using his

personal account, stating "Due to the sensitivy of the information I am using our personal

accounts I am attaching a document related to transfers made to 'consultants' of Mozambique

project."   The email had an attachment that listed several individuals, including Antonio Do

Rosario, Teofilo Nhangumele and Mozambican Individual 2.

(Title 18, United States Code, Sections 371, 3238 and 3551 et seq.)

COUNT THREE
(Conspiracy to Commit Money Laundering)

60.     The allegations contained in paragraphs one through 55 are realleged and

incorporated as if fully set forth in this paragraph.

61.     In or about and between January 2013 and December 2018, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendant MANUEL CHANG, together with others, did knowingly and intentionally conspire to

transport, transmit and transfer monetary instruments and funds to one or more places outside the

United States from one or more places inside the United States, and to one or more places inside

the United States from one or more places outside the United States, (a) with the intent to

promote the carrying on of one or more specified unlawful activities, to wit: (i) offenses against a

foreign nation involving the bribery of a public official, or the misappropriation, theft, or

19

embezzlement of public funds by or for the benefit of a public official, in violation of

Mozambican law, as defined in Title 18, United States Code, Section 1956(c)(7)(B)(iv); (ii) wire

fraud, in violation of Title 18, United States Code, Section 1343; and (iii) fraud in the sale of

securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff (collectively, the

"Specified Unlawful Activities"), contrary to Title 18, United States Code, Section

1956(a)(2)(A); and (b) knowing that the monetary instruments and funds involved in the

transportation, transmission and transfer represented the proceeds of some form of unlawful

activity, and knowing that such transportation, transmission and transfer was designed in whole

and in part to conceal and disguise the nature, location, source, ownership and control of the

proceeds of one or more specified unlawful activities, to wit: the Specified Unlawful Activities,

contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h), 3238 and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION<br>AS TO COUNTS ONE AND TWO

62.    The United States hereby gives notice to the defendant that, upon his

conviction of either Count One or Count Two, the governnment will seek forfeiture in

accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States

Code, Section 2461(c), which require any person convicted of such offenses to forfeit any

property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly

as a result of such offenses.

63.    If any of the above-described forfeitable property, as a result of any act or

omission of the defendant:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third party;

20

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNT THREE

64.     The United States hereby gives notice to the defendant that, upon his conviction of Count Three, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

65.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided

without difficulty;

21

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as

incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other

property of the defendant up to the value of the forfeitable property described in this forfeiture

allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United

States Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

_____
BREON PEACE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

_____
MARGARET A. MOESER
ACTING CHIEF, MONEY LAUNDERING AND
ASSET RECOVERY SECTION,
CRIMINAL DIVISION,
U.S. DEPARTMENT OF JUSTICE

_____
GLENN S. LEON
CHIEF, FRAUD SECTION,
CRIMINAL DIVISION,
U.S. DEPARTMENT OF JUSTICE

22

F. #2016R00695
FORM DBD-34
JUN. 85

No.

---

## UNITED STATES DISTRICT COURT
### EASTERN *District of* NEW YORK
### CRIMINAL DIVISION

---

THE UNITED STATES OF AMERICA

*vs.*

*MANUEL CHANG,*

Defendant

---

## SUPERSEDING INDICTMENT

(T. 18, U.S.C., §§ 371, 981(a)(1)(C), 982(a)(1), 982(a)(2)(B), 982(b)(1), 1343, 1349, 1956(h), 3238 and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c).)

---

*A true bill.*

_____

*Foreperson*

---

*Filed in open court this* _____ *day of* _____
*A.D. 20* _____

_____

*Clerk*

*Bail, $* _____

---

**Hiral D. Mehta, Jonathan Siegel, Assistant U.S. Attorneys (718) 254-6418, Margaret A. Moeser, Peter Cooch, U.S. Department of Justice Trial Attorneys, (202) 598-2345**

23