UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA

Case No. 1:18-cv-00681

v.


MANUEL CHANG,



Defendant.
-------------------------------------------------------------x


**DEFENDANT MANUEL CHANG'S MEMORANDUM OF LAW IN SUPPORT OF HIS
MOTION TO DISMISS THE INDICTMENT**

FORD O'BRIEN LANDY LLP
Adam C. Ford
Jamie H. Solano
Anjula S. Prasad
Arthur Kutoroff
275 Madison Avenue
24th Floor
New York, New York 10016

*Attorneys for Defendant Manuel Chang*

Dated: February 21, 2024

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................1

ALLEGATIONS ..........................................................................................................4

ARGUMENT ..............................................................................................................12

I.  Counts One and Two Should Be Dismissed Because They Fail to State a Claim After *Ciminelli v. United States*, 598 U.S. 306 (2023). .................................................13

    A.  Count One's Conspiracy to Commit Wire Fraud Is No Different From *Ciminelli*'s Alleged Bribery and Kickback Scheme Charged Through the Wire Fraud Statute.....13

    B.  Count Two's Securities Fraud Conspiracy Count Should Also be Dismissed because the Second Circuit Has Confirmed *Ciminelli* Applies to Securities Fraud Cases. ......16

II.  Count Two Should Be Dismissed Because It Impermissibly Applies Securities Fraud Extraterritorially. ...............................................................................................17

    A.  Count Two Fails to Allege Irrevocable Liability in the United States. ........................17

    B.  Count Two Should Be Dismissed Because It Does Not Allege a Domestic Securities Transaction. ...............................................................................................19

III.  Counts One and Two Should Be Dismissed Because They Fail to State an Actionable Misstatement or Omission Under Federal Fraud Statutes, Are Applied in a Way That Does Not Provide Fair Notice, and Impermissibly Permit a Finding of Criminal Liability for a Standardless Sweep of Conduct. ............................................................................23

    A.  "Use of Loan Proceeds" ........................................................................................25

    B.  "Bribe" and "Kickback" Payments to Mozambique Government Officials and Bankers ...............................................................................................................26

    C.  "Amount and Maturity Dates of Debt Owed by Mozambique" .................................29

    D.  "Mozambique's Ability and Intention to Pay Back Investors"..................................30

    E.  Credit Suisse's Failure to Disclose Information About the Price of Boats Purchased In Connection With the Project (the Eurobond Conspiracy)...........................................31

IV.  Count Three Should Be Dismissed Because It Fails to State a Claim and Fails to Allege Jurisdictional Facts...............................................................................................32

A.    Count Three Should be Dismissed Because the Statute Expressly Disclaims Jurisdiction Over Foreign Nationals Like Mr. Chang..................................................32

B.    Count Three Should be Dismissed Because the Indictment Fails to Properly Allege "Unlawful Activity," That Any of the Funds Were Derived From Specified "Unlawful Activity," and Violates Due Process Because It Fails to Allege Facts to Provide Mr. Chang Notice of Purported Violations of Mozambique Law.....................................34

C.    The Money Laundering Conspiracy Charge Should Be Dismissed Because It Does Not Allege That Mr. Chang Conspired to Send Money To or From the United States, the Essential Nature of the Alleged Money Laundering Conspiracy..........................37

V.    Due Process Prohibits the Extraterritorial Application of Counts One Through Three to Mr. Chang. ...........................................................................................................................39

VI.    All Three Conspiracy Charges in the Indictment are Impermissibly Duplicitous Because They Lump Two Distinct Conspiracies Together, One With Which Mr. Chang is Not Alleged to Have Any Involvement, Violating the Well-Established Rule Articulated in *Grunewald*.................................................................................................................40

A.    Mr. Chang Will Be Prejudiced in Several Respects by the Duplicitous Counts..........43

B.    The Counts Should be Dismissed or the Government Should be Forced to Elect to Proceed Only on the Infrastructure Conspiracy and Forgo the Eurobond Conspiracy. ....................................................................................................................................45

VII.    Criminally Prosecuting a Foreign Government's Minister for Acts He Undertook in His Official Capacity For a Country's Geopolitical Decisions Violates Several Longstanding Tenants of American Jurisprudence. ...................................................................................45

A.    The Indictment Should be Dismissed Because Mr. Chang's Criminal Prosecution Violates Common Law Sovereign Immunity...............................................................48

B.    The Indictment Should be Dismissed Because Mr. Chang's Criminal Prosecution Violates the Act of State Doctrine.............................................................................52

C.    The Indictment Should be Dismissed Because Mr. Chang's Criminal Prosecution is Inappropriate Under Notions of International Comity................................................55

VIII.    The Government Should Produce Its Communications with Foreign Governments and Material Information From Unproduced Search Warrant Affidavits...................................57

IX.    Reference to "Among Other Things" Should be Stricken From the Indictment. .................59

CONCLUSION.....................................................................................................................60

*Absolute Activist Value Master Fund Ltd. v. Ficeto,*
677 F.3d 60 (2d Cir. 2012) .......................................................................................... 18, 19

*Appeal of Chase Manhattan Overseas Banking Corp.,*
740 F.2d 956 (3d Cir. 1984) ................................................................................................ 56

*APWU v. Potter,*
343 F.3d 619 (2d Cir. 2003) ................................................................................................ 46

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.,*
77 F.4th 74 (2d Cir. 2023) ............................................................................................ 25, 29

*Banco de Espana v. Fed. Rsrv. Bank of New York,*
114 F.2d 438 (2d Cir. 1940) ................................................................. 52, 53, 55, 56

*Banco Safra S.A.-Cayman Islands Branch v. Samarco Mineracao S.A.,*
849 F. App'x 289 (2d Cir. 2021) ........................................................................................ 19

*Binday v. United States,*
143 S. Ct. 2491 (2023) ........................................................................................................ 15

*Callejo v. Bancomer, S.A.,*
764 F.2d 1101 (5th Cir. 1985) ............................................................................................ 53

*Cavello Bay Reinsurance v. Stein,*
986 F.3d 161 (2021) ............................................................................................................ 21

*Ciminelli v. United States,*
598 U.S. 306 (2023) ................................................................................................... passim.

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,*
752 F.3d 173 (2d Cir. 2014) ........................................................................ 25, 28, 29, 30

*Coleman v. Tennessee,*
97 U.S. 509 (1878) .............................................................................................................. 50

*Direct Sales Co. v. United States,*
319 U.S. 703 (1943) ............................................................................................................ 38

*Dow v. Johnson,*
100 U.S. 158 (1879) ............................................................................................................ 49

*Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V.,*
809 F.3d 737 (2d Cir. 2016) ....................................................................... 52, 53, 56

*First National City Bank v. Banco Nacional de Cuba,*
    406 U.S. 759 (1972)...................................................................................52, 53

*Goar v. Compania Peruana de Vapores,*
    688 F.2d 417 (5th Cir. 1982) ....................................................................48

*Grunewald v. United States,*
    353 U.S. 391 (1957).........................................................................42, 43, 44

*Heaney v. Gov't of Spain,*
    445 F.2d 501 (2d Cir.1971)....................................................................49, 50

*In re Lottery.com, Inc. Sec. Litig.,*
    2024 WL 454298 (S.D.N.Y. Feb. 6, 2024) ..........................................27

*In re Petrobras Securities,*
    862 F.3d 250 (2017)....................................................................................18

*In re Philip Morris Int'l Sec. Litig.,*
    89 F.4th 408 (2d Cir. 2023) ..............................................................30, 32

*In re Philippine Nat'l Bank,*
    397 F.3d 768 (9th Cir. 2005) ...................................................................53

*In re Telfonaktiebolaget LM Ericsson Sec. Litig.,*
    2023 WL 3628244 (E.D.N.Y. May 24, 2023) ....................................27

*In re Terrorist Attacks on September 11, 2001,*
    122 F. Supp. 3d 181 (S.D.N.Y. 2015) ...................................................49

*Ingram v. United States,*
    360 U.S. 672 (1959).............................................................................37, 38

*Kashef v. BNP Paribas S.A.,*
    925 F.3d 53 (2d Cir. 2019).......................................................................53

*Kolender v. Lawson,*
    461 U.S. 352 (1983).....................................................................................24

*Matar v. Dichter,*
    563 F.3d 9 (2d Cir. 2009)..........................................................................49

*McCormick v. United States,*
    500 U. S. 257 (1991)...................................................................................23

*Menaldi v. Och-Ziff Capital Mgmt,*
164 F. Supp. 3d 568 (S.D.N.Y. 2016) ............................................25, 30

*Microsoft Corp. v. AT&T Corp.,*
550 U.S. 437 (2007)...................................................................17

*Morrison v. National Australia Bank Ltd.*,
561 U.S. 247 (2010)............................................................. passim.

*Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings* SE,
763 F.3d 198 (2014)...................................................19, 20, 21, 22

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
11 F.4th 90 (2d Cir. 2021) .........................................................27

*Rehaif v. United States*,
139 S. Ct. 2191 (2019).........................................................35, 36

*Republic of Mexico v. Hoffman*,
324 U.S. 30 (1945)....................................................................49

*Republic of Philippines v. Marcos*,
806 F.2d 344 (2d Cir. 1986)........................................................53

*RJR Nabisco, Inc. v. Eur. Cmty.,*
579 U.S. 325 (2016) .................................................................32

*Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp.,*
576 F. Supp. 107 (D. Del.1983)....................................................56

*Samantar v. Yousuf*,
560 U.S. 305 (2010)............................................................48, 52

*SEC v. Govil,*
86 F.4th 89 (2d Cir. 2023) ..........................................................16

*Stratte-McClure v. Morgan Stanley*,
776 F.3d 94 (2d Cir. 2015)..........................................................30

*Turkiye Halk Bankasi A.S. v. United States*,
598 U.S. 264 (2023).........................................................46, 49, 50

*Underhill v. Hernandez*,
168 U.S. 250 (1897)...................................................................52

*United States v. Al Kassar*,
   660 F.3d 108 (2d Cir. 2011)......................................................................39

*United States v. Aracri*,
   968 F.2d 1512 (2d Cir. 1992).....................................................................41

*United States v. Benjamin*,
   2022 WL 17417038 (S.D.N.Y. Dec. 5, 2022) ...................................24, 28

*United States v. Brutus*,
   505 F.3d 80 (2d Cir. 2007)........................................................................42

*United States v. Bryant*,
   556 F. Supp. 2d 378 (D.N.J. 2008) ....................................................24, 31

*United States v. Cruikshank*,
   92 U.S. 542 (1875)....................................................................................36

*United States v. Epskamp*,
   832 F.3d 154 (2d Cir. 2016)......................................................................39

*United States v. Floyd*,
   555 F.2d 45 (2d Cir. 1977)........................................................................42

*United States v. Gabriel*,
   920 F. Supp. 498 (S.D.N.Y. 1996) ...........................................................44

*United States v. Gasperini*,
   2017 WL 2399693 (E.D.N.Y. June 1, 2017) ......................................12, 39

*United States v. General Dynamics Corp.*,
   644 F. Supp 1497 (C.D. Cal 1986) ..............................................................7

*United States v. General Dynamics Corp.*,
   828 F.2d 1356 (9th Cir. 1987) .....................................................................7

*United States v. Giffen*,
   326 F. Supp. 2d 497 (S.D.N.Y. 2004) .......................................................56

*United States v. Ho*,
   984 F.3d 191 (2d Cir. 2020)......................................................................38

*United States v. Kassir*,
   No. S2 04 CR. 356 (JFK), 2009 WL 995139 (S.D.N.Y. Apr. 9, 2009).....60

*United States v. Lech*,
   161 F.R.D. 255 (S.D.N.Y. 1995) ........................................................44

*United States v. Lloyds TSB Bank PLC*,
   639 F. Supp. 2d 314 (S.D.N.Y. 2009) ..............................................33

*United States v. Marcus Schloss & Co.*,
   710 F. Supp. 944 (S.D.N.Y. 1989) ...............................................44, 45

*United States v. McDermott*,
   245 F.3d 133 (2d Cir. 2001).............................................................42

*United States v. Nordlicht*,
   2023 WL 4490615 (E.D.N.Y. July 12, 2023) ....................................15

*United States v. Pirro*,
   212 F.3d 86 (2d Cir. 2000)..........................................24, 30, 35, 36

*United States v. Pope*,
   189 F. Supp. 12 (S.D.N.Y. 1960) .....................................................59

*United States v. Rajaratnam*,
   736 F. Supp. 2d 683 (S.D.N.Y. 2010) ..............................................41

*United States v. Rosenblatt*,
   554 F.2d 36 (2d Cir. 1977).............................................................37

*United States v. Sidorenko*,
   102 F. Supp. 3d 1124 (N.D. Cal. 2015) ...........................................39

*United States v. Stavroulakis*,
   952 F.2d 686 (2d Cir. 1992)..........................................12, 35, 37

*United States v. Stefan*,
   687 F.3d 1104 (8th Cir. 2012) ........................................................25

*United States v. Stringer*,
   730 F.3d 120 (2d Cir. 2013)............................................................24

*United States v. Sturdivant*,
   244 F.3d 71 (2d Cir. 2001).............................................................45

*United States v. Sun-Diamond*,
   526 U.S. 398 (1999).......................................................................23

*United States v. Thiam*,
   934 F.3d 89 (2d Cir. 2019).............................................................55, 56

*United States v. Turkiye Halk Bankasi A.S.*,
   20-3499 (2d Cir. Dec. 12, 2023) ..................................................50

*United States v. Urso*,
   369 F. Supp. 2d 254 (E.D.N.Y. 2005) ........................................24, 36

*United States v. Vilar*,
   729 F.3d 62 (2d Cir. 2013).............................................................19

*United States v. Walsh*,
   194 F.3d 37 (2d Cir. 1999).............................................................36

*W.S. Kilpatrick & Co., Inc. v. Environmental Tectonics Corp. Intern.*,
   493 U.S. 400 (1990) ....................................................................52, 53


Statutes and Rules:

18 U.S.C. § 1956(a)(2)(A) ...............................................................34, 38

18 U.S.C. § 1956(a)(2)(B) ...............................................................34

18 U.S.C. § 1956(c)(1).....................................................................35

18 U.S.C. § 1956(c)(7)(B).................................................................35

18 U.S.C. § 1956(f)(1)......................................................................32

18 U.S.C. §§ 201(b) .........................................................................23

18 U.S.C. §§ 666(a)(2)......................................................................23

41 U.S.C. § 52(2) .............................................................................23

Fed. R. Crim. P. 8(a) .......................................................................41

Fed. R. Crim. P. 12(b)(3)(B)(iii) ......................................................12

Fed. R. Crim. P. 12(b)(3)(B)(v) .......................................................12

*Restatement (Second) of Foreign Relations Law of the United States* § 66(f) (Am. L. Inst. 1965)
....................................................................................................49

# PRELIMINARY STATEMENT

The Second Superseding Indictment ("Indictment") against Mr. Chang is fatally flawed in numerous respects. As a threshold matter, Counts One and Two, the conspiracy to commit wire fraud and securities fraud counts must be dismissed under the Supreme Court's decision in *Ciminelli*, which precludes the Government from proceeding on a "right-to-control" theory of fraud, which the Government seeks to do here. *Ciminelli* was clear that its holding extended to securities fraud cases, and the Second Circuit in *SEC v. Govil*, held explicitly that securities fraud claims too cannot proceed on the theory the Government alleges here: that investors were deprived of the right to information prior to making an investment decision.

While *Ciminelli* compels dismissal of Counts One and Two, those counts suffer from other fatal flaws as well. They are impermissibly extraterritorial, in violation of the Supreme Court's pronouncements in *Morrison*. Accepting the Government's allegations in the Indictment as true for purposes of this motion, there is simply no conduct that Mr. Chang is alleged to have engaged in that had any connection whatsoever to the United States. That the alleged bribe payment—paid by a Lebanese company with a bank account in the United Arab Emirates to a Spanish bank account in the name of a Spanish company, owned by a Portuguese businessman, but allegedly controlled by Mr. Chang—happened to touch a United States correspondent bank in the midst of the wire transfer is insufficient as a matter of law to confer jurisdiction here. Finally, the alleged fraudulent statements are all non-actionable as a matter of law. The guarantees that Mr. Chang signed did not incorporate the provision the Government has attributed to him. The loan agreement and offering circular drafted by numerous Credit Suisse employees—of which the Government does not and cannot allege Mr. Chang was aware— contains vague, general, boilerplate language routinely found to be not fraudulent and non-

actionable and hence subject to dismissal. And the Government's fraud by omission allegations are equally flawed because the Indictment does not identify a requisite duty to disclose and the vague allegations invite an impermissible "standardless sweep" of enforcement.

With respect to Count Three, the conspiracy to commit money laundering, here too the government fails to allege necessary predicate facts. This Court lacks jurisdiction over Mr. Chang to adjudicate the money laundering charge because Mr. Chang is a non-U.S. citizen and his alleged conduct did not occur in the United States. The Government was required to allege which Mozambique felony law it alleges Mr. Chang violated as the underlying crime to the money laundering count. (Notably, we asked the Government for this information in a bill of particulars letter and the Government refused to produce it). Without an allegation of the underlying crime, this Count cannot stand.

Critically, all three counts must also be dismissed because they are duplicitous in that they allege two separate alleged conspiracies as one. Mr. Chang left his post as Minister of Finance on December 31, 2014, at which point he had no official (or unofficial) role in any alleged misconduct. The new Minister of Finance, current Prime Minister, Adriano Maleiane took over that role. The allegations in the Indictment make clear that there is first the "Infrastructure Conspiracy" in which Mr. Chang is alleged to have signed loan guarantees on behalf of Mozambique to obtain the loans for Mozambique's infrastructure projects. There is then another, entirely separate and distinct alleged conspiracy in 2016 in connection with the Eurobond exchange (the "Eurobond Conspiracy"). As alleged in the Indictment, Mr. Chang has nothing to do with anything that happened in this case after January 1, 2015—and by extension no involvement in the Eurobond Conspiracy. The Government has improperly combined two

separate conspiracies into one with the aim of looping Mr. Chang into conduct with which he was never involved: the charges are duplicitous in violation of the tenets set forth in *Grunewald*.

Even putting aside all of these legal hurdles that the Government has failed to overcome, this case represents a blatant infringement on the sovereign immunity of Mozambique, and by extension, its former Minister of Finance, and violates several important, fundamental tenets of our legal system. This case follows Mozambique's decisions to bolster its defense and infrastructure after the discovery of large oil reserves in 2011. The then-President of Mozambique along with several officials from the Minister of Defense and Secret Service, (including the now-sitting President of Mozambique who was, at the time, the Minister of Defense) developed a program to provide for coastal security (Proindicus), commercial fishing (EMATUM), and development of a port and additional security measures, including sophisticated radar and communications system (MAM). The Defendant, Mr. Chang, was not one of the Mozambique government officials who developed or approved the projects, nor was he in charge of any of them. He was merely tasked by the Mozambique government to sign the loan guarantees necessary to secure the financing that the Mozambique government decided on.

Our nation's longstanding commitment to the appropriate exercise of power and rule of law includes protections for foreign government officials from being charged due to the conduct of their government. Common law sovereign immunity, the act of state doctrine, and international comity which are intended to "preclude[] any review whatever of the acts of the government of one sovereign State done within its own territory by the courts of another sovereign State" bar Mr. Chang's prosecution. The U.S. Attorney's Office is asking this Court to break with long-standing precedent and determine that a country's sovereign immunity against criminal prosecution for its official acts undertaken in its own country should be disregarded.

This issue is of great importance and is currently being decided by the Second Circuit upon remand from the U.S. Supreme Court, in *Halkbank*. The Indictment alleges that the prosecution of Mr. Chang derives from his official acts taken in his official capacity as the Minister of Finance of Mozambique in connection with his country's national defense. It is not appropriate for the U.S. Government to criminally prosecute a foreign national for actions he undertook as a part of his government's official government decisions; doing so violates international comity, the act of state doctrine, and common law sovereign immunity. The current President of Mozambique directed this project and is currently running Mozambique. Permitting the Government the authority to arbitrarily engraft U.S. law onto Mr. Chang to attempt to punish him (but, only him) for his country's decisions violates longstanding jurisprudence that weighs strongly against permitting such a spectacle in this Court. Accordingly, Mr. Chang respectfully asks this Court to dismiss the Indictment in its entirety.

## ALLEGATIONS[1]

Mr. Chang is a citizen of Mozambique and was Mozambique's Minister of Finance from February 2005 to January 2015. Ind. ¶ 3. The Indictment contains no allegations that Mr. Chang ever lived, visited, communicated with someone in, conspired with someone in, or directed conduct to, the United States. He is charged with wire fraud conspiracy, securities fraud conspiracy, and money laundering conspiracy. The Indictment lists 17 other relevant entities and individuals, all of which are foreign, including: the sub-Saharan African nation of Mozambique; two Mozambique citizens: (1) an official in the Mozambique governmental state intelligence and security service who owned the subject entities along with other Mozambique government agencies, and (2) another individual allegedly working on behalf of the Office of the President of

---

[1] Mr. Chang denies every allegation in the Indictment but for purposes of this motion assumes the allegations to be true.

Mozambique, neither of whom are alleged to be coconspirators; two unnamed Mozambique coconspirators, allegedly liaisons to the Mozambique government; Privinvest, a United Arab Emirates based holding company (with UAE-based subsidiaries); two Lebanese citizens, a salesman and the CFO of Privinvest; two unnamed (international) coconspirators who worked for or with Privinvest; Credit Suisse, headquartered in Europe; Investment Bank 1, a bank owned by a foreign government;[2] three employees of Credit Suisse: (1) a citizen of New Zealand; (2) a citizen of the United Kingdom; and (3) a citizen of Bulgaria, each of whom are also alleged to be coconspirators; and the IMF, an international inter-governmental institution. Ind. ¶ 1-18.

The Indictment also references as relevant three special purpose vehicles ("SPVs") that were at all times owned, created, and overseen by the Republic of Mozambique, each of which was created to undertake the national defense and maritime projects in Mozambique for and on behalf of Mozambique. Ind. ¶ 2. A Mozambique citizen who was an official of Mozambique's state intelligence and security service ("SISE"), along with other Mozambique government agencies, owned the three SPVs. *Id.* ¶ 4. The SPVs were Proindicus S.A. ("Proindicus"), which was responsible for performing coastal surveillance for Mozambique's coastline; Empresa Mozambicana de Atum, S.A. ("EMATUM"), which was responsible for engaging in tuna fishing; and Mozambique Asset Management ("MAM"), which was created to build and maintain shipyards in Mozambique. *Id.* ¶ 2.

The indictment alleges that beginning in 2011, two individuals came up with a scheme to obtain a loan from Credit Suisse. Ind. ¶ 29. These individuals then allegedly "enlisted" Mr. Chang, who wrote a letter to a Privinvest co-conspirator. Ind. ¶ 31. The letter referenced an IMF limitation on the Government of Mozambique and stated "[w]e have devised an alternative

---

[2] The Indictment notes that this foreign-owned bank had an office in New York, among other places. Ind. ¶ 17.

solution," to form an SPV. Ind. ¶ 31. On behalf of the Government of Mozambique, Mr. Chang

signed guarantees for loans and an increased loan to fund the Proindicus project, which obligated

Mozambique to pay the loan if the Proindicus SPV was unable to repay it. Ind. ¶¶ 32-34. The

Indictment contains no allegations that while Mr. Chang remained the Minister of Finance, the

Proindicus SPV missed a loan payment. Credit Suisse and Investment Bank 1 loaned money to

the Proindicus SPV as a part of the project. *Id.* ¶ 34. Credit Suisse, in turn, marketed and sold

portions of the debt to investors, one of which was located in the United States. Ind. ¶ 35. The

loans and debt are not alleged to be securities. Proindicus contracted with Privinvest to the

project, and nearly all of the borrowed money was paid directly from the banks to Privinvest.

Ind. ¶ 24. Proindicus maintained loan payments until about March 21, 2017—four years after

Credit Suisse made its first loan to Proindicus and over two years after Mr. Chang left his

position as Minister of Finance. Ind. ¶ 34.

On August 2, 2013, the Mozambique-controlled SPV, EMATUM, contracted with

Privinvest to purchase vessels, equipment and training to create a state-owned tuna fishing

company. Ind. ¶ 39. On August 30, 2013, Credit Suisse agreed to make up to $850 million in

loans to EMATUM under the terms of a loan agreement (the "EMATUM Loan Agreement").

*Id.* That day, Mr. Chang signed a guarantee on behalf of the government of Mozambique for the

EMATUM loan (the "Mozambique EMATUM Guarantee"). *Id.* Both Credit Suisse and

Investment Bank 1 loaned money to EMATUM.

The Indictment does not allege that Mr. Chang drafted or reviewed the EMATUM Loan

Agreement, and he did not sign the EMATUM Loan Agreement. The parties to the EMATUM

Loan Agreement were EMATUM and Credit Suisse. [3] Ind. ¶ 39; *see also* Ex. 1 to Ford Decl. The

_____

[3] The entirety of alleged misstatements and obligations arise from the Guarantees and the loan documents; as such, they are properly considered on motion to dismiss because these contracts are the very subject of

EMATUM Loan Agreement stated that EMATUM was to "apply all amounts borrowed by it under the Facility towards the financing of the Project and the general corporate purposes of [EMATUM] (including any fees, costs and expenses, stamp, registration or other Taxes incurred by any Obligor in connection with the Finance Documents). *See* Ex. 1 at § 3.1. Both the EMATUM Loan Agreement and the Mozambique EMATUM Guarantee were governed by English law. *See* Exs. 1 and 2 to Ford Decl.

The Mozambique EMATUM Guarantee incorporated some of the representations and warranties from the EMATUM Facility Agreement by reference, but expressly did not incorporate several of them. *See* Ind. ¶ 59, Exs. 1 and 2. For example, the EMATUM Loan Agreement stated that the EMATUM SPV would comply with all Anti-Corruption Laws and would not engage in conduct that would constitute a Corrupt Act, including payments that would violate the FCPA, the UK Bribery Act and the Mozambican Anti-Corruption Legislation. *Id.*; Ex. 1. The Mozambique EMATUM Guarantee *specifically excluded* this provision from its

---

the Indictment. *United States v. General Dynamics Corp.*, 644 F. Supp 1497, 1500 (C.D. Cal 1986) (court considered contract referenced in the Indictment because "If those terms make it clear that the indictment should not proceed, it would be a travesty if the Defendants were forced to engage in a lengthy trial with the inevitable result that the Court would then dismiss the indictment once the Contract came into evidence. For example, if a contract explicitly and clearly said that a contractor could do "X", and if an indictment were returned that said the contractor had conspired to commit a fraud under the contract by doing "X", it would be absurd to require a trial. Yet that would seem to be the result of the position the Government has asked this Court to take. The Court will not do so. It will consider the Contract.") *rev'd on other grounds,* 828 F.2d 1356 (9th Cir. 1987).

"repeated representations,"[4] as well as from its "general undertaking"[5] sections. *See* Exs. 1 and 2. The EMATUM Loan Agreement's compliance with laws provision was equivocal; elsewhere in the EMATUM Loan Agreement, EMATUM agreed that if either EMATUM or Credit Suisse became aware of information reasonably suggesting that a Corrupt Act had occurred, EMATUM was required to confer with Credit Suisse to take "reasonably requested steps in response to such occurrence" or "mitigate the risk of any further such occurrence." Ex. 2. Notifying future investors of a Corrupt Act was not required by the EMATUM Loan Agreement.[6]

The Indictment alleges that in August 2013, Surjan Singh from Credit Suisse met with Mr. Chang and told him that the EMATUM loan "would be a public capital market transaction and sold to international investors." Ind. ¶ 59(c). In September and October 2013, Credit Suisse and Investment Bank 1 sent loan proceeds from the EMATUM Loan Agreement to Privinvest. Ind. ¶¶ 42, 59. Credit Suisse funded the EMATUM loan by selling loan participation notes to investors in the United States and elsewhere. Ind. ¶ 41. The EMATUM loan participation notes ("LPNs") are alleged to be securities. *Id*. ¶ 21. Credit Suisse sent potential investors materials that included the EMATUM Loan Agreement and an offering circular (the "EMATUM Offering

---

[4] See Mozambique EMATUM Guarantee (incorporated here by reference): "'Repeating Representations' means, for the purposes of this Guarantee, each of the representations set out: (a) in the following clauses of the Facility Agreement: clause 17.1 (*Status*) to (and including) clause 17.5 (*Power and authority*), clause 17.9 (*Written Information*), clause 17.10 (*Validity and Admissibility in Evidence*), clause 17.15 (*No immunity*) and clause 17.16 (*Private and Commercial Acts*) as made by the Guarantor under Clause 5.1 (*Representations and Warranties*)," whereas clause 17.17 (Compliance with laws) is specifically excluded in sequence.

[5] See Mozambique EMATUM Guarantee: "6.3 General Undertakings: The Guarantor hereby undertakes to perform the obligations set out in the following clause of the Facility Agreement: clause 19.1 (*Maintenance of legal validity*), clause 19.4 (*Claims Pari Passu*), clause 19.5 (*Negative pledge*), clause 19.8 (*Eurobond cross default terms*) and clause 19.9 (*Public procurement rules*) as if such clauses were set out in full in this Guarantee," specifically excluding 19.2 Compliance with laws.

[6] The Proindicus and MAM Facility Agreements and Mozambique Guarantees for these projects were worded similarly to the EMATUM documents. *See* Exs. 4-7 to Ford Decl.

Circular"). Ind. ¶ 41. The Indictment does not allege that Mr. Chang ever saw or discussed the

EMATUM Offering Circular. The parties to the EMATUM Offering Circular were all foreign and

the document itself was governed by English law. *See* Ex. 3 to Ford Decl. at 15. The first page of

the EMATUM Offering Circular stated:

> **The Notes have not been and will not be registered under the Securities Act and, subject to certain exceptions, <u>may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons.</u>** The Notes may be sold in other jurisdictions (including, without limitation, the United Kingdom and the Netherlands) only in compliance with applicable laws and regulations.

Ex. 3 at 1, 14 (emphasis added). The EMATUM Offering Circular warned potential investors

that "[w]here the servicing of securities, such as the Notes, is dependent upon underlying assets

relating to an emerging market, investors will be directly exposed to that emerging market and

any weaknesses, risks and vulnerabilities to which that emerging market is subject. Such

weaknesses, risks and vulnerabilities may not be present, or may only be present to a far lesser

extent, in more developed countries." *Id.* at pg. 2-3. The offering enumerated risks factors,

which included (but were not limited to) political instability and institutional weaknesses; risks

of regional conflict; social instability and the risk of social unrest; and corruption by government

officials and misuse of public funds. *Id.*

Although the Indictment alleges that "the loan proceeds were supposed to be used

*exclusively* for the maritime projects," (Ind. ¶ 24), in fact, the Offering Circular stated the

opposite. It provided that "[t]he Issuer will use the proceeds of the first issue of Notes *for the

sole purpose of* financing the purchase of the rights and obligations of the lender in respect of the

[EMATUM] Loan," Ex. 3 at 1, 17. Credit Suisse Securities (Europe) Limited, BNP Paribas, and

Citibank, N.A., London Branch further warned potential investors that:

> Each of the Joint Lead Managers[] and any of their affiliates is acting or may act in a number of capacities in connection with the issue of Notes and may enter into business dealings from which it may derive revenues and profits in addition to any fees stated in various documents, without any duty to account thereof. In particular, Credit Suisse International is receiving an arrangement fee in respect of the Loan from each of the Borrower and Abu Dhabi Mar LLC (the "Contractor"), which is the contractor involved in the supply of fishing vessels to the Borrower as part of the Project (as defined in the Facility Agreement). The fee from the Contractor may be variable.

Ex. 3 at 9.

In reliance on the representations in the Loan Agreement and Offering Circular, investors purchased EMATUM loan participation notes. Ind. ¶ 42. EMATUM maintained loan payments until about January 17, 2017 (Ind. ¶ 34)—almost three and a half years after Credit Suisse and Investment Bank 1 loaned $850 million to EMATUM, and over two years after Mr. Chang left his position as Minister of Finance. *Id.* ¶ 43.

As alleged, in early 2014, Mr. Boustani and a coconspirator from Privinvest "devised a shipyard project for Mozambique to further enrich themselves and their co-conspirators." *Id.* ¶ 47. In May 2014, Investment Bank 1 and a Privinvest-controlled entity arranged a syndicated loan of $540 million. *Id.* ¶ 48. This loan is not alleged to be a security. Mr. Chang signed the loan guarantee for MAM on behalf of the Republic of Mozambique. *Id.* MAM defaulted on its loan payment in May 2016—two years after Mr. Chang was no longer the Minister of Finance. *Id.* ¶ 50.

The Indictment alleges that Mr. Boustani caused Privinvest to send bribe and kickback payments to various Mozambique government officials and bankers in connection with the three Mozambique controlled SPV projects. Other than the Government repetitively throughout the Indictment calling these payments "bribes," "kickbacks," "corrupt," and "unlawful," there are no factual allegations in the Indictment whatsoever, that these payments were in fact, unlawful in

nature. Nor does the Indictment state the specific actions that were agreed to be undertaken as a result of these payments and whether they otherwise would have occurred but for the payments.

The Indictment alleges that, "[Mr.] Boustani wrote an email to Do Rosario on about October 17, 2013, stating: "I need asap invoices in the name of: Logistics International Abu Dhabi [a Privinvest-related company]. Invoices for everything my brother. Each one mentioning the subject (real estate purchase...etc....). Even for Pantero [Manuel Chang], a small paper say 'consultancy fees.'" Ind. ¶ 45. The Indictment alleges that between October 20, 2013, and December 4, 2013, Mr. Boustani caused Privinvest to make payments of approximately $5 million, from Privinvest's UAE-based bank account, through the Eastern District of New York, for the benefit of Mr. Chang, to a bank account in Spain. *Id.* ¶ 46.

The Indictment also alleges that Najib Allam maintained a spreadsheet at some unalleged time, which "indicates an anticipated payment of approximately $400,000" from Privinvest to Mr. Chang for approving the final guarantee to increase the Proindicus loan. *Id.* ¶ 37. The undated spreadsheet also allegedly included "an anticipated payment of approximately $5 million, or approximately 3.7 million euros," to Mr. Chang and others. *Id.* ¶ 51.

In connection with the following, the Indictment alleges that the coconspirators "conspired to defraud investors and potential investors in the Proindicus, EMATUM and MAM financings through numerous material misrepresentations and omissions relating to, among other things: (i) the use of loan proceeds; (ii) bribe and kickback payments to Mozambican government officials and bankers; (iii) the amount and maturity dates of debt owed by Mozambique, including the existence of the Proindicus and MAM loans; and (iv) Mozambique's ability and intention to pay back the investors." *Id.* ¶ 23.

The Indictment makes clear that Mr. Chang was no longer the Minister of Finance of Mozambique by January 1, 2015. Ind. ¶ 3. The Indictment nonetheless contains allegations regarding a Eurobond Exchange that was announced in March 2016. *Id.* ¶¶ 52-55. There are no allegations in the Indictment to suggest that Mr. Chang had any knowledge or involvement with the Eurobond Exchange, which is alleged to have been undertaken by Credit Suisse, Investment Bank 1, two other individuals who were former bankers and then worked for a Privinvest subsidiary, and other bankers. *Id.* ¶ 54. The exchange involved Eurobonds issued directly by the Mozambique government. The Indictment does not allege any bribes or kickbacks exchanged in connection with the Eurobond Exchange. The Indictment alleges that the documents issued in connection with the Eurobond Exchange were false and misleading about Mozambique's creditworthiness and corruption risk because the documents did not disclose information Credit Suisse had about a difference between the price Privinvest charged EMATUM for the 27 boats in that project and the fair market value of those boats. *Id.* ¶ 54.

## ARGUMENT

Pretrial challenges to the sufficiency and specificity of an indictment are appropriate "if the basis for the motion is reasonably available and the motion can be determined without a trial on the merits." *See* Fed. R. Crim. P. 12(b)(3)(B)(iii), (v). In deciding a pretrial motion to dismiss, the "indictment must be read to include facts which are necessarily implied by the specific allegations made." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (internal quotation marks and citation omitted);*United States v. Gasperini*, 2017 WL 2399693, at *2 (E.D.N.Y. June 1, 2017) (NGG).

**I.      Counts One and Two Should Be Dismissed Because They Fail to State a Claim After *Ciminelli v. United States*, 598 U.S. 306 (2023).**

**A. Count One's Conspiracy to Commit Wire Fraud Is No Different From *Ciminelli*'s Alleged Bribery and Kickback Scheme Charged Through the Wire Fraud Statute.**

In *Ciminelli v. United States*, the Supreme Court eliminated the Department of Justice's ability to prosecute individuals for wire fraud and securities fraud (as well as conspiracy to commit wire and securities fraud) based on an allegation that a defendant deprived a "victim" of "potentially valuable economic information" "necessary to make discretionary economic decisions," or what has been dubbed the "right-to-control" theory. 598 U.S. at 317. That theory—when it was viable—enabled the government to criminalize schemes that "affected the victim's economic calculus or the benefits and burdens of the agreement, pertained to the quality of services bargained for, or exposed the victim to unexpected economic risk" specifically in the context of bribery or kickback allegations. *Id. Ciminelli*, however, put an end to this practice explaining that the right-to-control theory is "inconsistent with the structure and history and of the federal fraud statutes" (*id*. at 315) and therefore "invalid under the federal fraud statutes." *Id.* at 317.

The facts in *Ciminelli* are in all material respects identical to the bribery and kickback scheme alleged here. *Ciminelli* involved an alleged bribery and kickback scheme in New York arising from a public works project– the "Buffalo Billions" project. There, a group of politically influential individuals designed the criteria for the project to ensure a specific construction company (LPCiminelli) would receive the contract for a $750 million project by disqualifying potential competitors. *Id.* LPCiminelli secured these contracts through its political connections: it paid a lobbyist $100,000 to $180,000 each year to help it obtain state contracts, including for the Buffalo Billions project. *Id*. at 310.

The Indictment here explicitly alleges that Mr. Chang and his alleged coconspirators deprived investors of potentially valuable economic information necessary to make discretionary economic decisions with respect to the purchase of Proindicus syndicated loan and the EMATUM LPNs.[7] Specifically, the Indictment alleges that Mr. Chang deprived United States investors of information about Privinvest's payments to employees and former employees of Credit Suisse and Mozambique government officials and how those funds would be used. The Government has affirmed that any questions posed in its letter request for a bill of particulars could be found in the trial transcript and exhibits from the trial of Boustani.[8] Consistent with this Government disclosure, at the trial of Mr. Boustani, the Government presented its case in chief explicitly on the right-to-control theory—and nothing else. The Government laid out its evidence against the defendants by highlighting investors who testified that they were unaware of these alleged payments and would not have invested in the syndicated loan or loan participation notes if they had known. *See* Ex. 8 to Ford Decl. (excerpts from Boustani Trial Transcript). During the Government's summation, the AUSA explained that the crime was "that the investors did not know about the bribes and kickbacks. You have heard investor after investor testify. No one would have invested in these loans if they knew about the bribe kickbacks." *Id.* at 4695. As the Government just recently explained to this Court during a recent appearance in this case: "[] it is a violation of U.S. law to conspire to fraudulently induce bond purchases within the United

---

[7] As noted above, Mr. Chang left his post as Minister of Finance on January 1, 2015, at which point he had no further involvement in any of conduct alleged in the Indictment. The Eurobond Exchange indisputably occurred sixteen months since he last had any involvement whatsoever in any activity related to these projects. Any allegations based on the Eurobond Conspiracy are likewise based on a right-to-control theory and must be dismissed for similar reasons.

[8] On January 24, 2024, counsel for Chang sent the Government a letter requesting information it would otherwise seek in a bill of particulars. After several telephonic and email meet and confers the Government represented that the answers to our questions were answered by the Trial Transcript and Government Exhibits in the Jean Boustani trial and that the proofs would be the same as in the Boustani trial. Based on this representation, Mr. Chang does not seek to compel a bill of particulars.

States by means of false assurances that foreign bribes would not be paid, as charged in the indictment."[9] (Dkt. 520). This is the epitome of right-to-control theory. While the conspiracy to commit wire fraud allegations in the Indictment might have survived pre-*Ciminelli*, these counts cannot now survive the Supreme Court's pronouncements in that case.

This Court would *not* be the first to dismiss wire fraud charges following *Ciminelli*. For example, in *United States v. Nordlicht*, the court vacated the wire fraud convictions of defendants accused of lying to investors about whether bondholders who voted in a consent solicitation were affiliated with the issuer and thus prohibited from voting because *Ciminelli* "rejected the notion that nondisclosure of a conflict could serve as the basis for a wire fraud conviction"). 2023 WL 4490615, at *6 (E.D.N.Y. July 12, 2023); *see also Binday v. United States*, 143 S. Ct. 2491 (2023) (reversing the denial of post-conviction relief for defendants convicted on a right-to-control theory).

At no point does the Indictment allege the deprivation of any traditional property interest. The Indictment alleges that Privinvest gave kickbacks to Credit Suisse employees (and former employees) and bribed Mozambican government officials and that Credit Suisse did not disclose these events in the relevant offering circulars drafted by other Credit Suisse employees. As such, the Government alleges these supposed bribes and kickbacks were not disclosed to investors. Ind. ¶ 24.[10] But as the Supreme Court has now made clear, knowledge of the supposed kickbacks and bribes is the archetype of "economically valuable information" that cannot form

---

[9] To the extent the Government attempts to reframe its case, this charge would not relate back to the original Indictment and would be time-barred.

[10] The Indictment also alleges that the "co-conspirators" deprived investors of information about "the use of loan proceeds" but this is just a restatement of the same theory since the only purported misuse of loan proceeds is for the alleged kickbacks and bribes. Indictment ¶ 24-25. Further, the Indictment alludes to misrepresentations regarding "the amount and maturity dates" of Mozambique's debt and its "ability and intention to pay back the investors" but includes no factual allegations to support this theory, and again is also merely "economic information." *Id.*

the basis of wire (and securities) fraud counts. The Government's allegations that this information would have assisted investors in determining whether the risk of investing in these entities, is the precise "right-to-control" theory that the Supreme Court invalidated in *Ciminelli*.[11]

### B. Count Two's Securities Fraud Conspiracy Count Should Also be Dismissed because the Second Circuit Has Confirmed *Ciminelli* Applies to Securities Fraud Cases.

The Supreme Court's rejection of the "right-to-control" theory in the context of the wire fraud statute applies with equal force to a charge for conspiracy to commit securities fraud in this Circuit. Although *Ciminelli* did not involve a securities fraud charge, the Supreme Court was explicit that its holding rejecting the right-to-control theory was not limited to wire fraud and applied to the "federal fraud statutes" as a whole. *Ciminelli*, 598 U.S. at 309, 314-16. Just this October, the Second Circuit interpreted this language to hold that *Ciminelli* applies with full force to securities fraud (and conspiracy to commit securities fraud). *SEC v. Govil*, 86 F.4th 89 (2d Cir. 2023). In *Govil*, the Second Circuit vacated a disgorgement award against a defendant who represented to investors that he would use proceeds from securities offerings to satisfy a company's outstanding debts and for general corporate purposes, but instead diverted over $7.3 million to his private account. *Id.* at 93. Investors were "thus denied the right to make an informed decision when considering whether to make the investment," but any finding that investors were a victim of securities fraud "without determining whether those investors suffered

---

[11] Since the Government commenced this case after the convictions between the July 2018 convictions in *Ciminelli* and the Supreme Court's May 2023 decision, it did not have the benefit of *Ciminelli* when it first commenced this proceeding.  But the Government should have immediately dropped the conspiracy to commit wire fraud count against Mr. Chang after the Supreme Court issued *Ciminelli* and the conspiracy to commit securities fraud count after *SEC v. Govil*. The Government should not have continued to detain Mr. Chang under a discredited theory.

pecuniary harm" was a reversible error. *Id.* at 105. Rather, like other fraud statutes, a successful allegation of securities fraud requires showing harm to a traditional property interest.

Like the conspiracy to commit wire fraud allegations, here, the Indictment's theory of conspiracy to commit securities fraud is merely that the alleged coconspirators deprived investors of information about the role of bribery in their investment in EMATUM in two supposed securities—the LPNs and the Eurobonds (sixteen months after Mr. Chang left his post). Even assuming there were kickbacks and bribery, and such kickbacks and bribery were not included in the offering circulars drafted by Credit Suisse without Mr. Chang's knowledge or input, such a denial of potentially valuable economic information is not actionable under the federal wire and securities fraud statutes. There is no stronger basis here for a supposed violation of securities laws than there was in *Govil*: both cases merely feature a supposed lie about the purported diversion of investor funds. Even if investors would consider this information to be material, it is not sufficient without an underlying deprivation to investors of their property rights or intent to defraud them of these rights. The Indictment here fails to allege either.

Investors in the LPNs and Eurobonds received precisely what they bargained for: an investment in a Mozambique-based fishing and security operation backed by the Mozambique government. The deprivation of information about the supposed bribes does not provide a basis for a securities fraud conspiracy charge here, regardless of whether this information would have been economically valuable to investors.

## II. Count Two Should Be Dismissed Because It Impermissibly Applies Securities Fraud Extraterritorially.

### A. Count Two Fails to Allege Irrevocable Liability in the United States.

It is a basic premise of our legal system that, in general, "United States law governs domestically but does not rule the world." *Microsoft Corp. v. AT&T Corp.,* 550 U.S. 437, 454

(2007). In 2010, the Supreme Court established unequivocally that § 10(b) has no extraterritorial application in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 265 (2010). The Court reasoned that in the absence of any indication that Congress intended for §10(b) to apply extraterritorially, the presumption against extraterritoriality dictates such conclusion. Accordingly, *Morrison* ruled that unless the suit is predicated on either a domestic securities transaction or a transaction in a domestically listed security, §10(b) does not apply. *Id.* at 267.

The Second Circuit decision in *Absolute Activist* elaborated on that standard: for "securities that are not traded on a domestic exchange," a transaction is considered "domestic if irrevocable liability is incurred or title passes within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto* ("*Absolute Activist*"), 677 F.3d 60, 67 (2d Cir. 2012).[12] In other words, for a transaction to qualify as domestic, either (1) the purchaser must have "incurred irrevocable liability within the United States to take and pay for a security, or ... the seller [must have] incurred irrevocable liability within the United States to deliver a security," or (2) legal title to the security must have transferred in the United States. *Id.* at 68; *In re Petrobras Securities*, 862 F.3d 250 (2017).

In its Indictment against Mr. Chang, the Government simply alleges that "Investors irrevocably committed themselves in the United States to invest millions of dollars in the loans," and that "[c]ertain investors irrevocably committed themselves in the United States to purchase EMATUM loan participation notes, and certain sellers irrevocably committed themselves in the United States to sell EMATUM loan participation notes to United States investors." Ind. ¶¶ 23, 42. But "[a]bsent factual allegations suggesting that the Funds became irrevocably bound within

---

[12] There is no allegation in the Indictment that either the Proindicus syndicated loan, the EMATUM LPNs, (or the Eurobond Exchange) traded on a domestic exchange, nor, as a matter of indisputable fact, did they.

the United States or that title was transferred within the United States, including, but not limited to, facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money, the mere assertion that transactions 'took place in the United States' is insufficient to adequately plead the existence of domestic transactions." *Absolute Activist*, 677 F.3d at 70. Further, in *Banco Safra S.A.-Cayman Islands Branch v. Samarco Mineracao S.A.*, the Second Circuit rejected the plaintiff's argument that using U.S. dollars or New York bank accounts to purchase bonds was sufficient to establish a "domestic transaction." 849 F. App'x 289, 294 (2d Cir. 2021); *see also United States v. Vilar*, 729 F.3d 62, 77 n.10 (2d Cir. 2013). As such, the Indictment does not properly allege irrevocable liability.

### B. Count Two Should Be Dismissed Because It Does Not Allege a Domestic Securities Transaction.

Even if the Government had adequately alleged "irrevocable liability" by a U.S. investor, that allegation alone is not sufficient to allege a "domestic securities transaction"—a prerequisite for §10(b) to apply extraterritorially. The Second Circuit in *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE ("Parkcentral")* carved out an exception to "domestic transactions," where claims—like those alleged by the Government here—are "so predominantly foreign" that the Exchange Act should not be applied. 763 F.3d 198 (2014). Based on the facts in *Parkcentral*, the Court concluded that "while that case unmistakably made a domestic securities transaction . . . necessary to a properly domestic invocation of §10(b), such a transaction is not alone sufficient to state a properly domestic claim under the statute." *Id.* at 215. The Court was explicit that "a rule making the statute applicable whenever the plaintiff's suit is predicated on a domestic transaction, regardless of the foreignness of the facts constituting the defendant's alleged violation, would seriously undermine *Morrison's* insistence that §10(b) has no extraterritorial application." *Id.*

In *Parkcentral*, investors in equity swaps pegged to the price of Volkswagen stock sued under Section 10(b), alleging that defendants made misleading statements that sought to hide their intentions to take over Volkswagen. *Id.* at 201-02. All of defendants' misconduct occurred in Germany, and Volkswagen stock only traded on European stock exchanges. *Id.* The Court assumed without deciding that the equity swaps at issue there were "domestic transactions" under Section 10(b), but nonetheless dismissed the claims because the facts in that case rendered the suit "predominately foreign." *Id.* at 216. The Court reasoned that allowing the lawsuit "would permit the plaintiffs, by virtue of an agreement independent from the reference securities, to hale the European participants in the market for German stocks into U.S. courts and subject them to U.S. securities laws." *Id.*

Under the *Parkcentral* analysis, the Government has not alleged facts of a "a domestic transaction" sufficient to overcome the fundamental rule that § 10(b) has no extraterritorial application. None of the actors in the alleged scheme, including Mr. Chang, are United States persons. Nor had a single one of them—prior to being arrested outside of America and brought here to be tried under U.S. laws by a U.S. jury—ever set foot in this country.[13]  As discussed above, the Indictment only alleges foreign conduct involving foreign actors. Like the underlying assets in *Parkcentral*, the EMATUM Offering Circular sent to investors was connected to an entirely foreign underlying asset.

The Government's reliance on the alleged misstatements to U.S. investors is equally insufficient to overcome the presumption against applying Section 10(b)-5 extraterritorially. The Indictment alleges that "Credit Suisse sent potential investors, including United States investors,

---

[13] The first Superseding Indictment alleges the "Minister of Finance" traveled to New York City in 2016 in connection with the Eurobond Exchange.  That was not a reference to Mr. Chang, who by that time had not had any involvement in these events since December 31, 2014, but instead refers to his successor, the current Prime Minister of Mozambique.

materials that included the EMATUM loan agreement and an offering circular" "[b]y email and other electronic means," and that "[c]ertain investors irrevocably committed themselves in the United States to purchase EMATUM loan participation notes" "[i]n reliance on the representations in the loan agreement and offering circular." Ind. ¶¶ 41, 42. But *Parkcentral* found similar facts insufficient to establish a "domestic transaction," even though the statements at issue in *Parkcentral* were "accessible in the United States and were repeated here by the defendants[.]" 763 F.3d at 201.

Indeed, the Supreme Court concluded in *Morrison* that the statute does not apply to frauds in connection with foreign securities transactions, even if those frauds involve domestic misrepresentations. 561 U.S. at 266. And the Second Circuit reaffirmed this rule in *Cavello Bay Reinsurance v. Stein*, where the Court dismissed the Section 10(b) claim, notwithstanding that the claim concerned alleged misstatements emanating from New York and a subscription agreement countersigned by the defendants in New York. 986 F.3d 161 (2021). In reaching its conclusion, the Court reasoned that "Cavello Bay seeks access to a domestic forum and judicial resources; but the transaction is structured to avoid the bother and expense (and taxation) of U.S. law. If either of these sophisticated institutional investors had wanted the regulatory hand of U.S. law, they could have bargained for it and structured a U.S. transaction." *Id*. at 167. This reasoning—and the law of this Circuit—renders the alleged misstatements made in the EMATUM Offering Circular as well as any alleged misstatement made in connection with the exchange of the EMATUM LPNs entirely too foreign to fall within the gambit of Section 10(b)-5's limited domestic reach. Ind. ¶ 26.

The law of this Circuit similarly does not recognize the government's allegation—that "Surjan Singh met with CHANG and told him that the EMATUM loan would be a public capital

markets transaction and sold to international investors"—as sufficient to justify applying [§10(b)] to wholly foreign conduct. Ind. ¶ 59(c). It "would require courts to apply [§10(b)] to [] activity clearly subject to regulation by foreign authorities solely because a plaintiff in the United States made a domestic transaction, even if the foreign defendants were completely unaware of it"—a scenario precluded by *Parkcentral*'s holding. *Parkcentral*, 763 F.3d at 215. Specifically, here, the first page of the EMATUM Offering Circular made clear that "[t]he Notes have not been and will not be registered under the Securities Act and, subject to certain exceptions, ***may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons***…" Ex. 3 at pg. 1 (emphasis added) As to Mr. Chang, a Mozambique citizen and former dignitary of his country, the Government asks this Court to allow it to proceed with charging him with a violation of U.S. securities laws based on the alleged purchase of U.S. investors—despite that Mr. Chang was completely unaware of any such purchase, even accepting the allegations in the Indictment as true. The *Parkcentral* Court addressed exactly this factual scenario, concluding:

> Although we recognize that the plaintiffs allege that the false statements may have been intended to deceive investors worldwide, we think that the relevant actions in this case are so predominantly [foreign] as to compel the conclusion that the complaints fail to invoke § 10(b) in a manner consistent with the presumption against extraterritoriality. *Morrison*, 561 U.S. at 266. The complaints thus fail to state a claim upon which relief may be granted.

763 F.3d at 216. This Court should reach the same conclusion here.

Lastly, the Government simply assumes that Mr. Chang violated Mozambican Anti-Corruption Legislation—the laws of his own country—without alleging which law he violated, and without there ever having been such a determination in a jurisdiction competent to render such a judgment. The Indictment simply lists payments from Privinvest to Mr. Chang from

October 2013 to December 2013, which it repeatedly calls "bribes or kickback payments" without any factual allegations to support these conclusory allegations.

Indeed, if Mr. Chang were a U.S. government official, he would be afforded rights under U.S. laws. Certainly, contributions to elected officials are not, by themselves, unlawful, unless such contributions are made in exchange for a statutorily proscribed *quid pro quo*, which *may* constitute unlawful bribery. *See United States v. Sun-Diamond*, 526 U.S. 398, 404–05 (1999); *cf. McCormick v. United States*, 500 U. S. 257, 273 (1991) (holding that elected official can commit Hobbs Act extortion for receiving campaign contributions only if payments are made "in return for an explicit promise or undertaking by the official to perform or not to perform an official act"). Under U.S. bribery laws (none with which Mr. Chang is charged), *e.g.*, 18 U.S.C. §§ 201(b), 666(a)(2), 41 U.S.C. § 52(2), "[t]he term 'kickback' means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to [enumerated persons] for the purpose of improperly obtaining or rewarding favorable treatment in connection with [enumerated circumstances]." The Government's conclusory allegations that monies sent to Mr. Chang from Privinvest were in violation of Mozambique law (without even specifying which law)—payments that very plausibly could have been made in compliance with U.S. laws if Mr. Chang were American, and based on the factual allegations in the complaint were made in compliance with Mozambique law (there are no allegations of any *quid pro quo*)—renders this case too foreign to overcome the presumption against extraterritoriality.

III.   **Counts One and Two Should Be Dismissed Because They Fail to State an Actionable Misstatement or Omission Under Federal Fraud Statutes, Are Applied in a Way That Does Not Provide Fair Notice, and Impermissibly Permit a Finding of Criminal Liability for a Standardless Sweep of Conduct.**

When the Government alleges wire and securities fraud, it must include in the Indictment specifically "what statements are alleged to be false, and in what respect they are false, in charges of criminal falsity." *United States v. Stringer*, 730 F.3d 120, 126 (2d Cir. 2013). In other words, where an element is based on a "material falsehood or an omission that amounted to a material falsehood," "the indictment must . . . allege what made the omission [or falsehood] criminal." *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000). This is because the "specification of how a particular element of a criminal charge will be met (as opposed to categorical recitation of the element) is of such importance to the fairness of the proceeding that it must be spelled out in the indictment[.]." *Stringer*, 730 F.3d at 126. Of course, "the quantum and type of factual specificity required in an indictment varies according to the charges alleged against the defendant." *United States v. Urso*, 369 F. Supp. 2d 254, 266 (E.D.N.Y. 2005) (NGG).

The fraud statutes must be applied in a way that gives a defendant fair notice that the conduct was illegal and cannot be applied in a way that permits a finding of criminal liability for a "standardless sweep" of conduct. *See Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983); *see also United States v. Benjamin*, 2022 WL 17417038 (S.D.N.Y. Dec. 5, 2022) (dismissing bribery and wire fraud charges on a motion to dismiss for lack of fair notice and failure to state a claim). "Where the legislature fails to provide such minimal guidelines, a criminal statute may permit a 'standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections." *Kolender*, 461 U.S. at 358. These issues are "properly dealt with on a motion to dismiss." *United States v. Bryant*, 556 F. Supp. 2d 378, 433 (D.N.J. 2008).

The Indictment includes four generic descriptions of alleged "misstatements and omissions" that form the basis of Counts One and Two: (1) the use of loan proceeds; (2) bribe and kickback payments to Mozambique government officials and bankers; (3) the amount and

maturity dates of debt owed by Mozambique, including the existence of the [two other] loans; and (4) Mozambique's ability and intention to pay back investors. The Indictment also alleges a fifth category of omission liability with the separate Eurobond Conspiracy. As discussed herein, none of these categories are specific enough to state a claim for securities or wire fraud, and as applied to Mr. Chang do not give him fair notice.

### A. "Use of Loan Proceeds"

Under the actual term of the agreements (as opposed to the Indictment's mischaracterization of them), EMATUM was to apply all amounts borrowed "towards the financing of the Project and the general corporate purposes of EMATUM." *See* Ex. 1 at § 3.1. The Indictment fails to allege how this is actionable fraud that could support conspiracy charges against Mr. Chang. As a matter of law, for something to be material, it must "be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome which, when it proves false or does not occur, forms the basis for a § 10(b) fraud claim." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG ("City of Pontiac")*, 752 F.3d 173, 185 (2d Cir. 2014); *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 101 (2d Cir. 2023) ("[T]he duty to disclose more [information] is triggered only when that which *is* disclosed is sufficiently specific to evoke a reasonable investor's reliance."). Moreover, there can be no omission liability absent a duty to disclose, which is also not alleged in the Indictment. *Menaldi v. Och-Ziff Capital Mgmt*, 164 F. Supp. 3d 568 (S.D.N.Y. 2016); *see also United States v. Stefan*, 687 F.3d 1104, 1108 (8th Cir. 2012) ("in order for a fraudulent disclosure to be actionable fraud . . . the duty to disclose must be independent of any duty

imposed by the contract"). "General corporate purposes" and "financing of the project" are far too vague to support a claim for an actionable misstatement.

Moreover, the EMATUM Offering Circular specifically stated that "Credit Suisse International is receiving an arrangement fee in respect of the Loan from each of the Borrower and Abu Dhabi Mar LLC (the "Contractor"), which is the contractor involved in the supply of fishing vessels to the Borrower as part of the Project (as defined in the Facility Agreement). The fee from the Contractor may be variable." Ex. 3 at pg. 9. The unspecified amount of fees to be paid by the Borrower and Abu Dhabi Mar LLC as part of the "general corporate purposes" were specifically articulated in the offering. See Ex. 3 at pgs. 15, 33. No reasonable investor was misled by the loan documents into believing that "all loan proceeds" were required to go exclusively to "the purchase of fishing infrastructure, comprising of 27 vessels, an operations centre and related training," because the documents did not say that. Mr. Chang—who is not alleged to have ever seen these documents, let alone drafted them—would not have had fair notice that this statement could give rise to criminal fraud.

### B. "Bribe" and "Kickback" Payments to Mozambique Government Officials and Bankers

The Indictment alleges that "the co-conspirators [] conspired to defraud investors and potential investors" through material misrepresentations and omissions relating to "bribe and kickback payments to Mozambique government officials and bankers," without articulating what those misrepresentations and omissions were. Ind. ¶ 23. The Indictment alleges that the loan agreement "prohibited improper payments in connection with the project, including payments that would violate the . . . FCPA, the UK Bribery Act, and the Mozambican Anti-Corruption Law." *Id.* ¶ 40. As discussed above, the EMATUM Loan Agreement did not contain a blanket

prohibition of bribery, and the Guarantees that Mr. Chang signed *expressly did not incorporate* those representations into the Guarantees. *See* Exs. 1-2.

Moreover, although the EMATUM Facility Agreement provided a blanket provision representing that the SPV would not violate anti-corruption laws under U.K., Mozambique, or U.S. law, this representation was equivocal. As discussed above, the EMATUM Facility Agreement stated that if either Credit Suisse or EMATUM learned that EMATUM had engaged in a Corrupt Act, the parties agreed that Credit Suisse and EMATUM would discuss the act or would take reasonable efforts to remedy it. *See* Ex. 1 at pg. 40, 41. Nowhere in the EMATUM Facility Agreement did the parties agree that investors would be notified if a Corrupt Act occurred. This sort of boilerplate provision is an unactionable compliance and policy-related statement, particularly because perfect compliance was never promised, or even contemplated, and the documents themselves did not state that Corrupt Acts would ever be disclosed to investors. *See, e.g., Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 103 (2d Cir. 2021) (bank asserted that it "strives to conduct our business in accordance with internationally recogni[z]ed principles in the area of anti-corruption"; court held that "no investor would take such statements seriously in assessing a potential investment because almost every bank makes these statements"); *In re Lottery.com, Inc. Sec. Litig.*, 2024 WL 454298, at *16 (S.D.N.Y. Feb. 6, 2024) (collecting cases); *In re Telfonaktiebolaget LM Ericsson Sec. Litig.,* 2023 WL 3628244, at *11 (E.D.N.Y. May 24, 2023) (holding that "Defendants' compliance- and policy-related statements are unactionable both because of their generality and because Defendants never promised perfect compliance.").

Indeed, EMATUM could not, by contrast, have *agreed to violate the law* in the contract. However, potential investors were duly warned of "risks relating to the Notes" on the second

page of the EMATUM Offering Circular, risks that included corruption by government officials and misuse of public funds. *See* Ex. 3 at 2.[14] And it is well settled that "'[d]isclosure is not a rite of confession,' and companies do not have a duty 'to disclose uncharged, unadjudicated wrongdoing.'" *City of Pontiac*, 752 F.3d at 184.

Additionally, the Indictment does not plead that this provision in the EMATUM Facility Agreement was false and misleading at the time it was made, much less that Mr. Chang was aware of the false and misleading nature of the EMATUM's representations therein. Under each of the credit facility agreements, the borrower was the SPV—EMATUM, Proindicus, and MAM. *See* Exs. 1, 4, and 6. Each of these SPVs was run by the Mozambique government through its security and intelligence service. The Indictment does not allege that EMATUM, Proindicus, or MAM paid bribes, and certainly does not allege that the Mozambique government, at the time the SPVs were created, knew or intended for the SPVs to engage in a Corrupt Act. Instead, the Indictment alleges that Privinvest, a foreign contracting company, paid money to Mr. Chang and others. The Indictment does not articulate how alleged payments from Privinvest to an account "for the benefit of" Mr. Chang, allegedly sent months after he signed the EMATUM Guarantee, rendered the credit facility agreements false and misleading when made, or that Mr. Chang believed he had violated the SPV's Corrupt Act provision (which he is not alleged to have ever seen, and which the document he signed on behalf of Mozambique expressly did not incorporate). Under these circumstances, there is no question that neither Mr. Chang nor the Republic of Mozambique made a false statement about EMATUM's payments.

And finally, much like the recent decision in *United States v. Benjamin,* 2022 WL 17417038 (S.D.N.Y. Dec. 5, 2022), the Government seems to plead as a foregone conclusion—

---

[14] The Government seems to suggest that omission of these risk factors is a "material omission," thereby tacitly acknowledging that enumerating such risks, cannot also serve as an omission under its own theory.

without any supporting allegations—that Mr. Chang or the SPVs somehow violated the FCPA, UK Bribery Laws, or Mozambican Anti-Corruption Legislation, without there ever having been any such determination or facts to support this allegation. Mr. Chang is not charged with any bribery charges in this case. He cannot be liable under the FCPA, and the Indictment is devoid of any particularity as to how or if he would have known that Mozambique SPVs were violating U.K. or Mozambique's laws, or that the SPV was participating in a "Corrupt Act," which in turn is defined as "any act or omission which would in the ordinary course of business be understood to be corrupt, wrongful, dishonest or criminal in nature."[15] And, again, the remedy under the agreements if a Corrupt Act was revealed was to discuss it between Credit Suisse and the SPV.

## C. "Amount and Maturity Dates of Debt Owed by Mozambique"

The Indictment does not sufficiently allege what was misleading about the amount and maturity dates of debt owed by Mozambique, including the existence of loans extended in the Proindicus and MAM projects. *Ark. Tchr. Ret. Sys.*, 77 F.4th at 101 ("[T]he duty to disclose more [information] is triggered only when that which *is* disclosed is sufficiently specific to evoke a reasonable investor's reliance."). But "importance and materiality are not synonymous." *City of Pontiac*, 752 F.3d at 185. To be "material," "the alleged misstatement must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome which, when it proves false or does not occur, forms the basis for a § 10(b) fraud

---

[15] *See* Ex. 1 at 3. "Corrupt Act" is defined as: (a) an offering of any payment to improperly influence the person concerned; (b) offering or giving of any advantage to influence the action of a person holding public office; (c) any act which improperly influences or is intended to improperly influence the procurement process; or (d) any act(s) of a similar nature to those described in paragraphs (a) – (c) which has been found or is likely to be found by a court in any competent jurisdiction to constitute an offence under any applicable law. Provision (e) refers to any violation of the FCPA, UK Bribery Act, and Mozambique Anti-Corruption Legislation, collectively referred to as the "Anti-Corruption Laws," referring back to the term defined under the agreement.

claim." *Id.* (finding representations that bank prioritized "adequate diversification of risk" was "too open-ended and subjective" to constitute an actionable guarantee that would be material). "As a general rule, omissions are actionable under § 10(b) only when a corporation has a duty to disclose." *Menaldi*, 164 F. Supp. 3d at 579 (citing *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015)). "Such a duty arises when (1) a statute or regulation requires disclosure or (2) disclosure is necessary to avoid rendering existing statements misleading by failing to disclose material facts." Here, the Indictment fails to allege what makes these omissions criminal fraud. *Accord Pirro*, 212 F.3d at 93. The Indictment does not allege how this information (or what specifically information was required), nor does it allege what existing statements were misleading by way of this allegedly omitted information. *City of Pontiac*, 752 F.3d at 185 (representations that company prioritized adequate diversification of risk was too open-ended and subjective to constitute a guarantee that the company would not undertake specific risk limits). This cannot form the basis of federal securities fraud.

### D. "Mozambique's Ability and Intention to Pay Back Investors"

The Indictment does not allege what was false or misleading about the documents' representations about Mozambique's ability or intention to pay back investors. The Second Circuit has made clear that "[d]isclosure is not a rite of confession,' and companies do not have a duty 'to disclose uncharged, unadjudicated wrongdoing.'" *Id.* at 184. The fraud laws "do not require the people in charge of an enterprise to take a gloomy, fearful, or defeatist view of the future, and instead allow them to be confident about their stewardship and the prospects of the [entity] they manage." *In re Philip Morris Int'l Sec. Litig.*, 89 F.4th 408, 420 (2d Cir. 2023). The Second Circuit "do[es] not recognize allegations of 'fraud by hindsight.'" *City of Pontiac*, 752 F.3d at 188. There are no allegations in the Indictment that would support this as a material

misstatement or omission as a matter of law. The Indictment alleges *nothing* to suggest that Mr. Chang knew when he was instructed to guarantee the loans that the entire Republic of Mozambique had no "ability" or "intention" to pay back the loans, nor is it alleged that he knew that the projects would default. Payments were made on each of the loans during his tenure and for years following Mr. Chang's departure as the Minister of Finance. Given this, there is no factual predicate for the allegation that Mozambique did not have the "ability" or "intention" to pay the loan when the guarantee was signed. At the very least, the Indictment alleges Mozambique had the intention and ability to pay for the entirety of Mr. Chang's post and for years after.

This sort of allegation also invites the vague "standardless sweep" of enforcement that courts have rejected. *See, e.g., Bryant*, 556 F. Supp. 2d at 432 (rejecting allegation that there was a fraudulent misrepresentation because defendant purportedly "did little or no legitimate and meaningful work" as standardless and vague because there would be no standard by which the defendant could know what was sufficiently "legitimate and meaningful"). What intention must have been "enough" of an intention for this not to be international securities fraud? What did Mozambique need to do to have sufficient ability according to these prosecutors? This allegation is impermissibly vague and does not state a claim.

### E. Credit Suisse's Failure to Disclose Information About the Price of Boats Purchased In Connection With the Project (the Eurobond Conspiracy).

The Indictment alleges further that people unrelated to Mr. Chang years after he left his position as Finance Minister prepared unspecified "documents" in 2015 or 2016 that did not disclose information about the price of boats. Ind. ¶ 54. According to the Indictment, the omitted price information about 27 boats is an example of the documents' false and misleading statements about Mozambique's creditworthiness and risk of corruption. This fails to state a

scheme to defraud and securities fraud as a matter of law. It is unclear how a price dispute about 27 boats (that Mr. Chang is not alleged to have any involvement in) gives rise to liability for unidentified statements about Mozambique's creditworthiness or corruption risk. Again, the Indictment does not explain whether this is an omission issue or a misleading statements issue, nor does it identify a duty that would render an omission actionable. Additionally, "an opinion statement about the interpretation of data is not misleading simply because the speaker knows, but fails to disclose, some fact cutting the other way." *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th at 423. This standardless sweep of conduct does not state criminal fraud.

IV. **Count Three Should Be Dismissed Because It Fails to State a Claim and Fails to Allege Jurisdictional Facts.**

A. **Count Three Should be Dismissed Because the Statute Expressly Disclaims Jurisdiction Over Foreign Nationals Like Mr. Chang.**

This Court lacks jurisdiction over Mr. Chang to adjudicate the money laundering charge against him because he is a non-U.S. citizen and his conduct did not occur in the United States. Title 18, United States Code, Section 1956(f) limits the extraterritorial application of the statute when it is applied to foreign nationals like Mr. Chang. Specifically, the statute limits extraterritorial application to only those situations where "in the case of a non-United States citizen, the conduct occurs in part in the United States." 18 U.S.C. § 1956(f)(1). Importantly, "when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms." *RJR Nabisco, Inc. v. Eur. Cmty.,* 579 U.S. 325, 339 (2016) (quoting *Morrison,* 561 U.S. at 265).

Because Mr. Chang is not a U.S. citizen, nor did he ever step foot in the United States during the relevant time, this issue hinges on whether his "conduct" occurred in part in the United States. While the statute contains several definitions, it does not define what the noun

"conduct" is intended to include. Merriam Webster defines "conduct" as "a mode or standard of personal behavior especially as based on moral principles" or "the act, manner, or process of carrying on." *Conduct*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/conduct (last accessed Feb. 14, 2023).

Here, the Indictment fails to allege the requisite jurisdiction required by Section 1956(f) because the Indictment does not allege that Mr. Chang's conduct prohibited by Section 1956 occurred, in part, in the United States. First, the Indictment does not allege that Mr. Chang conspired with any U.S. citizen who engaged in conduct prohibited by Section 1956. Nor does the Indictment allege that the conduct that is alleged to violate the money laundering statute—initiating or concluding a transaction—occurred in the United States. There are no allegations that anyone conspired to launder money to or from the United States, or that the agreement was undertaken while coconspirators were located in the United States. The Indictment alleges that other alleged coconspirators visited New York once, years after Mr. Chang left his post and does not allege Mr. Chang had any involvement in anything after December 31, 2014. Because the Indictment fails to allege conspiracy to engage in prohibited conduct in the United States, this count fails to state a claim as a matter of law.

This case is similar to *United States v. Lloyds TSB Bank PLC*, 639 F. Supp. 2d 314 (S.D.N.Y. 2009). There, the court found that it lacked extraterritorial jurisdiction over a foreign bank for foreign conduct under the same statute the Government has charged Mr. Chang with here. There, the Court specifically addressed the notion that proceeds transferring through a New York bank account could confer subject matter jurisdiction and rejected it outright:

> The Government places a faint reliance on the fact that some of the proceeds eventually transferred to or from the Bank's accounts may or did pass electronically through the New York banking system. This peripheral and transitory contact with

the United States counts for nothing in *forum non conveniens* analysis . . . ***and fare no better in subject matter jurisdictional analysis***.

*Id.* at 314 n.4 (emphasis added). The Court noted further that the rule of lenity "would appear . . . if applied to reach of the MLCA's extraterritorial jurisdiction, would support the Bank's contention that it cannot reach that far."  *Id.* n.7.

Any wires running through the Eastern District of New York is certainly not "conduct" by Mr. Chang that would warrant extraterritorial jurisdiction over him for a money laundering conspiracy charge. The extraterritorial provision was designed to prohibit transfers by defendants from the United States or to the United States—Mr. Chang is alleged to have done neither and is not alleged to have agreed with anyone to perform this transaction. Because this is a necessary implicit part of the offense and is not pleaded with any precision, and being mindful that the Second Circuit's presumption against extraterritoriality must limit the reach of the statute to its express terms, this claim must be dismissed.

**B. Count Three Should be Dismissed Because the Indictment Fails to Properly Allege "Unlawful Activity," That Any of the Funds Were Derived From Specified "Unlawful Activity," and Violates Due Process Because It Fails to Allege Facts to Provide Mr. Chang Notice of Purported Violations of Mozambique Law.**

Count Three fails to properly state a claim and provide sufficient notice of said claim to Mr. Chang because it fails both to allege "unlawful activity," as it must, and also fails to allege that Mr. Chang knew that the funds were from something derived from "unlawful activity," which is required under the statute. Section 1956 requires a defendant to know that: (1) the funds involved represented the proceeds of "unlawful activity" and the transaction was designed to conceal the proceeds of specified "unlawful activity," or (2) the transaction was intended to promote a specified "unlawful activity." *See* 18 U.S.C. § 1956(a)(2)(A) & (2)(B). Section

1956(c) specifically defines "unlawful activity" as "activity that constitutes a felony under State, Federal, or foreign law." *Id.* § 1956(c)(1). The Indictment fails to allege any facts in this regard.

"That the money is represented to be the proceeds of one of the listed, illegal sources is, of course, *essential to culpability*." *Stavroulakis*, 952 F.2d at 691(emphasis added). Here, similarly to the defendant's status as an alien in *Rehaif v. United States*, the "status" of the funds actually being from "unlawful activity," "is the 'crucial element' separating innocent from wrongful conduct." 139 S. Ct. 2191, 2197 (2019). This is because "[w]ithout knowledge of that status, the defendant may well lack the intent needed to make his behavior wrongful." *Id.*

But here, the Indictment fails to allege that Mr. Chang *knew* that the property involved in these transactions was from an "unlawful activity" that constitutes a felony, nor does the Indictment properly allege that it was, in fact, from a specific "unlawful activity" that is a felony. The Indictment alleges that the purported "unlawful activity" include various "offenses against a foreign nation involving the bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official, in violation of Mozambique law," but does not provide requisite specificity to establish that any of the violations were felonies under Mozambique law—and specifically fails to allege what Mozambique felony law was violated. Additionally, the Indictment does not allege, as it must, that the purported violations under Mozambique law were "offense[s] against a foreign nation," notwithstanding that this is required by Section 1956. 18 U.S.C. § 1956(c)(7)(B). The Indictment currently alleges generic terms that render Count Three unconstitutionally vague and does not state a claim.

The Government's failure to allege the specific Mozambique law is fatal. In *United States v. Pirro*, the Second Circuit made clear that "where the definition of an offence, whether it be at

common law or by statute, includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species—it must descend to particulars." 212 F.3d at 93 (quoting *United States v. Cruikshank*, 92 U.S. 542 (1875)). The Second Circuit was clear: "where an indictment charges a crime that depends in turn on violation of another statute, the indictment must identify the underlying offense." *Id*. And "for an indictment to fulfill the functions of notifying the defendant of the charges against him and of assuring that he is tried on the matters considered by the grand jury, the indictment must state some fact specific enough to describe a particular criminal act, rather than a type of crime." *Id.* Because the Indictment fails to allege what actions violated Mozambique law, it lacks the "factual particularity to ensure that the prosecution will not fill in elements of its case with acts other than those considered by the grand jury.'" *Urso*, 369 F. Supp. 2d at 266 (quoting *United States v. Walsh*, 194 F.3d 37, 45 (2d Cir. 1999)).

Here, the Indictment fails to properly allege with particularity a felony offense under Mozambique law that was an "offense against a foreign nation" that fits within the statutory definition of felony criminal "unlawful activity" for Count Three. The Indictment also does not specify what actions Mr. Chang took that purportedly violated a felony criminal law provision of Mozambique that is considered an offense against a foreign nation. Without these specifics, Mr. Chang is not properly notified of the conduct for which he is charged, and the Indictment fails to sufficiently allege "unlawful activity." *See Pirro*, 212 F.3d at 93*; accord Rehaif*, 139 S. Ct. at 2194 (holding in the context of Section 922(g) that the use of knowing to modify the status elements meant that the government must show that a defendant knew of his status as a felon).

This is not an academic argument—there is significant reason to doubt that the conduct alleged in the Indictment alleges a felony violation of Mozambique law, or a crime that

Mozambique considers to be "against a foreign nation." The allegations in the Indictment allege at best a misdemeanor under Mozambique law and are not offenses against Mozambique; accordingly, they do not state a specified unlawful activity. The Government cannot proceed forward without having to plead the statutory basis for this Specified Unlawful Activity ("SUA") and facts that if accepted as true, would rise to a felony under Mozambique's criminal law that Mozambique considers an "offense against" Mozambique. As currently pleaded, the Indictment is vague, does not protect against the Government filling in elements of its case with facts not considered by the grand jury, and does not state a claim.

> **C. The Money Laundering Conspiracy Charge Should Be Dismissed Because It Does Not Allege That Mr. Chang Conspired to Send Money To or From the United States, the Essential Nature of the Alleged Money Laundering Conspiracy.**

Count Three should also be dismissed because the Indictment does not allege Mr. Chang knowingly agreed to send money to or from the United States either to conceal true source of the money or to promote specified unlawful activity. "[A] general agreement to engage in unspecified criminal conduct is insufficient to identify the essential nature of the conspiratorial plan." *United States v. Rosenblatt*, 554 F.2d 36, 39 (2d Cir. 1977). A conspiracy defendant has "to know what kind of criminal conduct was in fact contemplated." *Id.* Here, "an essential ingredient" of the alleged conspiracy must be to send money to or from the United States for the purpose of promoting or concealing; without that portion of the plan, the intent to violate the money laundering statute "cannot exist." *See Ingram v. United States*, 360 U.S. 672, 677 (1959) (reversing conviction for conspiracy to evade taxes because while the defendants operated an illegal lottery under state law, there was no evidence that they knew of the tax liability); *accord Stavroulakis*, 952 F.2d at 692 (the "essential nature" of money laundering conspiracy is "an agreement to launder money"). To establish conspiratorial intent, a defendant's "knowledge must

be clear, not equivocal []. This, because charges of conspiracy are not to be made out by piling inference upon inference, thus fashioning . . . a dragnet to draw in all substantive crimes." *Ingram*, 360 U.S. at 680 (quoting *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943).

Here, the Indictment fails to allege that Mr. Chang knowing or intentionally entered into an agreement with anyone to transfer funds to or from the United States. Indeed, the only allegation involving Mr. Chang and funds is that Privinvest sent money from the United Arab Emirates to an account in Spain (allegedly for Mr. Chang's benefit), which are alleged to have gone "through the Eastern District of New York" somehow. Ind. ¶¶ 59 (i), (j), & (k). A money transfer between two foreign accounts that happens to go through the Eastern District of New York, without any knowledge by the defendant who is alleged to have conspired to violate Section 1956(a)(2)(A) by sending funds to or from the United States, is insufficient to plead that Mr. Chang knowingly agreed to violate Section 1956(a)(2)(A) and is the sort of impermissible "inference upon inference" that fashions "a dragnet to draw in all substantive crimes." *Ingram*, 360 U.S. at 680.

The Second Circuit has declined to hold that all transfers that go through the United States in any way, shape, or form sufficiently transfer "to" or "from" the United States. *See United States v. Ho*, 984 F.3d 191 (2d Cir. 2020). While the Court in *Ho* determined that some schemes that go through the United States might also be said to involve transfers that go to or from the United States, the facts of *Ho* are far different from the allegations in Mr. Chang's Indictment. *Ho* involved a defendant who sent bank information to his assistant that sent the wire transfer at issue to a U.S. correspondent account. *Id.* Here, by contrast, there is nothing in the Indictment to allege that Mr. Chang knew, much less agreed, that money would be sent either to or from or through the United States—he is not alleged to have seen the transfer or even received

the money. Without this knowledge, the Indictment fails to allege that Mr. Chang agreed to violate the money laundering statute that serves as the underlying conspiracy predicate.

V.   **Due Process Prohibits the Extraterritorial Application of Counts One Through Three to Mr. Chang.**

"Regardless of congressional intent, federal criminal statutes may only be applied extraterritorially where that application is consistent with due process requirements." *United States v. Gasperini*, 2017 WL 2399693, at *9 (E.D.N.Y. June 1, 2017) (NGG). "In order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." *United States v. Epskamp*, 832 F.3d 154, 168 (2d Cir. 2016). "For non-citizens acting entirely abroad, a jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests." *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011).

Here, there are no allegations in the Indictment that Mr. Chang's actions in signing loan guarantees on behalf of Mozambique was "aim[ed] . . . [at] caus[ing] harm inside the U.S. or to U.S. persons or interests," that would satisfy due process. *Gasperini*, 2017 WL 2399693, at *9. Quite the opposite, the loan guarantees say nothing of U.S. investors, and the facility agreements for the three SPV loans specifically say they will *not* be registered as U.S. securities. There is *nothing* in the Indictment that alleges a sufficient nexus between Mr. Chang and the United States for any three of these statutes, rendering their application entirely "arbitrary" and "fundamentally unfair." This is not a case involving international computer intrusions, terrorism, or piracy. *Accord United States v. Sidorenko*, 102 F. Supp. 3d 1124, 1133 (N.D. Cal. 2015) (noting that the government's attempt to analogize fraud and bribery case to terrorism cases was "troubling"). The Indictment contains no allegations that Mr. Chang's

activity was aimed to cause harm in the United States, to U.S. citizens, or to U.S. interests. Mozambique's decision to finance these projects through foreign banks using investment documents that expressly would not be registered in the U.S securities market is evidence of far the opposite. Here, Mr. Chang could never have reasonably anticipated being hauled into court in this country. The Indictment fails to allege a sufficient domestic nexus between Mr. Chang himself and the United States, and thus due process requires dismissal.

*Accord id*. at 1125-26.

> **VI. All Three Conspiracy Charges in the Indictment are Impermissibly Duplicitous Because They Lump Two Distinct Conspiracies Together, One With Which Mr. Chang is Not Alleged to Have Any Involvement, Violating the Well-Established Rule Articulated in *Grunewald*.**

Each of the three conspiracy counts combine two distinct schemes together. As highlighted throughout this brief, each of the conspiracy counts alleges fraud in connection with infrastructure projects undertaken by Mozambique-run SPVs, each of which Mr. Chang signed loan guarantee documents, and each of which he is alleged to have received "bribes" or "kickbacks" allegedly rendering the banks' investment documents false and misleading. These investment documents were circulated to investors and the loans were funded in 2013 and 2014, while Mr. Chang was the Minister of Finance of Mozambique (and thus able to bind the Mozambique government by signing the loan guarantees). The object of the alleged conspiracy (hereinafter, the "Infrastructure Conspiracy")—to dupe investors into investing in the infrastructure projects so Mr. Chang could receive bribe money—was complete by 2014 when the projects were financed by the banks, and certainly by December 31, 2014, when Mr. Chang left his position as Minister of Finance and no longer had any role official or unofficial with any of these projects.

But each of the three conspiracy counts impermissibly includes a distinct alleged scheme that occurred when Mr. Chang was not the Minister of Finance and was announced well over a year after the alleged Infrastructure Conspiracy had achieved its objective and Mr. Chang was no longer Finance Minister. The Indictment alleges that years after the original conspiracy, different individuals, not including Mr. Chang who had left his post a year and half prior, sought to conceal discovery of the Infrastructure Conspiracy, and allegedly convinced investors to exchange their investment notes for Eurobonds, the "Eurobond Conspiracy."

There is absolutely nothing in the Indictment that would support that when Mr. Chang allegedly joined the Infrastructure Conspiracy, his agreement also encompassed the agreement to one day several years later exchange the EMATUM LPNs for a Eurobond, *i.e.*, the Eurobond Conspiracy. The Indictment alleges the exact opposite, that the Eurobond exchange was undertaken several years later to avoid detection of the earlier scheme. The Eurobond Conspiracy is not alleged to help the Infrastructure Conspiracy and is not alleged to have been the result of any of Mr. Chang's conduct, loan guarantees by the Mozambique government, or the acceptance of any bribes or kickbacks. Each of the three counts inappropriately tries to combine the Infrastructure Conspiracy with the Eurobond Conspiracy to loop Mr. Chang in to a second conspiracy of which he had no involvement, rendering the counts impermissibly duplicitous.

"An indictment is duplicitous if it joins two or more distinct crimes in a single count." *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992). Rule 8(a) of the Federal Rules of Criminal Procedure requires that two or more offenses in an Indictment must be charged "in a separate count for each offense." *See* Fed. R. Crim. P. 8(a); *United States v. Rajaratnam*, 736 F. Supp. 2d 683, 687 (S.D.N.Y. 2010) ("Rule 8(a) requires separate counts for each charged offense."). Further, an indictment cannot charge multiple conspiracies in a single count. To prove

a single conspiracy, "the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001).

The Supreme Court has "repeatedly warned that [it] will view with disfavor attempts to broaden the already pervasive and wide-sweeping nets of conspiracy prosecutions." *Grunewald v. United States*, 353 U.S. 391, 404 (1957). There is, thus, an "established rule," that "once 'the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment.'" *United States v. Floyd*, 555 F.2d 45, 48 (2d Cir. 1977), *abrogated on other grounds by United States v. Brutus*, 505 F.3d 80 (2d Cir. 2007) (collecting cases and quoting *Grunewald*, 353 U.S. at 401-02). To rule otherwise "would wipe out the statute of limitations in conspiracy cases" and "extend indefinitely the time within which hearsay declarations will bind co-conspirators." *Floyd*, 555 F.2d at 48. *Grunewald* and its progeny "create[s] a barrier at the end of the conspiracy" once the main objectives of the conspiracy have been accomplished so as not to "blur the relatively clear line drawn by the Supreme Court's decisions on this subject." *Id.*

The absurdity of combining the Eurobond Conspiracy with the Infrastructure Conspiracy is revealed by a fair reading of the allegations regarding the two. *See* Ex. 9 to Ford Decl. (chart comparing allegations of both conspiracies). The Indictment alleges that sometime in 2015 (when Mr. Chang was no longer the Minister of Finance), the three separate SPVs run by Mozambique's Secret Service had problems servicing the debt and other Mozambique officials who are not identified as coconspirators "received inquiries from the IMF concerning the use of some of the loan proceeds." Ind. ¶ 52. The Indictment alleges that, in order to conceal discovery

of the scheme and hide things from the IMF, other coconspirators (again, not Mr. Chang) "proposed the Exchange," whereby the Mozambique government (again, not Mr. Chang) would issue Eurobonds directly in exchange for the loan participation notes. This "scheme" was announced in 2016—several years after the other three infrastructure projects had successfully obtained loan money from the foreign banks. Ind. ¶¶ 53, 54. The purpose ascribed to the Eurobond exchange was allegedly to cover up the other fraud scheme involving the three SPVs. The Indictment does not allege that any bribes or "kickbacks" were paid in connection with the Eurobond exchange. Nor does the Indictment identify a false statement made to investors in any of the Eurobond financing documents. Instead, the Indictment claims that the Exchange financing documents drafted by Credit Suisse were misleading by omission because they did not disclose that Privinvest had paid more than fair market value for boats.[16]

There is no question that the original alleged agreement contemplated by Mr. Chang as a part of the Infrastructure Conspiracy did not include the Eurobond Conspiracy. The Indictment itself alleges that coconspirators *other than Mr. Chang* came up with the Eurobond Conspiracy sometime in or after 2015 in response to the SPV's loan failures and IMF inquiries. The Eurobond Conspiracy, which developed long after Infrastructure Conspiracy's main objective was complete—to allegedly receive bribe money to successfully have loans financed, is precisely the type of subsidiary, separate conspiracy under *Grunewald* and its progeny, and renders each of the three counts duplicitous.

### A. Mr. Chang Will Be Prejudiced in Several Respects by the Duplicitous Counts.

Permitting the Government to proceed forward with each of its counts alleging the Infrastructure Conspiracy and the Eurobond Conspiracy will tremendously prejudice Mr. Chang

---

[16] As discussed above, that is not an actionable misstatement or omission under the federal fraud laws.

at trial. This is not a case where the Government could have charged Mr. Chang with stand-alone charges for the Eurobond Conspiracy. Mr. Chang had not been the Minister of Finance for Mozambique for over a year when the Eurobond exchange was announced, and the Indictment contains *zero* allegations to suggest that Mr. Chang had any involvement with the Eurobond exchange. Thus, if the duplicitous counts were permitted to proceed forward, Mr. Chang will be forced to defend against a transaction he had no involvement in whatsoever. *See United States v. Marcus Schloss & Co.*, 710 F. Supp. 944, 954 (S.D.N.Y. 1989) (noting that "[i]t would be unfair to require [the trial defendants] to explain and defend not only their own acts, but the acts of others"); *United States v. Gabriel*, 920 F. Supp. 498 (S.D.N.Y. 1996) (dismissing duplicitous count pretrial as violative of *Grunewald* and finding that defendant who had no role in second conspiracy would be prejudiced because he would be "linked for weeks to extensive testimony" about unrelated conspiracy in which he was a named defendant).

The Government will give the jury the inappropriate impression that Mr. Chang was involved in a conspiracy far longer than his actions are alleged, and he could improperly be convicted on the spillover effect of the jury hearing evidence of the Eurobond Conspiracy undertaken by other people long after Mr. Chang signed loan guarantees. *Accord United States v. Lech*, 161 F.R.D. 255, 257–58 (S.D.N.Y. 1995) (collecting cases and granting severance where defendant "had no involvement in the other schemes charged, and at most . . . . had cursory knowledge of the other criminal activities" of the other codefendants) (Sotomayor, J.). Additionally, Mr. Chang will be prejudiced because the Government will be permitted to introduce evidence of the Eurobond Conspiracy, including jurisdictional ties to the United States and venue in the Eastern District of New York, that it plainly lacks in support of the Infrastructure Conspiracy. *Accord Marcus Schloss & Co.*, 710 F. Supp. at 950 (noting that

evidence of second conspiracy would be irrelevant to first conspiracy). There is a high likelihood that Mr. Chang could be improperly convicted not on evidence of the Infrastructure Conspiracy, but instead on the basis of a mix of both conspiracies, one of which he had zero involvement in. Here, as in *Marcus Schloss*, "there is no reason to suspect, and every present reason to doubt, that [Mr. Chang] was a part of the [Eurobond Conspiracy]." 710 F. Supp. at 950.

**B. The Counts Should be Dismissed or the Government Should be Forced to Elect to Proceed Only on the Infrastructure Conspiracy and Forgo the Eurobond Conspiracy.**

Dismissal of duplicitous counts is appropriate. However, the Second Circuit has recognized that "courts have held that prior to a defendant's conviction, prejudice to the defendant can be avoided by having the government elect to proceed based upon only one of the distinct crimes included within a duplicitous count[.]" *United States v. Sturdivant*, 244 F.3d 71, 79 (2d Cir. 2001). Here, the prejudice that Mr. Chang faces at trial by the Indictment's combining the Infrastructure Conspiracy with the Eurobond Conspiracy can be alleviated by dismissing the portion of the Indictment that charges the Eurobond Conspiracy and striking those allegations from the Indictment. While this Court should dismiss the Indictment in its entirety, at the very least, dismissal of the Eurobond Conspiracy prior to trial is necessary to ensure that Mr. Chang is not prejudiced by the inclusion of evidence that deals with a conspiracy he is not alleged to have any involvement with and to avoid Mr. Chang being convicted on otherwise irrelevant evidence of the Eurobond Conspiracy.

**VII. Criminally Prosecuting a Foreign Government's Minister for Acts He Undertook in His Official Capacity For a Country's Geopolitical Decisions Violates Several Longstanding Tenants of American Jurisprudence.**

Here, the Indictment impermissibly challenges the official acts of several members of Mozambique's government undertaken for its country's defense on its own soil. On December

12, 2012, then Minister of Defense (now-President) Philipe Nyusi met with Mozambique's Minister of Interior, the Director of SISE (Mozambique's secret service and state intelligence agency), and others. *See* Ex. 10 to Ford Decl. (Memorandum of Meeting and accompanying translation). At the meeting, the government officials determined how to effectively implement a project to monitor and protect Mozambique's coastline, referred to as the "Zona Economica Exclusiva." *See id*. At that meeting, as reflected in the minutes, President Nyusi and others decided to create three private companies that would be run by Mozambique's defense and security forces. *Id.* The envisioned purpose of this entity was to sign financing agreements with potential financers to supply a monitoring system to protect the ZEE. *Id.*; Ind. ¶ 1 (Mozambique created special purpose vehicles that are the subject of the prosecution to accomplish projects "in Mozambique for and on behalf of Mozambique" related to the country's "coastal surveillance," "tuna fishing" and "shipyards.").

On January 8, 2013, the creation of Proindicus was announced in the Republic's official register. *See* Ex. 11 to Ford Decl. On January 14, 2013, in Maputo, Mozambique, President Nyusi wrote a letter to Mr. Chang, copying the Minister of the Interior and the Director of SISE. *See* Ex 12 to Ford Decl. (Letter from Nyusi to Chang and accompanying translation). The letter outlined that Mozambique's Defense and Security forces had analyzed several proposals to handle the protection of Mozambique's marine resources and infrastructures and found international financial institutions to grant loans to finance the solution. *Id.* President Nyusi stated that the defense forces had negotiated with Credit Suisse to finance the defense projects. *Id.* The letter from President Nyusi submitted Terms of Agreement between Mozambique and Credit Suisse and ordered Mr. Chang, "as representative of the Government of the Republic of Mozambique," to sign the term sheet. *Id.* As directed by now President Nyusi, Mr. Chang

ultimately signed the loan guarantees for these projects in his capacity and on behalf of the Republic of Mozambique. The financing documents, as highlighted above, were between foreign banks and the SISE-run SPVs, and were governed by U.K. law. For each of the guarantees, the Central Bank of Mozambique—a different government entity that is independent of the Ministry of Finance—also approved each of the guarantees (and increases thereto) because the country's leadership determined that these projects were necessary for the country's defense. *See, e.g.,* Ex. 13 to Ford Decl. (Approval of Proindicus loan increase by Central Bank of Mozambique and accompanying translation).

In 2013, Mozambique worked through recognizing the concerns discussed at now-President Nyusi's December 2012 meeting, and ultimately, Mozambique's Council of Ministers passed a decree titled "Integrated System of Monitoring and Protection Decree," (the "Decree") which was enacted into law on December 31, 2013, and published in Mozambique's register of laws. *See* Ex. 11 to Ford Decl. The Decree again recognized the need for defending Mozambique's national sovereignty and protecting Mozambique's people, resources, and assets. Specifically, the Council declared that the growth and development rates of Mozambique required Mozambique to have a modular and information system that would allow defense of Mozambique's national sovereignty. The Decree announced a monitoring and protection system called "SIMP," which would consist of satellites, radars, vehicles, boats, and aircraft, and decreed that the government could grant concessions for activities provided for in the scope of SIMP. The Decree mandated that the Ministers of Defense, Interior, and Finance sign contracts and regulate the application of the Decree. These projects were undertaken by Proindicus, MAM, and EMATUM referenced in the Indictment. The Indictment challenges Mozambique's SPV's work on the three projects, including the allocation of resources and money paid for certain

aspects of the projects, and ultimately alleges that the Republic of Mozambique lied to the worldwide community in creating the SPVs and guaranteeing the loans extended by foreign-headquartered banks.

The Indictment also contains allegations related to Mozambique's agreement with the International Monetary Fund (an agency of the UN) and challenges disclosures that Mozambique made to the IMF.  Ind. ¶¶ 18, 31, 53, 59(o).  The Indictment alleges further that, after Mr. Chang left his position as the Minister of Finance, other unidentified Mozambique governmental officials continued on with the separate Eurobond Conspiracy by completing a Eurobond Exchange selling bonds directly from Mozambique to hide the scheme from the IMF and the public. Ind. ¶¶ 53-54.

In short, the trial necessarily asks this Court to entertain a trial of the Republic's actions on the shoulders of Mr. Chang, and to sentence Mr. Chang to prison in America for acts the Republic decided to take to help its country's infrastructure.  Doing so would violate several doctrines that have guided our courts for over a century.

### A.  The Indictment Should be Dismissed Because Mr. Chang's Criminal Prosecution Violates Common Law Sovereign Immunity.

The Indictment alleges that Mr. Chang was, at all times he acted, the Republic of Mozambique's Minister of Finance. It also alleges his actions in signing the loan guarantees on behalf of the Republic were done in Mozambique and undertaken in his official capacity. "No principle of common law, ancient or modern, ever allowed actions against foreign sovereigns or their instrumentalities." *Goar v. Compania Peruana de Vapores*, 688 F.2d 417, 426 (5th Cir. 1982) (collecting cases). The Supreme Court has acknowledged that "the immunity of the foreign state extends to an individual for acts taken in his official capacity." *Samantar v. Yousuf*, 560 U.S. 305, 322 (2010).  More recently, the Supreme Court had the opportunity to declare that

common law sovereign immunity does not apply in criminal cases, but instead remanded a criminal case back to the Second Circuit to reexamine and determine whether a foreign bank owned by a sovereign can be criminally prosecuted or whether common law sovereign immunity prohibits such charges. *Turkiye Halk Bankasi A.S. v. United States,* 598 U.S. 264, 280-81 (2023).

The Second Circuit has acknowledged that "[c]ommon law recognizes the immunity of former foreign officials" for "acts performed in his official capacity." *Matar v. Dichter*, 563 F.3d 9, 14 (2d Cir. 2009) (quoting *Restatement (Second) of Foreign Relations Law of the United States* § 66(f) (Am. L. Inst. 1965); *see also Heaney v. Gov't of Spain,* 445 F.2d 501, 504 (2d Cir.1971) (plaintiff's concession that defendant was "at all relevant times 'an employee and agent of the defendant Spanish Government' " sufficed to dispose of the claim against the individual defendant). "In the absence of recognition of the claimed immunity by the political branch of the government, the courts may decide for themselves whether all the requisites of immunity exist." *Republic of Mexico v. Hoffman*, 324 U.S. 30, 34-35 (1945). In other words, "[d]istrict courts are empowered to determine common law sovereign immunity without input from the Executive Branch." *In re Terrorist Attacks on September 11, 2001*, 122 F. Supp. 3d 181, 186 (S.D.N.Y. 2015) (collecting cases). The Indictment alleges that Mr. Chang was at all times acting in his official role. Indeed, when the Eurobond Exchange took place (without Mr. Chang's involvement) the Government of Mozambique necessarily ratified the EMATUM guarantee signed by Mr. Chang.[17]

Historically, foreign officials have maintained absolute immunity from criminal prosecution for acts taken in their country in their official capacity on behalf of another sovereign. *See, e.g., Dow v. Johnson*, 100 U.S. 158, 165 (1879) (noting that it is "well settled

---

[17] Again, there are no allegations of bribery in connection with the Eurobond Conspiracy.

that a foreign army . . . stationed in [another country] by authority of its sovereign or government, is exempt from its . . . criminal jurisdiction" and there "would be something singularly absurd" in permitting criminal exposure); *Coleman v. Tennessee*, 97 U.S. 509, 515 (1878). This is consistent with international common law. *See* Ex. 14 at 12 (Brief of *Amicus Curiae* Professor Roger O'Keefe, *United States v. Turkiye Halk Bankasi A.S.*, 20-3499 (2d Cir. Dec. 12, 2023) (ECF No. 216) (noting that the "only other national court worldwide to address the issue," a French criminal court, has held that customary international law bars criminal proceedings against States and their agents).

In civil cases, the Second Circuit has recognized that courts can recognize sovereign immunity over foreign officials in certain categories of "political or public acts about which sovereigns have traditionally been quite sensitive," including the following: internal administrative acts; legislative acts; acts concerning the armed forces; acts concerning diplomatic activity; and public loans. *Heaney*, 445 F.2d at 503. The Second Circuit has rejected the concept that contracts by a government are private or commercial acts over which civil sovereign immunity does not apply. *Id.* at 503-04. Instead, the Second Circuit has focused on the underlying purposes of the contracted transactions. The two examples analyzed are pertinent here: "a contract by one government with an individual who agrees to generate adverse publicity against another in the contracting nation's hope that this will aid its initiatives to oust the second government from an area in which the contracting nation has a putative national interest—rather clearly falls within the fourth category of 'strictly political or public acts'" that are afforded sovereign immunity. *Id.* at 503. So, too "a contract by a foreign government for the purchase of bullets for its army or for the erection of fortifications" is also a sovereign act protected by sovereign immunity as opposed to a commercial transaction. *Id.* at 504.

Here, Mr. Chang is charged with conspiring to engage in wire fraud, securities fraud, and money laundering for signing loan guarantee documents on behalf of the Republic of Mozambique for loans taken out explicitly for Mozambique's national security for projects run by its Ministry of Defense and Secret Service. These are precisely the actions for which absolute sovereign immunity must apply.

Even if there could be a case where it would be appropriate to impute common law exceptions recognized in civil cases to the government's criminal prosecution of a foreign official, the conduct challenged by the Indictment is squarely within the type of "political or public acts about which sovereigns have traditionally been quite sensitive." *Id.* at 503. The Indictment challenges the Mozambique government's procurement and use of loans guaranteed by the Republic and ultimately issued directly by the Republic, i.e, "public loans," and challenges the Republic's use of special purpose vehicles and its relationship with the IMF regarding those loan guarantees—plainly internal administrative acts and diplomatic actions. The projects themselves, no different from contracts for an army's bullets, were for projects to help Mozambique's defense and infrastructure.

The SPVs at issue were developed by the Republic of Mozambique's Ministries of Interior, Defense, and Intelligence—three sections of the Republic responsible for its countries' defense, and more directly were controlled by the SISE, Mozambique's secret service and intelligence unit. The project's primary features were plainly for the country's defense; indeed, each of the three projects that the Republic of Mozambique guaranteed loans for were done at the direction of *then Minister of Defense*, *now reigning President* Nyusi.[18] This is precisely the type

---

[18] Indeed, some of the money that the Government has claimed as "bribes" and "kickbacks" has been alleged to have financed Nyusi's political campaign, and at least one of the Government's documents that it has alleged reflects bribes lists Nyusi as a recipient. The Government has not listed Nyusi, the current president of Mozambique, as a coconspirator.

of challenge to a sovereign's decisions that is not permitted under common law sovereign immunity. And, in any event, given the longstanding doctrine of sovereign immunity, Mr. Chang would not have had fair notice that he could be criminally prosecuted for his actions undertaken on behalf of Mozambique as the Minister of Finance.

### B. The Indictment Should be Dismissed Because Mr. Chang's Criminal Prosecution Violates the Act of State Doctrine.

In addition to being barred by common law sovereign immunity, the charges against Mr. Chang should be dismissed under the act of state doctrine. The act of state doctrine "'precludes any review whatever of the acts of the government of one sovereign State done within its own territory by the courts of another sovereign State.'" *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V. ("Federal Treasury")*, 809 F.3d 737, 745 (2d Cir. 2016) (quoting *First National City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 763 (1972)). Under the doctrine, "'the acts of the foreign sovereign within its dominions are deemed valid when entered into.'" *Id.* (quoting *Banco de Espana v. Fed. Rsrv. Bank of New York,* 114 F.2d 438, 444 (2d Cir. 1940)). The doctrine "requires that . . . the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." *W.S. Kilpatrick & Co., Inc. v. Environmental Tectonics Corp. Intern.*, 493 U.S. 400, 409 (1990).

The Supreme Court has recognized that "an official's acts can be considered acts of the foreign state, and 'the courts of one country will not sit in judgment of those acts when done within the territory of the foreign state.'" *Samantar*, 560 U.S. at 322 (quoting *Underhill v. Hernandez*, 168 U.S. 250, 252, 254 (1897)). "In this sense, the act of state doctrine 'is not some vague doctrine of abstention but a principle of decision binding on federal and state courts alike'; 'the act within its own boundaries of one sovereign State ... becomes ... a rule of decision for the courts of this country.'" *Fed. Treasury*, 809 F.3d at 743-44 (quoting *W.S. Kirkpatrick & Co.*, 493

U.S. at 406) (citations and internal quotation marks omitted)). It "make[s] no difference whether the foreign act is, under local law, partially or wholly, technically or fundamentally, illegal." *Banco de Espana*, 114 F.2d at 444. The "the acts of the foreign sovereign within its dominions are deemed 'valid when entered into,' irrespective of their status under foreign law." *Id*.

The Supreme Court had occasion to consider, and declined, to defer to the Executive branch on appropriate application of the act of state doctrine in *Banco Nacional de Cuba*, 376 U.S. 398 (1964), stating that it was "highly questionable whether the examination of validity [of the act of state doctrine] by the judiciary should depend on an educated guess by the Executive[.]" 376 U.S. at 436. The Second Circuit has made clear that "[w]hether to invoke the act of state doctrine is ultimately and always a judicial question." *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 58 (2d Cir. 2019) (quoting *Republic of Philippines v. Marcos*, 806 F.2d 344, 358 (2d Cir. 1986)). Courts have applied the act of state doctrine where the case challenged "official expropriation decrees of foreign sovereigns" and "orders of a sovereign's highest commander." *Kashef*, 925 F.3d at 58 (collecting cases). And, "even when an act of a foreign state affects property outside of its territory, 'the considerations underlying the act of state doctrine may still be present.'" *In re Philippine Nat'l Bank*, 397 F.3d 768, 773 (9th Cir. 2005) (quoting *Callejo v. Bancomer, S.A.,*, 764 F.2d 1101, 1121 n.29 (5th Cir. 1985)) (reversing district judge on a writ of mandamus for attempting to seek contempt proceedings against a Philippine bank because doing so necessarily challenged the validity of a judgment of the Philippine Supreme Court).

The Government's prosecution here ignores the act of state doctrine. This is more than a prosecution that would merely embarrass the Republic of Mozambique—the entire prosecution challenges the legality under U.S. law of foreign investment documents that the Republic entered into in Mozambique governed by the laws of the United Kingdom. The Government here asks

this Court to adjudicate as criminally fraudulent the acts the Republic of Mozambique took, through its own government on its own soil to protect itself from piracy and unrest, including through its then-Minister of Finance Mr. Chang. The entire crux of the Government's case rests on whether, when the Republic of Mozambique (through both Mr. Chang and separately through the Central Bank of Mozambique) guaranteed the loans for its infrastructure projects, that was fraud to the United States investors because, as alleged, the Republic's guarantee was false and misleading regarding "Mozambique's ability and intention to pay back the investors." Ind. ¶ 23. Here, as in *Federal Treasury*, the Republic of Mozambique's sovereign acts were "a wholly intragovernmental [act], executed by the sovereign acting as a government." 809 F.3d at 743-44. Because a jury would have to decide whether the projects were sham projects each of which were at the time, run by Mozambique; specifically, entities and individuals who made up Mozambique's Secret Service. A finding of guilt on any one of the counts necessarily adjudicates that these state-run projects were fraudulent and invalid—which would violate the act of state doctrine.

The Government has alleged that the Republic entering into the guarantees rendered these investment documents false and misleading as actionable fraud because, among other reasons, the SPVs run by the Republic's SISE did not allocate the project funds appropriately and the SPVs were aware of corrupt activity by way of alleged bribes and kickbacks paid by Mr. Boustani. A finding of guilt squarely challenges the Government of Mozambique's (acting through SISE's) actions and knowledge of their defense-centric SPVs and money the SISE took for these defense projects. Further, while the Indictment alleges that a spreadsheet (which, according to the trial transcript, was maintained in November 2014) states that at some time Mr. Chang would be paid $400,000 "for the final $278 million upsize" the Republic approved for the

Proindicus loan guarantee, records in the Government's production reflect that *SISE requested* this and every other increases to the original amounts of the loans as necessary for Mozambique's national defense. Permitting the Government's prosecution to go forward will be directly implicating and challenging one of the Republic's most sensitive portions of its government dedicated to the country's defense. The U.S. Government's attempt to challenge as invalid the Republic of Mozambique's decisions and execution of the three infrastructure projects, or their diplomatic relationships with the IMF, all done in Mozambique, violates the act of state doctrine.

As put by the Second Circuit, "[i]f these acts took place, they took place within [Mozambique]. It has been squarely held that the courts of this country will not examine the acts of a foreign sovereign within its own borders, in order to determine whether or not those acts were legal under the municipal law of the foreign state." *Banco de Espana*, 114 F.2d at 443. The Government's theory that it may ask a jury to determine whether the Republic of Mozambique's actions in Mozambique were criminal is not permitted under the act of state doctrine.[19]

### C. The Indictment Should be Dismissed Because Mr. Chang's Criminal Prosecution is Inappropriate Under Notions of International Comity.

The Indictment should be dismissed as a matter of international comity. International comity "is best understood as a guide where the issues to be resolved are entangled in international relations." *United States v. Thiam*, 934 F.3d 89, 94 (2d Cir. 2019). "Under the

---

[19] The ramifications of ignoring this longstanding tenet could be enormous. Adjudication of Mr. Chang's actions taken on behalf of Mozambique will bind Mozambique under international law, notwithstanding that the Republic has not been named as a defendant in this case. The Government has sought forfeiture of any property "involved in such offense" or property "traceable to such property." Permitting this prosecution to move forward has the potential of the Government attempting to seize for itself the $2 billion of money extended for these projects, notwithstanding that the Republic of Mozambique has paid hundreds of millions of dollars in light of the loan guarantees.

principles of international comity, United States courts ordinarily refuse to review acts of foreign

governments and defer to proceedings taking place in foreign countries, allowing those acts and

proceedings to have extraterritorial effect in the United States." *Id.*; *Fed. Treasury*, 809 F.3d at

742-43. This doctrine has been applied in both civil and criminal cases. *See Thiam*, 934 F.3d at

94; *United States v. Giffen*, 326 F. Supp. 2d 497, 507 (S.D.N.Y. 2004) (dismissing portions of

the Government's charges on motion to dismiss as a matter of international comity where "the

Government's suggestion that American legal standards be exported to Kazakhstan is simply a

bridge too far").

What the Government is trying to do here is no different than what has been rejected by

other courts and affirmed by the Second Circuit. The concerns laid out by the Second Circuit in

*Federal Treasury* are no less true in this case:

> The declaration of a United States court that the executive branch of the Russian
> government violated its own law by transferring its own rights to its own quasi-
> governmental entity . . . would be an affront to the government of a foreign
> sovereign. Even an inquiry into whether Russian law permitted the Assignment is
> a breach of comity. 'So long as the act is the act of the foreign sovereign, it matters
> not how grossly the sovereign has transgressed its own laws.'"

809 F.3d at 743 (quoting *Banco de Espana*, 114 F.2d at 444). "An argument in favor of the

export of United States law represents not only a form of legal imperialism but also embodies the

essence of sanctimonious chauvinism." *Rose Hall, Ltd. v. Chase Manhattan Overseas Banking*

*Corp.,* 576 F. Supp. 107, 163 (D. Del.1983), *aff'd Appeal of Chase Manhattan Overseas Banking*

*Corp.,* 740 F.2d 956 (3d Cir. 1984). This Court should reject the Government's attempt to

challenge the validity of the Republic of Mozambique's actions by prosecuting Mr. Chang, and

the Indictment should be dismissed. [20]

---

[20] In the event the Court determines that Mr. Chang has stated a potential claim that the Indictment should
be dismissed on any of these international grounds but believes more information is necessary, he
respectfully requests an evidentiary hearing. These principles exist to provide immunity not just from a

## VIII. The Government Should Produce Its Communications with Foreign Governments and Material Information From Unproduced Search Warrant Affidavits.

The Government has confirmed that it obtained records that it intends to use in this case and has not produced the underlying affidavits and materials that gave the Government legal authority to obtain these records but has refused to produce these records on the ground that Chang would lack standing the challenge the validity of the searches.  But the Government's position misses the point: information contained in the affidavits could contain information that is inconsistent with the Government's case, could contain information that is material to Chang's defense, and could contain *Brady* material.[21]  Whether Chang has standing to quash the evidence obtained from these materials is an entirely different issue. He is entitled to the affidavits and supporting documents under Rule 16, regardless of his standing. We have requested that the Government confirm that they have reviewed these papers and are satisfied that they do not contain *Brady*, or these other materials, but the Government has refused to provide that confirmation.  There is no question that these items are in the possession, custody, and control of the prosecution team; their refusal to both produce and even confirm that they do not contain information material to the defense or *Brady* is troubling.

Second, the Government has refused our requests that they produce the Government's ongoing communications with the Republic of Mozambique or South Africa.  These

---

judgment, but from adjudication altogether.  If the Government were able to violate rules designed to maintain international integrity merely by crafty wording of the Indictment, these tenants would have no teeth. *Accord APWU v. Potter*, 343 F.3d 619 (2d Cir. 2003) (recognizing that Court has power and obligation to determine facts via evidence outside the pleadings where jurisdictional facts are in dispute); *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 270 (2023) ("common-law sovereign immunity . . . is a rule of substantive law governing the exercise of the jurisdiction of the courts").

[21] For example, the Government refused to produce its communications with South Africa, but those communications contradicted the Government's prior representation to the Court that the Government delayed obtaining a warrant because they were conducting an ongoing investigation.

communications are relevant to Chang's defense, and the Government has explicitly *not* claimed privilege over them. We have reason to believe that the U.S. Government coordinated with the Republic of Mozambique in connection with proceedings that took place in the United Kingdom involving the transactions at issue here, and those communications can provide the basis to permit Mr. Chang to use certain portions of that testimony against the U.S. Government under Federal Rule of Evidence 804(b)(1), which provides that prior testimony of an unavailable witness is admissible if the party against whom it is offered or a person with motive and interest similar had the opportunity to examine the witness. Unavailable witnesses testified in that proceeding in a manner that is highly exculpatory and material to Chang's defense. Specifically, multiple witnesses testified there were no bribery payments made to Chang.

There is substantial reason to believe that the U.S. Government has coordinated with the Republic of Mozambique in connection with Mr. Chang's prosecution. The U.S. Government has, similarly, refused to disclose its communications with the Republic of Mozambique notwithstanding our repeated requests. The communications reflecting coordination with the Republic of Mozambique is also material to Mr. Chang's defense because Mr. Chang can use that evidence to discredit the U.S. Government's investigation. In this case, there are several key documents that the Government did not bother to obtain in the course of its investigation pertaining to the projects it has alleged were the result of Mozambique's fraud. Those documents reflect the legitimate nature of these projects and Mr. Chang's good-faith reliance on them. Records that reflect that the U.S. Government has been able to coordinate with the Republic of Mozambique when it suits them is material to our defense that the jury has not seen the whole story because the U.S. Government improperly brought Mr. Chang here without having obtained all the relevant records surrounding the propriety of these projects.

This is not a fishing expedition. Some of the records that the Government has refused to produce to Chang between the U.S. Government and South Africa reflect representations by the U.S. Government that can be used at trial to impeach the credibility of the investigation, among other things. For example, in April 2019, the Department of Justice attempted to secure Chang's extradition to the United States instead of Mozambique by making several questionable representations to the South African government. Specifically, the U.S. Department of Justice represented to the South African government that "virtually all of the banking activity in support of this [securities fraud] scheme was based in or passed through the U.S. banking system" and that the "vast majority" of victim-investors were located in the United States. This was false. Further, as reflected in the first superseding indictment, at the time the Eurobond was contemplated (and long after Chang's involvement in the alleged scheme had completely come to an end), less than 1/3 of investors in the EMATUM loan participation notes were based in the United States. Records such as this are material to the defense because they can be used to challenge the credibility of the Government's case in light of their prior representations to the heads of other countries.[22]

## IX.    Reference to "Among Other Things" Should be Stricken From the Indictment.

Chang also moves for the Court to strike out as surplusage the words 'among other things,' and "among others" as they appear in paragraphs 18, 23, 26, 44, 47, 48, 51 and 59 because the use of that phrase in those contexts renders the allegations false and misleading, and unconstitutionally vague. As the court explained in *United States v. Pope*, 189 F. Supp. 12, 25–

---

[22] At minimum, Mr. Chang respectfully requests that the Court order the Government to produce all communications between the U.S. Government (including the agents who are coordinating the U.S.'s interests with the foreign governments any members of OIA who have assisted and are assisting with this prosecution) with and pertaining to conversations with the Republic of Mozambique and South Africa for *in camera* review to determine whether they should be produced to Chang.

26 (S.D.N.Y. 1960) to permit "among other things" to remain in the various allegations prejudices the defendant because permits the prosecution to go beyond the specific charge of falsity made by the grand jury. Indeed, the government has recognized that this type of language "could impermissibly expand the specific charges returned by the grand jury." See e.g. *United States v. Kassir*, No. S2 04 CR. 356 (JFK), 2009 WL 995139, at \*4 (S.D.N.Y. Apr. 9, 2009) (government consent to court striking the use of "among other things" in two counts).

**CONCLUSION**

For the foregoing reason, this court should dismiss the indictment. In the alternative, the court should strike all allegations relating to the Eurobond Conspiracy.


Dated: New York, New York
February 21, 2024


Adam Ford
Jamie H. Solano
Anjula S. Prasad
Arthur Kutoroff
**FORD O'BRIEN LANDY LLP**
275 Madison Avenue, 24th Floor
New York, NY 10016
aford@fordobrien.com

*Attorney for Defendant Manuel Chang*