UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| UNITED STATES OF AMERICA, | MEMORANDUM & ORDER |
|---|---|
| -against- | 18-CR-00681 (NGG) |
| MANUEL CHANG, | |
| Defendant. | |

NICHOLAS G. GARAUFIS, United States District Judge.

Defendant Manuel Chang ("Defendant" or "Chang") is charged with three conspiracy counts: Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349 (Count One); Conspiracy to Commit Securities Fraud, in violation of 18 U.S.C. § 371 (Count Two); and Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h) (Count Three). (*See* Superseding (S-2) Indictment ("Indictment") (Dkt. 524) ¶¶ 56-61.) These charges stem from an alleged scheme whereby Defendant and co-conspirators defrauded investors to obtain over $2 billion in loans for purported maritime projects in Mozambique. (*Id.* ¶¶ 23-26.)

Currently before the court is Defendant's motion to dismiss the Indictment, motion to compel production of certain materials,[1] and motion to strike certain phrases from the Indictment. (*See*

---

[1] While this instant motion was pending, Chang also filed a separate motion to compel discovery, seeking all documents in the Government's possession pertaining to the "UK Proceeding." (*See* Discovery Mot. (Dkt. 569) at 1-4.) In the Government's response, filed on May 28, 2024, it submitted to the court that "[a]s of the filing of this letter, the government has produced all documents from the U.K. Proceeding in its possession, including all the trial transcripts, as well as statements and legal pleadings filed in the U.K. Proceeding by the government's cooperating witnesses in this case, Andrew Pearse and Surjan Singh." (Gov't Response to Discovery Mot. (Dkt. 570) at 1.) Finding that the defense has now been provided with all of the documents it has requested in its Discovery Motion, the court DENIES the motion at Docket No. 569 as MOOT.

Def.'s Not. of Mot. to Dismiss (Dkt. 542).) For the reasons discussed below, Defendant's pretrial omnibus motion is DENIED in its entirety.

## I.   BACKGROUND

### A.   Chang's Indictment[2]

The Indictment alleges that Defendant Chang and co-conspirators defrauded investors through a series of financial transactions in which they fraudulently obtained and defaulted on over $2 billion in loans, harming investors worldwide. (Indictment ¶ 23.) To facilitate the alleged scheme, three Mozambican state-owned entities—Proindicus, S.A. ("Proindicus"), Empresa Moçambicana de Atum, S.A. ("EMATUM"), and Mozambique Asset Management ("MAM")—were created. (*Id.* ¶ 2.) Each company was owned and controlled by the Government of Mozambique. (*Id.*) These companies were purportedly created to undertake three maritime projects in Mozambique: Proindicus was to perform coastal surveillance, EMATUM was to engage in tuna fishing, and MAM was to build and maintain shipyards. (*Id.*)

Proindicus, EMATUM, and MAM each contracted with Privinvest Group ("Privinvest"), an Abu Dhabi, United Arab Emirates-based holding company, to complete the maritime projects for Mozambique. (*Id.* ¶¶ 2, 8, 24.) Between 2013 and 2016, Proindicus, EMATUM, and MAM borrowed a combined $2 billion through loans guaranteed by the Mozambican government. (*Id.* ¶ 23.) These loans were arranged by two investment banks and sold to investors worldwide, including to investors in the United States. (*Id.*) Over the course of these transactions, however, Defendant and co-conspirators conspired to defraud those investing in the

---

[2] The following statement of facts are drawn from the Indictment and are assumed to be true for purposes of this motion. *United States v. Mango*, 199 F.3d 85, 89 (2d Cir. 1999).

maritime projects through various misrepresentations and omissions relating to, among other things: "(i) the use of loan proceeds; (ii) bribe and kickback payments to Mozambican government officials and bankers; (iii) the amount and maturity dates of debt owed by Mozambique, including the existence of the Proindicus and MAM loans; and (iv) Mozambique's ability and intention to pay back the investors." (*Id.*)

The contracts for each of the three projects stated that the loan proceeds were to be used exclusively for the respective maritime projects. (*Id.* ¶ 24.) Instead, Chang and his co-conspirators diverted portions of loan proceeds to themselves, Mozambican officials, and others for personal enrichment. (*Id.*) In furtherance of this scheme, Privinvest charged inflated prices for the equipment and services it provided to carry out the maritime projects so that some portion of the loan proceeds could be used to pay bribes and kickbacks for those involved in the scheme. (*Id.* ¶ 25.) In doing so, Chang and his co-conspirators used the U.S. financial system to seek and secure investors physically present in the United States, to cause sellers physically present in the United States to sell investments in the loans, and to send and receive U.S.-dollar denominated payments through U.S.-based wire transfers. (*Id.* ¶ 26.)

Chang was the Minister of Finance for Mozambique from approximately February 2005 through January 2015 (*id.* ¶ 3), and played an important role in furthering the scheme. Acting in his official capacity, Chang signed loan guarantees on behalf of the Republic of Mozambique for each of the projects—the Proindicus loan and related increase (*id.* ¶¶ 32, 34), the EMATUM loan (*id.* ¶ 39), and the MAM loan. (*Id.* ¶ 48.) Signing these guarantees bound Mozambique to repay the entirety of the loans if any of the companies were to default. In return for his signatures, Chang received at least $5 million in bribes and kickback payments from Privinvest. (*Id.* ¶¶ 26, 44, 46, 51.)

In 2015, all three entities and the Republic of Mozambique encountered problems servicing the debt they had amassed resulting, in part, from the Proindicus, EMATUM, and MAM loan financings in 2013 and 2014. (*Id.* ¶ 52.) To "hide from the public and [the International Monetary Fund ("IMF")] the near bankruptcy of the project companies" and further conceal discovery of the fraudulent scheme, co-conspirators proposed an exchange of EMATUM loan participation notes for Eurobonds ("Eurobond Exchange" or "Exchange"). (*Id.* ¶ 53.) The Exchange was designed to exchange EMATUM loan participation notes set to mature in 2020 for Eurobonds issued directly by the Mozambican government that would mature in 2023. (*Id.*) To ensure investors participated in the Exchange, co-conspirators, together with others, prepared documents that contained false and misleading information regarding the project loans, the related loan proceeds, and Mozambique's creditworthiness. (*Id.* ¶ 54.) After the Exchange, between May 2016 and March 2017, Proindicus, EMATUM, and MAM each defaulted on their loans and missed more than $700 million in payments. (*Id.* ¶ 55.)

## B. Procedural History

On December 19, 2018, Chang and seven co-defendants were indicted by a grand jury in the Eastern District of New York. (*See* Original Indictment (Dkt. 1).) On December 29, 2018, Chang was arrested while on a layover in an airport in South Africa. (*See* Indictment and Detention Use Order (Dkt. 22) ¶¶ 4-5.) Following Chang's arrest, the United States, pursuant to its extradition treaty with South Africa, submitted a formal request seeking Chang's extradition from South Africa to the United States regarding the instant offense. (*See* M&O Denying Mot. to Dismiss on Speedy Trial Grounds (Dkt. 523) at 4.) *See also United States v. Allam*, No. 18-CR-00681 (NGG), 2023 WL 8828888, at *2 (E.D.N.Y. Dec. 21, 2023). However, both Chang and the Government of Mozambique contested extradition to the United States,

spurring years of litigation proceedings. *Allam*, 2023 WL 8828888, at *2-3.

During this time, three co-defendants, Detelina Subeva, Andrew Pearse, and Surjan Singh, pleaded guilty. (*See* Min. Entries dated 5/20/2019 (Dkt. 77); 07/19/2019 (Dkt. 117); 09/06/2019 (Dkt. 160).) Co-defendant Jean Boustani proceeded to trial and was acquitted on all charges by a jury verdict on December 2, 2019. (*See* Boustani Jury Verdict (Dkt. 370).) Four and a half years after his initial arrest in South Africa, Chang was finally extradited to the United States on July 12, 2023. *Allam*, 2023 WL 8828888, at *3.

### C.  Chang's Motion

On February 21, 2024, the Defendant moved to dismiss the Indictment on a number of grounds and for other relief, arguing that: (1) Counts One and Two must be dismissed following the Supreme Court's decision in *Ciminelli v. United States*, 598 U.S. 306 (2023); (2) Count Two fails to allege a proper domestic application of securities fraud; (3) Counts One and Two fail to allege wire and securities fraud conspiracies; (4) Count Three fails for lack of extraterritorial jurisdiction and failure to state a claim for conspiracy to commit money laundering; (5) all three counts violate due process; (6) all three counts are duplicitous; and (7) prosecution of a foreign official violates long-standing principles regarding foreign sovereigns. (Def's Mem. in Supp. of Mot. to Dismiss ("Mot.") (Dkt. 543) at 1-4.) Defendant Chang also moves this court to compel the Government to produce certain documents and communications and to strike certain language from the Indictment. (*Id.* at 57-60.) The Government opposed the motion on April 22, 2024. (Gov't Opp. (Dkt. 560).) Defendant filed his reply on May 6, 2024. (Reply (Dkt. 563).) This court heard oral argument on Defendant's motion on May 23, 2024. (*See* Min. Entry dated 5/23/2024.)

## II.  LEGAL STANDARD

"[An] indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged. . . ." Fed. R. Crim. P. 7(c). "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or convictions in bar of future prosecutions for the same offense." *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).[3] In the Second Circuit, this generally requires an indictment to "do little more than [] track the language of the statute charged and state the place and time (in approximate terms) of the alleged crime." *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999). "[C]ommon sense and reason are more important than technicalities" and the indictment "need not be perfect." *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013).

Defendants may raise pretrial challenges to the sufficiency and specificity of an indictment "if the basis for the motion is reasonably available and the motion can be determined without a trial on the merits." *See* Fed. R. Crim. P. 12(b)(3)(B)(iii), (v). "In deciding a pretrial motion to dismiss, the Court must accept the Government's factual allegations as true, and the indictment must be read to include facts which are necessarily implied by the specific allegations made[.]" *United States v. Gasperini*, No. 16-CR-441 (NGG), 2017 WL 2399693, at *2 (E.D.N.Y. June 1, 2017).

---

[3] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

## III. DISCUSSION

Chang raises several arguments for dismissal. The court addresses each argument in turn before moving to Chang's additional requests concerning discovery and potential surplusage in the Indictment.

### A. Whether Counts One and Two Must Be Dismissed After *Ciminelli*

Chang moves to dismiss Counts One and Two under the Supreme Court's recent decision in *Ciminelli v. United States* which invalidated the right-to-control theory of wire fraud. (Mot. at 13-17.) *See also Ciminelli v. United States*, 598 U.S. 306 (2023). For the reasons set forth below, *Ciminelli* does not require dismissal of these counts.

#### 1. Conspiracy to Commit Wire Fraud (Count One)

Count One charges Chang with conspiring to violate the wire fraud statute, 18 U.S.C. § 1343. The essential elements of wire fraud in violation of 18 U.S.C. § 1343 are "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017).

"[T]o defraud" under this statute refers to "wronging one in his property rights." *Cleveland v. United States*, 531 U.S. 12, 19 (2000); *see also McNally v. United States*, 483 U.S. 350, 358 (1987). Prior to the Supreme Court's decision in *Ciminelli*, this Circuit considered the "right to control" one's assets a property interest, allowing the Government to seek convictions under the mail and wire fraud statutes when the defendants "deprive[d] a victim of potentially valuable economic information necessary to make discretionary economic decisions." *Ciminelli*, 598 U.S. at 310. In 2023, the Supreme Court roundly rejected this right-to-control theory in *Ciminelli v. United States*. *Id.* at 309. The Court held that, because "the wire fraud statute reaches only traditional

property interests[,]" the "right-to-control theory cannot form the basis for a conviction under the federal fraud statutes." *Id. at 316.* In *Ciminelli*, the indictment and jury instructions both relied entirely on the right-to-control theory. *Id.*[4]

Chang's argument that *Ciminelli* requires dismissal fails, however, because the Indictment does not rely on the right-to-control theory. Rather, the Indictment focuses on allegations that Chang sought to deprive investors and potential investors of money, a "traditional property interest." *Id.; see also United States v. Tournant*, No. 22-CR-276 (LTS), 2023 WL 8649893, at *9 (S.D.N.Y. Dec. 13, 2023) ("The wire fraud conspiracy charged in the Indictment thus had, as the Indictment alleges, the object of obtaining and retaining tangible property—money.").

Specifically, the Indictment charges that Chang violated the wire fraud statute by "devising a scheme and artifice to defraud one or more investors and potential investors . . . to obtain money and property from them . . . ." (Indictment ¶ 57.) As alleged,

> the co-conspirators, among other things, conspired to defraud investors and potential investors in the Proindicus, EMATUM and MAM financings through numerous material misrepresentations and omissions relating to, among other things: (i) the use of loan proceeds; (ii) bribe and kickback payments to Mozambican government officials and bankers; (iii) the amount and maturity dates of debt owed by Mozambique, including the existence of the Proindicus and MAM

---

[4] *Ciminelli* and *Percoco v. United States*, 598 U.S. 319 (2023), decided the same day, have led to the vacatur of at least one conviction in this district. *See United States v. Full Play Grp., S.A.*, No. 15-CR-252 (PKC), 2023 WL 5672268, at *15, *19-26 (E.D.N.Y. Sept. 1, 2023) (finding that after *Percoco* and *Ciminelli*, the wire fraud statute, Section 1346, does not extend to the "foreign commercial bribery schemes" charged against the defendants).

loans; and (iv) Mozambique's ability and intention to pay back the investors. (*Id.* ¶ 23.)

The Indictment also includes numerous allegations that the intent of the co-conspirators' misrepresentations was to obtain money and Chang's involvement in the conspiracy. (*See id.* ¶¶ 32-38, 39, 44-46, 48, 51.)[5] The Indictment thus sufficiently alleges a scheme to deprive investors of money through a series of misrepresentations, and not a scheme to deprive victims of "valuable economic information." *Ciminelli*, 598 U.S. at 310; *see also United States v. Bankman-Fried*, 680 F. Supp. 3d 289, 305 (S.D.N.Y. 2023); *United States v. Xu*, No. 23-CR-133 (JMF), 2024 WL 1332548, at *2 (S.D.N.Y. Mar. 28, 2024).[6]

The post-*Ciminelli* cases cited by Chang are unavailing. (Mot. at 15.) Chang points to *United States v. Nordlicht*, for instance, where Judge Cogan dismissed the wire fraud count because, based on the evidence presented at trial, "no reasonable jury could find that defendants intended to defraud bondholders of

---

[5] Moreover, the Government notes in its response to Chang's motion its expectation that it will prove at trial that the Defendant was involved in the conspiracy to defraud premised on this traditional property interest in the form of $2 billion in loan proceeds. (Gov't Opp. at 1-5.) *Cf. Ciminelli*, 598 U.S. at 310 n.1 ("[T]o defend against the defendants' motion to dismiss, the Government relied solely on the theory that the scheme defrauded [the victim] of its right to control its assets. . . . The District Court then relied expressly on the right-to-control theory in denying the motion to dismiss.").

[6] Because the Indictment does not rely on the right-to-control and the Government sufficiently pleads deprivation of a traditional property interest, the court need not consider whether *Ciminelli* even applies to an indictment's sufficiency. *See United States v. An*, No. 22-CR-460 (KAM), 2024 WL 2010017, at *7 (E.D.N.Y. May 7, 2024) ("In the context of [defendant's] motion to dismiss the Indictment, *Ciminelli* is inapposite. *Ciminelli* concerned an instructional error, not the sufficiency of an indictment."); *Ciminelli*, 598 U.S. at 317 (Alito, J., concurring) ("I do not understand the Court's opinion to address . . . the indictment's sufficiency . . .").

anything other than 'potentially valuable economic information.'" 2023 WL 4490615, at *6 (E.D.N.Y. July 12, 2023) (quoting *Ciminelli*, 598 U.S. at 314). The alleged property interest in *Nordlicht* involved "[a]t most" the bondholder victims' "knowledge that conflicted bonds were voting on the indenture amendments," which the court found could not serve as the basis for a wire fraud conviction under *Ciminelli*. *Id.* Here, in contrast, the purpose of the fraudulent scheme was to obtain investors' money. (Indictment ¶ 23.)

In making his right-to-control argument, Chang misreads the Indictment and what the Government intends to prove at trial. He states that the Indictment "explicitly alleges that Chang and his alleged coconspirators deprived investors of potentially valuable economic information necessary to make discretionary economic decisions" and that "[a]t no point does the Indictment allege the deprivation of any traditional property interest." (Mot. at 14-15.) To show this, Chang states, for instance, that the Indictment alleges that he "deprived investors of information about 'the use of loan proceeds.'" (*Id.* at 15 n.10.) But this quote from the Indictment refers to the alleged misrepresentation made by the co-conspirators, not the victims' property interest. As stated in the Indictment,

> Investors irrevocably committed themselves in the United States to invest millions of dollars in the loans. Over the course of the transactions, the co-conspirators, among other things, conspired to defraud investors and potential investors in the Proindicus, EMATUM and MAM financings through numerous material misrepresentations and omissions relating to, among other things: (i) the use of loan proceeds . . . (Indictment ¶ 23.)

When read in context, this section is clear that the object of the fraud was the money investors would put into the project—the

"millions of dollars." (*Id.*)[7] The deprivation of information relating to the "use of loan proceeds" refers not to the property interest but to the misrepresentation that was an aspect of the scheme to defraud investors to obtain their money. (*Id.*) *See also Weaver*, 860 F.3d at 94 (noting elements of the wire fraud statute).[8] As Judge Matsumoto recently stated, "*Ciminelli* did not reject the premise that depriving a victim of information in order to induce the victim to part with traditional property can be fraud." *United States v. An*, No. 22-CR-460 (KAM), 2024 WL 2010017, at *8 (E.D.N.Y. May 7, 2024). "*Ciminelli* simply rejected the notion that information itself can be property." *Id.* Such is the case here. The court thus denies Chang's motion to dismiss Count One, conspiracy to commit wire fraud, under *Ciminelli*.

> 2. Conspiracy to Commit Securities Fraud (Count Two)

Chang also argues that *Ciminelli* requires dismissal of Count Two, conspiracy to commit securities fraud. (Mot. at 16-17.) Chang's argument here also relies on the court finding that the Indictment

---

[7] Defendant also makes this argument with regard to other misrepresentations such as those regarding "amount and maturity dates" and "ability and intention to pay back the investors" and casts them as "economic information." (Mot. at 15 n.10.) But in each case, Defendant conflates a misrepresentation with the property interest to argue that *Ciminelli* requires dismissal. And in each case, the argument is unavailing.

[8] In *Ciminelli* and in other cases relying on the right-to-control theory, the deprivation of "information necessary to make discretionary economic decisions" was not simply part of the scheme to defraud, but the property interest. *Ciminelli*, 598 U.S. at 313. Examples of when a victim suffers deprivation of this property interest are when the fraudulent scheme "affected the victim's economic calculus or the benefits and burdens of the agreement, pertained to the quality of services bargained for, or exposed the victim to unexpected economic risk." *United States v. Percoco*, 13 F.4th 158, 170 (2d Cir. 2021), *rev'd and remanded sub nom. Ciminelli*, 598 U.S. 306.

alleges a deprivation of "potentially valuable economic information." (Mot. at 17.) It therefore fails for the same reasons his motion to dismiss Count One under *Ciminelli* fails. Chang's argument as to Count Two separately fails because, while *Ciminelli* discussed the "federal fraud statutes," the case's discussion was limited to the mail and wire fraud statutes, with no discussion of the securities fraud statutes. *See Ciminelli*, 598 U.S. at 312-16 (discussing the text and case law pertaining to the mail and wire fraud statutes); *see also id.* at 312 n.2 (noting that the court construes "identical language in the wire and mail fraud statutes *in pari materia*."); *Nordlicht*, 2023 WL 4490615, at *5 n.4 (citing 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5) (distinguishing the wire fraud statute discussed in *Ciminelli* and the securities fraud statutes).[9]

The court therefore denies Chang's motion to dismiss Count Two under *Ciminelli*.

## B.   Whether Count Two is Impermissibly Extraterritorial

Count Two charges Chang with conspiracy to violate securities law, predicated on the conspiracy to "commit any offense against the United States" clause of 18 U.S.C. § 371, and 15 U.S.C. §§ 78j(b) and 78ff. Encompassed in these statutes, and as alleged in

---

[9] To argue that *Ciminelli* extends to the securities fraud statute, Chang cites *Sec. & Exch. Comm'n v. Govil*, which discussed disgorgement under 15 U.S.C. §§ 78u(d)(5) and 78u(d)(7). 86 F.4th 89, 104 (2d Cir. 2023). In *Govil*, the Second Circuit defined who qualifies as a victim under the disgorgement provisions which authorize the SEC to seek equitable relief. *Id.* at 105 (citing *Liu v. Sec. & Exch. Comm'n*, 591 U.S. 71, 79 (2020)). In doing so, the court held that disgorgement requires finding that the victim suffered "pecuniary harm." *Id.* at 104. And the Second Circuit then rejected that pecuniary harm included "the right to make an informed decision," citing to *Ciminelli* in support. *Id.* at 105 (citing *Ciminelli*, 598 U.S. at 315). *Govil* did not purport to interpret the elements necessary to prove securities fraud under 15 U.S.C. §§ 78j or 78ff.

the Indictment, are violations of Section 10(b) of the Securities Exchange Act ("Exchange Act") and its implementing regulation, Rule 10b-5. (*See* Indictment ¶ 59). Chang moves to dismiss this count on the basis that it is an impermissible extraterritorial application of the securities laws. (Mot. at 17-23.) The court disagrees, finding that the Indictment alleges a domestic transaction sufficient to charge Chang with violations of Rule 10b-5.

It is well established that Section 10(b) of the Exchange Act does not apply to extraterritorial conduct—whether criminal or civil liability is sought. *See United States v. Vilar*, 729 F.3d 62, 67 (2d Cir. 2013).[10] The Supreme Court in *Morrison v. National Australia Bank Ltd.*, addressed the extraterritorial limits of the securities laws, holding that "Section 10(b) [of the Exchange Act] reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." 561 U.S. 247, 273 (2010). Thus, a defendant may be convicted of securities fraud only if he has "engaged in fraud in connection with (1) a security listed on a U.S. exchange, or (2) a security purchased or sold in the United States." *Vilar*, 729 F.3d at 67. As there is no claim that the securities at issue were listed on a U.S. exchange, the court must determine whether the Indictment properly alleges the existence of a domestic purchase or sale.

Generally, "in order to adequately allege the existence of a domestic transaction, it is sufficient for a plaintiff to allege facts leading to the plausible inference that the parties incurred irrevocable liability within the United States: that is, that the

---

[10] This includes conduct under a conspiracy, as charged here. *See United States v. Hoskins*, 902 F.3d 69, 96 (2d Cir. 2018) ("[C]ourts have repeatedly ruled that generally, the extraterritorial reach of an ancillary offense like aiding and abetting or conspiracy is coterminous with that of the underlying criminal statute.").

purchaser incurred irrevocable liability within the United States to take and pay for a security, or that the seller incurred irrevocable liability within the United States to deliver a security." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012). Even if a domestic transaction is pled, the court must still consider whether the facts of the case are "so predominantly foreign as to render the application of 10(b) impermissibly extraterritorial." *Giunta v. Dingman*, 893 F.3d 73, 82 (2d Cir. 2018) (citing *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 215 (2d Cir. 2014)).

Here, the Indictment alleges the existence of a domestic transaction by pleading that investors in the United States irrevocably committed themselves to the loans used to finance the maritime projects. In reviewing the fraudulent scheme, the Indictment alleges that between 2013 and 2016, co-conspirators obtained $2 billion through loans arranged by investment banks and sold to investors worldwide, including investors based in the United States. (Indictment ¶¶ 23, 54.) Those investors "irrevocably committed themselves in the United States to invest millions of dollars in the loans." (*Id.* ¶ 23.) The Indictment further alleges that the conspirators' reliance on the U.S. financial system "caus[ed] the sales of investments in the loans to be made by sellers physically present in the United States . . . ." (*Id.* ¶ 26.)

In connection with these transactions, the Indictment also alleges false and misleading statements were made to investors through financing documents to secure proceeds following the Eurobond Exchange (*id.* ¶ 54), as well as the use of U.S. banks to finance each of the loans. (*Id.* ¶¶ 26, 40, 42, 53-54.) For instance, the "EMATUM loan agreement provided that all payments by the borrower or the lenders would be paid to Credit Suisse's bank account at New York City Bank 1." (*Id.* ¶ 40.) In reliance on representations in the loan agreement, investors present in the United States purchased EMATUM securities. (*Id.* ¶ 42.) They

therefore incurred irrevocable liability in the United States sufficient to allege domestic transactions.

Chang further argues that, even if the court finds that investors incurred irrevocable liability, this case is similar to *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, because the facts presented are "so predominately foreign" as to render application of the securities statute impermissibly extraterritorial. 763 F.3d at 216. This court disagrees.

In *Parkcentral*, plaintiff-investors argued that they were defrauded into making securities-based swap agreements that were pegged to the price of a German company's shares, traded only on European stock exchanges. *Id.* at 205-07. The alleged fraud was based on purported misstatements by another German corporation and its executives that were made primarily in Germany. *Id.* at 207-08. There was no question that the swap agreements were made in the United States. *Id.* at 207. But importantly, the swaps themselves were agreements that were independent from the reference security that was affected by the misstatements. *Id.* at 216. The Second Circuit affirmed a dismissal of the indictment because requiring a foreign corporation operating on a foreign exchange to comply with U.S. securities laws based on a U.S. swap agreement would effectively require a company with solely foreign conduct to be hauled into U.S. court. *Id.*

In contrast, the Indictment in this case alleges significant domestic contacts with respect to U.S. investors. In the court's view, the facts of this case are more analogous to the facts of *Giunta v. Dingman*, 893 F.3d 73 (2d Cir. 2018), in which the security was domestic such that U.S. securities laws applied. In *Giunta*, a Bahamian permanent resident made material misrepresentations surrounding securities for Bahamian ventures that were listed on the Bahamian exchange. *See id.* at 82. However, the court declined to find that these "foreign components" rendered the

claims impermissibly extraterritorial because of certain domestic contacts, including, that the defendant traveled to New York to press an investor to invest further, the wire transfers originated in New York, and confirmation letters were sent to New York. *Id.* In this case, the Indictment includes allegations that certain co-conspirators and bankers at Credit Suisse prepared documents to convince investors in the United States and elsewhere to participate in the Eurobond Exchange. (Indictment ¶ 54.) This exchange, coming on the heels of inquiries from the IMF regarding Mozambique's use of the loan proceeds, allowed for the conspirators to further conceal the fraudulent scheme by extending the maturity date of the EMATUM securities by three years. (*Id.* ¶ 53.) The Indictment alleges that, in preparing these documents that were sent to investors, including those in the United States, the conspirators included false and misleading statements regarding the use of the original EMATUM loan proceeds and the risks of corruption and money laundering in Mozambique. (*Id.* ¶ 54.) Further, in order to ensure its success, other co-conspirators flew to New York to meet with certain investors regarding the Eurobond Exchange. (*Id.* ¶ 59(q).) And as noted above, wire transfers transmitting funds from investors went through Credit Suisse's New York bank account. (*Id.* ¶ 40.)

To the extent Chang argues that these transactions are so predominately foreign because they did not intend to go through the United States, that argument is without merit. *See Vilar,* 729 F.3d at 78 n.12 ("The parties' intention to engage in foreign transactions is entirely irrelevant."). As the Second Circuit made clear in *Vilar,* "territoriality under *Morrison* concerns where, physically, the purchaser or seller committed him or herself, not where, as a matter of law, a contract is said to have been executed." *Id.* at 78 n.11; *see also Morrison,* 561 U.S. at 268 (noting that "it is the foreign location of the *transaction* that establishes (or reflects the presumption of) the Act's inapplicability") (emphasis in original).

These repeated contacts with the United States, through the pur-
chase and exchange of EMATUM securities with U.S. investors,
use of U.S. bank accounts, and physical meetings with investors
in the United States support a finding that the Indictment has
properly pled domestic transactions under Rule 10b-5. Accord-
ingly, the court declines to hold that the transactions alleged
were so predominately foreign as to be impermissibly extraterri-
torial. *See Giunta*, 893 F.3d at 82-83.

The motion to dismiss Count Two on extraterritoriality grounds
is therefore denied.

### C.   Whether Counts One and Two Fail to State
### Actionable Misstatements or Omissions

Chang also argues that Counts One and Two must be dismissed
because the allegations forming the basis of these counts are not
sufficiently pled to state a claim for securities or wire fraud. (Mot.
at 23-32.) The court finds each of Chang's arguments unavailing.

An indictment "need do little more than to track the language of
the statute charged and state the time and place (in approximate
terms) of the alleged crime." *United States v. Rajaratnam*, No. 13-
CR-211 (NRB), 2014 WL 1554078, at *1 (S.D.N.Y. Apr. 17,
2014). "An indictment does *not*, however, have to specify evi-
dence or details of how the offense was committed." *United States
v. Wey*, No. 15-CR-611 (AJN), 2017 WL 237651, at *5 (S.D.N.Y.
Jan. 18, 2017) (emphasis in original). "That is because the valid-
ity of an indictment is tested by its allegations, not by whether
the Government can prove its case." *Id.*

Both Counts One and Two track the language of the statutes
charged.

Count One charges Chang and his co-conspirators with:

> knowingly and intentionally conspir[ing] to devise a scheme
> and artifice to defraud one or more investors and potential

investors in Proindicus, EMATUM, MAM and the Exchange, and to obtain money and property from them by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343. (Indictment ¶ 57 (Count One: Conspiracy to Commit Wire Fraud).)

Count One mirrors the necessary elements of the underlying statute for which Chang is charged with conspiring to violate. *Compare id., with* 18 U.S.C. §§ 1343, 1349.[11]

Count Two charges Chang and his co-conspirators with:

knowingly and willfully conspir[ing] to use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (i) employing one or more devices, schemes and artifices to defraud; (ii) making one or more untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

---

[11] 18 U.S.C. § 1343 finds it a crime to "devise[] or intend[] to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."

18 U.S.C. § 1349 reads: "Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

(iii) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon investors and potential investors in EMATUM and the Exchange, in connection with the purchase and sale of investments in EMATUM and the Exchange, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff. (Indictment ¶ 59 (Count Two: Conspiracy to Commit Securities Fraud).)

Likewise, Count Two tracks the conspiracy statute and the implementing regulation laws incorporated by reference. *Compare id., with* 18 U.S.C. § 371,[12] *and* 17 C.F.R. § 240.10b-5.[13]

Assuming the allegations are true, as the court must, the Indictment further alleges that, between 2013 and 2016, the Defendant, with others, conspired to defraud those investing in the maritime projects through misrepresentations and omissions

---

[12] 18 U.S.C. § 371 reads, in pertinent part: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both." Section 371 reaches "any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government[,]" *United States v. Coplan*, 703 F.3d 46, 61 (2d Cir. 2012), and incorporates the conspiracy to violate securities law and regulations.

[13] The Exchange Act's implementing regulation states that it is unlawful for "any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

relating to, among other things: "(i) the use of loan proceeds; (ii) bribe and kickback payments to Mozambican government officials and bankers; (iii) the amount and maturity dates of debt owed by Mozambique, including the existence of the Proindicus and MAM loans; and (iv) Mozambique's ability and intention to pay back the investors." (Indictment ¶ 23.) And the Indictment alleges that, during the Eurobond Exchange, documents sent to investors as prepared by co-conspirators "failed to adequately disclose the existence of the Proindicus and MAM Loans or the maturity dates of those loans" and "included false and misleading statements" regarding the original EMATUM LPNs. (*Id.* ¶ 54.) On its face, the Indictment contains the elements of each offense charged and states the time and place (in approximate terms) of the alleged crimes. This alone is sufficient under Rule 7(c). *See United States v. Yannotti,* 541 F.3d 112, 127 (2d Cir. 2008). Nevertheless, the court addresses each of Chang's contentions in turn.

### 1. Use of Loan Proceeds

Chang's first contention is that the alleged misrepresentations regarding the use of loan proceeds cannot support the conspiracy charges because they are immaterial with respect to the Defendant. (Mot. at 25-26.) Specifically, Chang argues that the Government has mischaracterized the EMATUM loan agreement and offering circular as requiring that all borrowed money go exclusively to the purchase of fishing infrastructure. (*Id.* at 25; (citing Indictment ¶ 59(d)-(e)).) In support, he points to other statements in the loan documents purporting to show that the use of loan proceeds was not so limited and thus the Government's allegations are insufficiently material to give rise to a claim.

The court need not decide whether the statements cited by Chang are material because that is a question for the jury. Chang is correct to note that the question of materiality "is the same in

both the civil and criminal context." (Reply at 6 (citing *United States v. Carroll*, No. 19-CR-545 (CM), 2020 WL 1862446, at *3 (S.D.N.Y. Apr. 14, 2020).) However, "materiality under the securities laws is a mixed question of law and fact that the Supreme Court has identified as especially well suited for jury determination." *Carroll*, 2020 WL 1862446, at *5. Chang asks the court to consider the sufficiency of the evidence set forth in the Indictment to determine whether the alleged misstatements are indeed material to sustain a charge under securities law.[14] But this is not the court's role.

Certain misstatements are immaterial as a matter of law, but that is not the case here. *See United States v. Litvak*, 808 F.3d 160, 175 (2d Cir. 2015). The loan documents stipulated that funds be used for "general corporate purposes" and discussed adherence to anti-corruption legislation. (*See* Ex. 1 to Ford Decl. ("EMATUM Term Facility Agreement") (Dkt. 543-2) at §§ 3.1, 19.2; Ex. 3 to Ford Decl. ("EMATUM Offering Circular") (543-4) at 15, 33.) These provisions could be interpreted by a reasonable investor to exclude the payment of bribes and kickbacks. The Indictment charges Chang and his co-conspirators with making affirmative misrepresentations to conceal the fact that they diverted portions of the loan proceeds to themselves and others to induce investment in the projects' securities. Chang fails to show how the representations prohibiting corrupt acts were "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 131 (2d Cir. 2011). The materiality

---

[14] (*See, e.g.*, Mot. at 26 ("No reasonable investor was misled by the loan documents into believing that 'all loan proceeds' were required to go exclusively to 'the purchase of fishing infrastructure, comprising of 27 vessels, an operations centre and related training,' because the documents did not say that.").) Whether a reasonable investor would be misled regarding the use of loan proceeds is for the jury to decide. *Carroll*, 2020 WL 1862446, at *5.

element is therefore properly alleged. *See United States v. Teyibo*, 877 F. Supp. 846, 861 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 681 (2d Cir. 1996).

### 2. Bribe and Kickback Payments to Mozambican Government Officials and Bankers

Chang argues that the Indictment (1) fails to articulate what misrepresentations and omissions were made in relation to bribe and kickback payments of Mozambican government officials and bankers; (2) fails to plead that the representations made were false and misleading at the time they were made; and (3) fails to sufficiently connect Chang's conduct to the conspiracy. (Mot. at 26-29.) The court disagrees.

The Indictment clearly sets forth purported misrepresentations. (Indictment ¶ 48.) Specifically, the Indictment alleges that the EMATUM agreement and offering circular required that "all amounts" borrowed under the agreement must go toward the "purchase of fishing infrastructure" and "the general corporate purposes of the Borrower" but prohibited "improper payments." (*Id.* ¶¶ 40-41.) The Indictment sets forth how these statements are allegedly fraudulent, identifying a spreadsheet reflecting that Privinvest "made and *anticipated* making bribe and kickback payments" to obtain the contracts as well as emails "providing an accounting of bribes through the Proindicus and EMATUM projects," including a purported $5-7 million to Defendant Chang. (*Id.* ¶¶ 37, 44, 51.) These allegations sufficiently articulate the relevant misrepresentations, plausibly suggest that such statements were misleading at the time they were made, and appropriately connect Chang's conduct in securing the loans to the conspiracy. This is more than sufficient to provide Chang with "adequate notice of the charges, allow [him] to prepare [his] defense, and ensure that [he is] not prosecuted based on evidence not presented to the grand jury." *United States v. Finazzo*, No. 10-

22

CR-457 (RRM) (RML), 2013 WL 619571, at *6 (E.D.N.Y. Feb. 19, 2013).

### 3. Amount and Maturity Dates of Debt Owed by Mozambique

Chang next argues that the purported omission of the amount and maturity dates of debt owed by Mozambique cannot form the basis of federal securities fraud absent allegations that members of the conspiracy had a duty to disclose the omitted information and identification of which statements were misleading by way of the omitted information. (Mot. at 29-30.)

Proving securities fraud requires a "material misrepresentation (or a material omission if the defendant had a duty to speak) or [use of] a fraudulent device." *Vilar*, 729 F.3d at 92. "As a general rule, omissions are actionable under § 10(b) only when a corporation has a duty to disclose." *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 579 (S.D.N.Y. 2016). "Such a duty arises when (1) a statute or regulation requires disclosure or (2) disclosure is necessary to avoid rendering existing statements misleading by failing to disclose material facts." *Menaldi*, 164 F. Supp. 3d at 579.

In his reply and at oral argument, Chang points to the Supreme Court's recent decision in *Macquarie Infrastructure Corp. v. Moab Partners L.P.*, which held that "[p]ure omissions are not actionable under Rule 10b-5(b)." 601 U.S. 257, 259 (2024). (*See also* Reply at 6-7.) In *Macquarie*, the Court was called upon to determine whether a failure to make a disclosure required by Item 303[15] can support a private claim under § 10(b) and Rule 10b-

---

[15] Item 303 of SEC Regulation S-K is a disclosure requirement that prescribes certain standards for the management discussion and analysis ("MD&A") section of financial statements. *See, e.g.*, SEC Form 10-K; SEC Form 10-Q. Relevant to *Macquarie*, Item 303 directs companies to include in MD&A descriptions "any known trends or uncertainties that have had

5(b) "in the absence of an otherwise-misleading statement." *Id.* at 262. The Court considered and rejected liability based on pure omissions in private rights of action, finding that Rule 10b-5(b) covers "half-truths, not pure omissions" because the Rule only prohibits the omission of material facts "necessary to make the statements made not misleading." *Id.* at 264. In other words, the Supreme Court held that a company's failure to disclose information required under SEC regulations—such as Item 303 of Regulation S-K—cannot support a private securities-fraud claim unless the omission makes the company's affirmative statements misleading. *Id.* at 265.

Here, the Government contends that it is not relying "solely" on omissions to prove the charges, but rather includes the omissions to "explain why the affirmative representations were false or misleading." (Gov't Opp. at 19 n.9.) This is precisely what the *Macquarie* Court held as proper for sustaining a claim.[16] The Indictment states that in failing to "adequately disclose the existence of the Proindicus and MAM Loans or the maturity dates of those loans," in conjunction with other omissions, the loan documents "therefore contained false and misleading information about the Eurobonds and Mozambique's creditworthiness." (Indictment ¶ 54.) But the Indictment does not stop there. It also includes the specific misrepresentations, including that (1) the EMATUM agreement "required EMATUM to 'apply all amounts borrowed by it under the [EMATUM loan agreement] towards . . . the purchase of fishing infrastructure,

---

or that are reasonably likely to have a material favorable or unfavorable impact" on financial performance. 17 C.F.R. § 229.303(b)(2)(ii).

[16] *Macquarie* concerned private rights of action in civil cases and thus has a limited application in the present criminal case. Even assuming this court were to extend that holding to the case at bar, doing so would prohibit actions alleging fraud under Rule 10b-5(b) based on a pure omission theory, a theory the Government explicitly rejects using here.

comprising of 27 vessels, an operations centre and related train-
ing" and "prohibited improper payments in connection with the
project, including payments that would violate [U.S., U.K., and
Mozambican law]" (*id.* ¶ 40); (2) the MAM loan agreement "re-
quired that the MAM Loan proceeds be used for project purposes
and prohibited illegal and corrupt payments" (*id.* ¶ 48); and (3)
the EMATUM Exchange documents included false statements re-
garding the original EMATUM LPNs and the fair market value of
the 27 vessels to be used for the project. (*Id.* ¶ 54; *see also id.* ¶
59(p) (noting reports that valued the vessels at $265 million to
$394 million less than the EMATUM loan).) A jury could find
these statements to be material to an investor's decision to pur-
chase the securities at issue. Thus, in failing to disclose pertinent
information to investors, affirmative misrepresentations were
made that form the basis of the fraudulent scheme. The court
therefore finds that failure to allege a duty to disclose in the In-
dictment does not warrant the dismissal of Counts One and
Two.[17]

> ### 4. Mozambique's Ability and Intention to Pay Back Investors

Chang further contends that the allegation that loan documents
were false or misleading regarding Mozambique's ability or in-
tention to pay back investors is too vague to state a claim. (Mot.
at 30-31.) This argument is without merit.

The court, once again, declines to consider the materiality of this
statement on this motion to dismiss the Indictment. *Carroll,* 2020
WL 1862446, at *5. In any event, the Indictment sufficiently de-
tails facts to infer that members of the conspiracy, including

---

[17] As discussed *supra,* the Indictment need not allege which specific repre-
sentations of the loan agreements map onto each of the purported
omissions. It is enough that the Indictment contains the "essential facts
constituting the offense charged." Fed. R. Crim. P. 7(c)(1).

Chang, misrepresented Mozambique's ability to pay back its investors. For example, the Indictment alleges that the conspirators devised the Eurobond Exchange "[t]o hide from the public and the IMF the near bankruptcy of the project companies . . . [and] avoid inquiry from the IMF and conceal discovery of the scheme." (Indictment ¶ 53.) Following the announcement of the Exchange in March 2016, the Indictment further alleges that by January 18, 2017, EMATUM defaulted on its financing payments. (*Id.* ¶¶ 43, 54.) These allegations, when taken together, plausibly suggest that statements made to investors did not accurately reflect Mozambique's ability or intent to pay back investors. As to Chang specifically, the Indictment describes spreadsheets and emails reflecting that Privinvest "made and *anticipated* making bribe and kickback payments" to others, including Chang. (*Id.* ¶¶ 37, 44-46, 51.) The notion that bribes were made in anticipation of the loans and Exchange is far from vague and states a colorable claim against Chang.

5. Failure to Disclose Information About the Price of Boats Purchased in Connection with the Eurobond Exchange

Chang's last contention in this section concerns the allegation that loan documents given to investors did not disclose pricing information for boats purchased for the EMATUM project. (Mot. at 31-32.) This argument must also fail.

Chang asserts that the Government points to one highly specific statement whose omission forms the basis of the fraud charge. When read in context, however, it cannot be said that failing to disclose a "significant shortfall" in the pricing of certain boats when trying to secure additional funding from investors is unclear or overly broad. (*See* Indictment ¶ 54.) Indeed, this kind of information tends to provide further context of the scheme rather than complicate it. Contrary to Chang's argument, the application of the law in this context does not create a "standardless

sweep," *Kolender v. Lawson*, 461 U.S. 352, 358 (1983), where, as here, the Indictment properly alleges conduct that squarely falls within the core of the federal fraud statutes' prohibitions. *United States v. Alshahhi*, No. 21-CR-371 (BMC), 2022 WL 2239624, at *11 (E.D.N.Y. June 22, 2022).

As Counts One and Two of the Indictment sufficiently set out the time and circumstances of the conspiracy and track the language of the relevant statutes, the court finds the Indictment sufficient to give Chang notice of the charges he must meet, and with sufficient precision so that he may plead double jeopardy in a future prosecution based on the same set of events. *Yannotti,* 541 F.3d at 127. Chang's motion to dismiss on the ground that Counts One and Two fail to state a claim is denied.

### D. Whether Count Three Fails for Failure to State a Claim and Lack of Jurisdiction

Chang moves to dismiss Count Three, conspiracy to commit money laundering under 18 U.S.C. § 1956(h), on the grounds that (1) the Indictment fails to state a claim, and (2) this court lacks jurisdiction to adjudicate the charge against Chang as a foreign national. (Mot. at 32-39.) Neither argument holds water.

#### 1. Failure to State a Claim

Defendant argues that the Indictment fails to properly state a claim warranting dismissal. Chang advances three primary arguments concerning (1) Chang's knowledge of the wire transfers as specified unlawful activity; (2) the Indictment's failure to identify the specific Mozambique law he is alleged to have violated; and (3) the Indictment's failure to connect Chang's conduct to the conspiracy. For the reasons discussed below, each of these arguments is without merit.

Count Three charges Chang with:

knowingly and intentionally conspir[ing] to . . . transmit and transfer monetary instruments and funds [into, out of, or through the United States] . . . (a) with the intent to promote the carrying on of one or more specified unlawful activities, to wit: (i) offenses against a foreign nation involving the bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official, in violation of Mozambican law, as defined in Title 18, United States Code, Section 1956(c)(7)(B)(iv); (ii) wire fraud . . . ; and (iii) fraud in the sale of securities . . . (collectively, the "Specified Unlawful Activities"), contrary to Title 18, United States Code, Section 1956(a)(2)(A); and (b) knowing that the monetary instruments and funds involved in the . . . transfer represented the proceeds of some form of unlawful activity, and knowing that such . . . transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of . . . the Specified Unlawful Activities, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i). (Indictment ¶ 61 (Count Three: Conspiracy to Commit Money Laundering).)

This count sufficiently tracks the language of the underlying money laundering statute, 18 U.S.C. § 1956(a)(2), which Chang is charged with conspiring to violate, and thus the conspiracy statute, 18 U.S.C. § 1956(h).[18] *See Walsh*, 194 F.3d at 44. Nonetheless, Chang argues that this is insufficient because the

---

[18] 18 U.S.C. § 1956(a)(2) reads, in pertinent part: "Whoever transports, transmits, or transfers, . . . a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—(A) with the intent to promote the carrying on of specified unlawful activity; or (B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation,

Indictment fails to state whether the purported specified unlawful activity is a felony and what, if any, felony under Mozambican law the Defendant has violated. However, the statute requires neither.

Chang miscites the definition of "unlawful activity" as "activity that constitutes a felony under State, Federal, or foreign law." (Mot. at 35 (citing 18 U.S.C. § 1956(c)(1).) In fact, 18 U.S.C. § 1956(c)(1) defines a longer phrase: "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity." *See United States v. Inniss*, No. 21-1211, 2022 WL 5061706, at *3 (Summary Order). This exact language is used in 18 U.S.C. § 1956(a)(1), but the Indictment charges only conspiracy to violate 18 U.S.C. § 1956(a)(2), so the Indictment need not allege that the "unlawful activity" be a felony. (Indictment ¶ 61.)

Moreover, the term "*specified* unlawful activity" ("SUA") is defined in the same section and includes "bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official." 18 U.S.C. § 1956(c)(7)(B)(iv). Contrary to Chang's assertions, "specified unlawful activity" is not required to be a felony. *See Inniss*, 2022 WL 5061706, at *3 ("[T]here is no requirement that the qualifying SUA under section 1956(a)(2)(A) be a felony" and notwithstanding section 1956(c)(1), "there is nothing else in the statute that

---

transmission, or transfer is designed in whole or in part—(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or (ii) to avoid a transaction reporting requirement under State or Federal law . . . shall be sentenced. . . ."

18 U.S.C. § 1956(h) reads: "Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

requires the underlying SUA to be a felony").[19] Accordingly, the Indictment's descriptions of specified unlawful activity in Count Three are sufficient.

Likewise, there is no requirement under the relevant statutes that the Indictment allege the specific foreign law violated. As this court has previously held, "[a] money-laundering indictment need not provide elements and other details of the 'specified unlawful activity.'" *United States v. Raniere*, 384 F. Supp. 3d 282, 307 (E.D.N.Y. 2019). Chief Judge Margo K. Brodie thoroughly considered and rejected this same argument in *United States v. Hwa*, finding that in the Second Circuit, notation of the country, but not the specific statute is sufficient to withstand a pretrial motion to dismiss an indictment. No. 18-CR-538 (MKB), 2021 WL 11723583, at *34-36 (E.D.N.Y. Sept. 3, 2021) (collecting cases). As the Indictment alleges bribery of a foreign public official as one of the SUAs in violation of Mozambican law, the Indictment sufficiently states a claim against Chang.[20]

---

[19] While true *Inniss* is a summary order and therefore does not have precedential effect, the court reaches the same conclusion upon a plain reading of the statute. (*See* Reply at 7-8.) In addition to the fact 18 U.S.C. § 1956(c)(1) defines a longer phrase than "unlawful activity," it would be redundant for § 1956(c)(1) to mandate that all specified unlawful activity be a felony when some subsections of § 1956(c)(7) explicitly require felony violations and others do not. *Cf.* § 1956(c)(7)(D) (including as SUA "any violation of section 543(a)(1) of the Housing Act of 1949" followed by "any violation of the Foreign Agents Registration Act of 1938" and "any *felony* violation of the Foreign Corrupt Practices Act") (emphasis added). Accordingly, the statute is not ambiguous, and the rule of lenity has no application here. *See Shular v. United States*, 589 U.S. 154, 165 (2020).

[20] To the extent Chang argues Count Three must be dismissed because it fails to allege that the Defendant knew the money at issue was derived from specified unlawful activity constituting a felony, this argument must also fail. The Indictment need not specify whether the SUA be a felony as discussed, nor does the Indictment need to allege that the Defendant knew the proceeds he received were from specified unlawful activity constituting

Finally, Chang argues that the Indictment fails to allege a conspiracy to commit money laundering because it does not state that Chang "knowingly" agreed to send money to or from the United States to either conceal its true source or promote specified unlawful activity. (Mot. at 37-39.) Yet, contrary to this assertion, the Indictment alleges just that: "defendant MANUEL CHANG, together with others, did knowingly and intentionally conspire to . . . transmit and transfer monetary instruments and funds [to and from the United States] . . . with the intent to promote the carrying on of one more specified unlawful activities . . . and . . . to conceal and disguise the nature, location, source, ownership and control of the proceeds." (Indictment ¶ 61.)

The Indictment alleges Chang conspired to transfer funds through the United States, allegedly received those funds through a bank account located in Spain and knew that those funds were derived from specified unlawful activities of wire fraud, securities fraud, money laundering, and bribery of a foreign official in violation of Mozambican law. Whether the Government can prove these allegations is for the jury to decide. *See, e.g., United States v. Kozeny*, 493 F. Supp. 2d 693, 715 (S.D.N.Y. 2007), *aff'd*, 541 F.3d 166 (2d Cir. 2008) ("[W]hether

---

a felony. *Raniere*, 384 F. Supp. 3d at 307. Moreover, the fact that the Government conceded in the Boustani trial that the jury instructions should only include provisions of Mozambican law constituting felonies under Section 1956(c)(1) does not automatically bind this court to the same finding on a motion to dismiss for a different defendant. There is no nonmutual collateral estoppel against the United States Government. *United States v. Mendoza*, 464 U.S. 154, 158 (1984). Both the Government and Boustani appear to have relied on an incorrect assumption that the definitions in Section 1956(c)(1) applied to Section 1956(a)(2). (*See* Gov't Ltr. re Boustani Jury Instructions (Dkt. 247) at 6 (citing *United States v. Hill*, 167 F.3d 1055, 1066-67 (6th Cir. 1999)).) The money laundering charge in *Hill* was pursuant to Section 1956(a)(1) (a provision not charged in this case) which references the language defined in Section 1956(c)(1) and therefore requires the unlawful activity constitute a felony under State, Federal, or foreign law. 18 U.S.C. §§ 1956(a)(1), (c)(1).

each defendant in fact subscribed to [a conspiratorial] agreement . . . [is an issue] for the jury and cannot be decided at this stage."); *United States v. Benussi*, 216 F. Supp. 2d 299, 311 (S.D.N.Y. 2002), *aff'd sub nom. United States v. Salmonese*, 352 F.3d 608 (2d Cir. 2003) (noting that "the precise scope of the conspiratorial agreement [is] an issue for the jury"). As such, Count Three properly states a claim.

Chang's request for dismissal on the above grounds is therefore denied.

### 2.  Extraterritorial Jurisdiction

Chang further argues that the court has no jurisdiction to charge a foreign national with money laundering under Section 1956. (Mot. at 32-34.) This argument is untenable. Under Section 1956(f), there is extraterritorial jurisdiction over non-citizens if (1) the conduct occurred in the United States and (2) the transaction involved more than $10,000. 18 U.S.C. § 1956(f). Both of these factors are satisfied. The Indictment alleges that upon receipt of loan proceeds from investors, co-conspirators diverted some of these proceeds to make "U.S. dollar denominated bribe and kickback payments, which were made using the U.S. financial system through transactions transferred through bank accounts in the United States, including at least $ 5 million to the defendant." (Indictment ¶¶ 26, 46, 59(i)-(k) (noting three separate bribe payments from Privinvest's UAE-based account, through the Eastern District of New York, for the benefit of the defendant, to a bank account in Spain).) In furtherance of this scheme, the Indictment also alleges that co-conspirators used "third-party entities and fabricated invoices" to conceal the unlawful nature of payments distributed to various Mozambican government officials, including Chang. (*Id.* ¶ 45.) These allegations support a showing that the relevant conduct here, *i.e.*, the wire transfers (totaling well over $10,000) occurred in the

32

United States, *see* § 1956(f), for purposes of promoting and concealing specified unlawful activities. *See, e.g., United States v. Hawit*, No. 15-CR-252 (PKC), 2017 WL 663542, at *8-9 (E.D.N.Y. Feb. 17, 2017) (finding permissible an extraterritorial application of Section § 1956(f) to a money laundering conspiracy charge under Section 1956(a)(2)).[21]

Chang's argument that wires running through a correspondent bank account in the Eastern District of New York is "certainly not 'conduct' by Mr. Chang that would warrant extraterritorial jurisdiction" (Mot. at 33-34), has been expressly rejected by the Second Circuit. "Indeed, courts – including the Second Circuit – have long conceived of transfers from one place to another as being severable, and resting in the United States, when moving through correspondent banks." *United States v. Ho*, 984 F.3d 191, 204-05 (2d Cir. 2020) (rejecting argument that use of correspondent accounts to conduct a dollar-denominated transaction

---

[21] Similar to the argument in *Hawit*, the Government contends that the Indictment alleges a domestic violation of §§ 1956(h) and 1956(a)(2) such that the court need not look to the extraterritorial provision of Section 1956(f). (Gov't Opp. at 23 n.11.) The court disagrees and adopts the reasoned analysis from Judge Chen and the Ninth Circuit in *United States v. Kouk*, 671 F.3d 931 (9th Cir. 2012) regarding the interplay of these provisions. The court need not find that the conduct charged under the money laundering statute is "domestic" because doing so may "thwart Congress's intent, embodied in Section 1956(f), to impose a $10,000 threshold on prosecutions that target non-U.S. citizens for money laundering offenses that occur in part in the United States." 2017 WL 663542, at *8 n.12; *see also Kouk*, 671 F.3d at 940 (declining to interpret the argument that Section 1956(f) is only invoked when the case involves "purely extraterritorial conduct" or conduct taking place entirely outside of the United States because such a finding would render the subsection (f)(1) a "nullity"). *Cf.* § 1956(f)(1) ("There is extraterritorial jurisdiction over the conduct prohibited by this section if . . . in the case of a non-United States citizen, the conduct occurs *in part in the United States*") (emphasis added).

is barred from coverage under Section 1956(a)(2)(A)).[22] Accordingly, the allegations in the Indictment are sufficient to warrant extraterritorial application of 18 U.S.C. § 1956(f).

### E.  Due Process

Chang also moves to dismiss all three counts on the grounds that the Indictment violates due process. (Mot. at 39-40.) The court disagrees.

"[I]n order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." *United States v. Epskamp*, 832 F.3d 154, 168 (2d Cir. 2016).

With respect to Count Two, conspiracy to commit securities fraud, this court already rejected Defendant's extraterritoriality argument. *See supra* section III.B. This negates the due process concerns raised by Chang. *United States v. Cornelson*, 609 F. Supp. 3d 258, 268-69 (S.D.N.Y. 2022).

Count One, conspiracy to commit wire fraud, is premised on the same allegations as Count Two and similarly comports with due process. Because wires for the alleged bribes and kickbacks, including to Chang, were transmitted through U.S.-based correspondent bank accounts, this conduct "renders application of the wire fraud statute to [Chang] domestic, and so he cannot

---

[22] Chang's reliance on *United States v. Lloyds TSB Bank PLC*, 639 F. Supp 2d 314 (S.D.N.Y. 2009), is both misplaced and distinguishable. In that case, the government sought to impose a civil penalty for violations of the Money Laundering Control Act. *Id.* at 315. The court found that it lacked subject matter jurisdiction over the defendant bank because it was not named as a participant in the underlying fraud conspiracy and its conduct consisted of transfers exclusively between non-U.S. banks. *Id.* at 319, 323-24. Here, Chang is a named participant, and the Indictment alleges transfers through correspondent U.S. banks.

be said to have acted entirely abroad." *Gasperini*, 2017 WL 2399693, at *9.

Count Three, conspiracy to commit money laundering, requires a slightly different analysis but the court ultimately reaches the same conclusion. As noted, the money laundering statute permits extraterritorial application pursuant to 18 U.S.C. § 1956(f). And this court already determined that the allegations in the Indictment meet the elements of §§ 1956(f) and 1956(a)(2). The court finds that the allegations concerning a scheme aimed at defrauding U.S. and foreign investors through the use of the U.S. financial system satisfy the "jurisdictional nexus" required for a foreign defendant. *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011) ("For non-citizens acting entirely abroad, a jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests."); *see also Cornelson*, 609 F. Supp. 3d at 268 (explaining that the test set forth in *Al Kassar* is used only where there is an extraterritorial application of a United States criminal statute).

While true that Chang never set foot on U.S. soil prior to the instant charges, "due process does not shield from prosecution" money laundering, securities, and wire fraud violations "simply because the defendant happens to be abroad." *Id.* at 269.

Chang's motion to dismiss the Indictment on due process grounds is therefore denied.

### F.   Whether all Counts are Duplicitous

Chang further argues that the Indictment impermissibly combines two distinct schemes into one, rendering the counts duplicitous. Accordingly, Chang submits that all three counts must be dismissed, or, in the alternative, the portions of the Indictment charging Chang with the Eurobond Exchange should be

stricken. (Mot. at 40-45.) Here, the court finds that the Indictment properly alleges a single conspiracy for which Chang may be charged.

"An indictment is impermissibly duplicitous where: (1) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be 'a separate count for each offense,' and (2) the defendant is prejudiced thereby." *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001). Acts that "could be characterized as part of a single continuing scheme" may be charged in a single count without being duplicitous. *Vilar*, 729 F.3d at 79.

When the charge is conspiracy, "an indictment is not duplicitous simply because it alleges that the conspiracy had multiple objects, and as long as the essence of the alleged crime is carrying out a single scheme to defraud, then aggregation is permissible." *United States v. Ralston*, No. 19-CR-774 (JSR), 2022 WL 769257, at *7 (S.D.N.Y. Mar. 14, 2022). Further, "[e]ach member of the conspiracy is not required to have conspired directly with every other member of the conspiracy; a member need only have participated in the alleged enterprise with a consciousness of its general nature and extent." *United States v. Rajaratnam*, 736 F. Supp. 2d 683, 688 (S.D.N.Y. 2010). "Pretrial dismissal is inappropriate so long as the Court cannot conclude on the basis of the pleadings alone that there is no set of facts that could warrant a reasonable jury in finding a single conspiracy." *United States v. Greenberg*, No. 21-CR-92 (AJN), 2022 WL 827304, at *11 (S.D.N.Y. Mar. 9, 2022). And if from the face of the Indictment, a single conspiracy is alleged, "the question of whether a single conspiracy or multiple conspiracies exists is a question of fact for the jury." *Rajaratnam*, 736 F. Supp. 2d at 688; *see also United States v. Berger*, 224 F.3d 107, 114 (2d Cir. 2000).

Here, Chang attempts to separate his conduct in signing loan documents for the three maritime projects funded in 2013 and

2014 from allegations concerning the Eurobond Exchange, arguing that because he left his position as Minister of Finance by 2015, he no longer had any role in the projects, and therefore cannot be tied to the 2016 Eurobond Exchange. (Mot. at 40-41.)

On its face, the Indictment properly alleges one single, ongoing conspiracy underlying each of the counts. That is, between January 2011 and December 2018, Chang, together with others, conspired to devise a scheme to defraud investors in Proindicus, EMATUM, MAM and the Exchange in order to obtain funds through the use of wires transmitted through the U.S. financial system and conceal said funds using deceptive devices and for personal enrichment. (Indictment ¶¶ 56-61.)[23] While true that Chang is not explicitly alleged to have been involved in the Eurobond Exchange (*see id.* ¶¶ 52-55), the allegations surrounding the Exchange are that the purpose was to "conceal discovery" of the fraud by delaying the bankruptcy of each of the projects. (*Id.* ¶ 53.) That the "vehicle" for the fraud changed in between does not, at this stage, render the funding of the maritime projects and the exchange of EMATUM securities two separate conspiracies. *Ralston,* 2022 WL 769257, at *8.

Likewise, that there were "[c]hanges in membership, differences in time periods, and/or shifting emphases in the location of operations do not necessarily require a finding of more than one conspiracy." *United States v. Jones,* 482 F.3d 60, 72 (2d Cir. 2006). Nor is it necessary that Chang have "expressly agreed with—or even have known the identities of—all the other coconspirators" to find a single conspiracy. *Id.*

Applying the considerations set forth by the Circuit in *Jones,* the court finds the Indictment alleges a single conspiracy on its face.

---

[23] Counts Two and Three both allege a shorter time frame for the conspiracies: January 2013 through December 2018. (*Id.*)

Whether there was in fact one unified conspiracy or multiple distinct ones are questions a jury must grapple with.

As to prejudice, the second factor under the duplicitous analysis, *see Sturdivant*, 244 F.3d at 75, Chang argues that including the later allegations concerning the Eurobond Exchange will give the jury an improper impression that Chang was involved in the conspiracy far longer than his actions are alleged, and evidence may be introduced to the jury regarding an exchange undertaken by other people long after Chang left office. (Mot. at 44-45.) These concerns, however, may be addressed through limiting instructions if the court finds such instructions appropriate to avoid unfair prejudice or confusion of the issues. *See Ralston*, 2022 WL 769257, at *8.

Thus, the court declines to dismiss on the grounds that the Indictment is duplicitous.[24]

### G. Whether Chang's Role as a Former Official Precludes Prosecution

Finally, Chang points to three sets of legal doctrines to argue that his official acts as a foreign national on behalf of a foreign sovereign preclude him from prosecution here in the United States. (Mot. at 45-56.) However, for the reasons discussed below and throughout this Memorandum & Order, this argument is also without merit.

---

[24] The court finds *Grunewald v. United States*, 353 U.S. 391 (1957) inapplicable where that case involved a one-year-long conspiracy to evade tax fraud prosecutions that was "complete" following a number of "no prosecution" rulings before the Tax Court over a two-year period. *Id.* at 394-395. In *Grunewald*, the alleged covering up of the conspiracy did not occur for another three years after that and was found to be separate from the original conspiracy and therefore barred by the statute of limitations. *Id.* at 396, 399-400, 405. (*Cf.* Mot. at 42.)

### 1. Common Law Immunity

Chang first argues that the prosecution violates common law immunity.

"Common law recognizes the immunity of former foreign officials." *Matar v. Dichter*, 563 F.3d 9, 14 (2d Cir. 2009). Historically, granting denial of foreign sovereign immunity was the "case-by-case prerogative of the Executive Branch." *Republic of Iraq v. Beaty*, 556 U.S. 848, 857 (2009). Under common law, courts generally "defer[] to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities." *Matar,* 563 F.3d at 13.[25] In deciding whether a foreign official is entitled to immunity, this court must inquire as to "whether the ground of immunity is one which it is the established policy of the State Department to recognize." *Samantar v. Yousuf*, 560 U.S. 305, 312 (2010); *see also Matar*, 563 F.3d at 14 (describing the question to consider as "whether [the defendant] is entitled to immunity in conformity to the principles accepted by the department of the government charged with the conduct of our foreign relations"). "[T]he relevant inquiry focuses on the official's acts, and not the official's

---

[25] This deference was abrogated by the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1604, enacted in 1976, to codify the complex rules governing foreign sovereign immunity. In doing so, the statute did not require the Executive Branch's immunity determination, replacing it instead with a legal framework that courts could apply in order to decide issues of immunity. *Matar,* 563 F.3d at 13. However, the Supreme Court has recognized, most recently in *Turkiye Halk Bankasi A.S. v. United States,* that the FSIA does not extend to claims of immunity in criminal cases. 598 U.S. 264, 275-77 (2023). Accordingly, courts may still look to the Executive Branch for guidance regarding immunity determinations. *See Samantar,* 560 U.S. at 325 (2010) (noting that common law governs claims of immunity against foreign officials).

status." *United States v. Cordones*, No. 11-CR-205 (AKH), 2022 WL 815229, at *5 (S.D.N.Y. Mar. 17, 2022).

Chang argues that he was acting on behalf of the Republic of Mozambique when he signed the loan guarantee documents for the three maritime projects, and as wholly foreign conduct for which the Government now seeks to challenge, absolute sovereign immunity must apply. (Mot. at 51.) However, in the context of the act of state doctrine, the Second Circuit has determined that "acts that flagrantly violate a foreign state's own laws cannot, at the same time, constitute official acts entitled to deference." *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 61 (2d Cir. 2019). That same guidance applies with equal force here. As Chang was charged with violating both U.S. and Mozambican law, the court cannot determine that his signing of loan documents, allegedly for purposes of defrauding investors and in exchange for illicit kickbacks, is official conduct for the benefit of the Republic of Mozambique. Indeed, his "mere *status*" as the former Minister of Finance "does not make his *conduct* official." *Cordones*, 2022 WL 815229, at *8. Chang's argument is thus premised on his status rather than the acts he committed, and he fails to identify reasons for why he is immune from prosecution for the acts alleged or how his immunity would conform with Executive Branch policy.[26] Under these circumstances, the court rejects Defendant's immunity argument.

### 2.  Act of State Doctrine

Chang also argues that the act of state doctrine bars his prosecution. (Mot. at 52-55.)

---

[26] The Executive Branch's bringing criminal charges against Chang, after waiting years due to extradition proceedings, manifests its view that Defendant is not entitled to immunity. *See Cordones*, 2022 WL 815229, at *5. This court finds deference to that decision appropriate and in accord with the both the interests of the United States and the principles underlying the foreign official immunity doctrine.

Under the act of state doctrine, U.S. courts are precluded from inquiring into the "validity of the public acts of a recognized foreign sovereign power committed within its own territory." *Eur. Cmty. v. RJR Nabisco, Inc.*, 150 F. Supp. 2d 456, 473 (E.D.N.Y. 2001). However, "[a]ct of state issues only arise when a court *must decide*—that is, when the outcome of the case turns upon— the effect of official action by a foreign sovereign. When that question is not in the case, neither is the act of state doctrine." *W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 406 (1990) (emphasis in original). The doctrine is "based on separation of powers — the strong sense of the judicial branch that its engagement in the task of passing on the validity of foreign acts of a state may hinder rather than further this country's pursuit of goals." *United States v. One Etched Ivory Tusk of Afr. Elephant*, 871 F. Supp. 2d 128, 142 (E.D.N.Y. 2012). "Where the Executive Branch files an action . . . courts are reluctant to invoke the act of state doctrine." *United States v. Giffen*, 326 F. Supp. 2d 497, 502 (S.D.N.Y. 2004); *see also Etched Ivory Tusk of Afr. Elephant*, 871 F. Supp. 2d at 142-43 ("[W]here the United States Government has brought suit, clearly the court need not worry that it will intrude into an area that the executive branch does not want it, or that the court's action will hinder its administration of its foreign affairs power").

Notwithstanding the Government's decision to indict and prosecute Chang, the court does not find that this is a case seeking to challenge the legality of the Republic of Mozambique's decision to enter into financing agreements to obtain funding for the three maritime projects. Rather, the focus is on Chang's actions in engaging in conspiracies to defraud investors and launder money using the United States financial system, for which he received

bribes and kickbacks.[27] If proven, his actions may be in violation of U.S. law and Mozambican law and would therefore not be considered actions of the Mozambican Government despite his former position in said Government. *See W.S. Kirkpatrick*, 493 U.S. at 406; *Kashef*, 925 F.3d at 61. Accordingly, the court rejects that the act of state doctrine requires dismissal of the Indictment.

### 3. International Comity

Lastly, Chang argues that his prosecution is inappropriate under notions of international comity. (Mot. at 55-56.)

"International comity has been defined as the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation." *Films by Jove, Inc. v. Berov*, 341 F. Supp. 2d 199, 212 (E.D.N.Y. 2004). "[C]omity in the international context (in conjunction with separation of powers principles) requires deference to international and executive branch processes and efforts to establish coherent policies on matters of substantial public concern." *RJR Nabisco, Inc.*, 150 F. Supp. 2d at 474. Accordingly, "United States courts ordinarily refuse to review acts of foreign governments and defer to proceedings taking place in foreign countries, so long as the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic

---

[27] Such an argument, as advanced by the Government in its opposition brief (*see* Gov't Opp. at 39-40), is not a recharacterization of the instant case as a "bribery case;" it is the underlying component of the wire, securities, and money laundering conspiracies. (*Compare* Reply at 9, *with* Indictment ¶ 24 ("In reality, the Proindicus, EMATUM and MAM maritime projects were used by the defendant MANUEL CHANG and his co-conspirators to divert portions of the loan proceeds *to pay millions in bribes and kickbacks* to themselves, other Mozambican government officials and bankers."); *and id.* ¶ 59 (noting as overt acts conspirators discussing fabricated invoices and subsequent payments totaling $5 million to Chang that are alleged to be bribes or kickbacks).)

public policy." *Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 246 (2d Cir. 1999). "When a court dismisses a complaint in favor of a foreign forum pursuant to the doctrine of international comity, it declines to exercise jurisdiction it admittedly has." *Bigio v. Coca-Cola Co.*, 239 F.3d 440, 454 (2d Cir. 2000). The decision to dismiss on international comity grounds is within the discretion of the district court. *Id.*

Here, Chang argues that the court should, as a matter of comity, dismiss the Indictment because the case is essentially a challenge to the validity of the Republic of Mozambique's actions. As support, Chang introduces an excerpt from an Annual Report from the Republic of Mozambique's Attorney General which contends that "[the Republic of Mozambique] remain[s] convinced that our country is the only one with jurisdiction to carry out criminal proceedings in this case. . . . [That Chang has yet to be tried in the United States] continues to harm the suit in Mozambique." (Ex. 18 to Reply at ECF 69.) While much of the concern stems from the delay in extraditing Chang to the United States from South Africa, this court acknowledges, as it must, the Republic's interest in prosecuting its own citizen and that the instant U.S. prosecution impacts the Republic's ability to do so. Yet, extending international comity in the manner Chang suggests is only applicable where such a decision is "consistent with the law and policy of the United States." *Allied Bank Int'l v. Banco Credito Agricola de Cartago*, 757 F.2d 516, 522 (2d Cir. 1985). The allegations that Chang pocketed millions by way of conspiring to defraud investors, including those in the United States, is not consistent with the law and policy of this country. The Indictment charges Chang with violations of several U.S. laws as well as violations of Mozambican law. However, the focus of the Indictment is on Chang's conduct relating to the abuse and integrity of the United States financial system. (*See generally* Indictment.) Accordingly,

the court declines to extend comity where, as here, there are strong public policies and interests of the United States at stake.[28]

Chang's motion to dismiss based on international comity grounds is therefore denied.

\*       \*       \*

In sum, none of the arguments Chang raises on his motion warrant dismissal of the Indictment. Many of Chang's assertions implicate factual determinations that more appropriately rest with the jury. Accordingly, Chang's motion to dismiss is therefore DENIED.

The court now turns to Chang's additional requests for production of documents and for striking certain phrases in the Indictment.

### H.  Communications with Foreign Governments and Related Materials

Chang moves this court to compel the Government to produce (1) its ongoing communications with the Republic of Mozambique and South Africa, and (2) underlying affidavits and materials from search warrants. (Mot. at 57-59.)

Pretrial discovery in criminal cases is governed by Rule 16 of the Federal Rules of Criminal Procedure. *See United States v. Delacruz*, No. 14-CR-815 (KBF), 2015 WL 2211943, at \*1 (S.D.N.Y. May 12, 2015). The rule provides, in pertinent part, that a defendant is entitled to obtain from the Government documents and objects that are "within the government's possession, custody, or control" if they are "material to preparing the defense"

---

[28] Likewise, international comity is used to protect the official acts of foreign governments, not to give those foreign governments the first opportunity to prosecute its own officials. *See, e.g., United States v. Thiam*, 934 F.3d 89, 94 (2d Cir. 2019).

or will be used by the Government in its case-in-chief at trial. Fed. R. Civ. P. 16(a)(1)(E).

"Evidence that the Government does not intend to use in its case-in-chief at trial is material if it could be used to counter the government's case or to bolster a defense; information not meeting either of those criteria is not to be deemed material within the meaning of the Rule." *United States v. Scully*, 108 F. Supp. 3d 59, 123 (E.D.N.Y. 2015). The defendant bears the burden of making a *prima facie* showing that the evidence sought is material. *United States v. Rigas*, 258 F. Supp. 2d 299, 307 (S.D.N.Y. 2003).

Rule 16 "does not entitle a criminal defendant to a broad and blind fishing expedition among items possessed by the Government on the chance that something impeaching might turn up." *United States v. Larranga Lopez*, No. 05-CR-655 (SLT), 2006 WL 1307963, at *8 (E.D.N.Y. May 11, 2006) (citing *Jencks v. United States*, 353 U.S. 657, 667 (1957)). *Brady* established that the Government has a constitutional obligation to disclose favorable and material information to the defendant in time for its effective use at trial. *See United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001); *Delacruz*, 2015 WL 2211943, at *2. However, "there is no general constitutional right to discovery in a criminal case, and *Brady* did not create one." *Scully*, 108 F. Supp. 3d at 123.

As to the affidavits and related material, Chang has sought these materials on the basis that they could contain, among other things, potential *Brady* material. (Mot. at 57.) Chang notes that he has requested the Government review these materials and confirm they do not contain *Brady* material, but that the Government has not yet done so. (*Id.*) The Government has affirmed in its opposition that it is aware of its continuing *Brady* and *Giglio* obligations and will continue to comply with them in this case. (Gov't Opp. at 45.) In light of these representations, the court need not command immediate review and disclosure of the affidavits at this time. *See Coppa*, 267 F.3d at 144 (noting that "the

government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner"); *Raniere*, 384 F. Supp. 3d at 325 (E.D.N.Y. 2019) ("The courts of this Circuit repeatedly have denied pretrial requests for discovery orders pursuant to *Brady* where the Government has made such good faith representations.").

Regarding the Government's communications with the Republic of Mozambique and South Africa, Chang contends that upon belief, the U.S. Government coordinated with the Republic of Mozambique in connection with proceedings that took place in the United Kingdom involving the same transactions at issue in this case, and those communications could provide a basis to allow Chang to use certain portions of that testimony against the U.S. Government under Federal Rule of Evidence 804(b)(1) and for the larger purpose of discrediting the U.S. Government's investigation into this matter. (Mot. at 58.) Similarly, Chang argues that communications between the U.S. Government and South Africa could reveal prior misrepresentations made by the U.S. which would be useful at trial to impeach the credibility of the U.S. Government's investigation. (*Id.* at 59.) As support, Chang notes that the Department of Justice represented to the South African Government in April 2019 that the "vast majority" of victims harmed by the scheme were located in the United States, but the first superseding indictment alleged otherwise, noting that 1/3 of investors in the EMATUM LPNs were based in the United States. (*Id.*) As there could be additional documents reflecting similar misrepresentations, Chang argues the documents sought are material to his defense.

The court agrees with the Government that Chang has failed to show that the communications provide a "basis" to use portions of testimony from the United Kingdom litigation in this case. Rule 804(b)(1) permits an exception to the rule against hearsay if the declarant is unavailable as a witness and the former testimony

"(A) was given as a witness at a trial, hearing, or lawful deposition . . . and (B) is now offered *against a party who had* — or, in a civil case, whose predecessor in interest had — *an opportunity and similar motive to develop it by direct, cross-, or redirect examination.*" Fed. R. Evid. 804(b)(1) (emphasis added). Here, the Government submits that it was not a party to the United Kingdom litigation and therefore had no opportunity to examine any witnesses. (Gov't Opp. at 44.) Thus, while Chang is technically correct that the rule is "available against others who are not a party," *i.e.*, those who are predecessors in interest in civil cases, Chang has not shown that this is of relevance here. (Reply at 10 n.6.) *See Greene v. City of New York*, No. 08-CV-00243 (AMD) (CLP), 2017 WL 1030707, at *19 (E.D.N.Y. Mar. 15, 2017), *aff'd*, 742 F. App'x 532 (2d Cir. 2018) (collecting cases).

Further, Chang has not shown how the requested documents are material to his defense. Merely arguing that there is "reason to believe" that the U.S. Government coordinated with Mozambique and that there could be additional documents reflecting any kind of prior misrepresentation is simply not enough to ensure that, absent those documents, the outcome of the trial is undermined.[29] *See Coppa*, 267 F.3d at 141. Without more, this court runs the risk of allowing defendants access to any communication the Government has with a foreign nation.

The court therefore declines Chang's motion to compel, or alternatively, for *in camera* review.

---

[29] Notably, the Government has explicitly denied this assertion, contending that it "has not communicated with the Republic of Mozambique or its counsel regarding the U.K. Proceeding and has not received any such information." (Gov't Response to Discovery Mot. at 7-8.)

## I.   Whether to Strike "Among Other Things" from Indictment

Last, Chang asks this court to strike as surplusage the words "among other things" and "among others" as they appear in various paragraphs of the Indictment because the use of that phrase in those contexts renders the allegations false, misleading, and unconstitutionally vague. (Mot. at 59-60.)

"Motions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial." *United States v. Mulder*, 273 F.3d 91, 99 (2d Cir. 2001). "In certain instances, however, language must be stricken because it impermissibly expands the charge." *United States v. Kassir*, No. 04-CR-356 (JFK), 2009 WL 995139, at *3 (S.D.N.Y. Apr. 9, 2009).

Upon review of the Indictment, seven of the eight challenged paragraphs use the phrases "among other things" or "among others" when discussing the background or overview of the fraudulent scheme and therefore not in charging paragraphs. (*See* Indictment ¶¶ 18, 23, 26, 44, 47-48, 51.) As this information goes to the nature of the conspiracy and what the Government seeks to prove at trial, these phrases are not prejudicial nor inflammatory to the defense and therefore will not be stricken. *Kassir*, 2009 WL 995139, at *3.

The last reference to "among others" appears in a charging paragraph (*see* Indictment ¶ 59 (Count Two)), and it sets up the list of overt acts that serve as the basis for the conspiracy to commit securities fraud. (*See id.* ("In furtherance of the conspiracy . . . the defendant MANUEL CHANG, together with others, did commit and cause to be committed, among others, the following [overt acts] . . .").) In *Kassir*, a case which Chang cites, the court expressly considered the phrase "among others" in a count that included overt acts. 2009 WL 995139, at *4. There, the court

found that the phrase clarified that "the list of overt acts which follows is not exhaustive." *Id.* That is the purpose of the phrase in paragraph 59 here and as such is proper.

Accordingly, Chang's motion to strike is denied.

## IV. CONCLUSION

For the reasons discussed in this Memorandum and Order, Chang's motion to dismiss the Indictment is DENIED. His motion to compel and motion to strike are also DENIED. Chang's second motion to compel (*see* Dkt. 569), is DENIED AS MOOT.

SO ORDERED.

Dated:   Brooklyn, New York
        May 31 , 2024

s/Nicholas G. Garaufis

NICHOLAS G. GARAUFIS
United States District Judge