

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

SME:HDM/GN/PC/MC
F.# 2016R00695

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 28, 2024

By ECF and Email

The Honorable Nicholas G. Garaufis
The Honorable Cheryl L. Pollak
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Manuel Chang
                  Criminal Docket No. 18-681 (NGG)

Dear Judge Garaufis and Judge Pollak:

      The government respectfully writes to move to quash improper Rule 17(c) subpoenas issued by the defendant to Credit Suisse Securities (Europe) Limited and Credit Suisse Group AG (collectively, the "Credit Suisse Subpoenas").[1] As set forth below, the subpoenas fail to meet either of the standards articulated under United States v. Nixon, 418 U.S. 683 (1974) and United States v. Tucker, 249 F.R.D. 58, 65 (S.D.N.Y. 2008), as the requests seek inadmissible information that has little to no probative value to this case. Accordingly, the government respectfully requests that the defendant's subpoenas be quashed.

      In addition, due to the arguments raised in the defendant's motion to compel, the government also moves to preclude the defendant from introducing evidence of the merits and resolution of the U.K. civil proceeding between Mozambique and Credit Suisse (the "U.K. Litigation"). Based on the defendant's subpoenas to Credit Suisse, it is clear that the defendant anticipates calling a witness to testify about the merits of that proceeding. Such testimony is neither relevant nor admissible, and would be highly misleading and confusing to the jury. As such, the government respectfully requests that the Court preclude any testimony or evidence about the merits or resolution of the U.K. Litigation.

---

[1] The Subpoenas were previously filed on the docket on June 22, 2024 as Exhibit A to the defendant's motion to compel. See ECF No. 596-1 (hereinafter, "Exhibit A").

I. <u>Background</u>

On June 6, defense counsel served Credit Suisse two Rule 17 subpoenas (the "Credit Suisse Subpoenas"), one to Credit Suisse Securities (Europe), Limited and the other to Credit Suisse Group AG. Both subpoenas request the same categories of documents and witness testimony:

- Copies of Credit Suisse's opening statements and exhibits referenced in the opening statement prepared in the proceeding filed under the caption The Republic of Mozambique v. Credit Suisse International, under Claim No. 2019-00127 in the High Court of Justice, Business and Property Courts of England and Wales, Commercial Court (QBD) (the "U.K. Litigation");

- Copies of any settlement agreement between Credit Suisse (including any affiliates and subsidiaries) and Privinvest (including any affiliates and subsidiaries); and

- A witness familiar with the Proindicus, EMATUM and MAM loans, as well as the positions Credit Suisse took in the U.K. Litigation.

On June 12, six days after serving the Credit Suisse Subpoena, defense counsel filed a motion to compel production of "Credit Suisse materials" that the government did not have in its possession, and accused the government of interfering with their ability to obtain documents from Credit Suisse's counsel, Matt Herrington. The motion contains several misrepresentations about conversations that defense counsel had with Mr. Herrington, including that they had asked Mr. Herrington to provide a transcript of the opening statement by Credit Suisse in the U.K. Litigation but that Mr. Herrington informed them that he had to check with the government before agreeing to turn over the documents to defense counsel. The government subsequently checked with Mr. Herrington as to the veracity of defense counsel's claims, and learned that none of the representations were true. In reality, Mr. Herrington explained that he would confirm the date of the Credit Suisse opening statement and whether the government had the requested transcript. Mr. Herrington confirmed with the government that it did <u>not</u> have the requested transcript, and notified defense counsel of such, and that defense counsel would need to request the document from the English courts. Moreover, Mr. Herrington explained to defense counsel that the opening statement did not appear relevant to this case: he explained that although Credit Suisse filed an opening statement in the U.K. Litigation, the bank had settled with Mozambique on the eve of trial <u>without any admission of liability</u>.[2] Thus, Credit Suisse's opening statement in the U.K. Litigation related only to its remaining civil claims against Privinvest in the U.K.

---

[2] As the Court may be aware, in October 2023, Credit Suisse (which was subsequently acquired by UBS) reached a settlement with Mozambique in the U.K. Litigation prior to the start of the civil trial. See Noele Illien & Kirstin Ridley, <u>Credit Suisse, Mozambique secure out-of-court 'tuna bond' settlement</u>, Reuters (Oct. 23, 2023, 11:10 AM), https://www.reuters.com/business/finance/credit-suisse-mozambique-reach-out-of-court-tuna-bond-settlement-2023-10-01/.

2

At the June 13 status conference before Your Honor, and in the government's filings submitted in advance of the conference (ECF No. 587), the government alerted the Court that defense counsel had misrepresented their communications with Mr. Herrington. The government also informed the Court that it had not interfered, and had no intention of interfering, with the defendant's discovery process, but reserved its right to challenge improper Rule 17 subpoenas.

This brings the government to the instant motion to quash. Following the June 13 status conference, the government learned that defense counsel and Mr. Herrington continued to discuss the propriety of the Credit Suisse Subpoenas.[3] As set forth in the attached correspondence between defense counsel and Mr. Herrington (see Ex. B), Mr. Herrington told defense counsel that no trial was ever held in the U.K. Litigation as to Mozambique's claims against Credit Suisse because the parties had reached a settlement. Nonetheless, defense counsel continued to request that Credit Suisse produce the "opening statements" requested in the Credit Suisse Subpoenas along with any exhibits referenced therein.

The communications make clear that Mr. Herrington is concerned that defense counsel is using a Rule 17 subpoena to seek inadmissible, irrelevant information from Credit Suisse. On June 18, Mr. Herrington even advised defense counsel that the "opening statements" they were seeking did not pertain to any of the matters at issue in this criminal trial. Specifically, Mr. Herrington explained to defense counsel:

> First, you have requested the production of the opening position statement that was filed by Credit Suisse's barristers in the English court proceedings just before those claims were settled. That document, which is not available in the public file of the UK court, is a 100-page submission treating (a) the Republic's ability to proceed under English law with its since-settled claims against Credit Suisse; (b) the Republic's entitlement under English law to declaratory relief on its since-settled claims; (c) the Republic's entitlement under English law to damages on its since-settled claims; (d) the Republic's entitlement under English law to consequential loss damages on its since-settled claims; (e) Credit Suisse's entitlement to damages on its since-settled English law claims; and (f) the viability of since-settled claims brought under English law by other lenders.

Id. In response, defense counsel refused to specifically address any of Mr. Herrington's concerns about the relevance and admissibility of the requested documents and, instead, repeatedly alleged that: (1) the records sought "relate to the same exact subject matter as the government's case against" the defendant (despite Mr. Herrington's detailed description of the issues contained in the document); (2) the "government is also seeking to rely on many of your records in support of its prosecution of our client" (despite the fact that documents produced by Credit Suisse were produced to the defendant as part of litigation in this matter); (3) the government was somehow colluding with Credit Suisse to hide the requested documents (which it is not); (4) the government has

---

[3] The government was not part of these calls between Mr. Herrington and Credit Suisse.

3

improperly refused to help the defendant obtain documents from Credit Suisse[4] and (5) defense counsel believes that the requested materials are "material to [their] defense" based on unspecified "documents [they] have obtained from others from the London Proceeding, including [Credit Suisse's] own filings in that case." Id.

Mr. Herrington subsequently reiterated his position that statements made by the bank's U.K. lawyers about legal claims in the U.K. are neither relevant nor admissible in this case. Mr. Herrington further explained that the process of identifying exhibits in the opening statement was a burdensome one. Because the case between Credit Suisse and Mozambique had settled before trial, the opening statement document was not used in open court by any party and therefore still governed by the equivalent of a protective order between the litigants in the U.K.

Mr. Herrington further opposed the defendant's request to produce a witness to testify about "positions Credit Suisse took in the UK Litigation" and informed defense counsel that he did not represent the unspecified individual they were seeking to subpoena. Mr. Herrington further notified defense counsel that based on their communications, Credit Suisse would ask the government to quash the subpoenas on its behalf.[5]

Having reviewed the communications described above, and the Credit Suisse Subpoenas, the government agrees that the Credit Suisse Subpoenas are improper under Rule 17. For the reasons set forth below, the government respectfully requests that the Court quash the Credit Suisse Subpoenas.

II. Applicable Law

    1. Standing to Move to Quash

As an initial matter, Rule 17(c)(2) of the Federal Rules of Criminal Procedure permits a court to quash or modify a Rule 17(c) subpoena on a motion promptly made. In addition to the subpoena's recipient, the government has standing to move to quash a third-party subpoena when "the [g]overnment's purpose in so moving is to protect the judicial process; particularly in 'preventing the undue lengthening of the trial, undue harassment of its witness, and prejudicial over-emphasis on [the witness's] credibility." United States v. Carton, Case No. 17-CR-680 (CM), 2018 WL 5818107, at *2 (S.D.N.Y. Oct. 19, 2018) (quoting United States v. Ranieri, 670 F.2d 702, 712 (7th Cir. 1982)); see also United States v. Nektalov, No. S2-03-CR-828 (PKL), 2004 WL 1574721, at *1 (S.D.N.Y. July 14, 2004) (same). The government also has standing where the

---

[4] This Court has already denied the defendant's prior motion for an order directing the government to affirmatively seek Brady material not in its possession and pertaining to Credit Suisse. See ECF No. 59, at 5-6. Credit Suisse is not a member of the Prosecution Team. The government does not have copies of the "opening statement" that the defendant seeks (which Mr. Herrington already confirmed to defense counsel), and again, the government is not required to affirmatively obtain it for the defendant.

[5] The government has never told Credit Suisse or Mr. Herrington to withhold documents, or to resist complying with any subpoenas.

4

subpoenaed party has asked the government to move to quash on its behalf. See, e.g., United States v. Nordlicht, 16-CR-640 (BMC), ECF No. 578, at 2 (conferring standing on the government where victim wrote a letter to the Court joining in the government's motion to quash).

Moreover, courts have "an independent duty to review the propriety of the subpoena — a duty in this case that requires the Court to consider whether the documents sought are privileged and whether the subpoena itself comports with the requirements of Rule 17." United States v. Vasquez, 258 F.R.D. 68, 72 (E.D.N.Y. 2009); see also United States v. Coriaty, No. 99-CR-1251(DAB), 2000 WL 1099920, at *6 n.4 (S.D.N.Y. Aug. 7, 2000) (considering government's motion to quash third-party subpoena, notwithstanding defendant's objections on ground that government had no standing, because "it is the responsibility of the court, not the opposing party, to ensure that a subpoena secured under Rule 17(c) is for a proper purpose" (quoting United States v. Nachamie, 91 F. Supp. 2d 552, 561 (S.D.N.Y. 2000))).

2. Applicable Standards for Rule 17

In United States v. Nixon, 418 U.S. 683 (1974), the Supreme Court articulated the criteria for weighing motions to quash or modify Rule 17(c) subpoenas. In order to require the production of documents requested in a Rule 17 subpoena prior to trial, the moving party must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition." Id. at 700. Otherwise put, the movant must make the threshold showings of "(1) relevancy; (2) admissibility; (3) specificity." Id. See also Stern v. U.S. Dist. Ct. for Dist. of Mass., 214 F.3d 4, 17 (1st Cir. 2000) (explaining that under Nixon, a subpoena duces tecum is not "unreasonable or oppressive" if the proponent establishes relevancy, admissibility, and specificity).

In United States v. Tucker, 249 F.R.D. 58 (S.D.N.Y. 2008), as amended (Feb. 20, 2008), Judge Scheindlin declined to apply the Nixon standard, holding that a defendant for purposes of Rule 17, "need only show that the request is (1) reasonable, construed as 'material to the defense,'" and (2) not unduly oppressive for the producing party to respond. Id. at 66.[6] As defense counsel pointed out, most recently, in United States v. Goldstein, No. 21 CR. 550 (DC), 2023 WL 3662971 (E.D.N.Y. May 25, 2023), Judge Chin, sitting by designation, also applied the more permissive Tucker standard in analyzing the propriety of the Rule 17 subpoenas in that case. Id. at *2–3. Nonetheless, Judge Chin made clear that the Tucker standard "does not change the 'fundamental characteristic' of Rule 17(c) subpoenas in criminal cases" and that even under Tucker,

---

[6] The facts of Tucker are distinct from this case. In Tucker, the government had provided the defendant with redacted excerpts from transcripts of one of the cooperating witness's phone calls – which, according to the defendant – had indicated that the witnesses might have been promised inducements for their testimony. As a result, the defendant subpoenaed the Bureau of Prisons for the witnesses' phone records seeking proof that they had been offered certain inducements by the government in exchange for their testimony.

such subpoenas "are not to be used as broad discovery devices." Id. (quoting Nixon, 418 U.S. at 698).

Notwithstanding Tucker and Goldstein, the government respectfully submits that the Nixon standard continues to apply to Rule 17 subpoenas to third parties. Indeed, in a summary order in United States v. Barnes, 560 F. App'x 36, 39–40 (2d Cir. 2014), the Second Circuit reaffirmed the principle that "Rule 17 subpoenas are properly used to obtain admissible evidence, not as a substitute for discovery." Id. at 39 (emphasis added). The Second Circuit further explained: "Where, as here, a party moves to quash subpoenas as unduly 'unreasonable or oppressive,' [] the party seeking compliance must make a preponderance showing that the materials requested are relevant, specifically identified, admissible, and not otherwise procurable by the exercise of due diligence." Id. at 39–40 (quoting Fed. R. Crim. P. 17(c)(2)). In Barnes, the defendant had complained that the district court erred in quashing his Rule 17 subpoena to the Bureau of Prisons for housing assignments, visitor logs, and phone and email records of nine other inmates and anticipated prosecution witnesses. Id. at 39. The Second Circuit rejected that argument, concluding that the defendant "failed to make [the requisite] showing" and the defendant's "speculation that inmates cooperating with the government were conspiring to testify falsely against him" constituted a "fishing expedition." Id. Although the defendant in Barnes urged the court to forego the Nixon standard in lieu of the Tucker standard, the Second Circuit declined to explicitly rule on which standard applied because the defendant's "speculative showing failed to meet even the 'articulable suspicion' requirement" of Tucker. Id. at 40 n.1.

This Court has also explained that Tucker is not binding authority and followed the Nixon approach. See United States v. Ashburn, No. 11-CR-0303 (NGG), 2015 WL 1033063, at *2 (E.D.N.Y. Mar. 6, 2015). Similarly, even after Tucker and Goldstein, numerous courts in this Circuit have continued to endorse and apply the Nixon standard when analyzing the propriety of a Rule 17 subpoena. See, e.g., United States v. Menendez, No. (S4) 23-CR-490 (SHS), 2024 WL 2801960, at *1 (S.D.N.Y. May 31, 2024) (citing Barnes and applying the Nixon standard); United States v. Kwok, No. 23 CR. 118-1 (AT), 2024 WL 1715235, at *2 (S.D.N.Y. Apr. 22, 2024) (same); United States v. Joseph, No. 23 CR. 68 (JPO), 2023 WL 8006613, at *1 (S.D.N.Y. Nov. 17, 2023) (same); United States v. Shea, No. 20 CR. 412-4 (AT), 2022 WL 13847351, at *2 (S.D.N.Y. Oct. 24, 2022) ("Tucker is not 'prevailing law in this district'" and "[d]istrict courts in the Second Circuit apply the standard identified in Nixon to third-party subpoenas issued by the defense."). Cf. United States v. Khan, No. 06-CR-255 (DLI), 2009 WL 152582, at *2 (E.D.N.Y. Jan. 20, 2009) ("Notwithstanding the Supreme Court's dicta and the two opinions from a court of concurrent jurisdiction, this court declines to break from long-standing precedent in this circuit, which holds that all subpoenas must comply with the Nixon standard."); United States v. Rivera, No. 13-CR-149 (KAM), 2015 WL 1540517, at *4 n.1 (E.D.N.Y. Apr. 7, 2015) (citing Barnes and applying the Nixon standard).

Nonetheless, as explained below, under Nixon, and even under the more permissive Tucker standard, the Credit Suisse Subpoenas is improper and should be quashed.

6

III.     The Credit Suisse Subpoenas Should Be Quashed

As an initial matter, the government has standing to quash the Credit Suisse Subpoenas. Credit Suisse has asked the government to move to quash the Credit Suisse Subpoenas on its behalf on the grounds that it is improper, and the government agrees.

The Credit Suisse Subpoenas fail to even meet the <u>Tucker</u> standard, much less the <u>Nixon</u> test. The Credit Suisse Subpoenas seek two categories of documents: (1) Credit Suisse's "opening statements and exhibits referenced in the opening statement" in the U.K. Litigation; and (2) any "settlement agreement between Credit Suisse (including any affiliates and subsidiaries) and Privinvest (including any affiliates and subsidiaries)." The defendant cannot show how these requested documents are "reasonable" and "material to the defense," much less relevant, specific and admissible under <u>Nixon</u>. <u>See</u> <u>United States v. Cherry</u>, 876 F. Supp. 547, 552 (S.D.N.Y. 1995) ("To ensure that Rule 17(c) subpoenas are not so abused, a party seeking production of documents must demonstrate that the materials sought are: (1) relevant; (2) admissible; and (3) specifically identified."). Moreover, the defendant's request for "all exhibits referenced in the opening statement" is unduly burdensome and oppressive to the producing party.

1. The Credit Suisse Subpoenas' Request for the "Opening Statements" Is Improper and Should Be Quashed

<u>First</u>, under either standard, the defendant's subpoenas constitute a fishing expedition for irrelevant and inadmissible evidence, and thus, cannot even meet the "reasonableness" standard set forth in <u>Tucker</u>. The "opening statements" sought by the defendant are documents containing legal arguments that Credit Suisse's U.K. lawyers planned to assert in opposition to the specific claims raised by Mozambique in the U.K. Litigation. As Mr. Herrington explained to defense counsel, these arguments are not relevant or specific to this case. Rather, they address, in "a 100-page submission . . . (a) [Mozambique's] ability to proceed under English law with its since-settled claims against Credit Suisse; (b) [Mozambique's] entitlement under English law to declaratory relief on its since-settled claims; (c) [Mozambique's] entitlement under English law to damages on its since-settled claims; (d) [Mozambique's] entitlement under English law to consequential loss damages on its since-settled claims; (e) Credit Suisse's entitlement to damages on its since-settled English law claims; and (f) the viability of since-settled claims brought under English law by other lenders." <u>See</u> Ex. B.

Defense counsel makes conclusory claims that Credit Suisse's "opening statement" "plainly constitutes evidence the defendant will seek to admit affirmatively at trial." There is no explanation, nor any basis for defense counsel to make such claims. As all lawyers know, an "opening statement" is argument made by an attorney. The opening statement is not an admission by Credit Suisse. And as the defendant knows, the U.K. Litigation between Mozambique and Credit Suisse settled before trial with <u>no</u> admission of liability by either side. Since there was no trial, the opening statement was never delivered or used at trial, and no witness from Credit Suisse ever testified at trial. The defendant should not be permitted to subpoena or admit documents prepared by foreign counsel (for a case in the U.K. that has since settled) in this case, either in its case-in-

7

chief or to impeach any employee from Credit Suisse about these documents.[7] Given what it seeks, the Credit Suisse Subpoena is plainly a fishing expedition in search of something useful for the defense. See Barnes, 560 F. App'x at 39 ("Rule 17 subpoenas are properly used to obtain admissible evidence, not as a substitute for discovery."). Rule 17 subpoenas are meant to be used as an "efficient trial tool," not a discovery device for obtaining inadmissible evidence based on pure speculation.[8]

The unreasonableness of the Credit Suisse Subpoenas' first document request is compounded by the fact that it would require Credit Suisse to undertake a burdensome process to produce the "exhibits referenced in the opening statement" to the defendant. As Mr. Herrington has already explained to defense counsel (and to the government), court procedures in the U.K. are simply different from those in the U.S. Even though documents may have been filed in the U.K. Litigation, they are not considered public documents unless they were used by the parties in open court. See Ex. B. Where, as here, certain of the requested documents were not used in open court, they remain subject to a confidentiality order in the case. Id. As Mr. Herrington further explained to defense counsel, determining the status of any particular exhibit would be a burdensome task, and if an exhibit was not used open court, it could not be provided to defense counsel unless they obtained the permission of either the producing party or the English courts. Credit Suisse should not be forced to undertake this process on the defendant's behalf, or disregard or violate the protective orders that are in place in the U.K. Litigation to comply with the

---

[7] The "opening statement" document does not even constitute evidence that could be used as legitimate impeachment evidence. The defendant should not be permitted to argue that an "opening statement" – a document prepared by lawyers in the U.K. in connection with civil claims that are just not at issue here – constitutes impeachment evidence for the government's cooperating witnesses Pearse, Singh, or any bank witness. And even assuming arguendo that any of the statements could be attributable to a Credit Suisse witness directly, if defense counsel sought to use the documents to prove the truth of the matters asserted, that would be inadmissible hearsay. Credit Suisse is not on trial and their statements are not party admissions under Rule 801(d).

[8] The defendant also wrongly speculates that the opening statement contains "exculpatory evidence." (Def. Br. at 8.) The defendant claims that Credit Suisse purportedly claims that Isaltina Lucas, the Deputy Minister of Finance who reported to the defendant, had responsibility for negotiating and approving the transactions at issue. (Id.) The government has always maintained that Lucas, along with the defendant and other members of the Mozambican government, are members of the conspiracy. Furthermore, the defendant alleges that Credit Suisse purportedly claims that "President Nyusi had a substantial role in considering and approving the Proindicus and EMATUM Transactions" and this therefore constitutes "exculpatory evidence." (Def. Br. at 8.) It is a matter of fact that Filipe Nyusi did not become President of Mozambique until January 15, 2015 – well after the original Proindicus and EMATUM Transactions were executed. Calling information "exculpatory information" does not actually mean the information is in fact exculpatory or material to the defendant's defense. "A general assertion that certain material 'might contain exculpatory information' is insufficient to prevail against a motion to quash under Rule 17(c)." Shea, No. 20 CR. 412-4 (AT), 2022 WL 13847351, at *3 (quoting United States v. Johnson, No. 10 CR. 431, 2013 WL 3948454, at *1 (S.D.N.Y. July 24, 2013)).

8

defendant's improper request, especially when the defendant has not come anywhere near meeting the standards for a Rule 17 subpoena.

Rather than address any of these issues in his motion, the defendant launches into a litany of accusations, alleging, among other things, that: (1) the government should have obtained the 100-page opening submission on its behalf (Def. Br. at 2); (2) that defense counsel was "able to obtain" documents from the U.K. Litigation, including a "'defence' in the U.K. Litigation" and that the government has somehow colluded with Credit Suisse to hide exculpatory documents by directing Credit Suisse to "unfile" its opening statement (id. n.3); (3) demanding to know if Credit Suisse would produce the document if the government asked (id. at 5); and (4) that producing the exhibits is not burdensome, and in fact, its lawyers "have incurred far more expenses in legal fees engaging in delay tactics" (id. at 7–10.) There is no merit to any of these allegations. The Court has already rejected the defendant's motion to compel the government to seek Credit Suisse's "opening statements" or "opening submissions," and the exhibits thereto, because those documents were not in the government's possession. (See ECF No. 595, at 5–6.) Additionally, the government has never asked or instructed Credit Suisse to refuse to produce documents to the defendant. Credit Suisse has explained why producing the requested documents would be improper under Rule 17 and a burdensome process to the bank that would necessarily involve seeking permission from the English courts and other litigants in the U.K. Litigation. Notably, the defendant's motion to compel completely omits any discussion of this issue.

For these reasons, there is no legitimate basis for the defendant's request for such documents, and the first request in the Credit Suisse Subpoenas should be quashed.

2. The Credit Suisse Subpoenas' Request for the Settlement Agreement With Privinvest Is Improper and Should Be Quashed

The defendant's request for "any settlement agreements" between Privinvest and Credit Suisse in the U.K. Litigation should also be quashed. Again, the materials sought are not material to the defense at all, nor do they satisfy the relevancy and admissibility requirements of Nixon. Defense counsel has not explained (and cannot explain) how the fact that the parties settled in the U.K. with no admission of liability helps his defense.[9] Instead, the defendant merely claims: "Credit Suisse's counsel's incorrect representations suggest further that it contains information that would be material to Mr. Chang's defense — Credit Suisse is trying to hide its records because it knows that it is not a victim, yet it is beholden to the government by virtue of its cooperation agreement not to contradict its narrative or hurt its prosecution of Mr. Chang." (Def. Br. at 11.) This is baseless speculation, and an attempt to fish for documents in the hope that they are helpful; such reasoning cannot justify a Rule 17 subpoena. See e.g., Ashburn, No. 11-CR-0303 (NGG), 2015 WL 1033063, at *3 (Rule 17 subpoenas that were premised on the defendant's desire to "see if there was more" in the documents fails even under the Tucker standard).

---

[9] In or about November 2023, Credit Suisse also reached a settlement with Privinvest in the U.K. Litigation. See, e.g. Reuters, "Credit Suisse ends 'tuna bond' dispute with shipbuilder Privinvest," (Nov. 7, 2023), available at https://www.reuters.com/business/finance/credit-suisse-ends-tuna-bond-dispute-with-shipbuilder-privinvest-2023-11-07/. The government understands that the parties also settled without any admission of liability there.

9

To attempt to justify the relevance of these documents, defense counsel cites to statements purportedly made by a "judge in the UK Litigation" that the settlement agreement is "relevant, substantive, evidence." (Def. Br. at 11.) Defense counsel explains that the same U.K. judge stated that the "settlement itself is a new matter, a new fact, and the agreement has properly been disclosed as relevant." (Id.) The meaning (and relevance) of these cryptic statements is completely unclear, as defense counsel provides zero context for when and why the U.K. judge made them. Nonetheless, there is no basis to believe that the settlement agreement is probative of any relevant issues in this case. All the agreement shows is that (1) there was a civil litigation between Privinvest and Credit Suisse; and (2) the matter settled without any admission of liability. This has no bearing on the disputed issues at trial, or on the defendant's guilt.

The defendant also glosses over the inadmissibility of the settlement agreement. The defendant simply argues that "as a settlement contract, it is also plainly evidentiary" and cites Fed. R. Evid. 801(c) for the proposition that verbal acts are admissible non-hearsay. (Def. Br. at 11.) But the defendant is not just seeking to ask a witness about whether Credit Suisse settled or not.[10] Rather, the defendant is seeking to admit the contents of the settlement agreement. In fact, defense counsel specifically told Mr. Herrington that they "obtained a copy of [Credit Suisse's] settlement agreement with several other parties in the London Proceeding, and that document contains information that we believe is material to our defense." (See Ex. B.)

The defendant's attempt to admit a settlement agreement as substantive evidence is in contravention of Rule 408 of the Federal Rule of Evidence. Rule 408 of the Federal Rule of Evidence prohibits the admission of evidence of compromise or offers of compromise "when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction." Fed. R. Evid. 408(a). See, e.g., Rates Tech. Inc. v. Cablevision Sys. Corp., No. 05-CV-3583 (DRH)(WDW), 2006 WL 3050879, at *2 (E.D.N.Y. Oct. 20, 2006) ("FRE 408 provides that settlement agreements are not admissible to prove liability or damages."); Peña v. Macy's Inc., No. 22-CV-09435 (PMH), 2024 WL 1833880, at *2 (S.D.N.Y. Apr. 26, 2024) ("Rule 408 applies to settlement agreements even 'if they are offered against a party who was not a participant in the settlement discussions or agreement.'") (quoting United States v. Am. Soc'y of Composers, Authors & Publishers, No. 13-CV-00095, 1989 WL 222654, at *9 (S.D.N.Y. Oct. 12, 1989)).[11] And again, it is unclear what purpose, if any, these documents would serve at trial when the settlement agreement does not require any parties to the agreement to admit liability. Moreover, the settlement agreement would likely be excluded under Rule 403 as any probative value is substantially outweighed by the substantial danger of seriously confusing and misleading the jury. See Levick v. Maimonides Med. Ctr., No. 08 CV 03814 (NG), 2011 WL 1673782, at *2 (E.D.N.Y. May 3, 2011) (CLP) ("[E]vidence

---

[10] If that were the case, there would be no need for defense counsel to subpoena a settlement agreement to establish that fact, because the news media reported on the settlement.

[11] Although Rule 408 permits courts to admit this evidence for another purpose, "such as proving a witness's bias or prejudice," that is not applicable here. There is no legitimate basis to say that somehow the fact Credit Suisse settled with Privinvest created a bias or prejudice on Credit Suisse's part in favor of the government or against the defendant.

regarding settlement agreements is often excluded at trial under Rule 403 of the Federal Rules of Evidence because of 'the danger of unfair prejudice and misleading the jury.'") (footnote omitted) (quoting Sweeten v. Layson's Home Improvements, Inc., No. 04 CV 2771, 2007 WL 1189359, at *3 (M.D. Pa. Apr. 19, 2007)).

Thus, there is no legitimate or reasonable basis for this request, and the second request of the Credit Suisse Subpoenas should be quashed.

### 3. The Credit Suisse Subpoena's Request for a Witness to Testify to the Merits of the U.K. Litigation Is Improper and Should Be Quashed Because the Court Should Preclude Evidence and Testimony Regarding This Subject

The government also moves to quash the Credit Suisse Subpoenas' request for a Credit Suisse witness who can speak to "the positions Credit Suisse took in the UK Litigation." However, before the Court can rule on this issue, the Court must first address a preliminary matter – whether the defendant should be permitted to introduce evidence of the merits of the U.K. Litigation at all, including (1) the claims asserted by the parties in that case, (2) the "positions Credit Suisse took in the UK Litigation," (3) and its resolution. The government respectfully submits that the defendant should not be permitted to do so, and moves in limine to preclude any testimony or evidence about the substantive nature and resolution of the U.K. Litigation.

Any evidence or inquiry into the substantive merits of the U.K. Litigation and the "positions Credit Suisse took in the UK Litigation" should be precluded as neither relevant nor admissible, and as highly confusing and misleading under Rule 403.[12] The defendant is improperly seeking to question a witness from Credit Suisse about its legal strategy in defending itself against a civil lawsuit filed by Mozambique in the U.K. As the government has already emphasized in its response to the defendant's prior motion to compel (see ECF No. 583), the government is not a party to the U.K. Litigation. While the subject matter of that proceeding may concern some or all of the transactions in this case, the U.K. Litigation is distinctly different from the criminal prosecution here. Among other things, the U.K. Litigation is a civil case between Credit Suisse, Mozambique and a number of other litigants; the claims arise under U.K. laws and seek civil remedies such as declaratory judgment; and the evidentiary and civil procedures in the U.K. are substantially different from U.S. criminal and evidentiary procedures.[13] Thus, the merits of the

---

[12] The government has not sought to put the merits of the U.K. Litigation at trial. Rather, the government has moved in limine to permit authentication of documents produced in the U.K. Litigation because Privinvest (a co-conspirator in this case) has not produced a business certification of records that the government intends to use at trial. Thus, the government will need to call U.K. lawyers who received the relevant documents from Privinvest in the U.K. Litigation only to authenticate the documents. The U.K. lawyers will not testify about the merits of that proceeding because it is not relevant to the instant case.

[13] For example, as the government previously explained in its response to the defendant's motion to compel, the government understands that there are two categories of documents that are used in litigation in the U.K. The first category are written witness statements, which are proposed statements that are either adopted or amended by the witness when he/she testifies at trial. The second category are known as "defences," which are formal pleadings that respond to/answer a

U.K. Litigation and the legal "positions" Credit Suisse took there simply have no probative value here in this U.S. criminal case.

In addition, as demonstrated by the defendant's own filings, any inquiry into the substantive aspects of the U.K. Litigation would only serve to confuse and distract the jury, and create a trial within a trial. Examining a Credit Suisse witness about its legal defense in the U.K. would require discussions about the claims between the parties in the U.K. lawsuit; the litigation that ensued; the legal defenses that U.K. counsel for both Credit Suisse and Mozambique asserted and the context in which the defenses were asserted, and the significance and evidentiary value of documents submitted by U.K. counsel by both sides. The defendant should not be permitted to create a sideshow at trial, diverting the jury's attention from the relevant disputed factual issues.

The defendant's request proves the government's point. The defendant broadly seeks a witness who is "familiar with the positions Credit Suisse took in the UK Litigation." The defendant does not even specify which stage of the UK Litigation they are requesting testimony about, what they mean by "positions," or explain how any witness who could speak about the entirety of the U.K. litigation could testify without implicating attorney-client communications or implicating inadmissible hearsay.[14] Defense counsel essentially seeks testimony from a lawyer for Credit Suisse to testify about its legal strategy in a civil litigation that ultimately settled in the U.K, and has already notified Mr. Herrington and another lawyer for Credit Suisse to be available for trial. See Ex. B. That is not reasonable or proper.

For these reasons, the government respectfully requests that the Court preclude testimony and evidence about the substantive aspects of the U.K. Litigation, and quash the Credit Suisse Subpoena to the extent that it seeks testimony on this subject matter.

4. **The Credit Suisse Subpoena's Request for a Witness to Testify About the "Proindicus, EMATUM and MAM loans" Is Improper and Should Be Quashed**

Finally, the government moves to quash the remaining request for a witness familiar with the "Proindicus, EMATUM and MAM loans." First of all, this is not a civil litigation and Rule 17 subpoenas are not the equivalent of, nor meant to be used as, a Rule 30(b)(6) subpoena in

---

claim and are legal filings prepared by attorneys. Should the defendant be permitted to elicit testimony about the merits and procedural posture of the U.K. Litigation based on statements or filings submitted in that case, then the government would need to call a U.K. legal expert on this matter to explain the actual evidentiary value of the documents. In total, this would be an unnecessary detour that distracts from the relevant evidence and ultimate issues the jury must decide in this case.

[14] Defense counsel cannot call a witness solely to use inadmissible evidence against the witness before the jury in the guise of impeachment. See United States v. Eisen, 974 F.2d 246, 262 (2d Cir. 1992). As set forth above, any statements made in legal filings Credit Suisse submitted in the U.K. Litigation would be hearsay, and the defendant should not be permitted to call a lawyer or a bank witness to elicit inadmissible hearsay under the guise of impeachment.

the civil context. Second, this request is impermissibly vague and broad.[15] The loans at issue span multiple years, and involved many individuals from Credit Suisse. The defendant has made no effort to identify what specific issues he wants testimony on regarding the three loans, and why that testimony is probative of the disputed issues and admissible. For that reason, the defendant's subpoena for a witness to testify about the three loans should also be quashed.

III.   Conclusion

For the reasons set forth above, the government respectfully requests that the Court grant the government's motion to quash the Credit Suisse Subpoenas. The government also respectfully requests that the Court grant the government's motion to preclude testimony and evidence relating to the merits, defenses, and resolution of the U.K. Litigation.

Respectfully submitted,

BREON PEACE
United States Attorney

By:   /s/
Hiral Mehta
Genny Ngai
Assistant U.S. Attorneys
(718) 254-7000

GLENN S. LEON
Chief, Fraud Section
Criminal Division
U.S. Department of Justice

By:   /s/
Peter L. Cooch
Trial Attorney
(202) 924-6259

MARGARET A. MOESER
Acting Chief, Money Laundering
& Asset Recovery Section
Criminal Division
U.S. Department of Justice

By:   /s/
Morgan J. Cohen
Trial Attorney
(202) 941-4529

cc:   Clerk of Court (NGG) (by ECF)
Defense counsel (by ECF)

---

[15] Mr. Pearse and Mr. Singh, both of whom worked for Credit Suisse, will testify at length about the three loans.