UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| UNITED STATES OF AMERICA, | |
|---|---|
| -against- | **MEMORANDUM & ORDER** |
| | **18-CR-00681 (NGG) (CLP)** |
| MANUEL CHANG, | |
| Defendant. | |

NICHOLAS G. GARAUFIS, United States District Judge.

Defendant Manuel Chang has been indicted on conspiracy charges arising from his alleged involvement in a scheme aimed at defrauding investors of billions of dollars for purported maritime projects in Mozambique. (Third Superseding Indictment ("Indictment") (Dkt. 578) ¶¶ 23-26.) The Indictment charges Chang with Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349 (Count One), and Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h) (Count Two). (*Id.* ¶¶ 56-59.) Pending before the court are the Government's and Chang's motions *in limine* seeking various pretrial rulings on several forecasted evidentiary issues. (*See* Gov't MILs (Dkt. 571); Chang Opp. (Dkt. 584); Gov't Reply (Dkt. 589); Chang MILs (Dkt. 572); Gov't Opp. (Dkt. 585); Chang Reply (Dkt. 590).) For the reasons that follow, each parties' motions are GRANTED in part and DENIED in part, with certain directives for the parties to address forthwith. Where further context is required to rule on the motion, the court RESERVES decision.

## I. BACKGROUND[1]

In brief, the Government intends to prove the following at trial:

---

[1] The following summary of facts the Government intends to establish is based on the allegations set forth in the Indictment (Dkt. 578), and, primarily, the Government's memoranda in support of its motions *in limine*

Defendant Chang, while serving as the Minister of Finance of Mozambique, along with several co-conspirators, conspired to fraudulently obtain over $2 billion from international investment banks, including Credit Suisse and VTB (collectively, "Investment Banks") and other investors, in connection with loans to three Mozambican entities: Proindicus, EMATUM, and MAM. (*See* Gov't MILs at 1; *see generally* Indictment.) And, to conceal the proceeds obtained unlawfully under Mozambican law and the federal wire fraud statute, Defendant Chang conspired to launder $7 million in bribe and kickback payments using the United States' financial system. (*See* Gov't MILs at 2; *see generally* Indictment.)

More specifically, from approximately 2013 to 2016, Proindicus, EMATUM, and MAM borrowed billions of dollars in loans guaranteed by the Mozambican Government. (Indictment ¶ 23.) The Government seeks to establish that, during the course of obtaining these loans, Chang and his co-conspirators made or caused to be made material statements to investors, including the Investment Banks, indicating that the loan proceeds "would be used solely by the Mozambican Entities for maritime projects to protect and benefit the country's coastline" and that there were "no bribes, kickbacks or improper acts made by anyone to influence their actions" in connection with the three maritime projects (the "Projects"). (Gov't MILs at 1-2; Indictment ¶¶ 23-26, 27, 37, 40-42, 44-46, 48, 51.) The Government seeks to prove that these statements were false, however, and that the Defendant and his co-conspirators either paid or received millions of dollars in bribes and kickbacks in connection with the financing of these loans. (*Id.*)

The Government anticipates establishing that the Defendant, as the Minister of Finance, played an essential role in the scheme

---

(Dkt. 571). This information provides context in deciding the pending motions.

by: "(1) devising the plan to have [Proindicus, EMATUM, and MAM entities] obtain the loans; (2) meeting with bankers regarding the loans and the diligence process; (3) communicating with his co-conspirators about the loans; and (4) signing the government guarantees for the loans, ensuring Mozambique's obligation to repay the loans if the borrowers defaulted (which they ultimately did)." (Gov't MILs at 2.) And in exchange for his signatures backing the loans on the Projects, and other related conduct, Chang received at least $7 million in unlawful proceeds. (*Id.*; Indictment ¶ 44.) The Government also intends to show that, in addition to defrauding investors, including those in the United States, Chang and his co-conspirators subsequently concealed the Defendant's criminal proceeds by laundering $7 million through Spanish and Swiss bank accounts in other entities' names. (Gov't MILs at 2; Indictment ¶¶ 56-59.)

The Government intends to prove that Chang was involved in one single, yet complex conspiracy that involves three interrelated groups of conspirators: (1) Privinvest officers and employees who made and facilitated bribe and kickback payments (the "Privinvest Conspirators"); (2) Mozambican officials who accepted bribe and kickback payments from Privinvest in connection with the approval of Project loans and guarantees (the "Mozambican Official Conspirators"); and (3) former Credit Suisse employees who received kickbacks for their roles in facilitating and securing the loan proceeds for the purported Projects (the "Credit Suisse Conspirators"). (Gov't MILs at 2-3.)

The Privinvest Conspirators included Jean Boustani (lead salesmen for Privinest), Iskandar Safa (CEO of Privinvest), Najib Allam (CFO of Privinvest), Basetsana Thokoane (an intermediary used by Privinvest), and Ayomin Senanayake (an assistant at Privinvest who worked for Allam and Boustani). The Mozambican Official Conspirators included Chang (generally acting as Minister of Finance), Antonio do Rosario (CEO of Proindicus,

EMATUM, and MAM, and an official in the State Information and Security Service ("SISE")), Isaltina Lucas (Deputy National Director of the Treasury), Armando Guebuza, Jr. (son of then-President of Mozambique, Armando Guebuza), Teofilo Khangumele (representative from the Office of the president), Gregorio Leao (Director General of SISE), and Adriano Laleiane (current Prime Minister of Mozambique and Chang's successor as Minister of Finance), among others. And the Credit Suisse Conspirators included Andrew Pearse (Managing Director at Credit Suisse), Surjan Singh (Managing Director at Credit Suisse), Detelina Subeba (Vice President at Credit Suisse), Adel Afioni (Managing Director at Credit Suisse), and Said Freiha (Managing Director at Credit Suisse). (*Id.*) A number of these named conspirators are charged as co-defendants in this case. (*See generally* Initial Indictment (Dkt. 1).) Several pleaded guilty, and one defendant, Jean Boustani, went to trial where he was acquitted of all charges. (*See* Judgment as to Boustani (Dkt. 371).)

In December 2018, Chang was arrested by South African authorities while on a layover on the way to Mozambique, pursuant to a provisional arrest warrant initiated by the U.S. Government. (*See* Speedy Trial M&O (Dkt. 523) at 4-6.) Following years of extradition proceedings, Chang was extradited to the United States in July 2023. (*Id.* at 6.) On June 4, 2024, a grand jury in the Eastern District of New York returned a third superseding indictment against Chang only, charging two conspiracy counts in violation of 18 U.S.C. §§ 1349 and 1956(h), respectively:

> **Wire Fraud Conspiracy (Count 1):** Knowingly and intentionally conspiring to devise a scheme to defraud investors and potential investors in the Projects, including the Investment Banks, and to obtain money and property from them by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing

4

such a scheme, to transmit by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds. (*See* Indictment ¶¶ 56-57.)

**Money Laundering Conspiracy (Count 2):** Knowingly and intentionally conspiring to transport, transmit and transfer monetary funds to and from the United States, (a) with the intent to promote the carrying on of the specified unlawful activities ("SUA"), to wit: (i) offenses against a foreign nation involving the bribery of a public official, in violation of Mozambican law, as defined in 18 U.S.C. § 1956(c)(7)(B)(iv); and (ii) wire fraud, in violation of 18 U.S.C. § 1343, contrary to 18 U.S.C. § 1956(a)(2)(A); and (b) knowing that the funds involved represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of the SUAs, contrary to 18 U.S.C. § 1956(a)(2)(B)(i). (*See id.* ¶¶ 58-59.)

Trial is set to begin on July 15, 2024. Both parties now move *in limine* requesting several evidentiary rulings in advance of trial. The court first considers the Government's motions *in limine* before turning to Chang's motions.

## II.  LEGAL STANDARD

"The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence." *United States v. Brown*, 606 F. Supp. 2d 306, 311 (E.D.N.Y. 2009) (citing *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984); *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996); *Nat'l Union Fire Ins. Co. of Pittsburgh v. L.E. Myers Co.*,

937 F. Supp. 276, 283 (S.D.N.Y. 1996)).[2] "Evidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds." *United States v. Paredes*, 176 F. Supp. 2d 179, 181 (S.D.N.Y. 2001).

"[C]ourts considering a motion *in limine* may reserve decision until trial, so that the motion is placed in the appropriate factual context." *Jean-Laurent v. Hennessy*, 840 F. Supp. 2d 529, 536 (E.D.N.Y. 2011). Further, a district court's ruling on a motion *in limine* is preliminary and "subject to change when the case unfolds, particularly if the actual testimony differs from what was [expected]." *Luce*, 469 U.S. at 41. The moving party bears the burden of establishing that evidence is inadmissible for any purpose and so properly excluded on a motion *in limine*. *See United States v. Pugh*, 162 F. Supp. 3d 97, 101 (E.D.N.Y. 2016), *aff'd*, 937 F.3d 108 (2d Cir. 2019), *opinion amended and superseded*, 945 F.3d 9 (2d Cir. 2019), *and aff'd*, 945 F.3d 9 (2d Cir. 2019).

## III. THE GOVERNMENT'S MOTIONS

The Government seeks (1) to admit categories of co-conspirator statements made in furtherance of the conspiracy or as statements against penal interest, and to preclude the Defendant from admitting the same; (2) to elicit testimony from investors regarding materiality for purposes of proving fraud; (3) that the court determine as a matter of law the elements of the applicable Mozambican anti-bribery laws pursuant to the specified unlawful activity charged in Count Two; (4) to prove venue under the first brought venue statute, 18 U.S.C. § 3238; (5) to preclude the Defendant from introducing certain evidence or making related arguments that are legally improper and/or irrelevant; (6) that the court take judicial notice of an official decision taken by the

---

[2] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

Constitutional Council of Mozambique; (7) to admit past recorded recollections; and (8) to authenticate certain certified business and electronic records.[3]

The court addresses each issue in turn. As discussed below, some requests require further development at trial before the court can rule on them; the decisions on such requests are reserved for trial. *See Pugh*, 162 F. Supp. 3d at 100-01 ("A court considering a motion *in limine* may reserve judgment until trial in order to place the motion in the appropriate factual context.").

### A.   Co-Conspirator Statements

The Government moves to admit various categories of co-conspirators' out-of-court statements on a conditional basis pursuant to Rule 801(d)(2)(E). Generally, the Government seeks to admit

---

[3] The Government also moved *in limine* to preclude the improper use of agent reports to impeach witnesses, (Gov't MILs at 69-71); to preclude argument or evidence concerning possible punishment and collateral consequences that may result from a conviction in this case, (*id.* at 71-72); and for the court to order the Defendant to disclose all Rule 17(c) subpoenas and the records received in connection with those subpoenas, (*id.* at 77-78). In light of Chang's representations in his Opposition that he does not intend to improperly use agent reports, (Chang Opp. at 55); does not intend to "open the door" as to potential punishment or collateral consequences but reserves the right to raise the issue should the Government open the door first (*id.*); and that the Defense has produced all of its Rule 17(c) subpoenas and related documents in its possession at this time (and will continue to produce records as they are received), (*id.* at 59-60), the Government submits that these issues need not be ruled on at this time. (Gov't Reply at 59.) Accordingly, the court DENIES these requests as MOOT, with leave to renew at trial.

Further, the Government also moved *in limine* to preclude the Defendant from introducing in its case-in-chief exhibits without prior disclosure and to request an Order directing Chang to identify and produce in Rule 16 discovery all documents and records he intends to use at trial. (Gov't MILs at 75-77.) The court granted this motion in a separate Order dated 6/25/2024. (*See* Rule 16 M&O (Dkt. 600).)

communications of three types: (1) statements by or communi-
cations of co-conspirators, including Boustani and other persons
the Government identifies as co-conspirators, regarding the De-
fendant   and/or   the   alleged   scheme;   (2)   accounting
spreadsheets/ledgers created and maintained by members of the
conspiracy detailing the amounts of bribes and kickbacks paid;
and (3) accounting spreadsheets/ledgers and related email
chains produced by Privinvest or Boustani in discovery in the U.K.
Proceeding[4] (the "Privinvest Documents"). The Government also
seeks to preclude the Defendant from admitting his own state-
ments or those of his co-conspirators.

The court will first address the Government's request to admit
statements of co-conspirators, including Boustani. Then the court
will address the related request to preclude Chang from admit-
ting co-conspirator statements. Finally, the court will address the
various documents the Government seeks to admit as co-con-
spirator statements.

1.   Out-of-Court Co-Conspirator Statements Offered
     by the Government

The Government argues that statements made by Boustani, as
well as communications between Boustani and others, include
inculpatory statements about Chang's and his alleged co-con-
spirators' roles in the conspiracy to defraud investors. (Gov't MILs
at 18-19.) The Government submits that Boustani's acquittal
does not preclude this court from admitting evidence that he was
a co-conspirator, particularly in light of the lower standard of

---

[4] The "U.K. Proceeding" refers to a civil litigation taking place in the United
Kingdom brought by the Republic of Mozambique against Credit Suisse
and its subsidiaries, as well as Surjan Singh, Andrew Pearse, and Detelina
Subeva, former Credit Suisse employees and Defendants who have
pleaded guilty in this case. (*See* Gov't Response to Discovery Mot. (Dkt.
570) at 1; M&O dated 6/21/2024 (Dkt. 595) at 3 n.1.)

proof necessary to admit co-conspirator statements (as opposed to convicting a person of a crime). (*Id.* at 20.)

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides that a statement "made by the party's coconspirator during and in furtherance of the conspiracy" is not hearsay. Fed. R. Evid. 801(d)(2)(E). To admit statements under this rule, the district court must find by a preponderance of the evidence "(a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy." *United States v. Al-Moayad*, 545 F.3d 139, 173 (2d Cir. 2008).

The court grants the Government's request and will follow the *Geaney* protocol for out-of-court co-conspirator statements that the Government seeks to admit under Rule 801(d)(2)(E). *See United States v. Ferguson*, 676 F.3d 260, 273 n.8 (2d Cir. 2011) (citing *United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir.1969)). "Under that protocol, statements proffered as coconspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence establishing that a conspiracy existed, that the defendant and declarant were members, and that the statements were made during the course of and in furtherance of the conspiracy." *United States v. Loera*, No. 09-CR-0466 (BMC), 2018 WL 2744701, at *6 (E.D.N.Y. June 7, 2018). Pursuant to *Geaney*, the court determines, after the evidence is in, whether the prosecution meets the foundational requirements under Rule 801(d)(2)(E), *i.e.*, the existence of a conspiracy, the defendant's and the declarant's participation, and that the statements were made in further of the conspiracy. *Geaney*, 417 F.2d at 1120. If the Government meets this burden, the statements will go to the jury to consider alongside the other evidence. *Id.* If the Government does not meet this burden, the court will instruct the jury to disregard the hearsay

or, "when this was so large a proportion of the proof as to render a cautionary instruction of doubtful utility," declare a mistrial if requested by the defense. *Id.*

Chang objects to the Government's motion on the basis that the Government has not put forward enough information to meet the requisite foundational requirements under Rule 801(d)(2)(E). (*See* Chang Opp. at 1, 3-15.) *See also Geaney,* 417 F.2d at 1120. Namely, Chang argues that the Government has not shown that there was a conspiracy, that Chang entered into a conspiracy (or would have entered such conspiracy even by accepting the bribes), or that any of the statements were in furtherance of the conspiracy. (*Id.*) However, the Government's request is for a conditional ruling. Further, the court agrees with the Government that Boustani's acquittal does not "destroy the admissibility" of his prior declarations. *See United States v. Clark,* 613 F.2d 391, 403 (2d Cir. 1979). (*See also* Gov't MILs at 20.)

Accordingly, the court GRANTS the Government's motion to admit out-of-court statements or communications by co-conspirators unavailable for trial (including Boustani, Allam, Do Rosario, and Nhangumele) on a conditional basis, subject to the Government establishing by a preponderance of the evidence each requirement under Rule 801(d)(2)(E). *See Geaney,* 417 F.2d at 1120. The Government alternatively moves to admit these statements as statements against penal interest. (*See* Gov't MILs at 3.) In light of the court's decision to conditionally admit these statements under Rule 801(d)(2)(E), decision on whether these statements are considered statements against penal interest is RESERVED. The Government may separately move at trial to admit these statements under specific hearsay exceptions, including Rule 804. *See* Fed. R. Evid. 804(b)(3) (statements against penal interest), as necessary.

2.  Co-Conspirator Statements Offered by the
    Defendant

The Government also moves to preclude Chang from admitting, either in his case-in-chief or on cross-examination, his own statements or statements of his co-conspirators. (Gov't MILs at 22-25.) The Government clarifies in its Reply brief that it requests the court preclude any "improper use" of the doctrine by the Defendant at trial in order to admit certain statements. (Gov't Reply at 25.) Chang argues that he may introduce such statements under the rule of completeness "in the event the Government tries to mislead the jury." (Chang Opp. at 20.)

Both sides agree on the general rule prohibiting a defendant from introducing his own out-of-court statements because such statements are hearsay without an exception. *See United States v. Kadir*, 718 F.3d 115, 124 (2d Cir. 2013). Two exceptions, however, may allow for admission of such statements: statements showing defendant's state of mind under Rule 803(3), and the completeness doctrine under Rule 106.

Under Rule 803(3), the state-of-mind exception to the hearsay rule allows into evidence "[a] statement of the declarant's then-existing state of mind . . . but not including a statement of memory or belief to prove the fact remembered or believed." Fed. R. Evid. 803(3).

Under the rule of completeness, "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." Fed. R. Evid. 106. Thus, the rule provides that "even though a statement may be hearsay, an omitted portion of the statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion." *United*

11

*States v. Kopp*, 562 F.3d 141, 144 (2d Cir. 2009). "The rule does not, however, require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages." *Id.*

Subject to the Government's clarification that it seeks to preclude Chang from admitting co-conspirator statements for an "improper use," (Gov't Reply at 29), the court GRANTS the Government's motion. Chang may not introduce such statements in his case-in-chief because they would constitute inadmissible hearsay. He may, however, introduce co-conspirator statements during cross-examination if they are necessary to provide the complete context of the Government's introduced statements or go to his state of mind.

### 3.   Ledgers and Spreadsheets

The Government also moves to admit, under Rule 801(d)(2)(E), two exhibits previously admitted in the *Boustani* trial (an email from co-defendant Allam with an attached excel document), (Gov't MILs at 10-15), and other versions of spreadsheets and ledgers from Privinvest that do not have cover emails that indicate who sent them. (*Id.* at 15-18.) The previously admitted exhibits and the other versions of spreadsheets and ledgers from Privinvest, the Government asserts, were created or maintained by co-conspirators and detail bribe payments made to the Defendant and co-conspirators in connection with the maritime projects. (*See* Gov't MILs at 11-12, 15-18.)

Chang objects, arguing that the Government cannot show that these documents meet the requirements under Rule 801(d)(2)(E), including that the "other" ledgers and spreadsheets cannot be shown to be made by co-conspirators. (Chang Opp. at 14-15.)

For the reasons discussed *supra*, the court will conditionally admit the two previously admitted exhibits on a conditional basis

under *Geaney*. The court notes that these two documents are likely admissible as co-conspirator statements where the documents were made or sent by co-defendant Allam to his personal email account and appear to detail what the Government asserts are bribe payments made to the Defendant and other co-conspirators. For the "other" ledgers and spreadsheets that were not admitted in the *Boustani* trial, however, the Government only identifies one ledger and notes that similar kinds of documents do not identify the author. (Gov't MILs at 15.) Despite the Government's assertions, it is not readily apparent that these documents are admissible as co-conspirator statements in furtherance of the conspiracy or as statements against penal interest. (*See, e.g.,* Chang Opp. at 14-15.) Accordingly, the court will RESERVE on the admissibility of these unidentified spreadsheets and ledgers until trial, when such documents will be placed in their appropriate context.

In sum, the court GRANTS the Government's motion as to the previously admitted ledgers and spreadsheets but RESERVES DECISION as to the remaining unidentified ledgers and spreadsheets until trial.

### 4. Privinvest Documents

The Government also moves to authenticate and admit nine Privinvest Documents (six email chains and three ledgers/spreadsheets) that were produced in the U.K. Proceeding. (Gov't MILs at 25, 30-32.) Chang objects to these documents, arguing that they cannot be properly authenticated and separately, that they constitute inadmissible hearsay. (Chang Opp. at 12-15, 22-27.)

The Government seeks to authenticate certain documents through the testimony of two witnesses: Katie Reith, an attorney at Quinn Emañuel Urquhart & Sullivan U.K. LLP ("Quinn Emanuel"), who represented Privinvest in connection with the Projects, and Rupert Butler, U.K. counsel for Andrew Pearse in

13

the U.K. Proceeding. (Gov't MILs at 25.)[5] The Government antic-ipates that Ms. Reith will testify that as part of Quinn Emanuel's representation of Privinvest, the firm hired an e-litigation vendor to collect documents from Privinvest, uploaded them onto an online database, that Ms. Reith personally reviewed the docu-ments at issue, and that the documents are the same documents she reviewed on the database. (*Id.* at 25-26.) The Government also anticipates that Mr. Butler will testify that he received the Privinvest Documents from either Privinvest or Jean Boustani in discovery in the U.K. Proceeding and that this testimony is cor-roborated by discovery production cover letters sent from Privinvest's and Boustani's counsel and the corresponding Bates numbers on the documents themselves. (*Id.* at 26.) Chang ob-jects, arguing that these documents cannot be properly authenticated because the proposed witnesses do not have per-sonal knowledge of what the records are. (Chang Opp. at 22-25.)

"Under Federal Rule of Evidence 901(a), the burden rests on the proponent of documentary evidence to provide 'sufficient evi-dence to support a finding that the matter in question is what the proponent claims.'" *Bell v. Rochester Gas & Elec. Co,* 329 F. App'x 304, 306 (2d Cir. 2009) (Summary Order) (quoting Fed. R. Evid. 901(a)). "The proponent carries his burden by introducing suffi-cient proof allowing a reasonable juror to find in favor of authenticity." *Id.* The Second Circuit has considered "the bar for authentication of evidence [] not particularly high, and proof of authentication may be direct or circumstantial." *Al-Moayad,* 545 F.3d at 172. "The proponent need not rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that

---

[5] The Government also submits that some documents, such as Government Exhibits ("GX") 2808 and 2808A, which comprise an e-mail authored by co-defendant Allam and an accounting spreadsheet allegedly detailing bribes, will be authenticated via certification. (*See* Gov't MILs at 11 n.3; *see also* Ex. A to Gov't MILs ("GX 2808"); Ex. B to Gov't MILs ("GX 2808A").)

the evidence is what it purports to be." *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007).

The court finds that the Government may authenticate the Privinvest Documents through testimony provided by Ms. Reith and Mr. Butler.

Chang's contention that documents the Government seeks to admit must be authenticated by someone with personal knowledge of the records is misplaced. He relies on *United States v. Vayner*, to argue that Rule 901 requires witnesses to adequately testify that the records are what the Government claims them to be. 769 F.3d 125, 129-32 (2d Cir. 2014). However, *Vayner* concerned the admission of a printout of a webpage that did not have enough information to permit a reasonable conclusion that the page was created by the defendant. *Id.* at 132. That is not the issue here. Indeed, courts considering the admissibility of electronic documents and communications have held that "evidence may be authenticated in many ways and the type and quantum of evidence necessary to authenticate [electronic sources] will always depend on context." *United States v. Ulbricht*, 79 F. Supp. 3d 466, 488 (S.D.N.Y. 2015) (quoting *Vayner*, 769 F.3d at 133).

Thus, Ms. Reith and Mr. Butler do not need personal knowledge of the records; rather the Government needs to show that their testimony provides a basis to authenticate the documents, which they would provide through circumstantial evidence.

Additionally, the Government asserts that at trial, it will establish that these documents are either "emails between two co-conspirators discussing the amounts, bank accounts, and details of the bribe payments to the defendant, or accounting ledgers and spreadsheets that track the payment of bribes and kickback payments to co-conspirators" and are therefore relevant and admissible as co-conspirator statements. (Gov't MILs at 32.) Assuming then, that the Government can prove by a preponderance of the evidence that the Defendant and the relevant declarants

were part of the same conspiracy and that these documents were made in furtherance of said conspiracy, as well as provide independent corroborating evidence of Chang's participation in the conspiracy, these documents are likely to be admissible as co-conspirator statements pursuant to Rule 801(d)(2)(E).

The court therefore GRANTS the Government's motion to authenticate and admit the Privinvest Documents. The court notes that the Government submits that Ms. Reith and Mr. Butler will testify as to the documents' existence but not whether the documents discuss bribe payments to the defendant or other illegal activities. (Gov't Reply at 27-28 ("The government is not calling Ms. Reith or Mr. Butler to interpret these documents; they are testifying to their authenticity.").)[6] Further, the court maintains that decision on the admissibility of the unidentified spreadsheets and ledgers, *i.e.*, those without a cover email or not previously admitted in the *Boustani* trial, is RESERVED.[7]

---

[6] Chang's additional argument that Ms. Reith's testimony will be constrained by attorney-client privilege is without merit. (*See also* Chang Response to Quinn Emanuel Ltr. (Dkt. 616).) As noted, the Government does not intend to elicit testimony regarding the substance of the documents but only as to their authenticity. (Gov't Reply at 28.) Their existence, production, collection, upload, and review by the witnesses, which the Government anticipates using to authenticate the documents, is not privileged. *See Com. Data Servers, Inc. v. Int'l Bus. Machs. Corp.*, 262 F. Supp. 2d 50, 58-59 (S.D.N.Y. 2003) (finding that documents were authentic when an attorney representing the firm had personal knowledge that the documents were obtained during discovery and submitted a declaration that these documents were true and correct copies). Further, the court recently received a letter from Quinn Emanuel reiterating the limited nature of Ms. Keith's testimony and affirming that, upon consultation with its client Privinvest, this testimony does not raise any privilege concerns. (*See* Quinn Emanuel Ltr. (Dkt. 613).)

[7] These include Exhibits C, F-7, and F-8, appended to the Government's opening motion.

### B.   Investor Testimony Regarding Materiality

The Government seeks to elicit testimony from investors in the Projects, including the Investment Banks, about whether purported misstatements in the project loan agreements and offering documents were material to their decision to invest. Specifically, the Government anticipates, through the use of hypothetical questions, eliciting testimony regarding two alleged misstatements in the loan documents: (1) that the loan funds would be used exclusively for the Projects; and (2) that the loan funds would not be used for bribes, kickbacks, or any other corrupt payments. (Gov't MILs at 32.)

For reasons that will be discussed in a separate Order addressing the Government's supplemental motion *in limine* seeking to preclude certain arguments regarding Credit Suisse, the below analysis addresses testimony from all other investors, but excludes consideration of investor testimony by those currently or formerly employed at Credit Suisse. (*See* Gov't Suppl. MIL (Dkt. 583).)

The Government outlines the contours of its proposed line of questioning to its investor witnesses regarding materiality. It requests the court's permission to ask the following:

(1) whether it would have been important for them to know that the use of the loan proceeds were being used to pay millions of dollars to bankers and Mozambican officials; (2) whether it would have been important for them to know that the contractor, Privinvest, had promised to pay or had paid millions of dollars to bankers and Mozambican officials in connection with the loans, and (3) whether the banks would have approved and invested in the loans and whether other investors would have invested in the loans if they knew such information. In addition, the government proposes asking: [(4)] "The government has alleged that these payments by

Privinvest are bribes and kickbacks. If the government's allegations are true, would that have been important for you to know and would you still have approved and/or invested in the loans?" (Gov't Reply at 37.)

Notwithstanding arguments against testimony from Credit Suisse, Chang objects to this request arguing that certain questions that discuss "bribes" would be guilt-assuming hypothetical questions that would confuse the jury. (Chang Opp. at 30-31.)

As background, Count One charges Chang with conspiring to violate the substantive wire fraud statute, 18 U.S.C. § 1343. The essential elements of wire fraud in violation of 18 U.S.C. § 1343 are "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017). "In order to prove the existence of a scheme to defraud, the government must also prove that the misrepresentations were material[.]" *Id.* A "false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the [decisionmaker] to which it was addressed." *United States v. Corsey*, 723 F.3d 366, 373 (2d Cir. 2013). Materiality is normally a question reserved for the jury given the inherently fact-specific nature of the inquiry. In fraud cases, "investor testimony can be relevant to whether a defendant's alleged misstatements or omissions were material." *United States v. Guo*, No. 23-CR-118 (AT), 2024 WL 1862022, at *6 (S.D.N.Y. Apr. 29, 2024); *see also United States v. Cuti*, 720 F.3d 453, 459 (2d Cir. 2013) (collecting circuit cases where courts have permitted the use of hypothetical question to inquire into the effect of a fraud).

"Whether a witness is testifying as an expert or non-expert depends on whether his testimony is based on personal perceptions of the matters in issue on the one hand or his specialized knowledge of issues relevant to the case on the other." *United States v. Johnson*, No. 16-CR-457 (NGG), 2017 WL 11490479, at

*2 (E.D.N.Y. Aug. 4, 2017). "A non-expert (or 'lay') witness may testify as to facts about which the witness has 'personal knowledge,' Fed. R. Evid. 602, as well as opinions that are '(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope' of the rule governing expert testimony, Fed. R. Evid. 701." *Id.*

The court concludes that the proposed testimony the Government seeks to elicit is properly considered lay opinion testimony. Regarding the first three questions proposed by the Government, (*see supra*; Gov't Reply at 37), the Government's formulation of these questions is narrowly tailored to the issue of materiality. The questions ask whether the use of funds in certain ways is material to decisions to invest and, under *Cuti*, the investor witnesses are equipped to provide testimony on the impact of their decisions as either fact testimony under Rule 602 or lay opinion testimony under Rule 701. *Cuti*, 720 F.3d at 458-59; *see also United States v. Velissaris*, No. 22-CR-105 (DLC), 2022 WL 17076747, at *5 (S.D.N.Y. Nov. 18, 2022). Prior to asking these hypothetical questions, there must be a foundation to do so, and the defense is permitted to challenge the factual accuracy of the disputed testimony. *Cuti*, 720 F.3d at 458-60.

The fourth question presents a closer call. In that question, the witness will be asked to assume that the payments made to Chang and other co-conspirators were illegal bribes and kickbacks and had they had known of these illicit payments, whether they would have still invested in the Projects. Chang's money laundering charge includes as an element that he committed specified unlawful activities which include "offenses against a foreign nation involving the bribery of a public official, in violation of Mozambican law." (Indictment ¶ 59.) Asking questions

that assume guilt or that allow witnesses to speak to the wrong-fulness of the defendant's actions may take away that analysis from the jury and would therefore not be authorized. *Cf. Cuti,* 720 F.3d at 460-61 ("The district court took pains to limit the hypotheticals to the impact of the withheld information and barred the witnesses from speaking to the wrongfulness of the defendants' actions, leaving that analysis to the jury."). Because the fourth question asks the witnesses to assume guilt of a key aspect of the crimes charged ("The government has alleged that these payments by Privinvest are bribes and kickbacks. If the government's allegations are true . . ."), it is inadmissible.

Accordingly, the court GRANTS in part and DENIES in part the Government's motion to elicit testimony from its investor witnesses regarding materiality so long as the proper foundation is established for each question and that these questions are posed as hypotheticals without requiring the jury to assume the guilt of the defendant. For those questions admitted, Chang is of course free to challenge the factual accuracy of these witnesses' testimony on cross-examination.

### C.   Applicable Elements of Mozambican Law

The Government also requests that the court determine before trial the elements of the applicable Mozambican anti-bribery laws for purposes of the specified unlawful activity charged in the money laundering conspiracy count. (See Gov't MILs at 35-39.) Because Chang both objects and moves *in limine* to preclude the designation of the Government's witness Victor Pereira Pinto as an expert on Mozambican law, the court will address the parties' arguments on the law when discussing Chang's motions *infra*. (*See* Chang Opp. at 35-41; Chang MILs at 24-31.)

In brief, the court concludes that Law 6/2004 applies, but DENIES the Defense's motion to preclude the designation of Mr. Pinto as an expert on Mozambican law. Subject to further briefing as outlined *infra*, the court RESERVES DECISION on the

Government's request to determine the applicable elements of the relevant Mozambique law before trial.

### D.  First Brought Venue Statute as Alternative Theory to Venue

Here, the Government moves *in limine* requesting that it be permitted to prove venue under the "first brought" or "high seas" statute, 18 U.S.C. § 3238, and that Chang be precluded from arguing that this case should have been brought in a different venue. (Gov't MILs at 40-48.) Chang objects to the request as improper and rejects the notion that he cannot argue that the Government has failed to prove venue. (Chang Opp. at 43-44.) For the reasons discussed herein, the court GRANTS the Government's motion.

#### 1.  Applicable Law

The Government bears the burden of proving venue. *See United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989). "Because venue is not an element of a crime, the government need establish it only by a preponderance of the evidence." *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011).

Section 3238 provides, in relevant part: "The trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought[.]" 18 U.S.C. § 3238.

In *United States v. Miller*, the Second Circuit considered whether a defendant could be tried under § 3238 in the District of Vermont for aiding and abetting the removal of a child from the United States. *See* 808 F.3d 607, 611 (2d Cir. 2015). There, the defendant moved to dismiss the indictment for improper venue, arguing that even if certain conduct occurred outside of the United States, § 3238 does not apply when the acts comprising the crime "were not *wholly* committed outside of the United

States" or in other words, when only some of the relevant offense conduct occurred within the United States. *Id.* at 618-19. The Second Circuit rejected this argument, finding that venue does not become improper under § 3238 "simply because it might also have been properly laid elsewhere pursuant to § 3237(a)."[8] *Id.* at 620; *see also id.* at 616 (noting that "when the acts constituting the crime and the nature of the crime charged implicate more than one location, the Constitution does not command a single exclusive venue").

Thus, "[i]f an offense is *begun* or *committed* on the high seas or out of the jurisdiction of any particular state or district, venue is proper in the district in which the offender is arrested or *first brought* even though parts of the crime were committed in some other district so that venue might have been proper there." 2 Charles Alan Wright, Fed. Prac. and Proc. Crim. § 304 (4th ed. 2004) (emphasis added); *see also United States v. Jensen*, 93 F.3d 667, 671 (9th Cir. 1996) (Fletcher, J., concurring) ("That the defendants also operated their vessels within the District of Alaska does not remove section 3238's applicability—the alleged offense was still 'begun or committed' upon the high seas during the period charged.") "The fundamental question in deciding the application of § 3238 is whether the acts are 'essentially foreign.'" *United States v. Klyushin*, 684 F. Supp. 3d 1, 12 (D. Mass. 2023) (first citing *United States v. Pendleton*, 658 F.3d 299, 304-05 (3d Cir. 2011); then citing *Miller*, 808 F.3d at 620).

---

[8] 18 U.S.C. § 3237(a) reads, in pertinent part: "Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."

### 2. Permission to Proceed on First Brought Statute

The Government submits that it has several bases for which it can prove venue but seeks a pre-trial ruling allowing it to prove venue under 18 U.S.C. § 3238 so that it can streamline its case-in-chief and potentially eliminate witnesses who would be called to testify on various bases of venue. The Indictment alleges venue under § 3238 for both counts. (*See generally* Indictment.) And the Government submits that it can prove venue under the first brought statute because the offense conduct "began" outside of the United States and Chang was "first brought" to the Eastern District of New York by way of John F. Kennedy International Airport. (Gov't MILs at 43-44; Gov't Reply at 43 n.25.) The Government intends to elicit testimony from FBI agents who escorted Chang on the flight from South Africa to New York, and that the flight was direct, making no stops before arriving at the JFK Airport. (*Id.* at 40 n.14.)

Upon these facts, the Government has sufficiently alleged venue under the statute such that it may advance this venue theory before the jury. *See United States v. Bankman-Fried*, 680 F. Supp. 3d 289, 315 (S.D.N.Y. 2023) ("[T]he question of whether there is sufficient evidence to support venue is appropriately left for trial."). The court notes that it is not ruling that venue under § 3238 is proper here, only that the Government may proceed on this theory of venue. Ultimately, the Government will still "need to prove venue to the jury." *United States v. Mackey*, 652 F. Supp. 3d 309, 323 (E.D.N.Y. 2023).[9] How this question is put to the jury will be determined following the charging conference.

Chang takes issue with this alternate venue theory because in his view, the Government is effectively "revers[ing] course," going

---

[9] The Defense mischaracterizes the motion as asking the court to determine venue prior to trial but that is not what the Government requested, as the Government clarifies in its Reply. (Gov't Reply at 41-42.)

from a theory that this case is about domestic conduct to one where "the vast majority" of communications and conduct took place outside of the United States. (Chang Opp. at 42-43.) However, Chang's argument is that the Government was untruthful in characterizing its case on dismissal rather than whether the Government may properly prove venue under § 3238 on the facts alleged. (*Id.*) The court acknowledges the argument, but notes that ultimately, this does not preclude the ability of the Government to prove both the present conspiracy charges and venue under Section 3238. And the court observes that the Defense has been on notice of this potential venue theory as early as December 21, 2023, when the Government superseded the indictment for a second time charging Chang only and alleging venue under Section 3238 for all three previous counts. (*See generally* S-2 Indictment (Dkt. 524).) Chang has raised no other reason for why advancing the theory before the jury would be improper.[10]

Accordingly, the Government's motion is GRANTED. The Government will be able to present evidence that venue is proper under Section 3238. Whether venue is, in fact, proper will be a question for the jury.

### 3.  Preclusion of Arguments that the Case Should be Brought Elsewhere

The Government also seeks to preclude Chang from arguing or eliciting evidence that this case should have been brought in a different country or jurisdiction. (Gov't MILs at 45-48.) The Government argues that these kinds of arguments are irrelevant and

---

[10] Moreover, many of Chang's concerns are with respect to this court's ability to hear this case at all. Chang may argue impermissible extraterritoriality and related issues when contesting the Government's theory of the case and proof of the wire fraud and money laundering conspiracies beyond a reasonable doubt. But, where venue has an entirely different (and substantially lower) standard, the court does not find it proper to preclude the Government's ability to prove the alternate theory.

misleading to a jury. (*Id.*) Chang opposes, arguing that preclusion of the argument hinders his ability to present a full defense. (Chang Opp. at 43.)

Only relevant evidence may be admitted at trial. Fed. R. Evid. 402. Evidence is relevant if it "has any tendency to make a fact more or less probable" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. This standard imposes a "very low" bar. *United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012). Even where it is determined to be relevant, evidence may be excluded if the court determines that "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Statements to the effect of "this case should be prosecuted elsewhere," "the jury should acquit/find Chang not guilty because the case is better suited in a different venue or jurisdiction such as Mozambique," and the like have minimal relevance and invite improper jury nullification. Notwithstanding an appropriate limiting instruction, such statements nevertheless run the risk of the jury improperly acquitting the Defendant if it believed that a more proper jurisdiction is outside of the United States. Accordingly, these statements are inadmissible under Rule 403. *See, e.g.,* *United States v. Napout*, No. 15-CR-252 (PKC), 2017 WL 6375729, at *13 (E.D.N.Y. Dec. 12, 2017) (precluding arguments and testimony that would invite improper jury nullification).

Chang argues, however, that he should not be prevented from arguing against: intent given that the loan documents are governed by the laws of the United Kingdom; jurisdiction and venue; and witnesses' reasonable understanding of what was in the loan documents. (Chang Opp. at 44.) The court does not read the Government's motion as foreclosing such arguments. While true

the court has made "jurisdictional rulings" in the first instance, these rulings were tied to whether the Government properly alleged the factual allegations to withstand a motion to dismiss, not whether it has, in fact, proven jurisdiction sufficient to convict Chang of the wire fraud and money laundering conspiracies. (*See* Gov't Reply at 45; *see generally* Omnibus M&O (Dkt. 573).)

Chang can make these arguments without eliciting testimony as to where the case *should have been brought*. As such, the Government's motion to preclude arguments to the effect of "this case should be brought elsewhere" is GRANTED. Chang may argue and elicit evidence relating to venue, jurisdictional requirements for each of the conspiracies, and witnesses' understanding of what was in the loan documents to the extent such arguments and evidence dispute the Government's case-in-chief and is not elicited for the impermissible purpose of suggesting that the case should have been brought elsewhere.

### E.  Preclusion of Certain Arguments for Irrelevance and Improper Purpose

The Government seeks to preclude certain arguments it anticipates Chang making at trial, asserting that these arguments either contradict controlling Second Circuit case law or create an improper risk of jury nullification. Specifically, the Government anticipates the Defendant making arguments (1) concerning whether the Investment Banks and other investors should not have or did not in fact rely on fraudulent misstatements, and whether they suffered any loss or whether Chang believed there would be harm to them; (2) suggesting that international wire transfers of money through correspondent banks are not covered by 18 U.S.C. § 1956(a)(2), the substantive money laundering statute with which Chang is charged with conspiring to violate, (*see* Indictment ¶ 59); and (3) concerning his detention in South Africa, his lack of ties to the United States, and the acquittal of his co-defendant Jean Boustani. (Gov't MILs at 48-59.) Relying

on the evidentiary rules laid out above (Rules 401-403), the court addresses each argument in turn.

### 1.   Investor Harm

The Government moves to preclude the Defendant from making any argument that "the Investment Banks and other investors (a) should not have relied on misstatements by the defendant or his conspirators or that they did not in fact rely on such fraudulent misstatements; (b) that they did not suffer any loss; and (c) that the defendant believed there would be 'no ultimate harm' to investors." (Gov't MILs at 49.) The Government notes as an example that Chang will rely on evidence obtained through Rule 17(c) subpoenas, where he sought documents from entities and investors relating to the Republic of Mozambique's assistance in ensuring Proindicus, MAM, and EMATUM made their interest payments and settlement agreements entered into between Mozambique and investors regarding payments purportedly owed under the Proindicus loan. (Gov't MILs at 51.) The Government submits that the "only conceivable reason" to seek these documents is to argue that investors were ultimately paid, and thus did not suffer any pecuniary harm. (*Id.* at 52.) In his Opposition, Chang argues that evidence that victims suffered loss is probative as to materiality and whether he possessed the requisite intent to enter the conspiracy. (Chang Opp. at 44-46.) He argues that the Government's concerns about jury nullification are premature and can be resolved through jury instructions. (*Id.*) However, he does not specify the evidence he seeks to admit that may concern actual loss or reliance.

Accordingly, the court limits its analysis to the issue of investor loss as it relates to the Defendant's intent and concludes that the Government's motion is GRANTED in part and DENIED in part.[11]

The focus of the inquiry in a wire fraud charge is on the Defendant's *intent to defraud*, not the state of mind of those allegedly defrauded, nor whether they were actually defrauded. *See United States v. Adelekan*, 567 F. Supp. 3d 459, 470 (S.D.N.Y. 2021); *see also United States v. Rossomando*, 144 F.3d 197, 201 n.4 (2d Cir. 1998) ("It is also irrelevant whether such a defendant does in fact pay back the loan, or more generally, whether the victim of a fraudulent scheme does in fact suffer harm, so long as concrete harm was contemplated."). "Although the materiality of the misrepresentations is an element of mail and wire fraud, the Supreme Court has held that the 'common-law requirements of 'justifiable reliance' and 'damages[ ]' . . . plainly have no place in the federal fraud statutes." *Weaver*, 860 F.3d at 95 (quoting *Neder v. United States*, 527 U.S. 1, 24-25 (1999)). Therefore, "[a] defendant's criminal liability for fraud does not depend upon a victim having sustained actual financial or property loss; rather, the government need only establish that the defendant intended to expose the victim to actual or potential loss or harm." *United States v. Watts*, 934 F. Supp. 2d 451, 471 (E.D.N.Y. 2013); *see also United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) ("[T]he proof must demonstrate that the defendant had a conscious knowing intent to defraud and that the defendant contemplated or intended some harm to the property rights of the victim."). Defendants are thus prohibited from raising as a defense that they believed that the victims will ultimately be

---

[11] In his Opposition, Chang acknowledges that the Government is not required to prove reliance and appears to confirm that he will not advance arguments or elicit testimony on reliance. (Chang Opp. at 45.) The court notes the Government's intent to reserve its right to move *in limine* on the issue of investor reliance should Chang advance arguments on those grounds. (Gov't Reply at 47 n.28.)

made whole. *See, e.g., United States v. Gatto*, 986 F.3d 104, 118 (2d Cir. 2021) ("The law is clear: a defendant cannot negate the fraud he committed by wishing that everything works out for his victim in the end."); *United States v. Calderon*, 944 F.3d 72, 90 (2d Cir. 2019) ("[T]he fact that the defendant believes (rightly or wrongly) that he will 'ultimately' be able to work things out so that the victim suffers no loss is no excuse for the real and immediate loss contemplated to result from defendant's fraudulent conduct.").

Further, a defense that Chang lacked the requisite intent because the loan documents ensured that investors would be paid back or made whole is not a defense to the charges here. *See Rossomando*, 144 F.3d at 201 ("[T]he defendant's good-faith intention to pay back the loan is no defense because he intended to inflict a genuine harm upon the bank."). And Chang does not provide any explanation for why he believes actual loss by investors is probative as to whether he had the requisite intent to enter the conspiracies to defraud and conceal bribe money.

However, it is possible that evidence that indicates actual loss by the investor victims, including the Investment Banks, may be relevant as to whether Chang knowingly entered a conspiracy and had an intent to defraud. Therefore, barring such evidence wholesale at this time would be inappropriate. *See Stoncor Grp., Inc. v. Peerless Ins. Co.*, 573 F. Supp. 3d 913, 917 (S.D.N.Y. 2021) ("Evidence challenged in a motion *in limine* should only be precluded when it is clearly inadmissible on all possible grounds.").

The Government's motion is therefore GRANTED in part and DENIED in part. To the extent Chang advances other arguments and evidence showing that the investors would ultimately be made whole or suffer no harm to demonstrate actual loss and reliance defenses, the Defense will be precluded from so arguing. Chang is permitted, however, to make arguments and present evidence (assuming such evidence is admissible) concerning actual loss for

the limited purpose of arguing that he did not possess the intent to enter the charged conspiracies. This is of course, subject to 403 balancing at trial and the Government is free to object should its probative value be called into question.[12] And, to limit the potential prejudicial impact of such information, the court may instruct the jury, if requested by the Government, that actual loss and reliance are not defenses to the charges.

### 2.   Wire Transfers through Correspondent Banks

The Government next moves to preclude arguments or cross-examination suggesting that international wires through correspondent banks do not constitute the movement of funds under the money laundering statute. (Gov't MILs at 54-56.) Chang appears to argue in opposition that this would prevent him from defending the money laundering charge and that the court "should let the jury decide whether it thinks completely foreign bank transactions that tangentially go through correspondent bank accounts are sufficient to establish a conspiracy to launder money beyond a reasonable doubt." (Chang Opp. at 46-47.)

To sustain a conviction for money laundering conspiracy, the Government must prove that Chang conspired to transfer funds to, from, or through the United States with the intent to promote a specified unlawful activity and knowing that the transfer of such funds were designed to conceal the fact that the proceeds were of a specified unlawful activity. *See* 18 U.S.C. §§ 1956(a)(2)(A), (a)(2)(B)(i). (*See also* Indictment ¶ 59.)

Chang is free to present his arguments disputing his part in the conspiracy, that he knew of or intended to transmit funds to promote specified unlawful activity or that he knew of or intended the transmission or concealment of illegal funds. But, to "let the

---

[12] Any other potential uses that Chang may raise will be addressed in appropriate context at trial.

jury decide" whether international, dollar-denominated money laundering transactions going through U.S. correspondent bank accounts are sufficient to satisfy the transaction requirement in a money laundering charge is both improper and contrary to law.

As this court noted when denying Chang's motion to dismiss the money laundering charge, the Second Circuit law is clear on this issue: "[C]ourts – including the Second Circuit – have long conceived of transfers from one place to another as being severable, and resting in the United States, when moving through correspondent banks." (*See* Omnibus M&O at 33 (quoting *United States v. Ho*, 984 F.3d 191, 204-05 (2d Cir. 2020)); *see also* Gov't MILs at 55-56 (reviewing *Ho* and collecting similar case law).) Whether wire transfers "tangentially" going through correspondent bank accounts satisfy the transaction element under 18 U.S.C. § 1956(a)(2)(A) is thus a purely a legal question that has been resolved in this Circuit. *See Ho*, 984 F.3d at 205-06 (collecting cases). The jury's role is not to decide the applicable law; its role is to determine whether the Government has proven all factual elements of the charged crime. *See United States v. DiCristina*, 726 F.3d 92, 105 (2d Cir. 2013). Thus, the jury must decide whether transfers occurred such that this element is met, not whether wires through correspondent bank account transfers are appropriately covered by 18 U.S.C. § 1956(a)(2).

Accordingly, the Government's motion is GRANTED.

### 3.  Detention, Ties to U.S., and Boustani Acquittal

Further, the Government seeks to preclude the Defendant from introducing evidence or argument concerning: "(1) the amount of time he was detained in South Africa prior to being extradited and the length of time of extradition; (2) the defendant's nationality and minimal or lack of connections to the United States; and (3) the acquittal of his co-defendant Jean Boustani in this matter." (Gov't MILs at 57-59.) The Government argues these areas

are irrelevant to the charges against Chang and unfairly prejudi-
cial as well as improper attempts to evoke sympathy from the
jury.

Chang does not address the request to preclude argument con-
cerning Boustani's acquittal, and as such, the Government's
motion as to that request is GRANTED. Should Chang need to
reference matters from the *Boustani* case, he is permitted to refer
to the case as a "prior proceeding" but is precluded from using
the word "acquittal" or otherwise referring to the outcome of the
prior proceeding. *See United States v. Ashburn*, No. 11-CR-0303
(NGG), 2015 WL 729818, at *3 (E.D.N.Y. Feb. 19, 2015).

As to his lack of ties to the United States, Chang argues that a
"wholesale prohibition" on any reference to these issues would
only confuse the jury, leaving jurors to assume Chang voluntarily
appeared here in the United States to stand these charges.
(Chang Opp. at 47-48.) The Government, in its Reply, notes that
it does not object to basic background evidence regarding the de-
fendant's citizenship or that he was the Minister of Finance or a
public official, but any evidence relating to his "international de-
fenses" concerning his lack of ties should not be permitted. (Gov't
Reply at 49-50.) The court disagrees.

Evidence or argument regarding Chang's background, which
necessarily involves his role as a high-ranking official in Mozam-
bique and his ties to the United States, is probative of the
existence of the conspiracies and whether he took part in said
conspiracies, and the evidence outweighs any risk of prejudice to
the Government's case. Because the Indictment seeks to convict
Chang with defrauding investors in the United States through
false statements that are intertwined with his role as Minister of
Finance, he is well within his right to contest these allegations.
*See United States v. Rogas*, 547 F. Supp. 3d 357, 362 (S.D.N.Y.
2021).

Accordingly, the Government's motion to preclude all argument concerning the Defendant's nationality and lack of connections to the United States is DENIED.

With regard to Chang's detention, however, Chang's five-year period of incarceration in South Africa has no bearing on whether he took part in the conspiracy—the relevant question the jury is tasked to decide. The court does not agree that a "wholesale prohibition" on any reference to his detention in South Africa would leave the jury to unduly speculate as to what happened in the five years Chang was not in the United States. (Chang Opp. at 48.) Such evidence is thus highly prejudicial and has little probative value. Accordingly, the Government's motion to preclude argument on the amount of time he was detained in South Africa and the related length of the extradition process is GRANTED.

In sum, the Government's motion is GRANTED in part and DENIED in part. Chang is precluded from arguing that he believed investors would ultimately suffer no harm, but is otherwise permitted to address actual investor loss as it pertains to his intent to enter the charged conspiracies; he is precluded from suggesting that international wire transfers passing through correspondent U.S. bank accounts do not satisfy the transaction element of the money laundering statute; he is precluded from referring to Boustani's acquittal, including using the word "acquittal" or otherwise referring to the outcome of that case; and he is precluded from advancing arguments concerning the length of his extradition and the length of time he was detained in South Africa. Chang is otherwise permitted to raise arguments concerning his nationality and lack of ties to the United States.

### F.   Preclusion of Improper Character Evidence

The Government seeks to preclude the Defendant from offering evidence that he did not commit fraud and accept bribes related to other projects. (Gov't MILs at 59-61.) According to the Government, such evidence would be irrelevant and inadmissible.

(*Id.*) Chang argues that evidence of his conduct in other projects is probative of whether the projects at issue were financed with an intent to defraud or representative of other projects carried out by the Republic of Mozambique. (Chang Opp. 48-49.) The Government in its Reply notes that Chang does not discuss what evidence he may admit to show the process for other projects and believes that such evidence would be impermissible "other acts" evidence. (Gov't Reply at 51.)

Federal Rule of Evidence 404(b) generally prohibits evidence of any "other act" to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. *See* Fed. R. Evid. 404(b)(1). But it permits such evidence for several defined uses, including motive, intent, preparation, knowledge, absence of mistake, or lack of accident. *See id.* 404(b)(2). The Second Circuit applies an "inclusionary approach" to the admission of other-act evidence, "allowing the admission of such evidence for any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test of Rule 403." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000).

Neither party presents examples of the type of evidence that it is contemplating here. But on balance, the court finds that similar prior conduct *could* be relevant and probative as to whether Chang possessed an intent or motive to engage in fraud for the particular projects at issue. The court notes that this does not, as the Government contends, open the door for the defense to turn the trial into a "side-show about the defendant's tenure in office." (*See* Gov't MILs at 62.) Evidence of Chang's relationship to other projects must still be relevant to the question before the jury and probative as to his role in the alleged conspiracies.

Thus, the court DENIES the Government's motion with leave to renew at trial.

### G.   Judicial Notice of Official Mozambican Decision

The Government requests that the court take judicial notice of an official decision taken by the "Constitutional Council"[13] of the Republic of Mozambique, wherein the Constitutional Council ruled that the EMATUM loan and the related guarantee signed by Defendant Chang were "null and void." (Gov't MILs at 62-63; *see* Ex. L-2[14] to Gov't MILs ("EMATUM Decision") at 19 (declaring "the acts inherent in the loan contracted by EMATUM, SA, and respective sovereign guarantee granted by the [Mozambique] Government in 2013 null and void").) Chang objects to this motion, arguing that the Government is improperly seeking to use the EMATUM Decision to prove that the 2013 EMATUM loan and guarantee were not included in the official budget for 2013 and that the guarantee exceeded the maximum amount allowed for government guarantees—issues that are irrelevant to the charges against Chang. (Chang Opp. at 49-54.)

A court may take judicial notice of a fact under Rule 201 if it "is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). This

---

[13] The Constitutional Council, the Government explains, is Mozambique's highest governing body with jurisdiction to administer justice in matters of a legal-constitutional nature. (Gov't MILs at 62.)

[14] The Government attaches the original EMATUM Decision in Portuguese, as well as the English translation and the certification of the translated version as exhibits L-1 through L-3, respectively, to the Government's motion. The Government notes that the EMATUM Decision was first published in 2019 on the official website of the Constitutional Council of the Republic of Mozambique, at http://www.cconstitucional.org.mz/. It appears this link no longer works, so the Government has identified an archived version, at http://167.71.131.195/eng/Jurisprudencia/5-CC-2019. (Gov't MILs at 63 n.27.)

rule extends to criminal judgments in other cases, including foreign judgments, where the court may take judicial notice of the judgment to establish the fact of such litigation, but not to prove the truth of the matters asserted in that litigation. *A.I. Trade Fin., Inc. v. Centro Internationale Handelsbank AG*, 926 F. Supp. 378, 387 (S.D.N.Y. 1996) (collecting cases); *see also Ding Lian Zou v. Gonzales*, 198 F. App'x 109, 110 (2d Cir. 2006) (taking judicial notice of administrative decisions from China).

The Government makes clear that it does not intend to use the EMATUM Decision for its truth, but only for the purpose of recognizing its existence. Indeed, the Government includes an excerpt of testimony from one of its witnesses in the *Boustani* trial and advises the court that it intends to elicit similar limited testimony in this upcoming trial. (Gov't Reply at 52.) In the *Boustani* trial, the Government's witness was asked to read the decision of the Constitutional Council (the last line of the full opinion) as well as note the date and that it was so ordered by the Constitutional Council. (*See Boustani* Trial Tr. dated 12/30/2019 (Dkt. 376) at 3544:4-17.) The Government asserts that the EMATUM Decision, and limited testimony on its existence, are relevant because the decision provides context as to what happened to the EMATUM loan participation notes that were later converted to Eurobonds and whether the Mozambican Government honored its guarantee. (Gov't Reply at 52.) These are permissible uses of the EMATUM Decision under Rule 201(b).

Chang does not challenge the authenticity of the EMATUM decision. He argues, instead, that the EMATUM Decision should not be judicially noticed because there are hotly contested issues of fact contained therein. (Chang Opp. at 50-51.) As support, Chang explains that outside counsel for Mozambique, as well as a Mozambican law firm, both issued opinion letters in 2013 that it was their opinion that the EMATUM contract was valid and enforceable. (Chang Opp. at 51.) However, these opinion letters

were drafted six years prior to the EMATUM Decision and are irrelevant to the existence and validity of the 2019 decision of which the court is asked to take judicial notice. And again, the Government does not intend to elicit testimony regarding the substance of the decision. Accordingly, the court finds no reason to doubt the validity or trustworthiness of the existence of the foreign judgment. *See United States v. Garland*, 991 F.2d 328, 335 (6th Cir. 1993).

Chang also argues against the decision's relevance. But whether the EMATUM Decision is relevant will be considered in the context of the trial.

The Government's motion for the court to take judicial notice of the EMATUM Decision is GRANTED. For clarity, this ruling is limited to the judicial notice of the document for purposes of establishing its existence; the court will consider any specific uses (and objections) regarding the facts or opinions therein at trial.

### H.  Past Recorded Recollections

The Government also seeks a pre-trial ruling allowing its anticipated witness, Mr. Robert Pepitone, to read the contents of a record identifying the dates on which Clearing House Interbank Payments System ("CHIPS") transfers were processed through a facility located in New York City as a recorded recollection pursuant to Rule 803(5). (Gov't MILs at 65-69.) Mr. Pepitone is a vice president and senior product manager for the CHIPS product at The Clearing House, a company that provides payment services to large global banks. (*Id.* at 65.) The Government anticipates that Mr. Pepitone's testimony will satisfy the requirements of Rule 803(5), but based on his prior testimony in the *Boustani* trial and in a criminal trial before Chief Judge Margo K. Brodie, the Government expects that Mr. Pepitone will not recall with specificity the time periods in which CHIPS used its New York City facility between the years 2012 and 2015. (*Id.* at 66-67.) Accordingly, the Government seeks a ruling in advance of

trial permitting Mr. Pepitone to read from the CHIPS Facility Records as a past recorded recollection.

Chang argues in his Opposition that the court should reject such a request as premature because the Government seeks to "effectively skip" the critical step in which the witness testifies to and declares their lack of recollection before their memory is refreshed. (Chang Opp. at 54.) In doing so, according to Chang, the Government attempts to bolster Mr. Pepitone's testimony before he has had a chance to testify as to what he does and does not recall. (*Id.*)

The recorded recollection exception to the rule against hearsay defines a statement as a "recorded recollection" when that record "is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately;" "was made or adopted by the witness when the matter was fresh in the witness's memory;" and "accurately reflects the witness's knowledge." Fed. R. Evid. 803(5). If the statement meets these requirements, the record may be read into evidence. *Id.*

The court agrees with the Defense that this motion is premature and therefore DENIES the motion with leave to renew at trial.

## I.   Business Records Certifications

Finally, the Government moves to authenticate[15] certain business records and foreign business records using certifications pursuant to Rule 902(11) and 18 U.S.C. § 3505, thus alleviating the need for testimony from various records custodians and witnesses. (Gov't MILs at 72-75.) The Government does not provide the underlying records and certifications to the court as there are over 2,000 of them. The Government has, however, provided a

---

[15] The Government's heading notes "admit" while its argument focuses solely on authentication. (Gov't MILs at 72-75.) The court reads the request as solely focusing on authentication which the Government appears to clarify in its Reply. (Gov't Reply at 57 n.37.)

chart listing over 2,000 records, the entity that produced the record, the Bates ranges for the record as produced in discovery, and the Bates ranges for the applicable certifications. (*Id.* at 72.) The Government also submits that it has provided the Defendant with all certifications and underlying records that it has in its possession and will continue to provide them as they become available. (*Id.* at 74.) Chang argues that the motion is premature, and that the Government is attempting to bury the Defense in over 2,000 records when it is unclear which records the Government will introduce at trial. (Chang Opp. at 55-59.) Because the Government has failed to identify what these records are and how they are relevant to this case, Chang needs additional time to review these records for authenticity and relevance. (Chang Opp. at 55-59.) He further asks the court to deny this request because the relevance of records must be established before their authenticity can be considered. (*Id.* at 59.)

Federal Rule of Evidence 902 governs certifications of domestic business records and states that "records of regularly conducted activities, as defined by Rule 803(6)(A)-(C), are self-authenticating when they are accompanied by 'a certification of the custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court.'" *United States v. Gasperini*, No. 16-CR-441 (NGG), 2017 WL 3140366, at *8 (E.D.N.Y. July 21, 2017), *aff'd*, 729 F. App'x 112 (2d Cir. 2018) (quoting Fed. R. Evid. 902(11)). As to foreign business records certifications, 18 U.S.C. § 3505 governs these records in criminal cases and similarly provides for authentication by certification and admissibility.

For both domestic and foreign business records, they are deemed admissible if they are accompanied by a certification of a qualified person showing that: (A) "the record was made at or near the time by—or from information transmitted by—someone with knowledge;" (B) "the record was kept in the course of a regularly

conducted activity of a business . . .;" (C) "making the record was a regular practice of that activity;" and (D) "the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." *See* Fed. R. Evid. 803(6); 18 U.S.C. § 3505(a) (mirroring the requirements set forth in Fed. R. Evid. 803(6)); *see also* Rule 902(11)-(12) (certification of records of regularly conducted activity).[16] The certifications may be written and authenticated prior to trial; a live witness is thus not required to authenticate properly certified business records. *See United States v. Arrington*, No. 15-CR-33, 2022 WL 4077685, at *5 (W.D.N.Y. Sept. 6, 2022) (collecting cases). Such records, even if authenticated, must still be relevant to be admissible. *See, e.g., United States v. El Gammal*, 831 F. App'x 539, 542 (2d Cir. 2020) (Summary Order) (citing Fed. R. Evid. 901(a)).

The parties appear to be discussing stipulations of the authenticity of certain documents. (Gov't MILs at 72 n.31.) But Chang argues that he cannot agree to their authenticity without additional time to review the documents and without more information from the Government on the documents' relevance. Thus, Chang has not raised authenticity concerns regarding any particular document.

The court will RESERVE on this issue until Chang has had time to review these documents and prepare objections, if any, as to *authenticity* and whether the Government has properly certified these documents. The Government is ORDERED to advise the court which, if any, certifications and underlying records have yet to be provided to the Defendant within three days of entry of

---

[16] *See also* 18 U.S.C. § 3505(c)(2) ("'[F]oreign certification' means a written declaration made and signed in a foreign country by the custodian of a foreign record of regularly conducted activity or another qualified person that, if falsely made, would subject the maker to criminal penalty under the laws of that country.").

this Order, and to provide an update when those documents have been produced. The court urges the parties to confer and stipulate to these records' *authenticity* when there are no reasonable arguments against authenticity to avoid unnecessary delay in admitting this evidence. Absent such stipulations, Chang is ORDERED to specify objections to the authentication and certification three days after the Government's update.

## IV. CHANG'S MOTIONS

Chang moves *in limine* seeking (1) to preclude the Government from eliciting testimony or making certain arguments that lack probative value and are prejudicial; (2) to preclude certain witnesses from testifying that they took "kickbacks," or otherwise require that the Government lay the requisite foundation to introduce co-conspirator statements; (3) to preclude the Government from introducing into evidence co-conspirator spreadsheets and emails; (4) to permit Chang to raise the act of state doctrine as an affirmative defense; (5) to preclude the Government from introducing evidence about the Eurobond Exchange; (6) that the court find Jean Boustani is an unavailable declarant under Rule 804(A)(5)(A), and to reject the Government's request to offer other portions of prior testimony under Rule 804(b)(1); and (7) to preclude testimony from all of the Government's experts due to inadequate disclosures and inaccurate opinions on applicable Mozambican law. (*See generally* Chang MILs (Dkt. 572).)[17]

---

[17] The Defendant also moved *in limine* to preclude law enforcement agents from testimony interpreting certain records, (Chang MILs at 12-14); to preclude the Government from referencing convictions in Mozambique, (*id.* at 23-24); and to preclude statements that Defense Attorney Adam Ford or his firm represented Palomar, (*id.* at 39). In light of the Government's representations in its opposition that it does not intend to elicit opinion testimony from law enforcement, (Gov't Opp. at 15-18); that it does not

The court will address each request in turn. For the reasons dis-
cussed below, Chang's motions are GRANTED in part and
DENIED in part, subject to certain issues on which the court RE-
SERVES decision until trial.

### A. Preclusion of Certain Arguments and Terms as Lacking Probative Value and Prejudicial

Chang moves to preclude various arguments or terms that he ar-
gues lack probative value, are highly prejudicial, and would
create a risk of misleading or confusing the jury. As these requests
generally implicate relevance and probative/prejudicial balanc-
ing concerns in Rules 401, 402, and 403, the court groups these
requests together, and takes them each in turn below.

#### 1. IMF's Collective Knowledge, Motivations, or Actions

First, Chang moves to preclude the Government from arguing
that Mozambique failed to disclose the existence of the Proindi-
cus and EMATUM loans to the International Monetary Fund
("IMF"), or relatedly, eliciting evidence from witnesses about the
adequacy of Mozambique's disclosures to the IMF, asserting that

---

intend to introduce evidence of convictions in Mozambique, (*id.* at 34-35);
and that it does not intend to make statements about defense counsel's
prior representation of Palomar, (*id.* at 39), the parties agree that these
issues need not be ruled on at this time. (Chang Reply at 15-16, 22, 32.)
Accordingly, the court DENIES these requests as MOOT, with leave to re-
new at trial.

Further, Chang also moved *in limine* to preclude the Government from
eliciting testimony from Andrew Pearse regarding bribe payments to an
unindicted co-conspirator as highly inflammatory and prejudicial. The
court will address this issue in a separate Order when addressing the Gov-
ernment's *Giglio* motion. (Dkt. 597.)

evidence of these other acts is precluded on "several bases," including Rule 404(b).[18] (Chang MILs at 1-3.) Specifically, he asserts that the Government should not be able to reference the IMF or its "knowledge" because Chang has no opportunity to defend against these accusations when the IMF refuses to comply with its Rule 17 trial subpoena, and permitting such evidence would be violative of the Confrontation Clause. (*Id.* at 1-2.) Moreover, the IMF is not considered a "victim" in this case so its alleged collective lack of knowledge regarding the Projects has no relevance here and would be highly confusing to the jury and unduly prejudicial to Chang. (*Id.* at 2.) Finally, because the Government's witnesses have no firsthand knowledge of what the IMF did or did not know, it would be improper and in conflict with co-defendant Andrew Pearse's testimony in the U.K. Proceeding. (*Id.* at 2-3.)

The Government opposes, arguing that evidence in the form of witness testimony, business records, and contemporaneous documents and emails about Mozambique's required disclosures to IMF is highly relevant to show Chang's role in the charged conspiracies. The Government intends to argue and produce evidence to show that Chang knew about the IMF debt limit and structured the loan agreements to circumvent that debt limit, including by instructing co-conspirators to remove from the loan guarantees a representation that Mozambique would notify the IMF about the existence of the guarantees. (Gov't Opp. at 1.) The Government also submits that it does not anticipate its witnesses claiming firsthand knowledge of what the IMF knew. Rather, the testimony the Government seeks to elicit from co-defendant Pearse will be appropriately limited as to what he understood regarding Mozambique's disclosures and Chang's conduct. (*Id.* at

---

[18] Under Rule 404(b)(1), evidence "of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

4-5 (citing *Boustani* Trial Tr. dated 8/21/2020 (Dkt. 401) at 390-392 (Pearse testifying as to what he understood was the agreement between Mozambique and the IMF, the debt limit provision, and a meeting he had with Chang where Chang refused to include the debt provision and they devised an alternative solution that removed the provision but noted that the Government of Mozambique would confirm compliance with all obligations to the IMF)).)

As to Chang's Confrontation Clause argument, this clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). "An out-of-court statement is testimonial if the primary purpose underlying it was to establish an evidentiary record in a manner that might reasonably be expected to be used in a later legal proceeding." *United States v. Ramos*, 622 F. App'x 29, 30 (2d Cir. 2015) (Summary Order); *see also United States v. James*, 712 F.3d 79, 96 (2d Cir. 2013) ("[A] statement triggers the protections of the Confrontation Clause when it is made with the primary purpose of creating a record for use at a later criminal trial.").

The court finds that there is no Confrontation Clause issue where Chang is free to cross-examine Pearse regarding what he understood Mozambique's disclosures to the IMF were and, with respect to Pearse's prior testimony, whether Chang was involved in circumventing those disclosures. *See* Rule 602 (noting witness must have "personal knowledge of the matter" and that evidence to prove requisite knowledge "may consist of the witness's own testimony"); *see also United States v. Stewart*, 433 F.3d 273, 291 (2d Cir. 2006) (finding that responses to government agents "may have an aura of 'testimony,' [but] there is no question that the contents of all such statements of one member of the conspiracy would be admissible against other members"). The

documents that the Government intends to use also appear to be either "business records or statements in furtherance of a conspiracy" and are therefore not testimonial. *See Crawford*, 541 U.S. at 56.

As to Chang's Rule 404(b) argument, "[w]here, as here, the indictment contains a conspiracy charge, uncharged acts may be admissible as direct evidence of the conspiracy itself." *United States v. Thai*, 29 F.3d at 812. "An act that is alleged to have been done in furtherance of the alleged conspiracy is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged." *United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992). Similarly, evidence that Chang knew of certain IMF limitations and allegedly instructed others to circumvent these limitations is likely not "other act" evidence prohibited under 404(b), but rather evidence that is a relevant "part of the very act charged." *Id.*

And as to relevance, the Government submits that the evidence would be relevant and highly probative of Chang's role in the conspiracy and provide context to the bribery and kickback scheme. (Gov't Opp. at 3.) In doing so, the Government focuses on Chang's actions as necessary to obtain the loan funds from which the kickback payments were diverted, and this cuts to the heart of the Government's case. (*Id.* at 4.) Demonstrating Chang's role in the conspiracy and providing proper context to his role and the misrepresentations would be highly relevant and outweigh any undue prejudice if part of the conspiracy charged.

Thus, the court GRANTS in part and DENIES in part the Defendant's motion to preclude argument and testimony concerning Mozambique's disclosures to the IMF. The Government may argue and introduce evidence that the Government of Mozambique failed to disclose its debt as well as elicit testimony as to what witnesses understood the disclosures to the IMF to mean and the circumstances surrounding the debt limit provision provided that

these witnesses have the requisite personal knowledge on these issues. However, to the extent that the Government seeks to elicit testimony about whether the IMF knew of the loan guarantees, or make arguments going to IMF's collective knowledge, those arguments are precluded.

### 2. Mozambique's Budgetary Laws, Ongoing Investigations, and Audit Findings

Chang also moves to preclude the Government from introducing evidence or testimony about Mozambique's budget laws and related administrative requirements, its ongoing investigations, and audit findings relating to the projects at issue, including an audit of Proindicus by "Kroll," asserting that each are irrelevant and prejudicial. (Chang MILs at 17-21.) Notwithstanding the Kroll audit, which the Government does not intend to introduce, the Government argues Chang's motion should be denied as vague and because its expected testimony and evidence are probative of Chang's involvement in the loan agreements terms, and his continuing involvement and role in the conspiracy generally. (Gov't Opp. at 26-28.)

Upon review, the court agrees that Chang's request is broad and vague in noting the "budget laws or other purported administrative hurdles or procedures" and "any investigations conducted by the Republic of Mozambique." (Chang MILs at 18-19.) It is thus unclear which evidence Chang is asking the court to exclude by referring to the budgetary laws, audits, and investigations. Without more context or specifics, the court is unable to determine how the potential evidence is relevant or what prejudice it could cause to Chang. Accordingly, the motion is DENIED with leave to renew at trial.

### 3. Use of the Term "Bribe"

Chang moves *in limine* to preclude the Government from using the term "bribe" to describe payments in this case because doing

so is "unduly prejudicial, misleading, and threatens to have the jury convict Mr. Chang of a crime with which he is not charged." (Chang MILs at 10.) In support, Chang notes that he is not charged with bribery nor is there a witness with firsthand knowledge who will testify that the payments to Chang were bribes. (*Id.* at 10-11.) In opposing this motion, the Government argues that Chang ignores the fact that one of the two specified unlawful activities alleged in the Indictment is "offenses against a foreign nation involving the bribery of a public official, in violation of Mozambican law[.]" (Gov't Opp. at 12; Indictment ¶ 59.) The Government also asserts that evidence of the illicit payment will be introduced through co-conspirator statements and statements against penal interest to show that "Privinvest paid millions of dollars in illicit payments to the defendant and his co-conspirators." (Gov't Opp. at 13.) And, in its view, calling these payments bribes is neither prejudicial nor misleading. (*Id.*)

The parties dispute the applicable Mozambican law in this case, *see infra* section IV.G, and in those laws, some specify the term bribery while others discuss the promise of money in exchange of some act. (*See* Gov't Opp. 12 & n.8 (comparing the competing laws).) Chang is correct that he is not charged with bribery, but the court finds such evidence is relevant and may further prove the actual charged conspiracies of wire fraud and money laundering. As to wire fraud, the Indictment alleges that such "bribes" and kickbacks" were the focus of the misrepresentations. (Indictment ¶ 23.) With respect to money laundering, the Government alleges that the Defendant concealed funds, in violation of Mozambique's anti-corruption law. (*Id.* ¶ 59.) Chang, of course, disputes the factual underpinning of these charges and is expected to do so at trial, including by challenging the evidence the Government solicits when using the term "bribe." But, although the term "bribe" is highly prejudicial, a blanket prohibition on its use is not warranted here where such evidence is highly relevant.

Accordingly, a wholesale preclusion of the word bribe is DENIED. Limited uses of the word, such as when demonstrating that payments to Chang satisfy the elements of the crimes charged, are proper. However, the Government's witnesses may not opine on whether payments made to Chang were bribes without proper foundation and in a manner where undue prejudice of the use of the term outweighs its relevance. To the extent this occurs, Chang may object to that testimony.

> 4. Arguments that Chang or "Bribes" "Caused" Project Defaults or "Loss"

Chang also moves to preclude the Government from arguing that Chang or "bribes" "caused" the Projects to default, investor losses, or Mozambique's financial hardships as unduly prejudicial under Rule 403. (Chang MILs at 14-16.) The Government acknowledges that it need not prove causation and that it does not intend to argue that bribes to Chang were the but-for cause of investor losses. However, the Government argues that such evidence is relevant to the nature of the charged conspiracies, Chang's "intent, knowledge, motive, and role in the charged conspiracies," and that the impact to the investors is necessary to "complete the narrative." (Gov't Opp. at 19-21.)

As noted *supra*, loss is not an element of the charged conduct, and Chang is not authorized to make arguments relating to investor loss other than to argue intent to enter the conspiracies. Relatedly, the Government seeks to admit evidence relating to loss for purposes other than illustrating the harm as an element of the offense.

The court agrees that loss may be relevant to proving the conspiracies and Chang's conduct. The Government's theory hinges on facts including, that the Defendant's signature on the government guarantees required or "caused" Mozambique to inherit large amounts of debt, that this existed as part of a conspiracy to defraud investors, including Investment Banks, that all three

loans defaulted, and that the conspirators sought to withhold the country's financial condition from investors to avoid disclosure of their misrepresentations. It is reasonable that these activities would touch on Chang's and his co-conspirators' actions having a causal effect on the borrowing, subsequent default, and their efforts to conceal the scheme. Thus, a blanket prohibition on Chang's conduct as a cause of the default would be inappropriate. However, the court notes that broad and conclusory statements asserting, for example, that Chang's signatures caused Mozambique to enter into a financial crisis, would be unduly prejudicial and certainly not necessary to complete the factual narrative.

The Defendant's motion to preclude the Government from introducing *any* evidence of what Defendant's conduct "caused" is therefore DENIED. But, as noted above, conclusory statements will be precluded and Chang may object at trial to the introduction of certain evidence of investor losses, default, or the impact to Mozambique as necessary.

### 5.   Mr. Brito as an "Associate" of Chang

Chang further moves to preclude the Government from referring to Mr. Luis Filipe Pereira Rocha Brito ("Brito") as an associate of Defendant Chang. (Chang MILs at 22-23.) The Government insists that evidence, in the form of co-conspirator statements and bank records, will show (1) that Chang texted with Mr. Brito on topics reserved for close personal friends, thereby establishing the importance of their relationship and (2) that Chang and co-conspirators used Mr. Brito to launder criminal proceeds through various Spanish and Swiss bank accounts. (Gov't Opp. at 33-34.) In fact, the Government intends to argue that Mr. Brito is an unindicted co-conspirator of Chang. (*See id.*)

The court cannot, at this time, find that the alleged relationship the Defendant shares with Mr. Brito has no relevance to the charges at issue or that he is not an associate of Mr. Chang. The

Government points to evidence it intends to introduce at trial showing this is the case, indicating that it intends to lay a proper foundation for referring to Brito as Chang's associate. (*Id.*) The Defendant may, of course, challenge this evidence, but he has not shown that wholesale exclusion is warranted.

The court therefore DENIES Chang's motion, with leave to renew in the event the Government seeks to characterize the relationship between Chang and Brito as associates without a proper foundation for doing so. *See United States v. Garcia*, 291 F.3d 127, 140 (2d Cir. 2002) ("Of course, the proponent of any evidence, not just lay opinion testimony, must establish a proper foundation for the evidence before a court may admit it.").

### 6. Conduct of Chang's Family Members

Finally, Chang seeks to preclude the Government from introducing evidence of actions involving the Defendant's family members as highly prejudicial and misleading. (Chang MILs at 17.) The Government objects, noting that it seeks to show, through emails between Chang, his family members, and co-conspirators, that: (1) his family was used to receive unlawful proceeds on Chang's behalf, and (2) a close relationship between members of the conspiracy existed, including Boustani and Antonio Do Rosario, who allegedly coordinated with Chang's wife, daughter, and son-in-law to travel to Lebanon to open bank accounts in Chang's daughter's name, days before Chang signed the last Proindicus guarantee. (Gov't Opp. at 23-25.)

Again, Chang makes a broad request to exclude a category of evidence when such breadth is not warranted. Whether exclusion of family communications is warranted will depend on the nature of the specific communications, their relevance, and the court's Rule 403 balancing in the context of the trial. Put differently, the court cannot readily determine that the probative value of the family communications outweigh the prejudice against Chang. Some of the evidence the Government seeks to introduce is

plainly relevant to Chang's role in the charged conspiracies. Some evidence, such as emails showing co-conspirators sending 1,000 bottles of wine, honey, and olive oil to the Defendant's wife two weeks after he signed the EMATUM guarantee could be relevant but could also confuse the issues or mislead the jury. (*See* Chang Reply at 19.) The court thus DENIES Chang's motion, but permits objection to the inclusion of particular pieces of evidence at trial, when the court is able to review the purported evidence in its relevant context.

### B.   Co-Conspirator Statements

Chang also seeks to preclude the Government from eliciting testimony and introducing "hearsay statements" of purported co-conspirators. As discussed *supra*, the court will follow the *Geany* protocol and conditionally admit certain statements from co-conspirators subject to these statements meeting the requirements of Rule 801(d)(2)(E). *See Loera*, 2018 WL 2744701, at *6. Accordingly, Chang's motion to preclude testimony and documents discussed *supra*, is DENIED with leave to renew at trial.

The court next turns to Chang's motions seeking to exclude the testimony of Andrew Pearse and Surjan Singh as co-conspirators and the Government's related motion to preclude the Defendant from asking witnesses impermissible legal questions on cross-examination.

### 1.   Pearse and Singh Testimony

Chang doubts that the Government can show that statements made by Andrew Pearse and Surjan Singh, co-defendants who pled guilty and are cooperating witnesses in this trial, are properly co-conspirator statements in furtherance of a conspiracy that involved Chang. (Chang MILs at 3-8.) He also specifically seeks to preclude the Government from introducing testimony from Pearse or Singh that they obtained "kickback" payments in

connection with their work on the Projects. (*Id.* at 8-10.) As support, Chang points to Pearse's testimony in the U.K. Proceeding that: he did not believe he was "involved in or part of a conspiracy to bribe Mozambican officials"; he was not aware of bribes to Government officials; he received $45 million from Privinvest but these were not bribes or illicit payments; and that he believed Chang had the authority to sign the guarantees and that he believed he had approval for the transactions. (*Id.* at 7.)

However, as the Government notes, co-conspirators need not "agree on the ancillary aspects of a scheme not running to the heart of the agreement" so long as there is evidence showing that "they agreed on the essential nature of the plan." *United States v. Stavroulakis*, 952 F.2d 686, 690 (2d Cir. 1992). (*See also* Gov't Opp. at 8-9.) The focus is therefore on the "underlying illegal objective" which determines the scope of the conspiracy. *United States v. LaSpina*, 299 F.3d 165, 174 (2d Cir. 2002).

Chang argues that there is no evidence to show that Pearse and Singh were members of the overall scheme to defraud or "obtain" money from investors. But the Government intends to show at trial that these cooperating witnesses were in a conspiracy with Chang (even if different from those charged). Chang will have the opportunity to challenge this contention through cross-examination, which may include raising arguments that these witnesses did not observe Chang taking bribes and were not aware of such bribes. Rather than preemptively excluding these witnesses' testimony, cross-examination is the proper way to test the Government's proof as to the conspiracy. And as with the evidence discussed *supra*, if the Government moves to include additional hearsay evidence under Rule 801(d)(2)(E) and fails to prove these statements are co-conspirator statements, Chang can object and move to strike the testimony if appropriate.

Relatedly, the Government moved in its Opposition to preclude the Defendant from asking on cross-examination impermissible

legal questions, such as whether Pearse and Singh believed they were in a conspiracy or co-conspirators with the Defendant. (Gov't Opp. at 11-12.) This motion is GRANTED. Chang is entitled to cross the witnesses on their knowledge of bribes paid to the Defendant, whether they entered into an agreement with the Defendant, and questions that get to whether they shared a common illegal objective with the Defendant. But the ultimate question of whether they were in fact in a conspiracy is a question reserved for the jury.

### 2. Spreadsheets and Emails

Chang moves to preclude the Government from introducing the Privinvest Documents (emails and spreadsheets) obtained from Pearse's U.K. counsel, arguing that because these records were not used in the *Boustani* trial and do not involve Pearse, they must be excluded. (Chang MILs at 12.) For the reasons discussed in the Government's motion seeking authentication and admission of these documents *supra*, Chang's motion is DENIED. The Government may authenticate these records in the manner discussed above,[19] and at trial, Chang may raise objections as to whether the Government established the foundational requirements of 801(d)(2)(E) to admit the substance of these documents.

### C. Act of State Doctrine

Chang moves *in limine* to be permitted to raise the act of state doctrine as an affirmative defense at trial. (Chang MILs at 16-17.) The Government argues that the doctrine is inapplicable in this case and points to this court's prior Memorandum & Order holding the same. (Gov't Opp. at 21-23 (citing Omnibus M&O at 41-42).) Notably, Chang cites no applicable authority where a

---

[19] As noted, counsel will not provide testimony as to the contents of these documents or any other testimony that would violate their professional responsibilities.

court ruled on the act of state as a permissible affirmative defense in a motion *in limine* for a criminal trial.[20] And the court finds such a request improper here. *See Allied Bank Int'l v. Banco Credito Agricola de Cartago*, 757 F.2d 516, 521 n.2 (2d Cir. 1985) ("Whether to invoke the act of state doctrine is ultimately and always a judicial question."). Chang's motion is therefore DE-NIED.

### D. Preclusion of Eurobond Exchange "Conspiracy"

Chang reinstates his arguments set forth in his omnibus motion to request that the Government be precluded from introducing evidence against Chang regarding the Eurobond Exchange. (Chang MILs at 21.) Chang raises in his Reply that because the Third Superseding Indictment, filed after the ruling on the motion to dismiss the Indictment, no longer charges him with a conspiracy to defraud investors in the Exchange, any evidence on this issue should be excluded. (Chang Reply at 20.) The Government concedes that the Indictment no longer includes allegations that Chang was involved in the Exchange, but argues that evidence of the Exchange is still necessary to "complete the narrative" of the wire fraud conspiracy charge. (Gov't Opp. at 29.) Accordingly, the Government does not seek to admit evidence that Chang was involved in the Exchange. (*Id.*) Instead it seeks to establish:

> that the Exchange was "designed to exchange the EMATUM loan participation notes, which were to mature in 2020, for Eurobonds issued directly by the Mozambican government that would mature in 2023"; that some co- conspirators proposed the Exchange "to conceal discovery of the [wire fraud]

---

[20] Chang does cite to a civil case involving allegations that a foreign sovereign government seized property, to wit, artwork seized by the Soviet government in 1918. (Chang MILs at 16 (citing *Konowaloff v. Metro. Museum of Art*, 702 F.3d 140, 145 (2d Cir. 2012)).) This case has little relevance to the allegations here.

scheme," and that the Exchange occurred and delayed the defaults of the loans at issue. (*Id.* (citing Indictment ¶¶ 52-54).)

Chang responds that the crimes are not necessary to complete the narrative, noting that the Exchange occurred sixteen months after Chang left the Ministry of Finance and several years after the acts for which Chang is charged. (Chang Reply at 30.)

Under Rule 404(b), "evidence of uncharged criminal conduct is not evidence of "other crimes, wrongs, or acts . . . if that conduct arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Robinson*, 702 F.3d 22, 37 (2d Cir. 2012) (citing *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000)). Uncharged acts may also be admissible as direct evidence of a conspiracy. *United States v. Kemp*, No. 21-CR-1684, 2023 WL 405763, at *5 (2d Cir. Jan. 26, 2023). But any evidence admitted for these additional purposes must likewise survive the Rule 403 weighing of its probative value against the danger of unfair prejudice. *Id.*

The Indictment still alleges that the Eurobond Exchange was done to conceal discovery of the scheme. If done as part of the conspiracy in which Chang played a part, this would be relevant to understanding the context surrounding fraud, including why the defaults on the EMATUM loan were delayed by three years, and relevant to complete the narrative of the wire fraud conspiracy. (*See* Indictment ¶¶ 52-54, 57.) However, whether this does in fact complete the narrative of the conspiracy depends in part on the scope of said conspiracy. Upon review of these facts, the court RESERVES DECISION on the Defendant's motion at this time. As the scope of the conspiracy becomes more apparent, the court may rule on whether the Eurobond Exchange is necessary to complete the narrative of said conspiracy. The court also notes

that even if admitted, should additional evidence or argument on the Exchange extend beyond the facts reviewed in the Government's Opposition, Chang is free to object and seek limiting instructions as needed. (*See also* Omnibus M&O at 35-38.)

### E.  Declaring Boustani Unavailable Pursuant to Rule 804(a)(5)(A)

Chang requests that the court conclude that Jean Boustani is an unavailable declarant for purposes of Rule 804(a)(5)(A) and sets forth the reasons for why he believes Mr. Boustani is deemed unavailable for the upcoming trial against Defendant Chang. (Chang MILs at 21-22.) The Government appears to agree, but further requests that, to the extent Chang offers portions of Boustani's trial testimony under Rule 804(b)(1), the Government be permitted to also introduce other portions of the same testimony. (Gov't Opp. at 30-33.)

First, the court GRANTS Chang's motion and finds Mr. Boustani an unavailable declarant pursuant to Rule 804(a)(5)(A) (declarant considered unavailable when absent from trial and testimony cannot be procured by process or other reasonable means).

The court RESERVES on the Government's related request for reasons discussed below.

Under Rule 804(b)(1), former testimony by an unavailable declarant is not hearsay if it "(A) was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and (B) is now offered against a party who had — or, in a civil case, whose predecessor in interest had — an opportunity and similar motive to develop it by direct, cross-, or redirect examination."

Thus, Boustani's testimony is admissible if the opposing party (here, Chang) had an opportunity and similar motive to develop it by direct, cross, or redirect examination. Boustani was a co-

defendant in this case, but Chang was not tried alongside Boustani and therefore did not have such an opportunity to cross-examine him. The Government cites to the Rule's Advisory Committee Notes and secondary sources to argue that if Chang is permitted to offer Boustani's prior trial testimony, fairness requires that the Government be allowed to admit testimony elicited in its prior cross-examination. (Gov't Opp. at 31 (citing Rule 804(b)(1) Advisory Committee Notes).) The Government notes that ruling otherwise would be contrary to the Rule. (*Id.*) Chang contests the request, noting that the Government cites only to a case involving testimony between the same parties in support of its Rule 804(b)(1) argument. (Chang Reply at 21.)

The court finds that Chang has the better argument as to Rule 804(b)(1). However, the Government also raises the rule of completeness under Rule 106 which provides that if a party introduces all or part of a statement, the adverse party may require the introduction of another part of that statement or any other statement that ought to be considered in fairness, even over a hearsay objection.

First, it is unclear to the court if Chang intends to offer Boustani's testimony pursuant to Rule 804(b)(1) or through other exceptions, such as Rule 804(b)(3) or the residual exception under Rule 807. The court thus RESERVES on this request until trial. However, the court finds that if Chang invokes Boustani's testimony under Rule 804(b)(1), the Government may seek to admit testimony from its prior cross-examination if it meets the requirements under Rule 106. The court will be better able to assess any specific proposed testimony in its appropriate context at trial. The court DIRECTS that the Defendant provide 24-hour notice to the court and the Government of its intent to introduce such testimony. Within this notice, the Defendant must include the specific portions of the testimony it seeks to introduce in order to

afford the Government the opportunity to prepare additional testimony as needed.

### F.  Expert Disclosures

Chang seeks to exclude all three of the Government's experts, but for different reasons. Regarding the Government's experts Special Agent Joel DeCapua and Mr. Sean O'Malley, Chang argues their disclosures are insufficient under Fed. R. Crim. P. 16(a)(1)(G)(iii) and Fed. R. Evid. 702. The court will set forth the applicable law and address the disclosures of DeCapua and O'Malley in this section. The parties' competing experts on the question of applicable Mozambican law(s) are addressed in the following section.

#### 1.  Applicable Law

Federal Rule of Criminal Procedure 16 sets forth requirements that the Government and the Defendant must adhere to when making certain disclosures related to expert testimony they seek to present at trial. Under Rule 16(a)(1)(G)(iii),

> The disclosure for each expert witness must contain: a complete statement of all opinions that the government will elicit from the witness in its case- in-chief, or during its rebuttal to counter testimony that the defendant has timely disclosed under (b)(1)(C); the bases and reasons for them; the witness's qualifications, including a list of all publications authored in the previous 10 years; and a list of all other cases in which, during the previous 4 years, the witness has testified as an expert at trial or by deposition. Fed. R. Crim. P. 16(a)(1)(G)(iii).

Thus, "Rule 16(a)(1)(G)(iii) and (b)(1)(C)(iii) require parties to disclose, for each expert witness, a complete statement of all opinions that the party will elicit from the witness in the party's case-in-chief and the bases and reasons for them." *United States v. Kwok*, No. 23-CR-118 (AT), 2024 WL 1773143, at *1 (S.D.N.Y.

Apr. 24, 2024). "[M]erely identifying the general topics about which the expert will testify is insufficient; rather, the summary must reveal the expert's actual opinions." *United States v. Baker*, No. 14-CR-356 (ENV), 2016 WL 7176588, at *1 (E.D.N.Y. Dec. 8, 2016); *see also* Fed. R. Crim. P. 16 Advisory Committee's Note to 2022 Amendment ("The amendment requires a complete statement of all opinions the expert will provide, but does not require a verbatim recitation of the testimony the expert will give at trial.").[21]

"If a party fails to comply with this rule, the court may (A) order that party to permit the discovery or inspection; specify its time, place, and manner and prescribe other just terms and conditions; (B) grant a continuance; (C) prohibit that party from introducing the undisclosed evidence; (D) enter any other order that is just under the circumstances." *United States v. Daskal*, No. 21-CR-110 (NGG) (LB), 2023 WL 9424080, at *17 (E.D.N.Y. July 12, 2023) (quoting Fed. R. Crim. P. 16(d)). "The district court has broad discretion to determine what remedial action, if any, is appropriate." *Id.*

Federal Rule of Evidence 702 "governs the admissibility of expert and other scientific or technical expert testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002). It requires that:

> (1) an expert have "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) the testimony be "based on sufficient facts or data;" (3) the testimony be "the product of reliable principles and methods;" and (4) an

---

[21] Rule 16 previously required only a "written summary" of the expert's opinion but was amended in 2022 to require more specificity "to facilitate trial preparation, allowing the parties a fair opportunity to prepare to cross-examine expert witnesses and secure opposing expert testimony if needed." *Id.*

expert must "reliably appl[y] the principles and methods to the facts of the case." *United States v. Belloisi*, No. 20-CR-219 (DLI), 2023 WL 2716551, at *2 (E.D.N.Y. Mar. 30, 2023) (quoting Fed. R. Evid. 702).

The district court has a "gatekeeping role" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms.*, Inc., 509 U.S. 579, 597 (1993). The Daubert inquiry is "fluid," and the court "must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos*, 303 F.3d at 266.

In addition, under Rule 403, "[e]xpert testimony may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Bah v. City of New York*, No. 13-CV-6690 (PKC), 2017 WL 435823, at *9 (S.D.N.Y. Jan. 31, 2017).

### 2. Special Agent Joel DeCapua

The Government intends to call Special FBI Agent Joel DeCapua to testify as an expert in "data transmission infrastructure," and specifically related to this case, how electronic communications travel to, from, and through the waters surrounding Manhattan. This testimony is relevant to the charged conspiracies where the Government must prove the use of wires in interstate and foreign commerce for wire fraud, that money was transferred through the United States for money laundering, and that acts occurred in the Eastern District of New York and in furtherance of the conspiracies. (*See* Gov't Opp. at 46; *see also* DeCapua Disclosure (Dkt. 565-1).)

Chang seeks to preclude Agent DeCapua as an expert because the proposed testimony outlined in the Government's expert disclosures fails to apply relevant facts from this case to Agent

DeCapua's principles and methods, and more importantly, fails to rely on specialized knowledge that a jury would need help understanding. (Chang MILs at 33-35.) Chang does not dispute DeCapua's qualifications or expertise. Instead, he argues that DeCapua's proposed testimony "applies no facts" to his "principles and methods." (Chang MILs at 33.)

To the contrary, the court finds DeCapua's proposed testimony to be relevant and in compliance with Rule 702, and that the Government's disclosure complies with Rule 16. The disclosure discusses the proposed testimony as reviewing that during the relevant time period of the charged conduct, in order for someone outside of Manhattan (including outside of the country) to communicate with someone in Manhattan, he must have done so in one of three ways. (*See* DeCapua Disclosure at 1.) DeCapua goes on to describe those three methods of communication, which all involve some form of travel through the Eastern District of New York by way of the waters surrounding Manhattan. (*Id.* at 1-3.) Significantly, his proposed testimony explains that one of the three methods of communication must have occurred, leaving the jury to determine, with these principles, whether such communications took place in this case. This kind of limited testimony is both proper and helpful in "contextualiz[ing] the evidence" for the jury. *United States v. Herron*, No. 10-CR-0615 (NGG), 2014 WL 1871909, at *8 (E.D.N.Y. May 8, 2014), *aff'd*, 762 F. App'x 25 (2d Cir. 2019).

DeCapua's purported testimony, as Chang concedes, is meant to "explain the mechanics of *how* information is actually communicated over wires and how communications between individuals inside Manhattan and outside Manhattan could travel through the waters surrounding Manhattan." (Chang Reply at 29-31.) These general principles may help a jury determine whether wires in fact occurred; whether, under similar principles, money

was transmitted through the United States; and whether each of these acts in fact occurred in the Eastern District of New York.

As Chang appears to acknowledge by arguing that the testimony should be excluded because it covers "basic concepts," the testimony is both limited and uncontroversial in nature. Having found no overriding potential for prejudice or confusion with the testimony at this juncture, the court DENIES Chang's motion to exclude Agent DeCapua as an expert. *See In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007) ("[D]oubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions.").

### 3.   Mr. Sean O'Malley

Chang similarly moves to preclude Mr. Sean O'Malley as an expert on the basis that testimony regarding whether funds were transported to, from, or through the United States is not relevant nor "complicated" such that it requires expert knowledge to aid the jury. (Chang MILs at 35-36.) Even if permitted to testify, Chang argues that opining on "how individuals outside the United States view the United States dollar," "what Mr. Chang knew about U.S. dollars," and suggesting that the Defendant wanted money "quickly," are all improper opinions that must be precluded. (*Id.* at 36-37.)

The Government intends to call Mr. O'Malley to explain international banking, in particular, how U.S. correspondent banking and wire transfers of U.S. dollars between two foreign banks occur. (Gov't Opp. at 41-42; *see also* O'Malley Disclosure (Dkt. 565-2).) The court agrees with the Government that testimony concerning financial concepts and banking are routinely considered proper subject matters for which an expert is needed to help understand. (*See id.* at 42-43 (collecting cases).) Indeed, the court acknowledges the complex factual allegations in this case, and the Government's burden to establish and prove various facts

that may be aided by testimony concerning the mechanics of wire transfers, correspondent banks, and the U.S. dollar's status as a global reserve currency. Thus, the jury will be aided by this expert testimony and its probative force outweighs any prejudice.

As to the proposed testimony on why foreign financial institutions seek and maintain U.S. correspondent accounts at U.S. banks, and that the U.S. financial system is the world's dominant reserve currency, the Government intends to establish that most of the foreign banks involved in these illicit transactions relied on U.S. correspondent banks to complete these transfers and that the bribes and kickbacks were paid in different currencies, but often in U.S. dollars. The proposed testimony is thus both helpful context for understanding the role of the U.S. financial system in foreign transactions and probative of the conspirators' knowledge that their wire fraud and money laundering conspiracies would use the U.S. financial system as part of their scheme. However, the court does note the potential prejudice that may result, for example, theories that foreign criminals are more likely to use the U.S. financial system and therefore Chang must be a criminal. Even so, the probative value of understanding foreign transactions is outweighed by this potential prejudice. Indeed, to the extent Chang disputes the expert's opinion or is concerned with prejudice, this is better handled through vigorous cross-examination rather than denying admission of this evidence. *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-md-1720 (MKB), 2022 WL 15053250, at *29 (E.D.N.Y. Oct. 26, 2022) ("[W]here a qualified expert bases his opinion on 'good grounds based on what is known,' imperfections in the data are properly attacked by the opposing party on cross-examination.").

The court also finds nothing "nefarious" about testimony that "[w]ire transfers are typically used to send large amounts of money quickly, both domestically and internationally" as opposed to automated clearing house ("ACH") transfers as explained in Mr. O'Malley's disclosure. (*See* Chang MILs at 37; O'Malley Disclosure ¶¶ 8-9.) Such a statement simply explains how these two methods of transmission work.

Finally, the court notes that the Government does not intend for Mr. O'Malley to opine on the Defendant's conduct, including Chang's perspective on the U.S. dollar. (*See* Gov't Opp. at 44 ("O'Malley has not been asked to opine on the Defendant's conduct whatsoever.").)

Defendant's motion to preclude Mr. Sean O'Malley as an expert is therefore DENIED.

### G. Mozambican Law and Experts

Count Two of the Indictment charges the Defendant with conspiring to launder money "with the intent to promote the carrying on of," among others, the specified unlawful activity of "offenses against a foreign nation involving bribery of a public official, in violation of Mozambican law[.]" (Indictment ¶ 59.)[22] Both parties agree that this court should determine the elements of Mozambican law to charge the jury on. (Gov't Opp. at 35). Both parties also proffer experts to support their reading of Mozambican law. (*See* Pinto Disclosure (Dkt. 565-3); Ex. 9 to

---

[22] In addition to the charge under Section 1956(a)(2)(A), the court notes that the Government also charges Chang with violating Section 1956(a)(2)(B)(i). (*See id.* ("[K]nowing that the monetary instruments and funds" involved the transfer "represented the proceeds of some form of unlawful activity," and knowing that such transfer "was designed in whole and in part to conceal . . . the nature . . . of the proceeds of" the specified unlawful activity, "contrary to 18 U.S.C § 1956(a)(2)(B)(i)").) (Indictment ¶ 59.) However, the parties' briefing only focus on violations of Mozambican law as it relates to Section 1956(a)(2)(A).

Chang MILs ("Dr. Mussequejua Disclosure") (Dkt. 572-10).)[23] The parties and experts disagree about which Mozambican law applies, however.

For the reasons discussed herein, the Court considers both expert disclosures and concludes that Mozambican Law 6/2004 is the most clearly applicable and appropriate law in this case. The court further directs the Government to propose elements under Law 6/2004 it intends to prove at trial.

"Issues of foreign law are questions of law" and therefore are within the court's province, rather than the jury's. Fed. R. Crim. P. 26.1; *United States v. Bankman-Fried*, No. 22-CR-0673 (LAK), 2023 WL 6162865, at *1 (S.D.N.Y. Sept. 21, 2023). A court deciding a foreign law question "may consider any relevant material or source—including testimony—without regard to the Federal Rules of Evidence." Fed. R. Crim. P. 26.1. Expert testimony should "aid the Court in determining the content of the applicable foreign law." *Bigio v. Coca-Cola Co.*, No. 97-CV-2858 (BSJ), 2010 WL 3377503, at *4 (S.D.N.Y. Aug. 23, 2010), *aff'd*, 675 F.3d 163 (2d Cir. 2012). However, "the Court is not obliged to credit the parties' partisan application of the governing law." *Id.*

Turning to the laws in dispute. Chang argues that the applicable law is Article 7 of Law 6/2004. (Chang Opp. at 41 (noting that the Government must prove the money derived from an unlawful activity, implicating Article 7 of Law 6/2004, discussed below); Chang Reply at 25;[24] *see also* Ex. 7 to Chang MILs ("Law

---

[23] Chang asks the court to preclude the designation of the Government's witness, Vitor Manuel Duarte Pereira Pinto, as an expert in this area. (Chang MILs at 24.) The Government does not appear to move to disregard Chang's proffered expert.

[24] Chang at times references Law 6/2004 broadly, which could either relate to Article 7 or Article 8. However, given language that the Government

6/2004") (Dkt. 572-8).) The Government argues that the applicable law is Article 8 of Law 7/98. (Gov't Reply at 53; *see also* Ex. 6 to Chang MILs ("Law 7/98") (Dkt. 572-7).)

Also relevant because of their impact on the interpretation of these laws are: Articles 318, 321 and 322 of the "1886 Penal Code," (Ex. 5 to Chang MILs) (Dkt. 572-6); and Articles 501-503 and 522 of the "2015 Penal Code," effective June 29, 2015, (Ex. O to Gov't Opp.) (Dkt. 585-15). (*See also* Ex. A to Pinto Disclosure ("Susano Disclosure") (Dkt. 565-3).)

Under Law 6/2004, Article 7 criminalizes passive corruption for *unlawful* acts. It reads:

> The entities referred to in Article 2, who, by themselves or through an intermediary party, with his/her consent or approval, request or receive money or the promise of money or any monetary benefit that is not due to them, to perform or not perform an act that implies violation of the **duties of his/her office**, shall be punished with a prison sentence of more than 2 to 8 years and a fine of up to one year. Art. 7, 6/2004 (emphasis added).

Article 8 of Law 6/2004, by contrast, criminalizes passive corruption for *lawful* acts where the relevant acts are "not contrary" to the duties of one's office. It reads:

> The entities referred to in Article 2 who, by themselves or through an intermediary party, with their consent or approval, request or receive money or the promise of money or any undue material or immaterial advantage, to perform or not perform acts that are **not contrary to the duties of their office and responsibilities**, shall be punished with a prison

---

must meet a higher burden and demonstrate an unlawful act, the court reads his argument as referring to Article 7 of Law 6/2004, only. (*See id.*)

sentence of up to one year, and a fine of up to two months. Art. 8, 6/2004 (emphasis added).

Under Article 2, paragraph 1, Law 6/2004 reaches "managers, officials, or employees of the State or local authorities, public enterprises, [and] private companies in which the State holds shares or public utility concessionary companies." *Id.* Art. 2.1. Paragraph 2 further defines "a public official or employee" as "any person who performs or participates in government affairs" and "for which they have been appointed or vested by direct effect of the law, by election, or by the determination of a competent authority." *Id.* Art. 2.2. Paragraph 3 extends even further to "those who, even if they are not included in any of the categories referred to in the preceding paragraph, bring about or contribute to the practice of the crimes listed in [this law], or profit from them." *Id.* Art. 2.3.

Law 7/98, a law that predated Law 6/2004, was a broader corruption statute, stating:

> The holder of a government position covered by article 1 of this Law that practices the crimes of corruption provided for in articles 318, 321 and 322 of the Penal Code is punished with a prison sentence of more than two to eight years and a fine, without prejudice to the penalty of expulsion, in the case of a civil servant and loss of office, if he is a manager. Art. 8, 7/98.

Under Article 1, ministers are expressly listed as "holders of governmental positions." *See id.* Art. 1. Incorporated by Law 7/98 is Article 318 of the operative penal code at the time, the 1886 Penal Code. Article 318 provides that a civil servant who commits a crime involving bribery and receives a kickback or gift to perform an "act of their duties, if this act is *unfair* and committed, shall be punished with a maximum sentence of two to eight years." Art. 318, 1886 Penal Code (emphasis added). However, if the act is deemed "fair" such that the employee is required to

perform it, that is, the act is lawful, "then he will be suspended for up to one year and sentenced to a fine of one month." *Id.* Art. 318 § 2.

A review of the laws shows several differences between them. First, Law 6/2004 provides a distinction between bribery concerning lawful acts (Article 7) and unlawful acts (Article 8). Chang appears to argue that Article 7, which is more stringent and includes a greater punishment, applies here. (*See* Chang Opp. at 41 (seeking a requirement that the Government prove the unlawful act under Law 6/2004).) Law 7/98 does not distinguish between lawful and unlawful acts and instead covers "acts of corruption" which includes bribery, as provided by Article 318. If the conduct under Article 318 is "unfair," this has the same penalty as Article 7 of Law 6/2004; if, however, the conduct is "fair," the penalty is a suspension of up to one year. Art. 318, 1886 Penal Code. The Government argues that Law 7/98 applies but does not discuss the fair/unfair distinction, noting that a violation of Law 7/98 may be found based on "an act that was either consistent with or that violated the duties of his/her office." (Gov't MILs at 39 (reviewing the proposed elements of Law 7/98).)

Second, the provisions provide for different punishments. Individuals face imprisonment "of more than two to eight years" if: they violate Law 7/98 with an "unfair" act; or they violate Article 7 of 6/2004 by an act in violation of his or her duties of office. Individuals face imprisonment of up to one year if they violate Article 8 of Law 6/2004 by an act that does not violate their duties of office. And those who violate Law 7/98 with a "fair" act will be suspended for up to one year and sentenced to a fine of up to one month.

Relevant to the different punishments, the court notes that it has ruled that, by its terms, the specified unlawful activity need not be a felony under the money laundering statute, §

1956(c)(7)(B). (Omnibus M&O at 29-30 (noting that the statute defines specified unlawful activity to include, with respect to financial transactions occurring in whole or in part in the United States, bribery of a public official without requiring the activity to be a felony)); *see also* 18 U.S.C § 1956(a)(2)(A). Chang still argues, however, that the punishment is consequential and that the court should not allow the Government to prove the money laundering conspiracy charge premised on a foreign bribery offense that carries a term of less than one year. (Chang Opp. at 39-40.) The court notes the Defendant's concerns about the breadth of the statute[25] but does not find his argument to be persuasive in overcoming the text of the statute which covers the conduct alleged.

Upon review of the laws at issue, the parties' arguments, and the expert disclosures, the court finds that Law 6/2004 applies to Chang's alleged conduct. Thus, the Government must prove a violation of Law 6/2004 to demonstrate bribery in violation of Mozambican law. (*See* Indictment ¶ 59.)

In making this finding, the court notes that both laws were on the books at the relevant time periods and both statutes, by their text, appear to apply to the charged bribery and kickback scheme. Indeed, the parties each note that the laws at issue are "substantially similar." (Chang Opp. at 37; Gov't Reply at 56.) Law 6/2004 is simply more specific in its coverage of bribery or kickback schemes for officers such as Chang, Art. 7-8, Law 6/2004, and includes different requirements when applying the punishments for violating the statute. Law 6/2004 also provides

---

[25] The court further notes that the breadth is limited by the statute's other requirements, including requiring a financial transaction occurring in whole or in part in the United States; requiring the offense to be against a foreign nation; and requiring the offense to involve bribery of a public official. 18 U.S.C. § 1956. Thus, the statute does not implicate any potential violation of foreign law as the Defendant implies. (*See* Chang Opp. at 39-40.)

that any provisions that contradict the law are considered re-pealed. *Id.* Art. 24. Thus, to the extent applicable, because Law 7/98 applies a different standard for criminalizing bribery and kickback schemes, it conflicts with Law 6/2004 and was there-fore repealed at all relevant times. Accordingly, Law 6/2004 applies.

Because both laws were enacted prior to the beginning of the relevant conduct and were in effect through the end of Chang's term as Finance Minister, there are no retroactivity or leniency arguments that warrant a different finding. The parties discuss the impact of the 2015 Penal Law, but the court finds that this law does not impact the relevant legal analysis. Criminal law in Mozambique generally has no retroactive effects, but an excep-tion to this rule is when a law that applied at the time of conduct is superseded or changed in any way. In such instances, the lighter penalty will always be applied to a defendant not yet con-victed and sentenced. (Pinto Disclosure ¶ 5; Dr. Mussequejua Disclosure ¶ 5.) Retroactivity of the 2015 Penal Law is not in is-sue because, although the money laundering conspiracy occurred between 2013 and 2018, (Indictment ¶ 59), the unlaw-ful activity at issue under Mozambique law would have occurred while Chang was Finance Minister, a role that he no longer had as of January 2015. (Indictment ¶ 3; *see also* Gov't Opp. at 36-37 (discussing the impact of the 2015 Penal Law); Chang Reply at 23-24 (same).) Thus, any impact from the 2015 Penal Law, passed in June 2015, does not alter whether Chang engaged in a specified unlawful activity under Mozambican law for the pur-poses of the money laundering statute. In addition, the applicable provisions set forth in the 2015 Penal Code provide more aggra-vating circumstances than those in place at the time of the relevant offense conduct, and thus, are considered less favorable law to apply to Defendant Chang. (*See* Pinto Disclosure ¶ 4 (adopting the Susano Disclosure from the *Boustani* trial in full); Susano Disclosure ¶ 26; Dr. Mussequejua Disclosure ¶¶ 3-4.)

The Government seems to suggest that Law 6/2004 would not cover Chang's conduct, leaving Law 7/98 to do so, but it does not provide a convincing explanation for why this would be the case. For instance, the Government's expert suggests that Law 7/98 applies because Law 6/2004 does not apply to Ministers or Vice Ministers. (Susano Disclosure ¶ 28 (explaining that Law 7/98 expressly lists Ministers whereas Law 6/2004 does not).) [26] However, this argument is perplexing. Law 6/2004 has three provisions speaking to the broad group of individuals it seeks to bring within the offense conduct. *See* Art. 2.1-2.3, 6/2004. The law states that it applies to managers, officials, or employees of, *inter alia*, the State or local institutions of Mozambique. *See id.* Art. 2.1. Article 2, paragraph 2 goes further to describe that public officials or employees are considered to be "any person who performs or participates in government affairs for which they have been appointed or vested. *See id.* Art. 2.2. Any doubt that such a law would apply to Chang's conduct is resolved by the subsequent paragraph mandating that those not included in any of the above categories, but "bring about," "contribute," or "profit from" the practice of crimes of corruption (including bribery) are within the scope of the law. *Id.* Art. 2.3; *see also id.* Art. 24 ("Provisions that contradict this Law are hereafter considered repealed.").

The Government also argues that Law 6/2004 "supplements rather than contradicts" Law 7/98. (Gov't Opp. at 36.) However, as discussed, both laws cover the relevant conduct. Therefore, while Law 6/2004 did not entirely replace or repeal Law 7/98, it did so here when both statutes would apply to the same conduct

---

[26] The Government bases this argument on testimony of its expert in the *Boustani* trial, the Honorable Helena Susano, on which the Government's expert in this trial, Mr. Victor Pinto, relies.

but provide different standards and punishments. In such circumstances, Law 7/98 would contradict Law 6/2004 and therefore be repealed. *See* Art. 24, Law 6/2004.

In sum, the court rules on the parties' motions relating to the applicable Mozambique law for the money laundering charge as follows. The court DENIES the Defense's motion to preclude the testimony of the Government's expert witness. [27] (*See* Chang MILs at 24.) The court RESERVES on the Government's request to determine the applicable elements of the relevant Mozambique law before trial. (*See* Gov't. MILs at 36.) The Government requested that it be permitted to prove this element of the money laundering charge under Law 7/98. For the reasons discussed, however, this is not the applicable law. The court therefore DIRECTS the Government to specify whether it seeks to prove "offenses against a foreign nation involving the bribery of a public official, in violation of Mozambican law," (Indictment ¶ 59), under Article 7 or Article 8 of Law 6/2004 within <u>three days of entry of this Order</u>. The court further DIRECTS the Government, in its letter, to also propose the elements that it must prove to show a violation of this law, as it did in its opening motions *in limine* when proposing Law 7/98 as the applicable law. (*See* Gov't MILs at 39.) Defendant Chang may file a response to the elements proposed by the Government within one day of the filing of the Government's letter.[28] The court will then identify the

---

[27] The court notes again that it considered both parties' experts as well as other evidence in reaching this legal conclusion.

[28] The court notes that Chang argues that the lower penalty under Article 8 of Law 6/2004 is consequential to whether the law is a specified unlawful activity under Section 1956(c)(7)(A). (*See* Chang Opp. at 39-40.) The court understands this argument but finds that controlling law does not require specified unlawful activities to be felonies, as discussed in the court's Memorandum and Order denying Chang's motion to dismiss. Thus, the supplemental briefing is to focus on the elements the Government must prove under Law 6/2004, rather than dismissal.

relevant elements the Government must prove under Mozambican law for the purpose of the money laundering conspiracy, which will be incorporated into jury instructions following the charging conference.

## V.  CONCLUSION

For the reasons stated above, each parties' motions are GRANTED in part and DENIED in part. Decision on certain motions are RESERVED until trial unfolds, and those issues receive appropriate clarity. Additionally, within three days of entry of this Order, the Government is (1) DIRECTED to specify the provision it seeks to use in applying Law 6/2004 and propose the applicable elements therein and (2) ORDERED to advise the court which, if any, certifications and underlying records have yet to be provided to the Defendant. The Defendant may respond within three days of the filing of the Government's letter in accordance with the instructions set forth in this Order. Defense counsel is also DIRECTED to give the court and the Government 24-hour notice when it intends to introduce Mr. Boustani's prior testimony at trial.

SO ORDERED.

Dated:   Brooklyn, New York
         July 3, 2024

s/Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge

73