UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

MANUEL CHANG,

Defendant.

**MEMORANDUM & ORDER**

**18-CR-00681 (NGG) (CLP)**

NICHOLAS G. GARAUFIS, United States District Judge.

Before the court are supplemental motions *in limine* filed by the Government in this case, as well as an outstanding request raised in the Government's initial motion *in limine* pertaining to testimony by Credit Suisse. (*See* Gov't MILs (Dkt. 571); Gov't Suppl. MIL ("Gov't 2d MIL") (Dkt. 583); Gov't 3d MIL (Dkt. 588); Gov't 4th MIL (Dkt. 601); Gov't Mot. to Quash Credit Suisse Subpoenas and MIL ("Gov't 5th MIL") (Dkt. 610).) For the reasons discussed herein, the Government's motions are GRANTED in part and DE-NIED in part, subject to certain issues on which the court RESERVES decision until trial.

## I.   BACKGROUND

The court assumes the familiarity with the allegations against the Defendant, which are discussed at greater length in prior opinions. (*See, e.g.*, Mem. & Order Resolving MILs dated 7/3/2024 ("MILs M&O") (Dkt. 626) at 1-5; Mem. & Order Denying Omnibus Mot. dated 5/31/2024 ("Omnibus M&O") (Dkt. 573) at 1-5.) After the parties filed their first set of motions *in limine*, the Government filed four supplemental motions. Briefing for these motions is complete, and the courts now addresses the merits of each.[1]

---

[1] The Government's 5th MIL was requested alongside a motion to quash in response to the Defendant's motion to compel Credit Suisse's compliance

## II.  THE GOVERNMENT'S OUTSTANDING MOTIONS *IN LIMINE*[2]

The Government moves *in limine* to (1) elicit testimony from Credit Suisse regarding the materiality of misrepresentations made in furtherance of the charged wire fraud conspiracy, (*see* Gov't MILs at 32, 34-35); (2) preclude Chang from introducing evidence or cross-examining witnesses not currently employed by Credit Suisse regarding the company's guilty plea, deferred prosecution agreement ("DPA"), or civil resolutions, (*see* Gov't 2d MIL at 2; Gov't 5th MIL at 11-12); (3) preclude evidence or argument relating to sanctions imposed by the U.S. Government on VTB Capital, (*see generally* Gov't 3d MIL); and (4) preclude the Defense from raising duress or good-faith as defenses. (*See generally* Gov't 4th MIL.)

### A.  Credit Suisse

In its initial motion *in limine*, the Government sought to elicit testimony by investors, including Credit Suisse, regarding the materiality of misrepresentations made in furtherance of the charged wire fraud conspiracy. (Gov't MILs at 32, 34-35.) Regarding investors other than Credit Suisse, the court granted the motion to permit materiality testimony in general but precluded the Government from asking hypothetical questions that assumed the Defendant's guilt. (*See* MILs M&O at 17-20.) In light

---

with Rule 17 subpoenas, which was referred to Magistrate Judge Cheryl L. Pollak. (*See* ECF Order dated 6/24/2024; ECF Order dated 6/28/2024; *see also* Chang Mot. to Compel Credit Suisse (Dkt. 596).) Magistrate Judge Pollak recently denied the Defendant's motion to compel, effectively granting the Government's requested relief. (*See* Order Denying Mot. to Compel (Dkt. 628).) Magistrate Judge Pollak did not address the evidentiary request sought in the motion, (*see id.* at 11 n.14); the undersigned addresses the matter in this Order. (*See* Gov't 5th MIL at 1.)

[2] The court adopts and incorporates the legal standard included in its prior Mem. & Order filed on July 3, 2024, when resolving the motions at issue here. (MILs M&O at 5-6.)

of the Government's supplemental motion raising issues regarding Credit Suisse's role as both an entity that was defrauded and that pleaded guilty to fraud, the court deferred decision with regard to Credit Suisse. (*Id.* at 17; *see also* Gov't 2d MIL at 1-2.) In its supplemental motion, the Government seeks to preclude admission of Credit Suisse's guilty plea and DPA as well as certain arguments Chang may otherwise seek to advance at trial. Chang characterizes this motion as precluding the Defense from arguing that Credit Suisse's "prior conduct and agreements with the government reflect that it is not a victim." (Chang Opp. to Gov't 2d MIL ("Chang Opp. to 2d MIL") (Dkt. 593) at 1.)

The court will first consider whether the Defense may argue that Credit Suisse was not a "victim" by virtue of its guilty plea and DPA. This requires a consideration of whether Chang is able to argue that Credit Suisse was not defrauded because it was also a perpetrator of the same conspiracy to defraud. The court will also consider the related issue of the admissibility of the guilty plea and DPA. Then the court will turn to the question of materiality testimony sought by the Government. Finally, the court will consider the admissibility of other civil settlement agreements involving Credit Suisse.

### 1.   Credit Suisse as a "Victim" of the Alleged Fraud

In October of 2021, the Government accepted a guilty plea by Credit Suisse's European subsidiary, Credit Suisse Securities (Europe) Limited ("CSSEL") and entered into a DPA with Credit Suisse Group AG as part of a "negotiated global corporate resolution." (Gov't 2d MIL at 1.) In the guilty plea and DPA, Credit Suisse admitted criminal liability for wire fraud conspiracy based on the actions "of its officers, directors, employees, and agents." (CSSEL Plea Agmt. (Dkt. 583-1) at ¶¶ 1, 13; Credit Suisse Group A.G. DPA ("CS AG DPA") (Dkt. 583-2) at ¶¶ 1-2.) In addition, Credit Suisse reached civil agreements with financial regulators

in the United States, United Kingdom, and Switzerland involving the conduct at issue here. (Gov't 2d MIL at 1 n.1.)

The guilty plea and DPA incorporate a "Statement of Facts" in which Credit Suisse agreed and stipulated to a list of facts relating to its involvement with Privinvest and the Republic of Mozambique. (*See generally* CS AG DPA attach. A ("CS Statement of Facts") at A-1; *see also* CSSEL Plea Agmt. ¶ 13; CS AG DPA ¶¶ 1-2[3].) In this Statement of Facts, Credit Suisse "admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees and agents" relevant to the guilty plea and DPA. (CS Statement of Facts at A-1.) It then details facts supporting the bank's guilt based on conduct by Credit Suisse "employees and agents, including Andrew Pearse, Surjan Singh, and Detelina Subeva," connected to arranging and fraudulently marketing the EMATUM loan participation notes and the subsequent Eurobond Exchange. (*Id.* ¶¶ 3-5, 18-20, 32.) Specifically, "Credit Suisse and its co-conspirators used U.S. wires and the U.S. financial system to defraud U.S. and international investors in the EMATUM Securities." (CS Statement of Facts ¶ 18; *see also* Indictment (Dkt. 578) ¶¶ 23, 26 (discussing the scheme to defraud investors charged against Chang).) The fraud at issue involved misrepresentations and omissions concerning "use of loan proceeds," "kickbacks to Credit Suisse bankers," "risks of bribes to Mozambican officials" and maturity dates of debt owed by Mozambique. (CS Statement of Facts ¶ 19; *see also* Indictment ¶ 23 (noting Chang's role in a conspiracy concerning the Proindicus, EMATUM and MAM financings and misrepresentations relating to use of proceeds and bribe and kickback payments to bankers and Mozambican government officials).) Credit Suisse benefitted

---

[3] Both the plea agreement and DPA include and incorporate the same Statement of Facts. The court will hereinafter cite to the Statement of Facts in Credit Suisse Group AG's DPA only, but notes that the facts set forth apply to both the parent corporation and the European subsidiary.

from its part in the conspiracy since it netted fee revenue for the bank. (*See* CS Statement of Facts ¶ 28 ("The larger loan also benefited [Credit Suisse] by increasing the fees Credit Suisse ultimately earned arranging the transaction.").) These facts support Credit Suisse's criminal liability based on the conduct of individuals acting within their authority as Credit Suisse employees. *See United States v. Demauro,* 581 F.2d 50, 53 (2d Cir. 1978) (noting the general rule that "a corporation is liable for the criminal acts of its employees if done on its behalf and within the scope of the employees' authority").[4] And Credit Suisse agreed not to, through "present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the company," make public statements in litigation or otherwise that contradict the Statement of Facts. (CS AG DPA ¶ 28.)

The Government now alleges in the present Indictment against Chang that, in addition to being a co-conspirator of the charged conspiracy, Credit Suisse was also a victim or otherwise defrauded by the same conduct. (Indictment ¶¶ 23, 57 (noting both that the loans at issue were "arranged by Credit Suisse and Investment Bank 1" and that Chang and his co-conspirators "conspired to defraud investors and potential investors in the Proindicus, EMATUM and MAM financings, *including Credit Suisse* and Investment Bank 1") (emphasis added).) The Government moves to preclude Chang from arguing that Credit Suisse was not defrauded because it admitted to its role in the conspiracy under the guilty plea and DPA. (Gov't 2d MIL at 2.) Chang

---

[4] As the Defense notes, Credit Suisse's managerial and compliance shortcomings helped facilitate the illicit conduct. (*See* Chang Opp. to 2d MIL at 4-5.) External auditors had "expressly warned" Credit Suisse of corruption risks associated with Privinvest, and senior management was aware that Mozambique and Privinvest posed a compliance danger, but Credit Suisse executives and departments nevertheless approved the EMATUM loan. (CS Statement of Facts ¶¶ 23-25, 40, 43.)

responds that excluding such testimony would hide relevant evidence from the jury. (Chang Opp. to 2d MIL at 1).

The initial question is therefore whether Credit Suisse's guilty plea and DPA are relevant to the Government's allegation that it is a victim[5] in this litigation.

Corporate criminal liability is generally imputed from employees' culpable acts under the principle of *respondeat superior*. *See, e.g., Fed. Ins. Co. v. United States*, 882 F.3d 348, 368 (2d Cir. 2018); *see also New York Cent. & H.R.R. Co. v. United States*, 212 U.S. 481, 495 (1909) ("We see no valid objection in law, and every reason in public policy, why the corporation, which profits by the transaction, and can only act through its agents and officers, shall be held punishable by fine because of the knowledge and intent of its agents to whom it has intrusted [sic] authority to act in the subject-matter of making and fixing rates of transportation, and whose knowledge and purposes may well be attributed to the corporation for which the agents act."). To convict a corporation for its employees' conduct, the employees' illicit acts must have been undertaken "on behalf of the corporation and within the scope of the agent's authority. . . ." *Fed. Ins. Co.*, 882 F.3d at 368; *see also United States v. Ionia Mgmt. S.A.*, 555 F.3d 303, 309 (2d Cir. 2009) (affirming corporate conviction where employees acted within the scope of employment and for employer's benefit). Thus, under *respondeat superior* liability, individuals and an entity may both be prosecuted for the same conduct so long as the individuals are acting within the scope of their employment. *Fed. Ins. Co.*, 882 F.3d at 368. To hold otherwise would absolve

---

[5] The court uses the term "victim" to describe Credit Suisse when considering the allegation that it was defrauded by Chang and his co-conspirators. The Government has not expressly called Credit Suisse a victim, and the court does not suggest that it should, but for purposes of the analysis here, the court finds victim to be a useful term.

employees or the corporation of criminal liability where an employee's illicit scheme benefits an employer.[6]

The Government argues that because corporate criminal liability is based on principles of *respondeat superior*, a corporation can be both a perpetrator (through its employees) as well as a victim (as an entity). (Gov't 2d MIL Reply (Dkt. 603) at 2-4; Gov't 2d MIL at 5.) To illustrate this and argue that this concept applies here, the Government notes that Pearse and Singh, while acting within their authority as Credit Suisse employees, lied and withheld information from compliance officers, and in doing so, fraudulently induced Credit Suisse to sell and invest into a loan it otherwise would not have. (Gov't 2d MIL at 3-4.)

However, in support, the Government does not cite cases where an entity was both part of a conspiracy and the victim of that conspiracy. The Government's support generally included cases where (1) *respondeat superior* principles were discussed to find that both the corporation as well as its agents were charged for the same criminal conduct, *e.g., United States v. Dotterweich*, 320

---

[6] The "benefit" necessary for imputing liability under *respondeat superior* is narrow. Benefiting the employer need not be the agent's primary goal, so long as it motivates them to even a slight degree. *See Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. NLRB*, 735 F.2d 1384, 1395 (D.C. Cir. 1984) ("[T]he acts of an agent motivated partly by self-interest—even where self-interest is the predominant motive—lie within the scope of employment so long as the agent is actuated by the principal's business purposes 'to any appreciable extent.'") (quoting *Restatement (Second) of Agency* § 236 cmt. b (Am. L. Inst. 1958)). And the conduct need not actually benefit the employer on balance. *See United States v. Automated Med. Lab'ys, Inc.*, 770 F.2d 399, 407 (4th Cir. 1985). The focus is thus generally whether the acts of the employee may be imputed onto the corporation. *See United States v. Sun-Diamond Growers of Cal.*, 138 F.3d 961, 970 (D.C. Cir. 1998) ("Where there is adequate evidence for [*respondeat superior*] imputation . . . the only thing that keeps deceived corporations from being indicted for the acts of their employee-deceivers is not some fixed rule of law or logic but simply the sound exercise of prosecutorial discretion."), *cert. denied in part*, 525 U.S. 964 (1998), *and aff'd on other grounds*, 526 U.S. 398 (1999).

U.S. 277, 281 (1943); *Fed. Ins. Co.*, 882 F.3d at 368; *Demauro*, 581 F.2d at 53; or (2) cases in which corporate entities were victims of their employees' conduct but where the corporate entities were not assigned corporate criminal liability under a *respondeat superior* theory of liability, *e.g., United States v. Yarmoluk*, 993 F. Supp. 206, 209 (S.D.N.Y. 1998). (*See generally* Gov't 2d MIL at 1, 4-5; Gov't 2d MIL Reply at 2-3.)[7]

These cases show that corporations can be charged with criminal liability or be victims, or both, depending on the circumstances. But these cases do not discuss whether it is appropriate for a corporation to also be a victim of the same conspiracy to which it had pleaded guilty based on conduct undertaken by employees acting on its behalf (*i.e., respondeat superior* principles). That is the question relevant to this motion and it is a question that is entirely separate from whether an employee and corporation can be charged for the same criminal conduct when the individual's actions are imputed onto that of a corporation.[8]

---

[7] The Government also cited *United States v. Ghavami.* (Gov't 2d MIL Reply at 2-3 (citing No. 10-CR-1217 (KMW), 2012 WL 2878126, at *5 (S.D.N.Y. July 13, 2012), *aff'd sub nom. United States v. Heinz*, 790 F.3d 365 (2d Cir. 2015)). This case considered whether 18 U.S.C. § 3293(2), which asks whether the scheme "affect[ed]" a financial institution, may apply to an institution that had entered a non-prosecution agreement for purposes of determining the applicable statute of limitations. *Id.* at *7. Notably, however, the case also specifically noted that the applicability of 18 U.S.C. § 3293(2) "is not limited to circumstances in which a financial institution is the object or victim of a scheme to defraud." *Id.* at *5.

[8] The Government also cited to *Federal Insurance* when making its *respondeat superior* argument. (*See* Gov't 2d MIL at 1, 4 (citing *Fed. Ins. Co.* at 368).) In this case, the Circuit discussed how the principle of *respondeat superior* may lead to corporate criminal liability based on the actions of an employee or agents acting on behalf of the corporation. *Fed. Ins. Co.* at 368. But the Circuit's discussion on this topic was in support of affirming a district court order *declining* to find that the corporate criminal was a victim

Credit Suisse may well be a victim of the charged conspiracy. This will depend on the scope of the conspiracy the Government seeks to prove at trial, and it will be a question of fact for the jury to decide. But Chang may, as part of his defense, make arguments that touch on Credit Suisse's status as a perpetrator to contest the allegations against him where relevant.

The Government's motion to preclude Chang's use of the guilty plea and DPA is fairly limited. It seeks only to prevent Chang from arguing that the admission of liability in and of itself means that Credit Suisse was not defrauded. And as discussed *supra*, an admission of liability by the corporation does not necessarily mean that the corporation was not defrauded. *See, e.g., Sun-Diamond Growers of Cal.*, 138 F.3d 961, 970 (D.C. Cir. 1998); *United States v. Lazarenko*, 624 F.3d 1247, 1250 (9th Cir. 2010), *amended on denial of reh'g*, No. 08-10185, 2010 WL 4888164 (9th Cir. Dec. 2, 2010). The Government's request is therefore GRANTED.

The court does not read the Government's request as seeking to preclude Chang from arguing that Credit Suisse was not a victim of the conspiracy in which Chang is charged and using the guilty plea and DPA as support. Indeed, the court finds that Credit Suisse's role or position with respect to the charged conspiracy relevant. Therefore, Chang is not precluded from defending against the charges at issue by referencing the guilty plea and DPA. *See Stoncor Grp., Inc. v. Peerless Ins. Co.*, 573 F. Supp. 3d 913, 917 (S.D.N.Y. 2021) ("Evidence challenged in a motion *in limine* should only be precluded when it is clearly inadmissible on all possible grounds.") Chang may argue that statements to

---

under the Mandatory Victims Restitution Act. *Id.* at 367-68. And the Second Circuit even noted that "a thief cannot be the victim of a crime when it becomes a thief precisely by turning that crime to its advantage as a way of stealing from others." *Id.* at 368.

Credit Suisse relating to loan proceeds were not material misrepresentations made with an intent to defraud Credit Suisse because Credit Suisse was part of the same conspiracy.

In making this ruling, the court acknowledges, as the Government notes, that there are thousands of employees at Credit Suisse and that corporations act through their employees. Credit Suisse pleaded guilty under principles of *respondeat superior* for the conduct of some but not all of its employees. But the focus here is on Credit Suisse's status as an *entity* that both pleaded guilty to a conspiracy to defraud investors, and which is now cast as the victim of a conspiracy. When employees acting on the bank's behalf make misrepresentations to others within the bank in order to defraud outside investors, it does not follow that the bank's admission that it was a perpetrator of the conspiracy is irrelevant to the Government's allegation that the bank was a victim here.[9]

The Government's motion *in limine* to prevent the Defendant from arguing that the guilty plea and DPA mean, in and of themselves, that Credit Suisse was not defrauded is therefore GRANTED, subject to the limitations on their use described herein. (*See* Gov't 2d MIL at 2.) The Government remains free to object to the introduction of aspects of the guilty plea and DPA by the Defense as the trial develops.[10] And as necessary to avoid

---

[9] Notably, the Government did not name Credit Suisse as a victim in the Statement of Facts, *i.e.*, it did not charge the bank as an entity with defrauding itself. (*See generally* CS Statement of Facts.)

[10] The Defense provides several bases on which the guilty plea and DPA could be admissible. (Chang Opp. to 2d MIL at 4, 9-10.) The Government contests each of these purported bases for admission. (*See* Gov't 2d MIL Reply at 4, 7-8.) Because the Defense's introduction of these documents primarily depends on what the Government seeks to argue in its case-in-chief, the court finds it best to reserve on these specific objections to introducing the DPA and guilty plea until they can be placed in their proper context at trial.

confusion of the issues or misleading the jury, the court may consider limiting instructions relating to any testimony concerning Credit Suisse's role as perpetrator and victim, depending on the scope of the conspiracy the Government asserts at trial and its connection to the guilty plea and DPA.

Regarding the Government's related request, however, the court agrees that Chang should not be allowed to cross-examine former Credit Suisse employees, namely the cooperating witnesses Pearse, Singh, and Subeva, about the corporate resolution in order to impeach the credibility of Credit Suisse. As noted by the Government, the corporate resolution and Statement of Facts were drafted and adopted years after Pearse, Singh, and Subeva all left Credit Suisse. (Gov't 2d MIL Reply at 7; *compare* CSSEL Plea Agmt. (signed and dated by both parties in October 2021), *and* CS AG DPA (same), *with* CS Statement of Facts ¶¶ 31-32 (noting Pearse left Credit Suisse in July 2013, Subeva left in August 2013, and Singh left in March 2017).) Accordingly, neither Pearse, Singh, nor Subeva could make or adopt the admissions contained therein, given that they were no longer at Credit Suisse by the time of the corporate resolution. The court concludes that cross-examination of these individuals on such testimony would be irrelevant and likely to confuse the jury; the court therefore GRANTS this motion.

2.   Propriety of Materiality Testimony by Credit Suisse

The court next considers whether the Government may elicit testimony from current Credit Suisse employees[11] relating to the materiality of purported misstatements in loan documents. (Gov't MILs at 32.) The Defense argues in opposition that Credit

---

[11] The court reads the Government's motion as focused on testimony from individual employees at the bank rather than as individuals representing Credit Suisse as an entity. To the extent that the Government seeks such testimony form a corporate representative of Credit Suisse, the Defense may renew its objections to allowing such testimony.

Suisse cannot testify on materiality because it was a "co-conspirator of Mr. Pearse and Mr. Singh" and thus complicit in the fraud. (Chang Opp. to Gov't MILs (Dkt. 584) at 28-29.)

It is clear that testimony from Pearse, Singh, or Subeva would not be considered objectively reasonable testimony on issues of materiality in light of their guilty pleas. However, there is no indication that testimony by other employees of Credit Suisse acting in their individual capacity would be similarly flawed. As discussed *supra*, although the entity entered into the guilty plea and DPA, not all Credit Suisse employees were directly involved in the EMATUM loan and Eurobond Exchange, and Pearse, Singh, and Subeva deliberately concealed their scheme from others at the bank. (*See* Gov't 2d MIL at 2-3.)[12] Thus, there is no indication that the individual witnesses called on behalf of Credit Suisse could not, if relevant, present testimony that would aid the jury in determining whether a reasonable investor would find certain information material.

As agreed by the parties, Chang is not limited from drawing on the DPA and guilty plea to impeach individual witnesses' testimony and credibility. (Gov't Reply at 1 n.1.) And as noted above, he may challenge the factual underpinning of their views on materiality which may implicate Credit Suisse's DPA and guilty plea. However, the Defendant may not discredit individuals testifying as to their thoughts on materiality by imputing the actions of

---

[12] Further, the guilty plea and DPA between Credit Suisse and the Government concern the EMATUM securities only. (*See* CS Statement of Facts ¶¶ 18-20, 27-72.) Thus, whether a distinct Credit Suisse employee could be considered a reasonable investor has no effect on questions concerning the Proindicus and MAM loans. (*See* Gov't MILs Reply (Dkt. 589) at 38.)

Credit Suisse as an entity onto all individuals working at the bank.[13]

With respect to current Credit Suisse employees that the Government intends to call, the court finds hypothetical questions seeking to determine whether certain statements made in the loan documents would have been material to their decision to sell the loans to investors (or otherwise invest) are both proper and relevant for the reasons discussed in its Mem. & Order resolving the parties' various motions *in limine*. (*See* MILs M&O at 17-20.)

The Government's motion to elicit materiality testimony from current Credit Suisse employees is therefore GRANTED in part and DENIED in part in accordance with the court's previous ruling. (MILs M&O at 17-20.)[14] But the Defense remains free to

---

[13] The Defense argues that Credit Suisse employees cannot provide materiality testimony because they are not "reasonable investor[s]" given Credit Suisse's admissions of culpability and relies on *United States v. Litvak*, 889 F.3d 56 (2d Cir. 2018) as support. (Chang Opp. to Gov't MILs at 28-29.) That case is inapposite. In *Litvak*, an investor was initially permitted to offer materiality testimony after he admitted he was wrong about certain market conditions despite his admission that he was wrong. *Id.* at 68-69. According to the Second Circuit, this allowed irrelevant and subjective evidence to be introduced when such evidence was highly likely to mislead and confuse the jury. *Id.* at 69 (explaining that "[a]t best," the investor's testimony had a "high probability of confusing the jury by asking it to consider as relevant [his perception] that was entirely wrong [and at] worst," the investor's testimony "would mislead the jury"). The Second Circuit concluded that the investor's testimony should not have been admitted and vacated the jury's verdict. *Id.* at 72. Here, there is no such concern. The individuals' testimony as to what they may find material is not premised on incorrect subjective understandings of the market, but on their experience and understanding of the facts that would be relevant to an objectively reasonable investor.

[14] The Government is permitted to elicit testimony regarding materiality from investors, including current Credit Suisse employees, so long as the proper foundation is established for each question and these questions are

raise more specific concerns regarding the reasonableness of a given witness's materiality testimony. And, of course, the Defense is free to cross-examine witnesses on the reasonableness and accuracy of their testimony.[15]

### 3. Admissibility of Credit Suisse's Resolution Agreements

The Government also seeks to preclude the Defense from introducing evidence of Credit Suisse's civil resolutions, including any testimony or evidence about the substantive nature and resolution of the U.K. Proceeding. (*See* Gov't 2d MIL at 1 n.1; Gov't 5th MIL at 11.) Specifically, the Government seeks to preclude testimony or evidence concerning the merits of the U.K. litigation, including testimony relating to the claims or positions of Credit Suisse in the litigation and its resolution, (Gov't 5th MIL at 11), as well as civil resolutions with the United States Securities & Exchange Commission ("SEC"), the United Kingdom's Financial Conduct Authority, and the Swiss Financial Market Authority. (Gov't 2d MIL at 1 n.1.)

As to substantive testimony relating to the U.K. Proceeding, the court agrees with the Government that the potential confusion of the issues or undue prejudice outweighs the minimal relevance that the testimony may provide. The U.K. Proceeding involved different claims and did not require the bank to admit liability.

---

posed as hypotheticals without requiring the jury to assume the guilt of the Defendant. (*See id.*)

[15] As noted *supra*, this analysis is limited to witnesses testifying in their individual capacity as to what they would consider material in order to aid the jury in determining whether information would be material to a reasonable investor. This ruling does not apply to witnesses that testify in a representative capacity, and thus on behalf of Credit Suisse as the entity. The court will take care to ensure individual testimony does not inadvertently turn into testimony representative of the bank or become overly subjective so as to confuse the issues or mislead the jury. Chang is free to raise concerns should that occur at trial.

Any testimony regarding the positions of the bank is irrelevant and likely to confuse the issues. The court therefore GRANTS the Government's request to preclude testimony or evidence from the U.K. proceeding concerning "(1) the claims asserted by the parties in that case, (2) the 'positions Credit Suisse took in the UK Litigation,' (3) and its resolution." (Gov't 5th MIL at 11.)

As to the resolutions with the SEC, the U.K.'s Financial Conduct Authority, and the Swiss Financial Market Authority, the Government argues that this evidence should be excluded without meaningfully detailing why preclusion is warranted. (*See generally* Gov't 2d MIL; *see also id.* at 1 n.1 (noting "[f]or the reasons discussed herein, the government also moves to preclude evidence and argument about these civil resolutions").) And similarly, the Defense only responds that these resolutions "reflect, again, admissions by Credit Suisse, some of which make clear that Credit Suisse's responsibility for these loans went beyond *respondeat superior.*" (*See* Chang Opp. to 2d MIL at 2 n.1.) The admissions by Credit Suisse in these resolutions may potentially be relevant for reasons similar to those discussed *supra* with respect to Credit Suisse's guilty plea and DPA. As the Government does not appear to have meaningfully advanced an argument for preclusion of these documents in particular, the court declines to rule on whether they should be precluded at this time.

In sum, the court rules as follows: the Government's motions to (1) preclude the Defendant from arguing that the guilty plea and DPA, in and of themselves, mean that Credit Suisse was not defrauded as part of the charged wire fraud conspiracy is GRANTED; (2) preclude cross-examination of former Credit Suisse employees about the guilty plea and DPA is GRANTED; (3) elicit materiality testimony from Credit Suisse employees is GRANTED in part and DENIED in part; and (4) preclude Chang from introducing evidence of Credit Suisse's other civil resolutions is GRANTED in part with decision RESERVED as to

resolutions with the SEC, the U.K.'s Financial Conduct Authority, and the Swiss Financial Market Authority.

### B. Evidence or Argument Relating to Sanctions Imposed on VTB Capital, or Related Entities

The Government moves *in limine* to preclude the Defendant from offering evidence or argument concerning sanctions imposed by the U.S. Government on entities related to VTB Capital,[16] arguing that this topic is not relevant to any consequential fact in this case, or alternatively, that it is unfairly prejudicial under Fed. R. Evid. 403. (*See generally* Gov't 3d MIL.) Specifically, the Government intends to call former VTB Capital employees personally involved in VTB's investment in the loans to each of the three Mozambican entities. (*Id.* at 2.) The Government does not, however, intend to call any representatives of VTB nor elicit testimony suggesting that the defaults were the material cause of VTB Capital's current financial condition. (*Id.* at 2 n.6; Gov't 3d MIL Reply (Dkt. 612) at 3-4.) Accordingly, the Government seeks to preclude three subcategories of evidence: (1) sanctions imposed by the U.S. Government and subsequent receivership; (2) the impact of the sanctions imposed on the financial harm suffered by VTB Capital; and (3) VTB Capital's ties to Russia. (*Id.*) The Defense opposes, arguing that these categories of evidence are relevant and more probative than prejudicial. (Chang Opp. to Gov't 3d MIL ("Chang Opp. to 3d MIL") (Dkt. 602) at 1, 3-4.)

Only relevant evidence may be admitted at trial. Fed. R. Evid. 402. Evidence is relevant if it "has any tendency to make a fact

---

[16] VTB Capital is a U.K.-based subsidiary of VTB Bank, a Russia-based bank owned by the government of Russia. Of relevance, the U.S. Government imposed sanctions on VTB Bank in 2014, following Russia's invasion of Crimea, and again in 2021. In April 2022, following the U.S. and other Western sanctions, VTB Capital was no longer able to operate on its own and was therefore placed into the administration of the U.K, where it currently remains. (Gov't 3d MIL at 1-2.)

more or less probable" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. Though the "standard of relevance established by the Federal Rules of Evidence is not high," *United States v. Southland Corp.*, 760 F.2d 1366, 1375 (2d Cir. 1985), district courts have "broad discretion to balance probative value against possible prejudice" under Rule 403. *United States v. Bermudez*, 529 F.3d 158, 161 (2d Cir. 2008). Even evidence deemed relevant may be excluded if the court determines that "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Rule 403 is concerned with "some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995).

The Government seeks to exclude evidence or argument that VTB Capital, or any of its related corporate entities, were sanctioned by the U.S. Government and were subsequently placed into receivership. (Gov't 3d MIL at 1-3.)

The Defense opposes, arguing that the sanctions and subsequent receivership are relevant because (1) VTB Capital resolved claims with the SEC pertaining to the Eurobond Exchange and thus questions concerning sanctions are relevant to challenge whether VTB Capital may be considered an objective, reasonable investor; (2) the Defense should be permitted to raise an alternative explanation to that which the Government will assert for VTB's financial woes; (3) VTB's status as a bank in receivership creates perverse incentives on which the Defense should be permitted to cross-examine the entity; and (4) similar questioning was permitted during the *Boustani* trial. (Chang Opp. to 3d MIL at 3-4; *see* Trial Tr. dated Oct. 30, 2019 (Dkt. 388-2) at 2048-49) (Cicely

Leemhuis[17] testifying that the United States Government issued sanctions against VTB Bank because of its close relationship with the Russian Government following Russia's invasion of Crimea and that these sanctions "altered the nature of the business") (objection overruled).)

The court RESERVES decision on this request.

The Government has submitted that it does not intend to call a representative of VTB Capital to testify, and therefore any opportunity to "test the government's presentation of VTB Capital as a duped victim" or challenge potentially "inconsistent" statements concerning the bank's resolution with the SEC would not be properly raised before the former VTB Capital employees who do not have the requisite knowledge to speak to these issues. (Gov't 3d MIL at 2 n.6; Chang Opp. to 3d MIL at 3.)

However, the Defendant points to the fact that the Government intends to elicit testimony that the Projects' defaults on each of the loans financially harmed VTB Capital. Thus, the Defense argues that it should be permitted on cross to clarify that other circumstances, specifically U.S. sanctions, also harmed VTB bank in order to dispute any suggestion that the loans were the but-for or sole cause of VTB Capital's financial condition. (*See* Chang Opp. to 3d MIL at 3-4; *see also* Trial Tr. dated Oct. 30, 2019 at 1964 (Leemhuis testifying on direct that Projects' loan defaults put a "significant impact of the ability of our London bank to do business"); *id.* at 2048-49 (Leemhuis testifying in the affirmative on cross-examination that the United States Government issued sanctions against VTB Bank because of its close relationship with the Russian Government following Russia's invasion of Crimea and explaining that these sanctions "altered the nature of the

---

[17] Cicely Leemhuis is one of the two former VTB Capital employees the Government intends to call at this trial. (Gov't 3d MIL at 2.) However, she no longer works for VTB and will not be appearing as a corporate representative. (Gov't 3d MIL Reply at 3.)

business") (objection overruled).) As to Chang's argument that VTB Bank's sanctions or VTB Capital's receivership provide motivation for their testimony, this argument is unavailing as the Government represents that neither witness works at nor will represent VTB at trial. (Gov't 3d MIL Reply at 3.) While the Defense may attempt to impeach these witnesses and question their testimony as it relates to materiality, it may not do so by imputing the wrongdoing of the sanctioned entities on individuals testifying in their non-representative capacity absent indications that the sanctions impacted their individual investment decisions or views on materiality.[18] Doing so would be irrelevant or, if minimally relevant, confuse the issues or mislead the jury.

In sum, in the event the Government introduces testimony concerning the financial impact of the loan defaults on VTB Capital, fairness concerns dictate that the Defense should also be permitted to offer alternative explanations for such harm. However, the court finds the motion premature until it can view the witnesses' testimony in the appropriate context. Accordingly, the court RESERVES DECISION on this motion. The court nevertheless concludes that the Defense may not impute the actions of the corporate entity on behalf of individual investors by impeaching them using the sanctions or corporate receivership.

## C. Duress and Good Faith as Defenses

The Government seeks to preclude the Defendant from offering improper argument relating to his claim that he was purportedly ordered to sign the loan guarantees at issue in this case, including but not limited to raising duress or good faith as defenses. (Gov't 4th MIL at 1-2 & n.2.) Chang opposes, arguing that he has a constitutional right to reject the Government's characterization of

---

[18] In the event that the Defense believes such evidence of influence on individual decisions or views on materiality arises, Chang is directed to raise this issue outside the presence of the jury prior to eliciting any such testimony.

evidence, and must be permitted to argue that the evidence supports a different narrative. (Chang Opp. to Gov't 4th MIL ("Chang Opp. to 4th MIL") (Dkt. 608) at 1.)

1. Ability to Raise a Duress Defense

First, the Government argues that the Defense should be precluded from raising a duress defense because the Defendant has given no indication that he plans to pursue such a defense. (Gov't 4th MIL at 2.) The Defense responds that Chang should be permitted to present a duress defense if there is evidence supporting it. (Chang Opp. to 4th MIL at 2.) The Government agrees that the Defendant is entitled to any legally proper defenses available to him, (Gov't 4th MIL Reply (Dkt. 621) at 2), but contends that Mr. Chang "cannot . . . present a duress defense at trial without first proffering sufficient supporting evidence to the Court at a pretrial conference." (*Id.*)

"In order to establish a claim of duress such as to constitute a legal excuse for criminal conduct, a defendant must show that (a) at the time of his conduct he was subjected to actual or threatened force, (b) the force or threat was of such a nature as to induce a well-founded fear of impending death or serious bodily harm, and (c) there was no reasonable opportunity to escape from the force or threat other than by engaging in the otherwise unlawful activity." *United States v. Villegas*, 899 F.2d 1324, 1343-44 (2d Cir. 1990). The "well-founded fear" element creates a high bar such that a generalized fear is not enough; there must be a specific threat of immediate harm. *Id.*

"The duress defense will not be submitted to the jury unless the defendant has presented some evidence on each of these elements." *Id.* However, if there is a foundation for such a defense, "even if the evidentiary foundation of the defense theory is only tenuous," the factual issues will be resolved by the jury. *United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997). Thus, a defendant must be able to "make a prima facie showing as to each of

the elements of the duress defense" in order for the defense to be submitted to the jury. *Villegas*, 899 F.2d at 1343.

In the event the court finds the evidence insufficient as a matter of law, Chang will not be able to argue this defense to the jury. *Id.* at 1343 ("[N]o proper interest of the defendant would be served by permitting his legally insufficient evidence to be aired at trial, and interests of judicial economy suggest that the jury should not be burdened with the matter."); *see also id.* ("These principles neither foreclose a defendant from presenting any legally sufficient evidence of duress at trial nor affect his right to present evidence on any other subject.").

The court RESERVES DECISION on this motion. The court notes that the Defendant has not made any serious showing of an intent to invoke duress as a defense. And there is no indication that the record would support a *prima facie* showing that Chang can meet each element of duress such that presentation of the defense is warranted. But if intending to raise such a defense, the court DIRECTS the Defense to give the court sufficient notice of its intent to do so, including by seeking an evidentiary hearing on the issue prior to the Defendant's presenting any evidence of duress as part of its case-in-chief.[19] *See, e.g., United States v. Bakhtiari*, 913 F.2d 1053, 1057 (2d Cir. 1990); *United States v. Bifield*, 702 F.2d 342, 346-47 (2d Cir. 1983).

### 2. Defendant's State of Mind

The Government argues that, even if the Defense established a legally proper claim of duress, such a defense cannot be used to negate the Defendant's criminal state of mind. (Gov't 4th MIL at

---

[19] The Defendant's case-in-chief includes cross-examination of Government witnesses if such evidence is presented.

3.) The Defense argues when discussing intent that the Government cannot prevent it from "arguing a lack of intent[.]" (Chang Opp. to 4th MIL at 2.)

Even where properly established, "the defense of duress does not negate a defendant's criminal state of mind when the applicable offense requires a defendant to have acted knowingly or willfully." *Dixon v. United States*, 548 U.S. 1, 7 (2006). Instead, "it allows the defendant to avoid liability because coercive conditions or necessity negates a conclusion of guilt even though the necessary *mens rea* was present." *Id.*; *United States v. Zayac*, 765 F.3d 112, 120 (2d Cir. 2014).

The parties appear to talk past each other in their arguments. The Government, in addition to arguing that duress should not be permitted, seeks a ruling precluding the Defendant from improperly using the duress defense as a way to negate his criminal intent, as required under the charged conspiracies. The Defense argues that it should be permitted to argue that Chang lacked the requisite intent, but duress would not go to intent; it would instead be a defense even if intent was shown.

Accordingly, should the court find that duress is a valid defense, the Government's motion to preclude the Defendant from improperly using duress to negate his criminal intent is GRANTED. This does not preclude the Defendant from arguing a lack of criminal intent separate from the duress defense. But it does preclude him from arguing, if permitted to argue duress, that he did not act intentionally or willfully due to duress.

3. Whether the Defendant Is Permitted to Argue that Because He Was Ordered to Sign the Loan Guarantees, He Could Not Have Committed Lawful Act Corruption Under Mozambican Law.

The Government argues that the Defendant should not be permitted to argue that since he was purportedly ordered to sign the

loan guarantees, he could not have committed lawful act corruption under Mozambican law, pursuant to Rules 401 and 402. (Gov't 4th MIL at 3-4.) Specifically, the Government contends that, because the relevant question for the jury is whether the Defendant received payments for completing those acts, this line of argument is irrelevant. (*Id.*)

The Defense highlights that, under Mozambican law, bribery requires that an act is undertaken in exchange for and induced by a payment. (Chang Opp. to 4th MIL at 4.)

As background, the court has ruled that the Government may prove its money laundering conspiracy charge by showing that Chang violated Law 6/2004, Article 7 or Article 8, which includes performing acts not contrary to the duties of his office in exchange for money. (*See* MILs M&O at 69-72 (concluding Law 6/2004 is the applicable Mozambican law for the specified unlawful activity of "offenses against a foreign nation involving bribery of a public official" charged under Count 2).) Being ordered to sign the loan guarantees is relevant to such a determination because it goes to his reason for signing the loan guarantees and whether it was done in exchange for illicit payments. However, being ordered to sign the loan guarantees is not, on its own, inconsistent with a finding of bribery under Mozambican law. As the Government correctly notes, Law 6/2004 does not require that the payment or promise of payment be the "inducing" motive of the official act. (Gov't MILs Reply at 6.) Rather, even lawful acts within the scope of an official's authority may constitute a violation of Article 8 of Mozambican Law 6/2004 when the act was done in exchange for payment, or the promise of payment. (*See* Law 6/2004 (Dkt. 572-8).) The Defense is free to introduce evidence showing that Chang was ordered to sign the loan guarantees as part of its argument that he did not do so for monetary payments. If such evidence is introduced, the Government may rebut it and it is up to the jury to

determine which side to believe. However, the Defense cannot argue that being ordered to do something therefore means Chang *could not* as a matter of law have committed lawful act corruption under Mozambican law. Doing so would misstate the law and runs the risk of confusing the jury.

Therefore, the Government's motion *in limine* to preclude the Defense from arguing that because Chang was ordered to sign the loan guarantees, he *could not* have committed lawful act corruption under Mozambican law is GRANTED.[20]

Relatedly, the court declines to preclude the Defense from arguing in its opening statements or summation that, because the Defendant was ordered to sign the loan guarantees, he is not guilty. (Gov't 4th MIL at 1 n.1.) The Defense may make the argument as outlined above but will be precluded from making impermissible legal conclusions regarding the elements of Mozambican law.

### 4.   Good Faith as a Defense

The Government also seeks to preclude the Defense from relying on an improper good faith defense. (Gov't 4th MIL at 2, n.2.) The Defense opposes for similar reasons as those discussed with respect to duress and criminal intent. (Chang Opp. to 4th MIL at 3.)

Good faith is a proper defense to wire fraud if used to rebut that the Defendant had an intent to defraud by showing an honest belief in the truth of the relevant representations. *See United States v. Alkins*, 925 F.2d 541, 550 (2d Cir. 1991). However, an "'I was following orders' excuse is not equivalent to a good faith

---

[20] For similar reasons, the Defense is precluded from arguing that because Chang was ordered to sign the loan guarantees, he could not have committed wire fraud conspiracy. While he may dispute the Government's proof as to these elements, including lack of intent, he cannot suggest that by nature of the directive, he cannot possess an intent to defraud.

defense." *United States v. Connolly,* No. 16-CR- 370 (CM), 2019 WL 2125044, at *13 (S.D.N.Y. May 2, 2019). An individual may still possess the requisite intent to meet an element of the crimes here even if ordered to engage in the relevant criminal activity. This applies to the wire fraud charge as well as the charged violation of Mozambican law—an element of the money laundering charge (*i.e.,* Chang may have had the requisite *mens rea* such that he engaged in corruption under Mozambique Law 6/2004 if he received money to perform an act even if there was a separate order to engage in such act). Whether this was in fact the case when presented with such an order will be a question for the jury. But arguing that it *cannot* be the case is improper and misleading to the jury.

The court RESERVES DECISION on this motion. To the extent Chang seeks to raise an improper "I was following orders" defense as good faith, that argument will be precluded. *Connolly,* 2019 WL 2125044, at *13 (noting that such an excuse is not equivalent to a good faith defense). However, it is unclear whether he seeks to advance a good faith defense by other means and how the direction to sign the guarantees may support such a defense.

## III. CONCLUSION

For the reasons discussed, the Government's remaining motions *in limine* are resolved as follows.

The motions to preclude the Defendant from (a) arguing that the guilty plea and DPA, in and of themselves, mean that Credit Suisse was not defrauded as part of the charged wire fraud conspiracy and (b) cross-examining former Credit Suisse employees about the corporate resolution are GRANTED, subject to the limitations set forth in this Order. The motion to elicit materiality testimony from Credit Suisse employees is GRANTED in part and

DENIED in part in accordance with this court's prior ruling in its Mem. & Order ruling on the initial motions *in limine.*

The motion to preclude evidence of Credit Suisse's other civil resolutions is GRANTED in part with decision RESERVED as to resolutions with the SEC, the U.K.'s Financial Conduct Authority, and the Swiss Financial Market Authority. Decision on the motion to preclude evidence or argument relating to sanctions imposed by the U.S. Government on VTB Capital and its receivership is RESERVED until trial. Decision on the motion to preclude the Defendant from raising duress or good faith as defenses is also RESERVED, except that the Defendant is precluded from making certain arguments when asserting these defenses. The Defendant is further DIRECTED to give the court sufficient notice of its intent to raise an affirmative duress defense, including by seeking an evidentiary hearing on the issue prior to the Defendant presenting any evidence of duress as part of its case-in-chief.

SO ORDERED.

Dated:   Brooklyn, New York
         July 11, 2024

                              s/Nicholas G. Garaufis
                              NICHOLAS G. GARAUFIS
                              United States District Judge