UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

MANUEL CHANG,

Defendant.

**MEMORANDUM & ORDER**

**18-CR-00681 (NGG) (CLP)**

NICHOLAS G. GARAUFIS, United States District Judge.

On August 8, 2024, following a four-week trial, a jury found the Defendant Manuel Chang ("Chang" or "Defendant") guilty of conspiracy to commit wire fraud and conspiracy to commit money laundering. The Defendant now moves for a judgment of acquittal or, in the alternative, a new trial, pursuant to Rules 29(c) and 33 of the Federal Rules of Criminal Procedure, respectively. (*See* Mot. for Acquittal and New Trial ("Mot.") (Dkt. 741).) For the reasons set forth below, the Defendant's motions are DENIED.

## I.   BACKGROUND

The court assumes familiarity with the relevant facts and procedural history of this case. Nevertheless, the court briefly summarizes the charges, procedural history, and evidence presented at trial to the extent they are relevant to this motion.

### A.   Charges

Chang was indicted by a Grand Jury on December 19, 2018. (Original Indictment (Dkt. 1).) The Grand Jury returned superseding indictments on August 16, 2019, (First Superseding Indictment (S-1) (Dkt. 137)), December 21, 2013, (Second Superseding Indictment (S-2) (Dkt. 524)), and June 4, 2024, (Third Superseding Indictment (S-3) ("Indictment") (Dkt. 578)).

In the Indictment dated June 4, 2024, the operative indictment at trial, the Government charged the Defendant with the following two counts:

> [Wire Fraud Conspiracy (Count 1):] In or about and between January 2011 and December 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere out of the jurisdiction of any particular State or district, the defendant MANUEL CHANG, also known as "Pantero," "Chopstick" and "Kung Fu," together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud one or more investors and potential investors in Proindicus, EMATUM and MAM, including Credit Suisse and [VTB Capital], and to obtain money and property from them by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

> [Money Laundering Conspiracy (Count 2):] In or about and between January 2013 and December 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere out of the jurisdiction of any particular State or district, the defendant MANUEL CHANG, also known as "Pantero," "Chopstick" and "Kung Fu," together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds to one or more places outside the United States from one or more places inside the United States, and to one or more places inside the United States from one or more places outside the United States, (a) with the intent to promote the carrying on of one or more specified unlawful activities, to

wit: (i) offenses against a foreign nation involving the bribery of a public official, in violation of Mozambican law, as defined in Title 18, United States Code, Section 1956(c)(7)(B)(iv); and (ii) wire fraud, in violation of Title 18, United States Code, Section 1343 (collectively, the "Specified Unlawful Activities"), contrary to Title 18, United States Code, Section 1956(a)(2)(A); and (b) knowing that the monetary instruments and funds involved in the transportation, transmission and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of one or more specified unlawful activities, to wit: the Specified Unlawful Activities, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(*See* Indictment ¶¶ 57, 59.)

Put simply, the Indictment charged Chang with unlawfully diverting millions of dollars of loan proceeds that were intended for three projects designed to develop the Republic of Mozambique's ("Mozambique") maritime infrastructure (the "Projects"). None of these projects generated much revenue, and all three of them defaulted in the beginning of 2016, resulting in significant losses for the investors. The Indictment alleged that Chang and others conspired to defraud investors as they amassed over $2 billion in loans for Projects that were guaranteed by the Mozambican government.

## B.  Procedural History

On December 19, 2018, Chang and seven co-defendants were indicted in the Eastern District of New York. (*See* Original Indictment.) On December 29, 2018, Chang was arrested while on a layover in an airport in Johannesburg, South Africa, pursuant to a provisional arrest warrant initiated by the U.S. Government.

(*See* Aff. in. Supp. of Req. for Use of Redacted Indictment and Detention (Dkt. 22) ¶¶ 4-5; Dec. 21, 2023 Mem. & Order Denying Mot. to Dismiss on Speedy Trial Grounds ("Speedy Trial M&O") (Dkt. 523) at 4-6.) As both the Defendant and Mozambique's government contested his extradition to the United States, years of extradition proceedings followed. (*See generally* Speedy Trial M&O.)

During this time, three co-defendants, Detelina Subeva, Andrew Pearse, and Surjan Singh, pleaded guilty. (*See* Min. Entry Dated May 20, 2019 ("Subeva Guilty Plea") (Dkt. 77); Min. Entry Dated July 19, 2019 ("Pearse Guilty Plea") (Dkt. 117); Min. Entry Dated Sept. 6, 2019 ("Singh Guilty Plea") (Dkt. 160).) A fourth co-defendant, Jean Boustani, proceeded to trial and was acquitted on all charges by a jury verdict on December 2, 2019. (*See* Boustani Jury Verdict (Dkt. 370).) Defendants Najib Allam, Antonio Do Rosario, and Teofilo Nhangumele have yet to appear in this action and are presumed to reside in countries that do not have extradition treaties with the United States. (*See, e.g.,* Speedy Trial M&O at 6-7; *see also* Subeva Pre-Sentence Investigation Report (Dkt. 408) ¶ 42 (noting that Defendants Allam, Do Rosario, and Nhangumele have yet to be apprehended).)

On May 24, 2023, South Africa's highest court concluded that Chang should be extradited to the United States. (Speedy Trial M&O at 6.) Approximately one month later, Chang was extradited to the United States. (*Id.*)

Prior to trial, the court ruled on various pre-trial motions and motions *in limine*; none of which are challenged in the instant motion. (*See, e.g.,* Speedy Trial M&O; March 27, 2024 Mem. & Order Denying Def. Mot. to Suppress (Dkt. 547); May 31, 2024 Mem. & Order Denying Def. Omnibus Mot. to Dismiss S-2 Indictment ("Omnibus MTD M&O") (Dkt. 573); June 25, 2024 Mem . & Order Granting Gov't Motion *in Limine* ("MIL") (Dkt. 600); July 3, 2024 Mem. & Order Resolving MILs ("Omnibus MIL

M&O") (Dkt. 626); July 8, 2024 Mem. & Order Resolving *Giglio* Mot. and MILs Filed Under Seal (Dkt. 645); July 12, 2024 Mem. & Order Resolving Suppl. MILs (Dkt 668); July 12, 2024 Mem. & Order Denying Mot. to Dismiss Count One of S-3 Indictment (Dkt. 670).)

Magistrate Judge Cheryl L. Pollak selected a jury on July 15, 2024. (*See* Min. Entry Dated July 16, 2024 (Dkt. 676).) Trial commenced the following day, on July 16, 2024. (*See* Min. Entry Dated Jul. 16, 2024 (Dkt. 710).) On July 30, 2024, upon the close of the Government's case, Chang moved pursuant to Federal Rule of Criminal Procedure 29(a) for a judgment of acquittal on both counts, which the court denied. (*See* Min. Entry Dated July 30, 2024 (Dkt. 718); *see also* Trial Tr. ("Tr.") 2064-65.) Chang renewed his Rule 29(a) motion following the close of his defense, and the court again denied Chang's motion. (*See* Min. Entry Dated Aug. 1, 2024 (Dkt. 720); *see also* Tr. 2434-35.) The jury began its deliberations on the afternoon of August 6, 2024 and rendered its verdict two days later, finding the Defendant guilty of both counts of the Indictment. (*See* Min. Entry Dated Aug. 6, 2024 (Dkt. 722); Min. Entry Dated Aug. 8, 2024 (Dkt. 730); Jury Verdict (Dkt. 732).) In accordance with the schedule proposed by the parties and accepted by the court, Chang filed the instant motion on September 13, 2024. (*See* Mot.) The Government filed its opposition on October 14, 2024, (Gov't Opp. (Dkt. 747)), and the motion was deemed fully briefed upon the filing of Chang's reply in support of the motion on October 21, 2024, (Def. Reply ("Reply") (Dkt. 749)).

## C.  Evidence Presented at Trial

At trial, the Government argued that Chang, while serving as the Minister of Finance of Mozambique from February 2005 to January 2015, along with several co-conspirators, conspired to fraudulently obtain over $2 billion in loans from international financial institutions, including AllianceBernstein, Credit Suisse,

VTB Capital, and NWI Management (collectively, "Investors"). These Investors loaned money to three government-owned companies specifically created for the Projects: Proindicus, EMATUM, and MAM. (*See generally* Indictment; Tr. 2501-89 (Government's Initial Summation).) Privinvest, a Lebanese global shipbuilding company, was the primary contractor for all three projects. The Government argued at trial that Chang and his co-conspirators conspired to obtain the loan proceeds in a manner that violated both Mozambican law prohibiting bribery and United States law prohibiting wire fraud, and that they conspired to launder $7 million in bribe payments to Chang using the United States' financial system. (*See generally* Indictment; Tr. 2502-89.)

As support, the Government principally relied on the statements of co-conspirators, including email and text communications, as well as documents exchanged during those communications. (*See, e.g.,* GX1926; [1] GX1928-GX1932; GX1960-T; GX2009; GX2013; GX2036; GX2052; GX2392; GX2392-A; GX2523; GX2528; GX2796; GX3154; GX3227; GX3230; GX3241; GX3271-GX3275; GX5089.) The Government offered numerous exhibits, including spreadsheets and ledgers detailing the various bribe and kickback payments made to Chang and his co-conspirators, documents showing Chang's involvement in the structuring of the loans, the loan agreements' terms, and the government guarantees signed by the Defendant. (*See, e.g.,* GX1927-A; GX1933; GX2052-A; GX2052-B; GX2074; GX2613-A; GX2613-T; GX2758; GX2805; GX2807; GX2807-A-T; GX2808; GX2847; GX2847-A; GX3303; GX3303-A; GX5007-A; GX5007-B.) The Government also offered testimony from over a dozen witnesses. This testimony came from experts in forensic analysis, data transmission infrastructure, and international banking; an attorney from Quinn Emanuel Urquhart & Sullivan, LLP, the law firm that represented Privinvest in connection with the Projects; a senior

---

[1] "GX" refers to Government Exhibits.

product manager for the Clearing House, the payments company that operates and clears most domestic and international high value payment transactions in United States dollars ("USD"); representatives from the Investors and the banks that facilitated the transfers of the kickback payments; and two key co-conspirators, Defendants Andrew Pearse and Surjan Singh, both of whom have pleaded guilty for their roles in securing fraudulent loans for the Projects while they were employed by Investor Credit Suisse.[2]

Much of the testimony from Pearse and Singh centered around their own wrongdoing in helping to prepare fraudulent financial loan documents for the Projects to encourage investors to lend money and coaching their co-conspirators on how to successfully obtain international financing for the Projects. Pearse testified extensively about his involvement in the fraudulent scheme, detailing how between 2011 and 2013, he was the managing director in charge of the European Global Finance Group for Credit Suisse, a global investment bank.[3] (Tr. 81.) As head of the Global Finance Group, Pearse oversaw and managed a team focused exclusively on lending money to clients in developing countries, one of which was Mozambique.[4] (*Id.* at 81-82.) Pearse testified that he "received $45 million dollars" in "kickbacks and illegal

---

[2] Pearse pleaded guilty to conspiracy to commit wire fraud and Singh pleaded guilty to conspiracy to commit money laundering. (*See* Pearse Guilty Plea; Singh Guilty Plea.) Both have yet to be sentenced.

[3] Credit Suisse Group AG has since merged with UBS Group AG, a multinational investment bank and financial services company. Credit Suisse also entered into a deferred prosecution agreement with the Government as part of a "negotiated global corporate resolution," admitting criminal liability for wire fraud conspiracy based on the actions of its employees, including Pearse, Singh, and Subeva. (Supp. MILs M&O at 3-4.)

[4] Prior to the formation of the Projects, the Rovuma basin gas field, located off the cost of northern Mozambique, was discovered, revealing high value resources in that area. (*Id.* at 98-100.)

payments from Privinvest" in exchange for his assistance in re-
ducing a "subvention fee" that was due from Mozambique to
Credit Suisse in relation to the loans, "creat[ing] the documents
that were to be presented to the banks," and "help[ing] each of
the [Project] companies and Privinvest answer [] questions" "to
ensure that those documents plus the information that was sup-
plied to the banks was such that it maximized the possibility that
the banks would make the loans." (*Id.* at 83-84, 102, 104, 509.)
Pearse also testified that he provided false information in the
loan documents that were sent to Investors and opened a secret
bank account in Abu Dhabi where he received his illegal pay-
ments and used those payments to pay co-conspirators. (*Id.* at
84-85, 105, 163-64, 509-10.) One of the people Pearse paid was
Singh.

Singh's trial testimony was similarly detailed. Singh, who also
worked for Credit Suisse's Global Finance Group during the rele-
vant period, testified to "accept[ing] and receiv[ing] kickbacks or
bribes" totaling $5.7 million dollars in order to "champion" or
"put resources behind and get approvals for part of the Proindi-
cus transaction and the EMATUM transaction." (*Id.* at 1246-49.)
Singh testified that he worked with co-conspirators to "create a
fake employment and a fake residency" in Abu Dhabi that ena-
bled him to open a bank account there where he ultimately
received his kickback payment. (*Id.* at 1273, 1304.)

As for Chang, the evidence at trial, through co-conspirator state-
ments and documents, established that Chang was paid upwards
of $7 million in exchange for his involvement in structuring the
Projects, obtaining the loans, and signing the government guar-
antees for each of the loans. (*See, e.g.,* GX1933-B; GX2758.)
Further, the Government presented evidence that Chang laun-
dered the illicit proceeds through Spanish and Swiss bank
accounts bearing names that were not his own. (*See, e.g.,*
GX2392 (email from Do Rosario to Boustani with attachment

"Kung Fu.pdf");[5] GX2392-A (email attachment of scanned folded up piece of paper with Swiss bank account information under the name Genoa Asset SA ("Genoa Asset") that identified Barclays as the New York correspondent bank); Tr. 1679 (FBI forensic accountant testifying that a Privinvest subsidiary transferred approximately $5 million into a Spanish account under the name Thyse International Corporation ("Thyse International") that was controlled by Chang associate Luis Brito); GX1504 (summary charts of Privinvest payments to Thyse International that identified Bank of America as the New York correspondent bank).)

Chang was found guilty of both conspiracy counts as charged in the Indictment. (*See* Jury Verdict.)

## II.  STANDARD OF REVIEW

### A.  Federal Rule of Criminal Procedure 29

Under Rule 29, the court may enter a judgment of acquittal after the jury has rendered a guilty verdict if the defendant can show that the evidence entered at trial was "insufficient to sustain a conviction." Fed. R. Crim. P. 29(a), (c). The defendant bears a "heavy burden" when challenging the sufficiency of the evidence because the trial court "must consider the evidence 'in the light most favorable to the prosecution' and uphold the conviction if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Aguilar,* 585 F.3d 652, 656 (2d Cir. 2009) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original)).[6] Thus, "[t]o

---

[5] Pearse testified that "Kung Fu", "Chopstick(s)" and "Pantero" were nicknames that Boustani and Do Rosario called Chang. (*See* Tr. 111-14.) The other evidence presented at trial demonstrated Boustani's and Do Rosario's routine use of these nicknames for Chang throughout the course of the conspiracy.

[6] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

sustain the jury's verdict, the government need not disprove every possible hypothesis of the defendant's innocence." *United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014). Rather, the court must consider the evidence presented "in its totality, not in isolation." *Id.* at 59. These principles ensure that the court is "careful to avoid usurping the role of the jury." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999). Indeed, "Rule 29(c) does not provide the trial court with an opportunity to sub-stitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *Id.* In other words, if the court "concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000).

"[A] defendant's burden is even heavier in the case of a conspiracy conviction, where deference to a jury's finding is especially important because a conspiracy is by its very nature a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court." *United States v. Aguilar*, No. 20-CR-390 (ENV), 2024 WL 3558505, at *1 (E.D.N.Y. July 26, 2024) (citing *United States v. Snow*, 462 F.3d 55, 68 (2d Cir. 2006)).

### B.  Federal Rule of Criminal Procedure 33

Rule 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). "Although a trial court has broader discretion to grant a new trial pursuant to Rule 33 than to grant a motion for a judgment of acquittal pursuant to [Rule 29], where the truth of the prosecution's evidence must be assumed, . . . that discretion should be exercised sparingly." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). Indeed, the Second

Circuit has explained that a district court should exercise such discretion and grant a new trial only "in the most extraordinary circumstances." *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993); *see also, e.g., United States v. Torres*, 128 F.3d 38, 48 (2d Cir. 1997) (same).

In evaluating a Rule 33 motion for a new trial, the court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *Ferguson*, 246 F.3d at 134. "[T]he court is entitled to weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." *Sanchez*, 969 F.2d at 1413. However, the "district court must strike a balance between weighing the evidence and credibility of witnesses and not wholly usurping the role of the jury." *Ferguson*, 246 F.3d at 133. "For this reason, it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment, such as where testimony is patently incredible or defies physical realities." *United States v. Naim*, No. 13-CR-660 (NGG), 2015 WL 3440253, at *15 (E.D.N.Y. May 20, 2015). At bottom, "to grant a new trial pursuant to Rule 33, there must be a real concern that an innocent person may have been convicted." *United States v. McPartland*, 81 F.4th 101, 123 (2d Cir. 2023).

## III. DISCUSSION

### A. Motion for a Judgment of Acquittal

Chang moves for a judgment of acquittal on both counts, arguing that the Government failed to put forward sufficient evidence to support a conviction on either count. (*See* Mot. at 1-13.)

#### 1. Wire Fraud Conspiracy

The federal wire fraud statute punishes those who:

> hav[e] devised or intend[] to devise any scheme or artifice to defraud, or for obtaining money or property by means of

false or fraudulent pretenses, representations, or promises, transmit[ted] s or cause[d]s to be transmitted by means of wire. . . in inter-state or foreign commerce, any writings . . . for the purpose of executing such scheme or artifice.

18 U.S.C. § 1343. "A defendant commits wire fraud when he knowingly conspires to devise "(1) a scheme to defraud, (2) money or property [is] the object of the scheme, and (3) use[s] . . . wires to further the scheme." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017). As the "gravamen of the offense is the scheme to defraud," the government must also prove that the misrepresentations made were "material" and that the defendant "acted with fraudulent intent." *Id.* A "false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the [decisionmaker] to which it was addressed." *United States v. Corsey*, 723 F.3d 366, 373 (2d Cir. 2013); *see also Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 193 (2016) (explaining that "under any understanding of the concept, materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation").

Additionally, the Supreme Court has rejected the "right-to-control" theory of wire fraud liability, holding that a claim that a defendant "deprive[d] the victim of potentially valuable economic information necessary to make discretionary economic decisions" is "not a valid basis for liability under § 1343." *Ciminelli v. United States*, 598 U.S. 306, 309 (2023) (reasoning that "the federal fraud statutes criminalize only schemes to deprive people of traditional property interests" (*i.e.*, money or property)).

In order to sustain Chang's wire fraud conspiracy conviction, the Government must have proven that Chang entered a joint enterprise to commit wire fraud with others, and Chang knowingly and intentionally joined the enterprise with the intent to accomplish its unlawful objective. *United States v. Torres*, 604 F.3d 58,

65 (2d Cir. 2010). Chang moves for acquittal on this count, arguing that (1) the Government produced no evidence at trial that the Chang "entered into an agreement with anyone in which he contemplated some actual harm or injury to anyone" and (2) acquittal is required under *Ciminelli* "because the government did nothing more than present the jury with a 'right to control' theory." (Mot. at 4.)

The court first addresses Chang's *Ciminelli* argument. Chang recycles his past argument urging this court to dismiss the indictment under *Ciminelli*. (*See* Def. Mem. in Supp. of Omnibus Mot. to Dismiss (Dkt. 543) at 12-16.) However, this court already considered and rejected this argument when it denied Chang's motion to dismiss the Second Superseding Indictment before trial. The court concluded that the indictment "sufficiently alleges a scheme to deprive investors of money through a series of misrepresentations, and not a scheme to deprive victims of 'valuable economic information.'" (*See* Omnibus MTD M&O at 9.) [7] Indeed, the Indictment alleges that Chang violated the wire fraud statute by "knowingly and intentionally conspir[ing] to devise a scheme and artifice to defraud one or more investors and potential investors in Proindicus, EMATUM and MAM, including Credit Suisse and [VTB Capital], and to obtain money and property

---

[7] The Indictment and the Second Superseding Indictment contain almost identical language on the basis for the Government's wire fraud charge against Chang. (*Compare* Indictment ¶ 57, *with* Second Superseding Indictment ¶ 57). Accordingly, the court is not inclined to revisit its prior ruling that the indictment did not allege a right-to-control theory. *See Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir. 2008) (explaining that the law of the case doctrine "counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice").

13

from them by means of one or more materially false and fraudulent pretenses." (Indictment ¶ 57.)

As the right-to-control theory was never implicated by the Indictment, this alone may serve as a basis to deny the motion. *See United States v. Whitehead*, No. 22-CR-692 (LGS), 2024 WL 3085019, at *3 (S.D.N.Y. June 21, 2024). Nevertheless, Chang attempts to revive his *Ciminelli* argument. Chang argues that because "the only evidence at trial was about whether knowledge of bribe payments would have affected investors' economic calculus in deciding to invest in the loans", the Government's theory at trial hinged on Investors' reliance on potentially valuable economic information and therefore dismissal is required. (Mot. at 4-5.) Not so.

First, this was not the only evidence presented at trial. The Government also offered evidence that the loans were governed by certain contracts which explained the loan and repayment terms (the "Facility Agreements") and the government guarantees which explained the Republic of Mozambique's role as a guarantor of the Facility Agreements. (*See* Tr. 1008:8-22 (witness from investor VTB Capital testifying that the Proindicus, MAM, and EMATUM Facility Agreements all had substantially similar terms and clauses regarding compliance with laws, use of the loan proceeds, and corrupt acts).) The Facility Agreements had anti-corruption provisions that expressly prohibited corrupt acts, including the offering or acceptance of bribes and kickbacks.[8] (*See* GX4.)

---

[8] The term "anti-corruption provisions" refers collectively to the "Purpose," "Use of Proceeds," and "Compliance with Laws" provisions of the Facility Agreements. (*See, e.g.*, GX4.) These provisions required the borrower to use "all" of the loan proceeds for the Projects, prohibited use of the proceeds in ways that "would violate Anti-Corruption laws, or in any way, which constitute a Corrupt Act," certified that the borrower has not

Chang's arguments that "each investor got precisely what they bargained for" and "all investors were apprised of the risks involved with these financings" are disingenuous and unpersuasive. (*See* Mot. at 5.) The Government presented the jury with sufficient evidence for it to conclude that the investors did not get what they bargained for because the evidence demonstrates that the Investors desired a corruption-free investment.

Second, while true that various investors testified about how misrepresentations in loan documents would significantly impact their decision to invest, that testimony was not presented to advance a right-to-control theory, but was offered because it was probative as to the materiality of co-conspirators' misrepresentations. *See Weaver*, 860 F.3d at 94; *United States v. An*, No. 22-CR-460 (KAM), 2024 WL 2010017, at *8 (E.D.N.Y. May 7, 2024) ("*Ciminelli* did not reject the premise that depriving a victim of information in order to induce the victim to part with traditional property can be fraud.").

In light of the evidence presented at trial, the court finds that Chang's reliance on *United States v. Nordlicht*, No. 16-CR-640 (BMC), 2023 WL 4490615, at *6 (E.D.N.Y. July 12, 2023) and *Binday v. United States*, 143 S. Ct. 2491 (2023) is still unavailing. (*See* Omnibus MTD M&O at 9 (denying motion to dismiss because "[t]he post-*Ciminelli* cases cited by Chang [were] unavailing").) For instance, in *Nordlicht*, the court dismissed the plaintiff's claim that the defendants committed wire fraud by depriving bondholders of knowledge of a conflict of interest

---

breached "any Anti-Corruption Laws," and required the borrower to promise that it would not "make or accept any offer, payment, promise to pay, or authorizing the payment or acceptance of any money or any gift or anything of value, directly or indirectly, to or for the use or benefit of any official or employee of any government. . . if any part of such conduct would violate or create liability for it or any person under any applicable law relating to bribery, kickbacks or similar corrupt practices." (*Id.* at 19, 44-45.)

because those bondholders "never had a claim" to the proceeds of the bond sale. 2023 WL 4490615, at *5. The *Nordlicht* court reasoned that because the original bond at issue permitted the proceeds to be used "in a variety of ways that didn't include paying back bondholders," the Government's claim concerned the mere nondisclosure of a conflict and not the deprivation of a traditional property interest under *Ciminelli*. *Id.* at *5-6. The case put forward by the Government against Chang at trial was different.

The Government presented the jury with sufficient evidence to determine that Chang and his co-conspirators intended to defraud Investors by siphoning off money – portions of the loan proceeds – for the co-conspirators' private enrichment and failed to disclose the same to the Investors. "By diverting a portion of the [loan proceeds] for purposes not authorized under the [Facility Agreements] . . . the scheme would necessarily deprive [the Investors] *of money or property*" while also depriving them of accurate documentation of how said proceeds were to be utilized. *United States v. Jabar*, No. 09-CR-170 (LJV), 2024 WL 3897030, at *3 (W.D.N.Y. Aug. 22, 2024) (emphasis in original) (quoting *United States v. Jabar*, 19 F.4th 66, 80 (2d Cir. 2021)); *see also United States v. Sullivan*, 118 F.4th 170, 209 (2d Cir. 2024) ("Unlike the 'right-to-control' property interest that the Court rejected in *Ciminelli*, such contractual rights to payment have long been recognized as valuable property, even if the payment has not yet occurred.") Finding no reason to dismiss under *Ciminelli*, Chang's motion for acquittal on that basis is denied.

Chang's other argument for why he should be acquitted on the wire fraud conspiracy charge – that the Government offered insufficient evidence that Chang entered intentionally into an unlawful agreement to commit wire fraud that contemplated some actual harm or injury to anyone – presents a closer call. He asserts that the evidence instead showed that he executed the

loan guarantees "as a part of Mozambique's infrastructure policy decisions." (Mot. at 4.) He also challenges the materiality of the alleged misrepresentations, arguing that there was "absolutely no evidence" that the anti-corruption provisions were included in the Facility Agreements as part of a plan to defraud Investors or the International Monetary Fund ("IMF"), and that the evidence showed that these "boilerplate" provisions were not a core part of the loan deals that Chang guaranteed on behalf of Mozambique. (Id. at 6-11.)

The Government asserts that it presented the jury with "significant evidence" on Chang's criminal intent to join the wire fraud conspiracy. (Gov't Opp. at 24). In support of this position, the Government points to (1) Chang's leading role in structuring and negotiating the loan deals with Investors, (2) his meetings with Pearse and Singh to review the Facility Agreements and guarantees and discuss the fact that the loans would be syndicated and bonds would be sold to international investors, (3) his signing of the loan guarantees promising that the Mozambican government would pay the loans if the Project companies defaulted, and (4) his "accept[ance] [of] $7 million [in] bribe payments from Privinvest, which [were] repeatedly memorialized in Privinvest's own ledgers and records and in emails between various co-conspirators." (Id.) The Government also cites trial testimony from investors showing that the misrepresentations at the heart of this conspiracy were material, and that these misrepresentations pertained to a core element of the Investors' bargain. (Id. at 24-29.)

The court finds that the Government presented sufficient evidence for the jury to find that the misrepresentations at issue here were material. Several representatives of the Investors testified at trial that the presence of the anti-corruption provisions in the Facility Agreements was critical to their ultimate decision on whether to lend money for the Projects.

Marco Santamaria, the portfolio manager for Investor Alliance-Bernstein, testified that he looked for several material provisions in making his decision, including how the proceeds would be used, and whether there was an associated government guarantee. (*See* Tr. 1181, 1193 (testifying that evidence of kickback payments demonstrate that the loan proceeds "would not be used for productive purposes for the repayment of the loans" and that such payments "would also create some reputational risk" for AllianceBernstein).) Santamaria confirmed that the government guarantees were especially important for his analysis of the investment because the Project companies had no operational or financial history. (*See id.* at 1196.)

Jason Kaplan, the portfolio manager for Investor NWI Management, testified that he reviewed the offering circular and government guarantee signed by Chang. (*Id.* at 1801, 1805). Kaplan testified that NWI Management would not have executed the loan had it known that the proceeds would be used to pay millions of dollars in payments to Mozambican officials and bankers. (*Id.* at 1806, 1802 (noting that corrupt payments to government officials "taint the transaction").) Kaplan also testified that a country's compliance with its IMF obligations is an important consideration for NWI Management when analyzing an investment. (*See id.* at 1805 ("It's important that countries [are] in compliance both with [their] payments and with any financial mark of criteria for an IMF agreement that [they have] made."), 1806 (explaining that undisclosed debt "can be a big problem").)

Pearse and Singh, the co-conspirators who worked for Investor Credit Suisse, also testified to the significance of the anti-corruption provisions for their employer's investment decision. (*See id.* at 285, 1283-84.)

In sum, Chang's argument that the anti-corruption provisions were mere "boilerplate," (Mot. at 7), is not supported by the evidence. (*See, e.g.,* Tr. 1038 (representative of Investor VTB

Capital testimony: "Q. So would it be fair to say that with respect to these [anti-corruption] terms, these are all boilerplate terms? Is that a fair statement? A. No.").) The misrepresentations made in the Facility Agreements, and by extension, the loan guarantees, were material because they were "sufficiently specific for [the Investors] to reasonably rely on [those representations] as a *guarantee*" that the parties and individuals on either side of the loan transaction would not engage in a scheme to divert the loan proceeds to themselves for personal gain. *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014) (emphasis added). The record reflects that the misrepresentations had a significant "effect on the likely or actual behavior of the [Investors who were the] recipient[s] of the alleged misrepresentation[s]." *Universal Health Servs., Inc*, 579 U.S. at 193.

The Government presented he jury with sufficient evidence to conclude that Chang contemplated harm to investors. Chang's argument that although he signed the government guarantees, he was not aware of the express misrepresentations made in the Facility Agreements is unpersuasive.[9] A person who guarantees

---

[9] The court takes notice of Chang's assertion that the anti-corruption provisions of the Facility Agreements were not incorporated into the loan guarantees signed by Chang. (Reply at 14). However, the Government presented the jury with sufficient evidence to support an inference that Chang had knowledge of the anti-corruption provisions. (*See* Tr. 1293-96 (Singh testifying that there was a "symbiotic-type relationship" between the Pro-indicus loan and the government guarantee, noting that it would be "impossible" for a guarantor to understand its obligations under the guarantee without referring to the terms of the loan agreement), 251-52 (Pearse testifying that when he met with Chang in February 2013 to discuss financing the Projects, Chang "spoke very eloquently and in detail about the project"), 397 (Pearse testifying that in his April 2014 meeting with Chang regarding the MAM project, it was clear that Chang had "read the documents, the feasibility study and the business plan".) The determination of whether Chang's signing of the guarantee while simultaneously

loans in exchange for fraudulent kickback payments paid out from the loan proceeds cannot evade criminal liability for lies told to induce lenders simply because he signed the guarantees and not the loan agreements themselves. *See Weaver*, 860 F.3d at 96 (differentiating the materiality analysis for criminal wire fraud liability from the risk-allocation principle of civil damages actions).

Chang played an integral role in structuring and negotiating the loan deals. (*See* GX5007-A; GX5007-B (letter from Chang to the Privinvest CEO proposing that the government could create a special purpose vehicle ("SPV") "specifically established to handle this project" to avoid IMF constraints on the government directly accepting commercial loans); GX2074 (email summarizing meeting notes between Privinvest and Chang noting that Chang "[was] aware that [Credit Suisse] would not lend [to] a newly formed SPV, [and] therefore proposed to give a Sovereign Guarantee to [Credit Suisse] from the Ministry of Finance to 'backup' the loan").) Indeed, Pearse testified that Chang had the parties modify a provision that would have required Chang to notify the IMF about the loans, requesting that it instead represent that Mozambique was in compliance with its obligations to the IMF. (*See* Tr. 251-53; GX5 at 10 (contract with revised Clause 5.5.).)[10] Chang met with investors several times to discuss financing for the Projects and the loan details. (*See, e.g.*, Tr. 397.) Chang knew that the government would issue bonds to help pay back the loans and that those bonds would be sold to international investors. (*See id.* at 1324 (Singh testifying that he

---

receiving kickback payments was "false or misleading" is rightfully a decision for the jury. *See Guadagna*, 183 F.3d at 129 (explaining that under Rule 29 courts must give "full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact").

[10] The previous draft contract was not entered into evidence, but the jury was permitted to credit the testimonial evidence regarding the negotiations.

discussed with Chang that the bonds would have Chang's name on them).) Nevertheless, Chang signed the loan guarantees, promising that his country would pay back the debts if the Project companies could not.

Chang's argument that the Government's theory rested on an undisclosed "gentlemen's agreement," (Mot. at 10), is insufficient to warrant an acquittal here because there was enough evidence independent of the "gentlemen's agreement" to find Chang guilty. Furthermore, the Government did not argue that the "gentlemen's agreement" was a material misrepresentation. The Government referenced the "gentlemen's agreement" because Defendant's agreement to guarantee a $278 million increase in the loan for which he and others were simultaneously taking kickbacks was probative of Chang's intent to defraud Investors. (See Tr. 2699.) Neither does the Government's reference to the representation that the Mozambican government was in compliance with its obligation to the IMF provide Chang with a basis for acquittal. Chang's assertion that the Government presented "no evidence to support its suggestions that Minister Chang was dishonest with anyone about Mozambique being in compliance with its IMF obligations," (Mot. at 11), is contradicted by the evidence. Pearse testified over objection that he learned from the Minister of Finance who took office after Chang that Chang had never notified the IMF of the $2 billion in loans that were secured for the Projects. (Tr. 255-63.)

For the reasons discussed *supra*, Chang's argument that the Government produced "absolutely no evidence" that the purpose of including the anti-corruption provisions in the Facility Agreements was done as part of a scheme to mislead or defraud investors is unavailing. The inference that Chang asks this court to make is that Chang was simply doing what "he was told to do as a part of Mozambique's infrastructure policy decisions" when he negotiated and structured the loans, then guaranteed them.

(Mot. at 4.) However, the jury already considered this possibility and declined to accept it. *See United States v. Florez*, 447 F.3d 145, 154-55 (2d Cir. 2006) (explaining that "the task of choosing among permissible competing inferences is for the jury, not a reviewing court"). The fact that other Mozambican officials, including the president and other ministers, were on board with the strategy to finance the Projects with loans from international investors is separate from Chang's unlawful conspiracies. The jury had ample evidence to determine that Chang contemplated actual harm to investors when he accepted $7 million of loan proceeds that were intended to be used exclusively to develop Mozambique's maritime infrastructure and ultimately enable the government to pay investors back with the revenues generated from the Projects. As Chang has failed to meet his "heavy burden," the Rule 29 motion as to his wire fraud conspiracy conviction is denied.

### 2. Money Laundering Conspiracy

In order to sustain a conviction of money laundering conspiracy, the Government must have proven that Chang and others entered into a joint enterprise to commit either promotional or concealment money laundering, and Chang knowingly and intentionally joined the enterprise.[11] *See Torres*, 604 F.3d at 65. Promotional money laundering is when a defendant:

> transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the

---

[11] Because Chang was charged with both theories of money laundering conspiracy, the jury only needed to unanimously determine that he was guilty under at least one theory. (*See* Indictment ¶ 59 (charging violations of 18 U.S.C. §§ 1956(a)(2)(A) (promotional money laundering) and 1956(a)(2)(B)(i) (concealment money laundering)); *see also* Tr. 2767-83 (providing jury instructions).) Notably, the jury found Chang guilty under both theories. (*See* Jury Verdict.)

> United States or to a place in the United States from or through a place outside the United States . . . with the intent to promote the carrying on of specified unlawful activity.

18 U.S.C. § 1956(a)(2)(A). This provision of the money laundering statute requires that the Defendant have acted with intent to promote the carrying on of one or more "specified unlawful activi[ties]," which are set forth in the Indictment as (1) offenses against a foreign nation involving the bribery of a public official, in violation of Mozambican law, as defined in 18 U.S.C. § 1956(c)(7)(B)(iv) and (2) wire fraud, in violation of 18 U.S.C. § 1343. (Indictment ¶ 59.)

A defendant commits concealment money laundering when he:

> transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States . . . knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

18 U.S.C. § 1956(a)(2)(B)(i); *see also United States v. Scott*, No. 17-CR-630 (ER), 2023 WL 6064329, at *11 (S.D.N.Y. Sept. 14, 2023).

Here, Chang argues that the Government failed to present sufficient evidence to sustain a conviction of concealment or promotional money laundering conspiracy. Chang submits that no evidence, direct or circumstantial, was offered to show that he entered into an agreement to launder funds, nor was there

23

evidence to suggest that he took steps to conceal unlawful proceeds, that he agreed to launder money to promote specified unlawful activity (*i.e.*, wire fraud under United States federal law or bribery under Mozambican law), that the money sent to his associate Luis Brito was actually from specified unlawful activity, or that Chang undertook any action as a result of a bribe in violation of Mozambican law. (Mot. at 11-12.) Each of these arguments fails.

Beginning with Chang's agreement to launder unlawful proceeds, the evidence presented by the Government showed that the Defendant knowingly and intentionally entered into an agreement to launder funds by passing along a crumbled piece of paper with bank account information for an account under the name "Genoa Asset SA" to co-conspirator Do Rosario. (*See* GX2392; GX2392-A.) As shown in GX2392 and GX2392-A, on August 2, 2013, Do Rosario emailed a piece of paper to Boustani, noting in the subject line that the information is "From Kung Fu." (*See* GX2392.) The Government established from several witnesses that Kung Fu was a nickname that the co-conspirators used to refer to Defendant. (*See* Tr. 111-14.) An October 2013 email chain from Boustani to Do Rosario shows Boustani telling Do Rosario that he needs Do Rosario to send him invoices "asap" for "[c]onsultancy fees" paid to "THYSE INTERNATIONAL IN-CORPORATION." (*See* GX5089.) [12] Do Rosario responds to Boustani, asking "Is this for Panthero? Mine I'll be sending shortly!," referring to the Defendant by another nickname that the co-conspirators regularly used for him. (*Id.* at 1.) Later that day, Boustani responded with two words: "Yes bro." (*Id.*)

---

[12] GX5089 is an email between "Manuel Jorge" and "Jean Boustany". Pearse testified that Do Rosario communicated with co-conspirators under the name Manuel Jorge via the msajo2025@yahoo.com account. (Tr. 451.)

The Government established, via the testimony of FBI forensic accountant Cara Alpaugh, that Privinvest sent millions of dollars to both the Genoa Asset account and the Thyse International account during the conspiracy. The USD-denominated payments for Genoa Asset went from Privinvest's account to Genoa Assets's account at Barclays bank in New York, and then went on to Genoa Assets's account at Barclays' Switzerland branch. (*See* Tr. at 1520-21 (Barclays executive testifying about the money transfers); *see also* GX1504.) The USD-denominated payment for Thyse International went from Privinvest's subsidiary's account to Thyse International's account at Bank of New York Mellon, and then went on to Thyse International's account at Banco Espirito Santo in Spain. (*See* Tr. 1552-54 (Bank of New York Mellon executive testifying about the money transfers); *see also* GX1504.)

An individual named Luis Brito, who was based in Mozambique, controlled both the Genoa Asset and Thyse International accounts. The Government presented the jury with evidence showing that Chang and Brito had a close personal relationship. (*See* GX 1958-T (texts between Chang and Brito where they discussed family members, medical appointments, weddings, and exchanged birthday and holiday wishes).) According to bank records, the accounts for Thyse International and Genoa Asset were supposed to be used for business activities "in the motor vehicle area." (*See* GX1415-T (Brito "[d]escrib[ing] *the operation to be conducted*" with the Thyse International bank account (emphasis in original)); *see also* GX1439 (Genoa Asset's Client Identification File showing that the accounts would "receive income from the car industry activity in Mozambique").) During trial, the court admitted into evidence a summary table, based on documents from the aforementioned banks, of the international bank transactions at the heart of the wire fraud and money laundering conspiracies. (*See* GX1504.) The transactions aligned with the Privinvest ledger entries of payments made to "Chang." (*See*

GX1933.) Based on the testimony from Alpaugh, who described the complex transfers of money between the accounts, the jury had ample evidence to infer that the reason why Privinvest was sending money to accounts controlled by Chang's associate Brito – who otherwise was not involved in the Projects whatsoever – was to launder the payments to Chang from the loan proceeds. (Tr. 1660-88.)

To sustain a money laundering conspiracy conviction, the Government need not have provided direct evidence of Chang formally instructing Privinvest to divert loan proceeds to an unauthorized private account. *See United States v. Gotti*, 459 F.3d 296, 337 (2d Cir. 2006) ("Under our Circuit's precedent, the government is required to link the moneys in question to specified unlawful activities, but this link can be made through circumstantial evidence."). The Government's evidence of Chang's engagement in the wire fraud conspiracy was sufficient evidence that Chang promoted unlawful activity, in violation of the federal wire fraud statute. That same conduct also violated Mozambican law prohibiting bribery.[13] There was sufficient evidence for the jury to find that Chang's conduct promoted wire fraud that is unlawful under U.S. law and bribery that is unlawful under Mozambican law, both of which are "specified unlawful activit[ies]" under 18 U.S.C. § 1956(c)(7)(A)-(B). Additionally, the overwhelming evidence that the money Chang was paid was actually transferred from Privinvest through United States accounts under names other than Manuel Chang's and not seemingly controlled by him on their face supports an inference that he attempted to conceal the nature of the money, violating 18 U.S.C. § 1956(a)(2)(B)(i). As such, Chang's motion for a judgment of

---

[13] Articles 7 and 8 of Mozambican Law 6/2004 prohibit acts by "public official[s]" done in exchange for money, the promise of money or any monetary benefit.

acquittal as to his money laundering conspiracy conviction is denied.

For the reasons stated above, Defendant's Rule 29 motion for a judgment of acquittal is denied.

## B. Motion for a New Trial

In the alternative, Chang also moves for a new trial, raising various challenges to the Government's rebuttal summation, arguing that the Government constructively amended the Indictment, and claiming that the Government's new theories at trial represented a prejudicial variance. (Mot. at 13-36.) The court addresses Chang's arguments in turn.

### 1. Government's Rebuttal Summation

During summation, counsel are "free to make arguments which may be reasonably inferred from the evidence presented." *United States v. Roldan-Zapata*, 916 F.2d 795, 807 (2d Cir. 1990). To that end, "[a] prosecutor is not precluded from vigorous advocacy, or the use of colorful adjectives, in summation." *United States v. Rivera*, 971 F.2d 876, 884 (2d Cir. 1992). However, there are guardrails in place that protect defendants from improper prosecutorial advocacy in summation. The Government may not "imply the existence of evidence not placed before the jury" or ask the jury to "trust the Government's judgment rather than its own view of the evidence." *United States v.* Williams, 690 F.3d 70, 76 (2d Cir. 2012). Prosecutors are "entitled to comment on a defendant's failure to call witnesses to contradict the factual character of the government's case, . . . as well as his failure to support his own factual theories with witnesses." *United States v. Parker*, 903 F.2d 91, 98 (2d Cir. 1990).

The Second Circuit has made clear that "[a] defendant who seeks to overturn his conviction based on alleged prosecutorial misconduct in summation bears a heavy burden." *United States v. Farhane*, 634 F.3d 127, 167 (2d Cir. 2011); *see United States v.*

*Forlorma*, 94 F.3d 91, 93 (2d Cir. 1996) (reasoning that a conviction will only be overturned on these grounds in a "rare case"). The court considers three factors in evaluating prejudice to the defendant caused by prosecutorial remarks in summation: (1) "the severity of any misconduct," (2) "the measures taken to cure the misstatements," and (3) "their likely effect on the outcome." *Forlorma*, 94 F.3d at 95. In analyzing the first factor, the court also weighs the extent to which the misstatements are "intentional and the extent to which the statements were made in response to defense contentions." *See United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir. 1981).

### a.  Vouching

Chang argues that he is entitled to a new trial because counsel for the Government, Assistant United States Attorney Hiral Mehta, improperly vouched for the Government's evidence throughout the rebuttal summation. (Mot. at 15-17.) For example, Chang points to the following statements by Mehta: "[t]hat's true, I completely agree with that," (Tr. 2690); "I think that's obviously not true," (*Id.* at 2692); and "[w]e don't have to show any payment to him, but we have it," (*Id.* at 2694). Chang also takes issue with the following statement by Mehta made during summation:

> You have the evidence. Look at it. Enjoy it, okay? Nothing to hide. *He's guilty beyond a reasonable doubt, no doubt in my mind.* Now, look at the evidence though; not what I say. What I say doesn't matter. The evidence matters, the evidence matters. What I say is argument. The evidence shows he's guilty beyond a reasonable doubt.

(Tr 2679:13-19 (emphasis added).) Mehta conceded that the statement "[h]e's guilty beyond a reasonable doubt, no doubt in my mind" was improper at sidebar at the close of trial, and the Government has since described the statement as a "regrettable and avoidable." (*See id.* at 2707; Gov't Opp. at 35.) However, the

Government asserts that Mehta did not otherwise improperly vouch for the Government's evidence.

Mehta's statement that there was "no doubt in [his] mind" that the Defendant was "guilty beyond a reasonable doubt" was improper. Although the Government's rebuttal was designed to respond to defense counsel's contentions that "the Government's case should not be trusted" because the Government was "circumspect with the evidence that they wanted [the jury] to see," (Tr. 2651), and was "restricting [the jury's] view because they want[ed] [the jury] to have a narrow view of the evidence," (*Id.* at 2652), that does not permit Mehta's insertion of his personal view as to Chang's guilt into the Government's closing argument. *See Modica*, 663 F.2d at 1181 (reasoning that consideration of the extent to which prosecutor's statements were made in response to defense counsel's contentions is permissible when analyzing prejudice to the Defendant). A prosecutor's personal view of the defendant's guilt has no place in summation because the jury's decision of the defendant's guilt should be made solely on the evidence.

However, in deciding on whether to reverse Chang's conviction and grant him a new trial, the court must also analyze the actions taken to cure the misstatement. Mehta recognized the impropriety of his statement, immediately telling the jury that what he said did not matter because what matters is the evidence. (Tr. 2679 ("Now, look at the evidence though; not what I say. What I say doesn't matter.").) Mehta's statement that *the evidence* – and not his argument made during summation – provides a sufficient basis to prove Chang's guilt beyond a reasonable doubt cured his earlier improper statement. (*See also id.* at 2789 (court instructing the jury that "closing arguments, and other statements or arguments of Counsel are not evidence").)

The Court finds that the Government's summation, viewed as a whole, does not support a finding of "unacceptable vouching"

that would require reversal of the jury's verdict. *See United States v. Nersesian*, 824 F.2d 1294, 1328 (2d Cir. 1987) (affirming conviction where the prosecutor made "repeated" use of personal expressions, including statements like "I think it is important" and "I don't think we have to guess" because "[t]he prosecutor's offending conduct was [] limited to a relatively small portion of an overall lengthy summation"). While the court recognizes that a prosecutor's statements made during rebuttal summation present a greater risk of prejudice because the defendant cannot respond, Defendant has not pointed to any portions of the Government's initial summation to support his improper vouching claim. Indeed, Defendant's entire Rule 33 motion is confined to alleged improprieties in the statements that the Government made in rebuttal.

In *United States v. Burse*, 531 F.2d 1151, 1155 (2d Cir. 1976), the court reversed the defendant's conviction because the prosecutor referred to his own personal impressions of the evidence, "leaving the impression that the government had within its possession evidence of [the defendant's] guilt which had not been given to the jury." However, the government's improper vouching in *Burse* was one of eight enumerated types of misconduct committed by the government during its summation that were listed by the court. *See id.* (noting also that based on a "careful examination of the record," the government's case against the defendant was "not strong"). The rebuttal summation and overall case presented by the Government against Chang differs from the summation and the case that the prosecutors presented against the defendant in *Burse*. In light of the voluminous documentary and testimonial evidence offered by the Government discussed *supra*, the court finds that the vouching statements made by Mehta during the rebuttal summation were unlikely to have changed the decision reached by the jury. *Floyd v. Meachum*, 907 F.2d 347, 355 (2d Cir. 1990) (reasoning that courts considering claims with multiple allegations of prosecutorial misstatements

must determine "whether the cumulative effect of the totality of the challenged statements, when viewed in context, affected the fundamental fairness of the trial").

### b. *Burden Shifting*

Chang argues that the Government wrongfully shifted its burden of proof to the Defendant when it suggested at trial that Chang never introduced the real estate contracts that would have explained the lawful nature of the payments made by Privinvest to co-conspirator Defendant Do Rosario. (Mot. at 17-19.) In his motion, Defendant cites no testimony or documents in evidence at Defendant's or Boustani's trial supporting his alibi theory for why Privinvest paid government official Do Rosario $12 million or the nature of the alleged real estate contracts. The Government's assertion that the Defendant failed to support his own theory with competent evidence is permitted under the law of this Circuit. *See United States v. Bubar*, 567 F.2d 192, 199-200 (2d Cir. 1977) (reasoning that the prosecution can comment on the defendant's failure "to contradict the factual character of the government's case" with its own evidence); *see also United States v. Truman*, 581 F. App'x 26, 20-31 (2d Cir. 2014) (same) (citing *Bubar*)(summary order).

Chang also argues that the Government's suggestion that he did not offer certain testimony from Boustani's trial was improper burden shifting. (Mot. at 18-19.) However, during Defendant's summation defense counsel told the jury that the Government had put forward an incomplete view of the evidence during the Government's initial summation. (*See* Tr. 2651-52.) The Government was entitled to respond to that assertion in its rebuttal. *See United States v. Carr*, 424 F.3d 213, 227 (2d Cir. 2005) ("[T]he government is allowed to respond to an argument that impugns its integrity or the integrity of the case."); *see also United States v. Morales*, No. 21-885-CR, 2024 WL 220402, at *4 (2d Cir. Jan. 22, 2024) (summary order).

Further, to the extent that either of the Government's comments improperly suggested to the jury that the Defendant had any burden of proof, a position which the court does not endorse, that risk was mitigated by the court's instruction to the jury. (*See* Tr. 2719 ("Unless and until the Government meets its burden of proof beyond a reasonable doubt, the presumption of innocence remains with the Defendant."), 2789 ("Finally, bear in mind that the Government has the burden of proof and that you must be convinced of the Defendant's guilt beyond a reasonable doubt in order to return a guilty verdict.").) The Defendant has not met his "heavy burden" of proving that the Government's rebuttal summation improperly shifted its burden of proof to the Defendant in such a manner that deprived him of a fair trial.

### c.  *Evidentiary Basis for the Government's Inferences*

Chang's argument that the Government introduced facts not in evidence during its rebuttal summation is unavailing because the Government asked the jury to make reasonable inferences based on the evidence in the record.

Defense counsel argued in summation that the Defendant was not guilty because the text messages linking Chang to Brito were too indirect. The Government's response telling the jury to "[f]ocus on the evidence in this case" and arguing that the defendant could have had other communications with Brito is not improper. (Tr. 2699-2700.) Conspiracies are often secretive by their nature and the Government did not commit misconduct by asking the jury to focus on the co-conspirator communications that were in evidence.

Chang's argument that evidence of the undisclosed "gentlemen's agreement" cannot support a material misstatement is unavailing. (*See* Mot. at 10.) The "gentlemen's agreement" was a separate agreement between Defendant, Boustani and Do Rosario concerning payments on the Proindicus loan that had

already been executed.[14] Pearse testified that the "gentlemen's agreement" was an undisclosed agreement between Chang, Do Rosario and Boustani whereby Privinvest, the contractor for all of the Projects, would actually pay the interest that the Project companies were supposed to pay on the Proindicus loan "to avoid the burden falling on the Republic of [Mozambique]." (Tr. 429; GX2847 (Boustani email to Dominic Schultens and Pearse promising that "if we raise the 278m$ during this year, I will reimburse them the interest payment").) Chang's assertion that there is "no evidence" that the Investors would have considered this fact to be important is without merit and runs contrary to witness testimony. The existence of a separate agreement whereby the contractor would act as a guarantor because the borrower could not make scheduled interest payments is obviously material to the Project companies' ability to make timely payments, the nature of Mozambique's role as a guarantor, and Chang's intent to defraud by failing to disclose a separate "gentlemen's agreement" that provided for the payment of Project debts by the contractor.

There was ample evidence in the record to support the Government's assertion that the real estate contracts in question were suspect. The Government presented an email in which Boustani told Do Rosario via email that he needed invoices "asap" for transactions. (*See* GX5089.) However, this request for invoices also included instructions on what these documents needed to say. (*See id.* (instructing Do Rosario that each invoice should "mention[] the subject" and provided examples including "real estate purchase. . . etc. . . Even for Pantero, a small paper saying 'consultancy fees'"); *see also* GX2755 (email from Boustani to co-conspirator Allam noting that co-conspirator Isaltina Lucas's "total [payment] is 2"); GX2755-A (attachment with real estate

---

[14] The agreement was signed by Chang, Do Rosario, and Schultens, who the agreement expressly noted was signing "[f]or and on behalf of" Boustani. (*See* GX2847-A.)

invoice showing a payment of $1.75 million).) The Government's assertion during summation that it was unlikely that Privinvest's multimillion-dollar payments – made into accounts in foreign banks under names that have no relation to the Projects – were legitimate is fair in light of the evidence.

The Defendant's argument that the Government improperly suggested that money was returned from Brito's account to Mozambique's Ministry of Finance one week after Boustani testified at his own November 2019 trial is unpersuasive. (*See* Tr. 2689-90.) In the testimony from Boustani's trial that was read to the jury at Defendant's trial, the jury heard Boustani's testimony that the "7" marked for "Chopstick" in an email between Boustani and his subordinate co-conspirator Naji Allam was not proof of payment, but instead was a "budget" because he was "not sure how much Privinvest paid Mr. Chang." (Tr. 2418; GX2758.) Shortly thereafter, Boustani testified that Privinvest paid approximately $5 million to Thyse International and also confirmed that he emailed Allam so that Allam would transfer money to the Thyse International accounts controlled by Brito. (*See* Tr. 2419:8-12.) In light of Boustani's testimony and the bank records entered into evidence, the Government's argument that the jury should infer wrongdoing from the close proximity between when Boustani testified and Brito transferred money from the Thyse International accounts to Mozambique's finance ministry was not improper.

### d.   *Other Statements*

The Defendant's other challenges to the Government's rebuttal summation are unavailing. (*See* Mot. at 19-20, 23-29.) The court discusses each of these challenges in turn below.

First, the Government did not misrepresent Boustani's testimony about payments that Privinvest may or may not have made to Mozambican officials, including Chang. The Defendant wanted to introduce testimony from Boustani's direct examination where

Boustani denied that any illicit payments were made because Privinvest had a "strict policy" against making kickback payments to secure projects. The Government responded by designating testimony from Boustani's cross examination where he admits that he approved the transfer of millions to a bank account under the name Thyse International. Defendant objected to those designations, claiming that they were outside of the scope of the testimony designated by Chang. (*See* Def. Ltr. Dated July 31, 2024 (Dkt. 697); Gov't Ltr. in Resp. Dated July 31, 2024 (Dkt. 698).) The court heard oral argument and ultimately overruled Defendant's objection, allowing a more complete set of Boustani's testimony to be read into evidence. (*See* Tr. 2312-17; *compare* Tr. 2232, *with* Tr. 2418-2419). The jury also heard two competing arguments in summation about what to conclude from the testimony. The Government's arguments in summation did not misrepresent Boustani's testimony because the jury's role was to determine which inference was more reasonable in light of the inconsistent prior testimony. *See Florez*, 447 F.3d at 154-55 (explaining that it is the jury's task, not the court's, to "choos[e] among permissible competing inferences"). The jury made that determination when it found Defendant guilty, and the court will not overturn the jury's proper exercise of its factfinding authority absent a more robust showing of prejudice by the Defendant.

Second, the Government's arguments made during summation concerning the relevance of certain evidence were not improper. (*See* Tr. 2683, 2693-94, 2697.) Counsel for the Government are permitted during summation to make "legitimate attempt[s] to focus the jury's attention upon the evidence and away from defense counsel's claims." *Williams*, 690 F.3d at 75-76 (affirming conviction where prosecutors argued in summation that the defense counsel was "grasping at straws," "focusing on distractions," and "attempting to take the jury's eyes off the ball"). Both the Government and Defendant were "free to argue

to the jury during summation regarding the relevance, or lack thereof, of the trial evidence." *Zsa Zsa Jewels, Inc. v. BMW of N. Am., LLC*, No. 15-CV-6519(KAM)(RLM), 2022 WL 2315977, at *4 (E.D.N.Y. June 27, 2022). The Government's statements regarding the relevance of certain evidence were permissible lines of argument.

Third, the Government's reference to Pearse's and Singh's guilty pleas during summation was not improper. An exception to the rule that prosecutors may not suggest that the conviction of a testifying co-conspirator is evidence of the defendant's guilt is that prosecutors can reference co-conspirators' guilty pleas to "invit[e] the jury to consider the implausibility of a defendant's claim that the [co-conspirator-]witnesses were all committing perjury." *United States v. Chartier*, No. 17-CR-372 (JS), 2021 WL 3795352, at *31 (E.D.N.Y. Aug. 26, 2021) (quoting *United States v. Rodriguez*, 587 F.3d 573, 583 (2d Cir. 2009)). Defense counsel argued in summation that after the jurors looked closely at Pearse and Singh's testimony, they would "realize that not even Mr. Pearse or Mr. Singh were receiving unlawful payments." (Tr. 2662.) However, their testimony showed otherwise. (*See id.* at 152-53 (Pearse admitting that the Chief Financial Officer of Privinvest "was the one who made the payments to [him], [the] kickbacks"), 1248 (Singh testifying that he "accepted and received kickbacks or bribes to [himself] and [he] was aware that [his] boss [Pearse] at the time had also been promised kickbacks and [Singh] didn't make anyone aware of this at the time").) Further, the court instructed the jury that "closing arguments, and other statements or arguments of Counsel are not evidence." (*Id.* at 2789.) The Government's use of the term "partners" to collectively describe Chang, Pearse, and Singh was not improper because their names, in addition to the names of other co-conspirators, were all found under that title in the Privinvest ledgers that were used to track who was receiving kickback payments. (*See* GX2808-A.) As permitted under *Rodriguez*, counsel for the

Government properly responded to defense counsel's assertion that Pearse and Singh did not receive unlawful payments by pointing to their guilty pleas and the substantive evidence presented at trial. (*See* Tr. 2668.)

Fourth, Mehta told the jury to not take "[his] word" in deciding whether Chang had in fact received $7 million in bribes. (Tr. 2675.) Citing one Second Circuit case, Chang argues that this statement was improper. *See Bellamy v. City of New York*, 914 F.3d 727, 763 (2d Cir. 2019) (reviewing civil Section 1983 summary judgment decisions). The court finds that this statement by Mehta does not warrant granting Chang a new trial because although indications of what a prosecutor's "word" is are improper, (*see id.)*, the reason why these statements are improper is because juries are impaneled to make their determinations based solely on the evidence. Here, Mehta expressly asked the jury to do just that. His statements that immediately followed cured any impropriety by pointing the jurors away from his "word" and toward the duly admitted evidence presented at trial. (Tr. 2675 ("Don't take my word for it. *Read the e-mails. Read the ledgers.*") (emphasis added).)

Fifth, Chang's argument that because the Government called Chang's argument "absurd" and "ridiculous" during summation he is entitled to a new trial is unavailing. *See United States v. Young,* 470 U.S. 1, 11 (1985) ("Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding."); *see also United States v. Ngono*, 801 F. App'x 19, 24 (2d Cir. 2020) (summary order) (affirming conviction where the Government called defendants' arguments "absurd, almost laughable"); *United States v. Ganim*, 256 F. App'x 399, 401 (2d Cir. 2007) (summary order) (affirming conviction where prosecutors argued that defense's argument "was so absurd that if the jurors failed to convict, they were 'suckers'"). Further, Chang's

argument that because Mehta mentioned counsel for Defendant by his name, "Mr. Ford," approximately 13 times during summation the Government had lodged an "ad hominem personal attack" on defense counsel is without merit. (Mot. at 27.) The case cited by Defendant for this proposition is inapposite because that case concerned serious and repeated prosecutorial misconduct, which was not present here. *See United States v. Drummond*, 481 F.2d 62, 62 (2d Cir. 1973) ("The record clearly shows a consistent pattern of misconduct by the prosecutor in the case before us. . . this court has noticed incidents of this prosecutor's misconduct in the past. . . [t]his is the third time that the conduct of this same assistant United States attorney has required comment by this court.).

Lastly, counsel for the Government did not inflame the jury's passion. Chang's motion *in limine* asked the court, *inter alia,* to preclude the Government from arguing that Chang or "bribes" caused the Projects to default, investor losses, or Mozambique's financial hardships. The court denied the motion, concluding that such a "blanket prohibition" was not warranted because it was reasonable that Chang and his co-conspirator's conduct would have a "causal effect on the borrowing, subsequent default, and their efforts to conceal the scheme." (Omnibus MIL M&O at 49.) However, the court precluded the Government from offering "broad and conclusory statements asserting, for example, that Chang's signatures caused Mozambique to enter into a financial crisis." (*Id.*) During the Government's rebuttal summation, Mehta made the following statement:

> Just think about that. The temerity of someone in that position. A minister of a country, a developing country with limited resources, to say, you know what, I'm going to guarantee these loans and I know I'm getting paid millions of dollars and those loans are being padded with his bribes and his partners' bribes.

(Tr. 2692:12-17.) In this statement Mehta is not asserting that Chang's signing of the guarantees caused a default; the statement does not even mention the default. Additionally, Mehta's descriptions of Chang as being "temerit[ous]" and Mozambique as a "developing country with limited resources" do not amount to prosecutorial misconduct. *See Torres v. Costello*, No. 97-CV-5480 (RR), 2001 WL 811924, at *10 (E.D.N.Y. June 1, 2001) (explaining that "[b]lunt and colorful language is often employed" in rebuttal summation).

Accordingly, Chang's motion for a new trial on the basis of improper statements in the Government's rebuttal summation is denied.

### 2. Constructive Amendment

"An amendment of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecutor or court after the grand jury has last passed upon them." *United States v. Zingaro*, 858 F.2d 94, 98 (2d Cir. 1988) (emphasis omitted). Thus, in order to prevail on a constructive amendment claim, a defendant must demonstrate that "either the proof at trial or the trial court's jury instructions so altered an *essential element* of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *United States v. Frank*, 156 F.3d 332, 337 (2d Cir. 1998) (emphasis added). The Second Circuit has reasoned that prosecutors have "significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial." *United States v. Rigas*, 490 F.3d 208, 228 (2d Cir. 2007). "Where charges are constructively narrowed or where a generally framed indictment encompasses the specific legal theory or evidence used at trial, there is no constructive amendment." *United States v. Salmonese*, 352 F.3d 608, 620 (2d Cir. 2003).

The core criminality pleaded in the Indictment was a scheme, operating between approximately 2011 and 2018, where Defendant and others conspired to fraudulently cause international investors to loan over $2 billion for the development of Mozambique's maritime infrastructure. The Government alleged that the co-conspirators defrauded investors "through numerous material misrepresentations and omissions relating to, among other things: (i) the use of loan proceeds; and (ii) bribe and kickback payments to bankers and Mozambican government officials." (Indictment ¶ 23.)

Defendant claims that the Government constructively amended the Indictment by (1) asserting that the lie that Chang told to the banks was the unexecuted gentleman's agreement and (2) suggesting that Chang and co-conspirators made false and misleading statements regarding Mozambique's compliance with its obligations to the IMF. (Mot. at 33-35; Reply 3-6.) The Government responds, contending that (1) the lie told to the banks was not the unexecuted gentleman's agreement but was actually the accompanying guarantee that was indeed signed by Defendant and was probative of his intent to defraud and (2) the Indictment and court orders from before and during trial provided Defendant ample notice that evidence regarding the IMF disclosure issue would be presented at trial. (Gov't Opp. at 57-60.)

The court finds that the Government did not constructively amend the Indictment. The Government did not claim in its rebuttal summation that the "lie to the banks" was the gentlemen's agreement, but rather noted that Chang's agreement to guarantee the upsize in the gentlemen's agreement was probative of his intent to defraud Investors. (See Tr. 2699 (Mehta arguing in rebuttal summation that the gentlemen's agreement is "important because it shows intent. . . Intent to put his country on the hook in exchange for a payment that no one knows about"; GX2847-A

(signed "gentlemen's agreement" between Chang, Boustani, and Do Rosario that would "[i]ncreas[e] the maximum amount which Proindicus c[ould] borrow (*and the Ministry of Finance agrees to guarantee*) by US$278 million (the 'Optional Increase') from US$622 million to US$900 million") (emphasis added); GX80 (government guarantee of upsize contemplated in gentlemen's agreement).) Chang signed the government guarantee, GX80, and submitted it to Investor Credit Suisse. (*See* Tr. 416-30 (Pearse testimony regarding the upsize and gentlemen's agreement).) The Indictment's use of the term "among other things" when describing the "numerous material misrepresentations and omissions" in the criminal scheme meant that the list of misrepresentations in the Indictment was not exhaustive. (*See* Indictment ¶ 23.) The Indictment put Defendant on notice that evidence regarding agreements between the co-conspirators and related documents presented to Investors to secure funding for the Projects could be presented at trial. *See United States v. Heimann*, 705 F.2d 662, 666 (2d Cir. 1983) ("[P]roof at trial need not, indeed cannot, be a precise replica of the charges contained in an indictment."). Thus, the court finds that the Government's argument in rebuttal summation about the probative value of the Defendant's guarantee of the loan upsize follows from the core of criminality that the Government alleged in the Indictment. *See Rigas*, 490 F.3d at 230 (reasoning that courts analyzing constructive amendment claims "must read an indictment to include facts which are necessarily implied by the specific allegations made" in the indictment).

Defendant was also on notice that misrepresentations concerning the IMF would be presented at trial. The Indictment made this expressly clear at several different points. (*See* Indictment ¶¶ 18 ("Mozambique was also required to make certain disclosures to the IMF, including disclosures related to loans and indebtedness"), 31 ("On or about December 22, 2012, CHANG wrote a letter to Prinvest Co-Conspirator 2, which was forwarded to an

employee of Credit Suisse ('Credit Suisse Empoyee 1')... explaining that 'the financing of this project is still constrained by the IMF imposed limitation on the Government for Mozambique to accept commercial credit for commercial projects.'"), 52 ("Mozambican government officials received inquiries from the IMF concerning the use of some of the loan proceeds.").) These paragraphs were incorporated by reference into the charging paragraphs for both the wire fraud conspiracy and money laundering claims. (*Id.* ¶¶ 56, 58.) And the court already denied the Defendant's motion *in limine* to preclude the Government from arguing that Mozambique did not comply with its obligations to disclose its debts to the IMF. (*See* Omnibus MIL M&O at 45-46 (permitting the Government to "argue and introduce evidence that the Government of Mozambique failed to disclose its debt as well as elicit testimony as to what witnesses understood the disclosures to the IMF to mean and the circumstances surrounding the debt limit provision").) The court rejected Defendant's argument to preclude this evidence under Federal Rule of Evidence 404(b) because "evidence that Chang knew of certain IMF limitations and allegedly instructed others to circumvent these limitations is likely not 'other act' evidence prohibited under 404(b), but rather evidence that is a relevant 'part of the very act charged.'" (*Id.* at 45 (quoting *United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992)).)

The fact that the IMF was not an "Investor" is irrelevant to the constructive amendment analysis because the Government never argued that IMF was an Investor in the Projects. The evidence regarding the IMF disclosure was probative of the Defendant's intent to defraud and materiality of representations regarding

42

compliance with IMF obligations.[15] The Government certainly did not make the IMF issue a focal point of its closing argument; the Government only mentioned the IMF three times, all of which were discussing Pearse's testimony on Chang's knowledge of the loan agreements' terms. (*See* Tr. 2565, 2682-83.)

Defendant's motion does not raise an objection to the court's instruction regarding who the Defendant must have conspired to defraud in order sustain a conviction.[16] While representations made to the IMF are probative as to intent and materiality, the proof at trial does not demonstrate that the Government constructively amended the Indictment. *See United States v. Gross*, No. 15-CR-769 (AJN), 2017 WL 4685111, at *23 (S.D.N.Y. Oct. 18, 2017) ("The Second Circuit has repeatedly stated that, 'constructive amendment . . . occurs when the government's presentation of evidence *and* the district court's jury instructions *combine* to modify essential elements of the offense charged.'" (emphasis added)(quoting *United States v. Wozniak*, 126 F.3d 105, 109 (2d Cir. 1997))). Thus, Chang's motion for a new trial based on a constructive amendment claim is denied.

---

[15] The evidence was probative as to materiality because it provided insight into what representations Investors considered to be important when making their investments. (*See* Tr. 1805-06 (Singh testifying about the importance of a debtor's compliance with IMF obligations), 1197-98 (Santamaria testifying over objection that "it would have been important to know" that Mozambique was in compliance in all respects with its obligations to the IMF).)

[16] The Defendant points to the jury's questions regarding the IMF as evidence of the jury's confusion regarding how the IMF disclosure evidence related to the charges at issue during the trial. (*See* Jury Notes (Dkt. 733) at 2, 4(asking to review Singh and Pearse testimony regarding IMF disclosures).) The court is not persuaded that the jury was confused as to the charges in this admittedly complex case merely because the jury asked to review witness testimony.

### 3. Variance

"A variance occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *Zingaro*, 858 F.2d at 98 (emphasis omitted). "A variance in proof rises to a constitutional violation only if it infringes on the notice and double jeopardy protections of an indictment." *United States v. D'Amelio*, 683 F.3d 412, 417 (2d Cir. 2012). While the distinction between a constructive amendment and a variance "may appear [to be] merely one of degree, there is an important difference in outcome: a constructive amendment of the indictment is considered to be a *per se* violation of the grand jury clause, while a defendant must show prejudice in order to prevail on a variance claim." *Salmonese*, 352 F.3d at 621.

Defendant raises a variance claim on largely the same basis as his constructive amendment claim. (*See* Mot. at 35-36.) The court finds that none of the arguments that the Government advanced in its initial summation constitute a variance from the charges in the Indictment; neither was the Defendant unfairly ambushed by arguments advanced in the Government's rebuttal summation because he had no opportunity to respond. The evidence presented at trial "substantially correspond[ed]" to the core of criminality alleged in the Indictment, and Defendant has not made the showing of prejudice required for a successful variance claim. *Salmonese*, 352 F.3d at 621-22.

The court finds that permitting Defendant's convictions of conspiracy to commit wire fraud and conspiracy to commit money laundering to stand would not result in manifest injustice. *See Ferguson*, 246 F.3d at 134. Defendant's Rule 33 motion for a new trial is therefore denied.

## IV. CONCLUSION

Having considered thoroughly the entire case and Defendant's specific arguments, the court concludes that the guilty verdict rendered by the jury was amply supported by competent, satisfactory and sufficient evidence properly admitted in the course of a fair trial, and that Defendant raises no substantial questions on appeal. Accordingly, the Defendant's motions for a judgment of acquittal pursuant to Rule 29 of the Fed. R. Crim. Pro. and for a new trial pursuant to Rule 33 of the Fed. R. Crim. Pro. are hereby DENIED.


SO ORDERED.


Dated:    Brooklyn, New York
          November 13, 2024

                                        s/Nicholas G. Garaufis
                                        NICHOLAS G. GARAUFIS
                                        United States District Judge