

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JRS/PC/MC
F. #2016R00695

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 16, 2025

<u>By ECF</u>

The Honorable Nicholas G. Garaufis
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re: <u>United States v. Manuel Chang</u>
           <u>Criminal Docket No. 18-681 (S-3) (NGG)</u>

Dear Judge Garaufis:

      The government respectfully submits this letter, pursuant to the Court's January 15, 2025 order, in response to the defendant's January 15, 2025 letter. <u>See</u> ECF No. 766 ("Def. Letter").

      The government notes at the outset that it is unfortunate that the defendant chose to wait until approximately 40 hours before the sentencing to file its letter. Virtually every argument in the letter is a response to the government's arguments set forth in the government's sentencing memorandum and responses to the defendant's objections to the presentence investigation report, both of which were filed on November 13, 2024, over two months ago. There is no apparent reason why these arguments could not have been included in the defendant's original sentencing memorandum, which was filed on November 19, 2024, let alone raised in the two months since. It is also unclear why the letter was filed under seal — the letter contains no sensitive information and contains no argument or explanation for why sealing is appropriate — and it is equally puzzling that the letter was not provided to the government until after the government contacted the Court and defense counsel to ask for a copy. Whether or not these tactics were attempts at gamesmanship, the effect is to hamper the government's ability to fully respond to the arguments in the letter and deprive the Court of the ability to fully consider the merits prior to sentencing. Such conduct should be strongly discouraged.

      In any event, as set forth below, the defendant's arguments are meritless. Rather than engaging with the law or the facts, the defendant merely repeats arguments that the Court and the jury have already decisively rejected. The defendant's arguments should therefore be rejected once again.

I.      Reliance on Gain to Calculate the Guidelines is Appropriate

The defendant argues that the government has not shown any loss as a result of the defendant's fraudulent scheme. See Def. Letter 1. As the Court has previously held, the government proved at trial that "the presence of the anti-corruption provisions in the Facility Agreements was critical to [investors'] ultimate decision on whether to lend money for the Projects," United States v. Chang, No. 18-CR-681 (NGG), 2024 WL 4766371, at *8 (E.D.N.Y. Nov. 13, 2024), and that as a result of the defendant's fraud and corruption, "the investors did not get what they bargained for because the evidence demonstrates that the Investors desired a corruption-free investment," id. at *7. Under Second Circuit law, pecuniary loss necessarily exists where a victim is deprived of the terms and specifications it bargained for. See United States v. Canova, 412 F.3d 331, 352 (2d Cir. 2005) ("When a party fraudulently procures payment for goods or services by representing that they were produced or provided according to certain specifications, it is not the task of a sentencing court to second-guess the victim's judgment as to the necessity of those specifications. Whether the testing time on a pacemaker, the number of rivets on an airplane wing, or the coats of paint on a refurbished building is a matter of necessity or whim, the fact remains that the victim has been induced to pay for something that it wanted and was promised but did not get, thereby incurring some measure of pecuniary 'loss.'"). The defendant's argument that no loss occurred therefore fails.

Indeed, multiple victims testified at trial that they lost millions of dollars as a result of their being fraudulently induced to invest in the loans at issue. See Tr. 1055-56 (testimony by Leemhuis that VTB lost hundreds of millions of dollars); Tr. 1810-11 (testimony by Kaplan regarding NWI's losses); see also GX 313 (MAM default letter reflecting VTB's losses); GX 610, 610A (charts showing Alliance Bernstein losses);; GX 761 (chart showing NWI losses). The defendant's claim that these losses were not caused by the fraud (Def. Letter 1-2) ignore the fact that these investors would not have lent money to the projects at all if they had not been defrauded about the corrupt nature of the Mozambican projects and the bribes paid to officials like the defendant. See Chang, 2024 WL 4766371, at *8-9 (citing testimony by Santamaria and Kaplan); see also Tr. 982-983 (testimony of Leemhuis). Thus, absent the fraud, the victims would have incurred none of these losses, and every dollar of loss was caused by the fraud. See United States v. Turk, 626 F.3d 743, 748 (2d Cir. 2010) (in the case of a fraudulently obtained loan, "loss is the principal value of the loans [victims] made . . . which were never repaid"); see also United States v. Calderon, 944 F.3d 72, 96 n.12 (2d Cir. 2019) ("if the Defendants here had, say, misrepresented the value of collateral held by the foreign banks and those [foreign] banks had then defaulted on their loans, we would not hesitate to conclude that they 'proximately caused' the [domestic] banks' losses, even if the [foreign] banks' ability to repay the loans was also affected by market forces"); United States v. Paul, 634 F.3d 668, 677 (2d Cir. 2011) ("[T]he loss to Merrill Lynch and Spear, Leeds was not caused by the decline in value of SLM stock but, rather, by the making of the loans in the first instance.").

The defendant's reliance on United States v. Moran, 2024 WL 2577970 (E.D.N.Y. May 24, 2024), is unavailing. As the Court is well aware, in Moran, the government had argued that a cooperator should be responsible for loss that had not been included in his co-conspirators' loss calculation and for which the government offered no reliable evidence. See id. at *5-7. Here, as discussed above, the government established the existence of loss through testimony of several witnesses and documents admitted at trial.

To be sure, the government has not endeavored to calculate the exact amount of loss. Instead, the government has taken the conservative approach of advocating for calculating loss based on the defendant's gain — $7 million — a figure that is certainly below the losses suffered by the investors (and indeed is less than the losses suffered by either VTB or Alliance Bernstein alone). The defendant's complaint about the use of this lower figure is baffling. See Def. Letter 2. In any event, the use of gain is entirely permissible. Under the applicable Guidelines, the Court "shall use the gain that resulted from the offense as an alternative measure of loss . . . if there is a loss but it reasonably cannot be determined." See U.S.S.G. § 2B1.1(b)(1) notes to table (B). Here, there was a loss, and its full calculation cannot be reasonably determined because of the number of investors and the complexity of the scheme, among other reasons. Use of gain is therefore appropriate. See United States v. Tzolov, 435 F. App'x 15, 17 (2d Cir. 2011) ("Judge Weinstein found that Appellant inflicted pecuniary loss on his victims, but that the amount of loss could not reasonably be determined. Therefore, he appropriately used the gain realized by Appellant . . . as an alternative measure of loss pursuant to the Guidelines provision quoted above.").

Finally, the defendant's claim that he did not gain anything because all of the bribe payments went to Luis Brito is nothing more than yet another denial of the evidence at trial and the jury's verdict. See Def. Letter 2. The government proved, and the jury necessarily found, that the payments to Brito were bribe payments to the defendant that were put in Brito's name as a means to launder the funds. See Chang, 2024 WL 4766371, at *12 ("[T]he jury had ample evidence to infer that the reason why Privinvest was sending money to accounts controlled by Chang's associate Brito — who otherwise was not involved in the Projects whatsoever — was to launder the payments to Chang from the loan proceeds."). The defendant's argument that he did not gain because Brito paid $7 million to Mozambique after the defendant was indicted fares no better. See Def. Letter 2. The Guidelines are clear that payments to victims made after the fraud is uncovered do not provide any set-off for the loss calculation. See U.S.S.G. § 2B1.1 3(D)(i).

Accordingly, the defendant's arguments against the use of his $7 million gain to calculate loss all fail.

II.   There Were 10 or More Victims

The defendant argues that there were not 10 or more victims because, according to the defendant, there were no victims because no one suffered any loss. See Def. Letter 2. As discussed above, this premises is flawed, as every person who invested on the basis of materially false terms suffered some amount of pecuniary loss. See Canova, 412 F.3d at 352. Moreover, the evidence at trial showed that VTB Capital and Alliance Bernstein, whose losses were proven at trial, invested on behalf of over 10 clients, who themselves suffered losses. See ECF No. 755 ("Gov. Sent'g Mem.") 8 (citing exhibits). The defendant's claims that no one lost money thus fail (again).

As to the number of victims, the defendant does not appear to contest that there were more than 10 investors, nor could he. See Gov. Sent'g Mem. 8 (discussing number of victims and citing exhibits). The defendant's argument that there were not 10 or more victims is therefore meritless.

3

### III. An Enhancement for Conduct Outside of the United States Applies

The Guidelines call for a 2-point enhancement where "a substantial part of a fraudulent scheme was committed from outside the United States." U.S.S.G. § 2B1.1(b)(10)(B). The defendant does not attempt to dispute that this enhancement applies based on its plain language. Nevertheless, he argues that it should not apply to foreign nationals. See Def. Letter 3. The sole case the defendant cites in support of this argument is United States v. Hussain, No. 16-CR-462 (CRB), 2019 WL 1995764 (N.D. Cal. May 6, 2019), aff'd, 818 F. App'x 765 (9th Cir. 2020). But the defendant notably fails to mention that Hussain actually rejected this precise argument, holding that "the text draws no distinction between domestically-domiciled defendants who commit their crimes abroad and foreign defendants who commit their crimes from their home countries." Id. at *2. The Hussain court further explained that applying the enhancement to foreign nationals is consistent with the provision's purpose, as "it is the fact that 'a substantial part of the fraudulent scheme was committed from outside the United States,' not the intent of the defendant in doing so, that 'makes it difficult for law enforcement authorities to discover the offense or apprehend the offender.'" (quoting U.S. Sent'g Comm'n, Amendments to the Sentencing Guidelines 7 (May 18, 1998)). The defendant's argument is thus utterly without legal support and contrary to applicable caselaw.

Because this enhancement applies pursuant to U.S.S.G. § 2B1.1(b)(10)(B), the Court need not address whether it would also apply under § 2B1.1(b)(10)(C), which applies where "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." Nevertheless, toi the extent the Court addresses it, that provision applies as well. The defendant does not appear to dispute that the offense involved sophisticated means — including complex structures and terms designed to obscure disclosure — but claims that this sophistication was unrelated to his criminal conduct and that the defendant did not engage in the sophisticated conduct. See Def. Letter 3-4. That claim ignores that the evidence showed that the projects involved corruption from the very beginning and that the defendant was a key participant in structuring the projects, including their sophisticated elements. See Chang, 2024 WL 4766371, at *10 ("Chang played an integral role in structuring and negotiating the loan deals.").

Accordingly, the defendant's arguments against the 2-point enhancement under § 2B1.1(b)(10) should be rejected.

### IV. No Downward Departure is Warranted

The defendant argues that the Court should apply a downward departure if the Court applies enhancements under both U.S.S.G. §§ 2B1.1(b)(10) and 2S1.1(b)(3). See Def. Letter 4. The defendant cites no caselaw holding that such a departure is warranted but, rather, cites only one case for the general proposition that a court may, in its discretion, apply a downward departure, when "cumulation of substantially overlapping enhancements, [are] imposed upon a defendant whose adjusted offense level translates to a high sentencing range." United States v. Abiodun, 536 F.3d 162, 170 (2d Cir. 2008). Here, where both enhancements separately apply for independent reasons — the foreign conduct warranting the § 2B1.1 enhancement and the complex money laundering warranting the § 2S1.1 enhancement — the government submits that the enhancements do not overlap and no departure is warranted. See

4

Gov. Sent'g Mem. 11 n.9.  To hold otherwise would effectively reward defendants who chose to engage in complex money laundering conduct substantially outside the United States.

V. The Court Should Defer Calculation of Restitution

The defendant states that the Probation Department has not provided him with certain victim affidavits and that the Court should not impose restitution at this time.  See Def. Letter 4-5.  Notably, the two PSR addenda addressing restitution were not disclosed until January 7, 2025 and January 13, 2025.  In light of the factual disputes raised by the defendant and the limited time since disclosure, the government agrees that the Court should not impose restitution at this time and should instead defer final determination of the victims' losses until a later date, not to exceed 90 days after sentencing.  See 18 U.S.C. § 3664(d)(5).

VI. Forfeiture of Money Paid to Brito's Accounts is Mandatory

The defendant argues that he should not be required to forfeit the $7 million in bribe payments to him because he laundered those payments through an account in someone else's name.  See Def. Letter 5.  Putting aside the entire lack of equity in this argument, it is legally irrelevant.  Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956 . . . or any property traceable to such property" is subject to forfeiture, and under 18 U.S.C. § 982(a)(1), "[t]he court, in imposing sentence on a person convicted of an offense in violation of section 1956 . . . shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property."  Whether or not the defendant ever received the money, the $7 million of payments from Privinvest to Brito's accounts were involved in a money laundering transaction and are subject to forfeiture.  Moreover, the defendant must be ordered to pay a money judgment equal to that amount because, as a result of his actions, those funds have "been transferred or sold to, or deposited with, a third party [i.e., Brito]" and "been placed beyond the jurisdiction of the court [i.e., in accounts in Spain and Switzerland]."  21 U.S.C. § 853(p)(1)(B), (C).

The defendant argues that the transfer of the funds to Brito were not the result of any act by him.  See Def. Letter 5.  But the evidence was to the contrary, as the jury found.  See Chang, 2024 WL 4766371, at *11-12 (summarizing evidence of the defendant's involvement in the conspiracy to launder money through Brito's accounts).  Moreover, while Brito later sent $7 million to Mozambique, the defendant cites no law — and the government is aware of none — suggesting that a payment by another individual to a foreign country has any impact on the defendant's forfeiture obligations under U.S. law.

In any event, even if forfeiture were not mandated under the money laundering provisions, the $7 million in payments to the defendant must be forfeited as proceeds of the wire fraud scheme and the money laundering scheme.  "[T]he term 'proceeds' means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture."  18 U.S.C. § 981(b)(2)(A) (emphasis added).  Thus, where a defendant obtains proceeds through an intermediary — such as a shell company or a straw account holder — the defendant is required to forfeit the proceeds just as if he had obtained them directly.  See Honeycutt v. United States, 581 U.S. 443, 450 (2017) ("For instance, the marijuana mastermind

5

might receive payments directly from drug purchasers, or he might arrange to have drug purchasers pay an intermediary such as the college student. In all instances, he ultimately 'obtains' the property — whether 'directly or indirectly.'"). Forfeiture of $7 million is therefore mandatory.

VII. Conclusion

For the reasons set forth above, except for the defendant's request to defer determination of restitution, all of the defendant's arguments are without merit.

Respectfully submitted,

CAROLYN POKORNY
Acting United States Attorney

By: /s/
Hiral Mehta
Jonathan Siegel
Assistant U.S. Attorneys
(718) 254-7000

GLENN S. LEON
Chief, Fraud Section
Criminal Division
U.S. Dept. of Justice

By: /s/
Peter L. Cooch
Trial Attorney
(202) 924-6259

MARGARET A. MOESER
Acting Chief, Money Laundering & Asset Recovery Section
Criminal Division
U.S. Department of Justice

By: /s/
Morgan J. Cohen
Trial Attorney
(202) 616-0116

cc: All counsel of records (by ECF)